**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>TONOPAH SOLAR ENERGY, LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 20-11884 (___) |

**DECLARATION OF JUSTIN D. PUGH IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Justin D. Pugh, hereby declare, under penalty of perjury, as follows:

1. I am the Treasurer (the "**Treasurer**") of Tonopah Solar Energy, LLC (the "**Debtor**" or "**TSE**"), the debtor and debtor in possession in the above-captioned chapter 11 case (the "**Chapter 11 Case**"). I am also a Managing Director of FTI Consulting, Inc. ("**FTI**"). TSE engaged FTI, effective December 4, 2017, to provide turnaround management services, and designated my colleague, Chris LeWand, as President and me as Treasurer.

2. I am familiar with the day-to-day operations and business and financial affairs of the Debtor. All facts set forth in this declaration (the "**Declaration**") are based on my personal knowledge, my communications with other members of the Debtor's senior management, discussions with my colleagues who are also working on this matter, my review of relevant documents, or my opinion, based on my overall professional experience, in light of my personal knowledge of the Debtor's operations, business affairs, and financial condition. If called as a witness, I could and would competently testify to the matters set forth herein based on the foregoing.

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number, is Tonopah Solar Energy, LLC (1316). The Debtor's headquarters is located at 11 Gabbs Pole Line Road, Tonopah, NV 89049.

3. My experience in the restructuring industry spans more than eight (8) years and encompasses a broad range of corporate recovery services and interim management roles, including engagements involving business workouts and turnarounds, operational restructuring, fiduciary and related matters. Among my industry specializations are renewable energy, manufacturing, retail, real estate, and financial services. My extensive restructuring experience includes operating and managing businesses in and out of court, overall case management, sales and liquidation of assets and business interests, advising boards of directors, claims development and adjudication, managing litigation, negotiating settlements, and administering claims payment structures in a variety of cases.

4. I hold a B.S. in Finance, an M.S. in Finance and Mathematics, and an M.B.A. I am also a Chartered Financial Analyst and hold Series 7, 79, and 63 licenses.

5. On the date hereof (the "**Petition Date**"), the Debtor filed a voluntary petition for relief with the United States Bankruptcy Court for the District of Delaware (the "**Court**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), thus commencing the Chapter 11 Case. The Debtor is operating its business and managing its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. Concurrently with this Declaration, the Debtor has filed the *Chapter 11 Plan for Tonopah Solar Energy, LLC* (as it may be amended, supplemented, restated, or modified from time to time, the "**Plan**"), as well as a disclosure statement for the Plan (as it may be amended, supplemented, restated, or modified from time to time, the "**Disclosure Statement**"). As further discussed below, the Plan provides for the comprehensive restructuring of the Debtor's balance sheet (the "**Restructuring**").

7. The Debtor has also filed various applications and motions seeking immediate or expedited relief (collectively, the "**First Day Motions**") to enable the Debtor to operate as effectively as possible, remediate the Power Plant (as defined herein), maximize the value of its assets, and effectuate the Restructuring. As described below, the Debtor seeks to, among other things, (i) ensure the continuation of repair activities without interruption; (ii) preserve its prepetition cash management system and implement a postpetition cash management system to receive funds for use during the pendency of the Chapter 11 Case; (iii) obtain the use of cash collateral (as such term is defined in section 363(a) of the Bankruptcy Code, "**Cash Collateral**"); (iv) preserve valuable relationships with trade vendors and other creditors whose claims are not expected to be impaired by the Chapter 11 Case; and (v) pursue an expeditious confirmation of the Plan and exit from chapter 11. As further discussed below, I am familiar with the contents of each of the First Day Motions, and I believe the Debtor would suffer immediate and irreparable harm absent the ability to continue its business operations through the relief sought in the First Day Motions.

## I. GENERAL BACKGROUND

### A. Overview of the Debtor



8. The Debtor owns and operates a net 110-megawatt concentrated solar energy power plant (the "**Power Plant**") located near Tonopah in Nye County, Nevada. The Power Plant is also known as the Crescent Dunes Solar Energy Project (the "**Project**"). The Project is the first utility-scale concentrated solar power plant in the United States to be fully integrated with energy storage technology. The Power Plant uses solar power technology to concentrate and convert sunlight into heat energy, which is stored and converted, through a series of heat exchangers, to generate high-pressure steam. Specifically, the Power Plant includes 10,347 heliostats (mirror assemblies) that collect and focus the sun's thermal energy to heat molten salt flowing through an approximately 640-foot tall solar power tower (the "**Receiver Tower**"). The Power Plant converts solar energy to heat energy by concentrating sunlight on the Receiver Tower, where molten salt is super-heated to a design temperature of 1050° F to create a source of heat energy. Upon exiting the Receiver Tower, this molten salt is maintained in a vessel, the hot salt tank, before it is transmitted to the other areas of the Power Plant. The balance of the Power Plant then relies on conventional technology to convert the heat energy to high-pressurized steam through a steam generation system, which powers a turbine that creates electricity for sale. At the time of its construction, the Power Plant was unique among solar energy plants for many reasons, including its use of a non-degradable energy storage technology that can produce electricity at night, in the absence of sunlight.

9. Until October 2019, the electricity generated by the Power Plant was sold exclusively to the Nevada Power Company, d/b/a NV Energy ("**NVE**"), under that certain *Long-Term Firm Portfolio Energy Credit and Renewable Power Purchase Agreement* dated November 4, 2009 (as amended, the "**PPA**"), which, as discussed below, was terminated by NVE in the fall of 2019. The Debtor's sole source of revenue was the sale of power under the PPA.

10. The Debtor is currently managed by officers supplied by FTI, whose actions are overseen and directed by the Debtor's board of managers. The Debtor also obtains operational support from third party contractors. The Debtor's operating agreement prevents it from directly employing personnel. Therefore, as of the Petition Date, the Debtor has no employees of its own.

11. Due to certain issues with a critical plant component, discussed below, the Power Plant is not currently generating any electricity; thus, it is not generating any revenue from the sale of electricity. The Debtor's vendors and contractors are working to fix structural issues that would allow the Debtor to recommence operations.

**B. <u>History of TSE and the Crescent Dunes Solar Energy Project</u>**

12. TSE was formed in February 2008 by SolarReserve, Inc. ("**SolarReserve**") to develop a solar energy power plant in the Nevada desert that would utilize a molten salt receiver to generate power. The Project was to be the first utility-scale solar project of its kind in the United States to store energy as heat in the form of molten salt, effectively functioning as a giant battery, with the capability to generate electricity at night. The Project's design was an innovative solution to the core limitation of renewable energy sources such as solar and wind—their intermittency. TSE also anticipated that the Project would generate at least 600 construction jobs and 45 permanent jobs, and would avoid the release of nearly 279,000 metric tons of carbon dioxide into the atmosphere annually that would have been produced if conventional electricity generation technologies were used.

13. The development of the Project was dependent on identifying (a) a construction company to assume the risks associated with the required turnkey fixed-price engineering, procurement and construction contract, and (b) a utility to purchase the Power Plant's renewable, clean power that would be generated by a solar energy power plant under a long-term power purchase agreement. After extensive negotiation and a protracted regulatory approval

process, TSE found a purchaser in NVE, and, in November 2009, it entered into the PPA. The PPA initially contemplated that TSE would build the Power Plant, and, upon completion, NVE would be the exclusive offtake purchaser of the power generated by the Power Plant.

14. The following month, SolarReserve applied for a loan guarantee from the U.S. Department of Energy (the "**DOE**"), and TSE executed a contract (the "**EPC Contract**") with Cobra Thermosolar Plants, Inc. ("**CPI**") to provide engineering, procurement and construction services in connection with the Project (at an initial fixed price amount of $766.4 million).

15. TSE obtained equity investments from SolarReserve, Cobra Energy Investments, LLC ("**CEI**"), which is an affiliate of ACS Servicios Comunicaciones y Energía S.L. ("**ACS**" and, together with CEI and CPI, "**Cobra**"),[2] and Banco Santander, S.A. TSE and the DOE executed that certain *Loan Guarantee Agreement*, dated as of September 23, 2011, between the Debtor and the DOE (as amended, the "**LGA**") in an authorized amount of up to $737 million, whereby the DOE guaranteed the project loan made to TSE by the Federal Financing Bank (the "**FFB**"). The initial amount of the loan guarantee was approximately $692 million. As is typically the case in project loan documents, the LGA expressly provided that the financing thereunder was conditioned upon the effectiveness of the PPA, which would provide the sole source of operating cash flow to service the project loan. The Debtor does not believe that the Project would have been financed without, among other factors, the execution of the PPA and NVE's consequent commitment to purchase power generated by the Project at a price greater than $135 per megawatt hour (the "**PPA Purchase Price**").

[2] ACS is a multinational Spanish construction and infrastructure company that is publicly traded on the Madrid Stock Exchange.

26841489.1

16. As one of the conditions to guaranteeing the project loan and entering into the LGA, and as is common in the renewable energy industry, the DOE—as project lender—required the execution of the *Consent and Agreement* dated October 23, 2011 (the "**Direct Agreement**"), by and among TSE, NVE and PNC Bank, National Association d/b/a Midland Loan Services, a division of PNC Bank, National Association, as collateral agent (the "**Collateral Agent**"), to memorialize certain rights of the Collateral Agent on behalf of the senior secured lender in connection with the PPA. The Direct Agreement creates privity between and among the then-exclusive purchaser of the power generated by the Power Plant (NVE), the supplier of the power (TSE) and the Collateral Agent and provides for specific PPA-related rights in favor of the Collateral Agent (for the benefit of the DOE), including additional protections for the Collateral Agent as it relates to the PPA, particularly in the event of a PPA default resulting in its possible termination.[3]

17. In accordance with the EPC Contract, CPI agreed to complete construction of the Project by a date certain at a fixed price and to secure "Provisional Acceptance" of the Project before tendering a "turnkey" power plant to TSE. As set forth in the EPC Contract, CPI further agreed to pay both liquidated damages and certain contractually-defined damages in the event that the Power Plant did not generate specific minimum levels of electricity and satisfy other specified performance criteria. TSE has alleged that CPI failed to perform under, and is in breach of, the EPC Contract. CPI has vigorously denied such allegations. These allegations are the subject of a pending arbitration proceeding between CPI and TSE, described below.

[3] It is common in the renewable energy industry, and often a required condition of funding from secured lenders, that the parties to a power purchase agreement enter into a direct agreement with the secured lender to afford the secured lender sufficient protection and comfort in connection with their project loan.

18. The Power Plant commenced commercial operations and production in November 2015 and achieved "Provisional Acceptance" in December 2016.[4]

19. In December 2016, Capital One, N.A. ("**Capital One**") acquired a tax equity stake in TSE's immediate parent and sole member, Tonopah Solar Energy Holdings II, LLC ("**TSEH II**"). As of the date of that investment, Capital One's capital account balance was $47.25 million.

20. In October 2016, the Power Plant ceased operations due to a leak in the hot salt tank. Following its repair, the Power Plant resumed generating electricity in July 2017 and remained operational until early April 2019, at which time the discovery of a second leak in the hot salt tank required the Power Plant to cease operations again. As the contractor under the EPC Contract, CPI has analyzed the root cause of the leak and is currently repairing the hot salt tank in an effort to resume Power Plant operations.

21. As of the Petition Date, the repair process is ongoing, the hot salt tank remains non-operational, and the Power Plant is not generating any electricity.

**C. <u>Litigation between TSE and CPI</u>**

22. In November 2017, CPI commenced an arbitration proceeding against TSE (the "**ICC Arbitration**") under the Rules of Arbitration of the International Court of Arbitration of the International Chamber of Commerce. CPI alleges, without limitation and in general terms, that TSE breached the EPC Contract by, among other things, (i) impermissibly controlling the performance testing process under the EPC Contract referred to as the "Continuous Performance

---

[4] Despite the commencement of commercial operations and production, the construction of the Power Plant was never completed. CPI failed to meet its contractually obligated deadlines to construct the Power Plant, which required repeated amendment to the EPC Contract. In fact, Provisional Acceptance was only achieved by amendment of the EPC Contract; that amendment specifically stated that CPI had failed to complete construction of the Power Plant. For the avoidance of doubt, CPI vigorously opposes the preceding characterization.

Measurement" (the "**CPM**"); (ii) unilaterally altering the main software infrastructure of the Power Plant during the CPM period; (iii) wrongfully denying access to information and the Power Plant itself necessary to conduct the CPM; and (iv) wrongfully calculating and claiming entitlement to contractually-defined damages referred to in the EPC Contract as "CPM Payments"[5] (collectively, the "**CPI Arbitration Claims**").[6] TSE vigorously denies these allegations.

23. In February 2018, TSE filed its Answer in the ICC Arbitration, asserting numerous counterclaims against CPI (the "**TSE Arbitration Claims**"). The TSE Arbitration Claims include, without limitation and in general terms, that (a) CPI breached the EPC Contract by failing to (i) deliver the guaranteed electricity output from the Power Plant, (ii) engineer, procure and construct the agreed upon Power Plant, and (iii) make certain critical payments and remediate in a timely manner various defects in the work it performed at the Power Plant; and (b) CPI's conduct has amounted to bad faith and/or gross negligence.[7] CPI vigorously denies these allegations.

24. Prior to a scheduled hearing on the merits of these claims, TSE filed in December 2019 a supplemental statement of counterclaims wherein it alleged claims for breach of contract, breach of the covenant of good faith and fair dealing, interference with contractual relations, and fraud (collectively, the "**Supplemental Claims**").[8] CPI vigorously denies all of

---

[5] Since shortly after the transfer of care, custody, and control of the Power Plant from Cobra to TSE in December 2016, TSE has received CPM Payments from Cobra pursuant to a performance shortfall provision included in the EPC Contract, which requires Cobra to compensate TSE for the Power Plant's failure to meet specific contractual performance criteria. Cobra has disputed such CPM Payments.

[6] The information provided in this paragraph is intended to provide a general summary of the CPI Arbitration Claims. CPI's full allegations are set forth in the documents filed by CPI in the ICC Arbitration.

[7] The information provided in this paragraph is intended to provide a general summary of the TSE Arbitration Claims. TSE's full allegations are set forth in the documents filed by TSE in the ICC Arbitration.

[8] The information provided in this paragraph is intended to provide a general summary of the TSE Arbitration Claims. TSE's full allegations are set forth in the documents filed by TSE in the ICC Arbitration.

these allegations. The hearing on a subset of the CPI Arbitration Claims and TSE Arbitration Claims was slated for January 2020; however, this hearing was postponed due to the unexpected illness of one of the arbitrators.

25. On March 23, 2020, CPI and TSE agreed to a 60-day stay of the ICC Arbitration proceedings, as the parties continued extensive negotiations regarding the Plan, including a consensual resolution of the claims in the ICC Arbitration. The arbitration panel granted the requested stay on March 24, 2020. On May 11, 2020, the arbitration panel granted an additional 60-day extension until July 25, 2020. On July 22, 2020, the panel granted a further extension until September 25, 2020. If the ICC Arbitration proceeds, CPI and TSE are both seeking damages pursuant to and/or for breach of the EPC Contract and as may be available under applicable law. The Plan, if confirmed, would resolve all of the claims pursued by both parties in the ICC Arbitration.

### D. The Independent Managers Join the Board

26. As of the commencement of the ICC Arbitration, the Board of Managers of TSE included two managers appointed by SolarReserve and one independent manager. In accordance with the *Second Amended and Restated Limited Liability Company Agreement of Tonopah Solar Energy, LLC*, dated as of May 22, 2018, and as a result of certain conflicts of interest that arose between Cobra and SolarReserve in connection with the management of the Power Plant and the overall corporate governance of TSE, TSEH II appointed two independent managers unaffiliated with Cobra and SolarReserve—Mark Manski and Joseph A. Bondi—to the Board of Managers of TSE (the "**Independent Managers**") and replaced one of the two SolarReserve-appointed managers with a manager nominated by Cobra. Among other duties, the Independent Managers were vested with the authority to review, evaluate and recommend key

decisions to the full Board of Managers regarding the management of the Power Plant to the extent that conflicting interests of SolarReserve and/or Cobra were implicated.

**E. Hot Salt Tank Leak**

27. In late March 2019, a significant leak in the hot salt tank was discovered, which required TSE to halt all power-generating operations at the Power Plant in early April 2019. The molten salt was removed from the hot salt tank and CPI began repairing the tank. TSE and CPI disagree on the root cause of the leak and which party bears responsibility for the leak. For as long as the Power Plant remains non-operational, TSE is not selling any power and is not generating any revenue.

**F. DOE Notices Events of Default and Replaces Non-Independent Managers**

28. By letter dated September 17, 2019, the DOE sent TSE a *Notice of Events of Default* (the "**DOE Default Notice**"). In the DOE Default Notice, the DOE alleges that TSE is in default under several provisions of the LGA.

29. In connection with the DOE Default Notice, the DOE—through the Collateral Agent—exercised certain proxy rights over TSEH II's sole member interest in TSE under that certain *Equity Pledge Agreement* dated October 21, 2011, by and between TSEH II and the Collateral Agent (the "**Equity Pledge Agreement**") and the Irrevocable Proxy granted by TSEH II to the Collateral Agent pursuant thereto. Specifically, the DOE alleged that all of TSEH II's rights in respect of "voting, consensus and other powers of ownership pertaining to the Pledged Collateral" vested in the Collateral Agent, as provided for in the Equity Pledge Agreement following the occurrence and during the continuance of an Event of Default under the LGA.

30. Exercising these powers, the Collateral Agent executed a *Written Consent of the Sole Member of Tonopah Solar Energy, LLC*, effective as of September 17, 2019, which removed the two non-Independent Managers, who were representatives of the indirect equity

holders SolarReserve and Cobra, respectively. In their place, the DOE appointed two individuals with significant restructuring and turnaround experience—Anna Phillips and Charles Reardon (the "**Successor Managers**"). As a result, the TSE Board of Managers as of the Petition Date consists of the two Successor Managers and the two Independent Managers, who have voted unanimously to authorize the filing of the Chapter 11 Case.

## G. Operation and Maintenance Agreements

31. Under that certain *Operation and Maintenance Agreement* between the Debtor and PIC Group, Inc. ("**PIC**"), dated as of September 20, 2011 (the "**O&M Contract**"), PIC provides certain operational and maintenance services for the Debtor at the Power Plant including, but not limited to: (a) developing a work force through hiring and training; (b) operating the Power Plant in a clean, safe and efficient manner in accordance with the O&M Contract and certain budgets and industry practices; (c) maintaining records such as operating logs, manuals, and reports; (d) maintaining and calibrating tools and instruments; (e) implementing and updating certain environmental programs; (f) performing general preventative maintenance; (g) interfacing with certain regulatory bodies; (h) maintaining permits and licenses; and (i) undertaking those activities customarily performed by an operating and maintenance contractor for a power plant.

32. As the future owner and operator of the Power Plant, and, as further discussed below, as a condition of Cobra's support for the RSA and the proposed transaction, CEI has requested, and the Debtor has agreed, to seek approval of the transfer of operations and maintenance of the Power Plant from PIC to CEI within thirty-five (35) days of the Petition Date. To effectuate the transfer of operations to CEI, the Debtor has entered into a new operation and maintenance agreement (the "**Operating Agreement**") between the Debtor and a CEI affiliate, Cobra Industrial Services, Inc. ("**CIS**"), which is subject to approval of the Court and pursuant to which CIS will provide administrative, maintenance, and operating services under terms that are

substantially similar to those in the O&M Contract. Accordingly, the Debtor will no longer require the services provided by PIC under the O&M Contract once the Operating Agreement is approved by the Court.

**H. <u>The Debtor's Prepetition Capital Structure</u>**

33. As of the Petition Date, the Debtor has outstanding debt obligations in the aggregate amount of over $432 million, including accrued and unpaid interest and applicable late charges, consisting primarily of TSE's obligations to the DOE under the LGA and the other Prepetition Financing Documents.

34. After receiving the DOE Default Notice in September 2019, the Debtor failed to make another payment of principal and interest scheduled for June 22, 2020. On June 29, 2020, DOE delivered a supplemental notice of event of default for the missed payment.

**a. Secured Claims**

35. On September 23, 2011, in connection with the Project, TSE entered into the LGA with the DOE to guaranty the funding of up to $737 million to TSE by the FFB (the "**DOE Loan**"). The DOE Loan is secured by substantially all of TSE's assets, including the Project, TSE's rights under its major contracts (including the EPC Contract), and all cash maintained in DOE controlled accounts, but subject to permitted liens and specified excluded assets. The DOE Loan is further secured by, among other collateral, an equity pledge from TSEH II of its sole member interest in TSE in favor of the Collateral Agent pursuant to the *Equity Pledge Agreement* (through which DOE appointed the Successor Managers). The DOE Loan accrues interest at an approximate weighted average rate of 2.9% per annum and matures in December 2036.

36. As of the Petition Date, the approximate principal amount outstanding under the DOE Loan is $425 million and accrued and unpaid interest under the DOE Loan is approximately $7.4 million.

26841489.1

**b. Litigation Claims**

37. As noted above, TSE and CPI assert significant claims against one another in the ICC Arbitration. In the event that CPI were to prevail in the ICC Arbitration, CPI may be entitled to a significant claim against TSE's bankruptcy estate.

38. In addition to the ICC Arbitration, TSE is a defendant in two interrelated civil actions commenced in Nevada state court by a Project subcontractor, Brahma Group, Inc. ("**Brahma**"), in respect of which Brahma is seeking contractual damages in excess of $13 million. Brahma initially filed a lien (the "**Lien**") against the Project with respect to one of the civil actions, which was bonded by CPI. Subsequently, Brahma filed an identical civil action in a separate Nevada state court, which was removed to the federal district court in Nevada on September 9, 2018. Brahma moved to foreclose on the Lien (the "**Lien Action**"). In conjunction with the Lien Action, a subcontractor of Brahma, H&E Equipment, filed a companion lien action against TSE (the "**Subcontractor Lien Action**" and together with the Lien Action, the "**Pending Lien Actions**"), which was also bonded by CPI. TSE successfully appealed the state court's decision to proceed with the Pending Lien Actions, and they are now stayed pending the decision of the federal district court on the underlying claim.

39. Further, a subcontractor, Nooter Eriksen ("**Nooter**"), initiated a proceeding in Nye County, Nevada, against TSE, as a co-defendant alongside Solar Reserve, LLC ("**SR LLC**"),[9] a subcontractor to the Project, and Liberty Moly, LLC, an easement provider. Upon information and belief, Nooter Eriksen provided certain materials to SR LLC that SR LLC deployed on the Project. TSE paid SR LLC for these materials; however, according to the

---

[9] In addition, on December 31, 2019, SolarReserve commenced an assignment for the benefit of creditors in the State of California.

complaint filed, SR LLC never paid Nooter. As it relates to TSE, Nooter is suing to foreclose on a lien that it has placed on the Project. TSE has filed an answer in this action and is awaiting further scheduling.

40. Additionally, SolarReserve CSP Holdings, LLC ("**SR CSP**") in the fall of 2019 brought an action (the "**Books and Records Action**") against TSE in the Delaware Court of Chancery (the "**Court of Chancery**") for breach of contract in respect of TSE's alleged failure to provide access to the books and records of the company (the "**Breach of Contract Claim**"). TSE filed an answer on February 24, 2020. A bench trial took place on May 13, 2020. On July 24, 2020, the Court of Chancery issued a memorandum opinion resolving the Books and Records Action in TSE's favor.

41. Finally, SR CSP brought an action against the Debtor in the Delaware Court of Chancery on October 2, 2019. SR CSP initially sought to name a manager to the Debtor's board, and, in an amended complaint filed on November 5, 2019, SR CSP instead sought equitable dissolution of the Debtor. The Debtor filed a motion to dismiss the complaint on December 16, 2019. On March 18, 2020, the Delaware Court of Chancery granted TSE's motion and dismissed the action in its entirety. SR CSP has filed an appeal. SR CSP filed an opening brief on June 2, 2020, and TSE filed a reply brief on July 2, 2020.

**c. Non-Litigation Unsecured Claims and Equity**

42. The Debtor has approximately sixty (60) known unsecured creditors that are believed to hold claims totaling in excess of $2.8 million in the aggregate. Those creditors

include trade claimants and other routine, ordinary course creditors, certain of which are deemed by TSE to be critical vendors as described more fully below.

43. All of the equity interests in TSE are owned by TSEH II. The equity interests in TSEH II are divided into two classes: Class A Units[10] held solely by Capital One, as "Tax Equity Investor" and Class B Units owned by Tonopah Solar Energy Holdings I, LLC ("**TSEH I**"). TSEH I is owned indirectly by Banco Santander (26.8%) and directly by Tonopah Solar Investments, LLC (73.2%). Tonopah Solar Investments, LLC is owned by CEI (50%), and SR CSP (50%). A chart reflecting the organizational structure of the Debtor is attached hereto as **Exhibit A**.

## I. Events Leading up to the Chapter 11 Case

44. A series of events, set off by the March 2019 leak of the hot salt tank, necessitated the filing of the Chapter 11 Case.

45. **Hot Salt Tank Leak**. As set forth above, the hot salt tank—an essential component in the operation of the Power Plant—experienced a leak in late March 2019. Consequently, the Power Plant has been unable to produce any electricity since April 2019, and the Debtor has not generated any revenue through the sale of power since that time. Its only source of cash inflow has been the CPM Payments, which have now ended.

46. **Termination of the PPA.** In the ten years that have passed since the execution of the PPA, the market price of renewable energy has dropped to a level that is significantly below the PPA Purchase Price (an escalating figure beginning at $135 per megawatt hour, which had reached approximately $139 per megawatt hour at the time the PPA terminated).

[10] The Class A Units representing the equity interests do not have voting rights with respect the appointment of the managing member, but there are certain reserved actions for which the consent of the holders of both the Class A Units and the Class B Units is required.

Eager to free itself from the long-term obligation to purchase site-specific power generated at the Power Plant at a price it no longer viewed as economic, NVE capitalized on the operational difficulties at the Project and served a notice of default under the PPA on January 1, 2019 ("**NVE Default Notice**").

47. Upon receipt of the NVE Default Notice, TSE, along with CPI, worked diligently to cure the potential event of default alleged in the NVE Default Notice within the applicable cure periods. Nevertheless, on October 4, 2019, the PPA was terminated with respect to all parties.

48. Since the termination of the PPA, CPI has continued with repair activities at the Power Plant, and TSE has investigated options for replacing the terminated PPA with a similar offtake contract. Given the shifts in the market dynamics since the execution of the PPA nearly ten years ago, there is not an equivalent PPA available today nor is there a PPA that would permit TSE to satisfy the repayment of the DOE Loan and satisfy its own operating costs even if the Power Plant were operational.

49. **Restructuring Support Agreement.** In early 2020, facing liquidity issues, the Debtor, Cobra, and DOE began discussions regarding the compromise and settlement of the DOE's claims for an agreed-upon reduced amount. Ultimately, following months of extensive arm's-length negotiations, the Debtor, CEI, and DOE agreed in principle to implement the terms of a de-leveraging transaction through a pre-negotiated chapter 11 plan that also involved the settlement of the ICC Arbitration.

50. On July 29, 2020, the Debtor and Cobra entered into that certain *Restructuring Support Agreement* ( as may be amended, the "**RSA**"), pursuant to which, among other things: (a) the DOE shall receive, in full and complete satisfaction of the Debtor's

outstanding obligations under the Loan Documents (as defined in the LGA), a payment of $200 million in cash upon the Effective Date of the Plan (as defined therein), plus a $100 million contingent note to be guaranteed by Cobra, with Cobra funding the Debtor's obligations under the Plan through new debt financing and cash to be provided on the Effective Date of the Plan; (b) the security interests granted under the Security Documents (as such term is defined in the LGA) shall be released; (c) the parties shall mutually release each other from all Claims (as defined in the Plan) on the terms set forth in the Plan; (d) Cobra or an affiliate thereof shall own 100% of the company upon completion of the restructuring; and (e) all other claims shall remain unimpaired as set forth in the Plan. The RSA may be terminated in the event of certain breaches by the parties thereto and upon the occurrence of certain events, including, for example, the failure to meet specified milestones relating to the filing, confirmation, and consummation of the Plan. Pursuant to the Plan, it is contemplated that all claims, other than the DOE's, will be either paid in full on the Effective Date or otherwise rendered unimpaired.

51. The RSA may be terminated in the event of certain breaches by the parties thereto and upon the occurrence of certain events (each, an "**RSA Milestone**" and collectively, the "**RSA Milestones**") relating to the filing, confirmation, and consummation of the Plan. A summary of certain RSA Milestones is below:[11]

| **RSA Milestone Termination Events**[12] | |
|---|---|
| 11:59 p.m. (EST) on the date that is two (2) Business Days after the RSA is executed | unless (i) the Bankruptcy Case is commenced in the Bankruptcy Court, (ii) a motion to reject the O&M Contract is filed with the Bankruptcy Court (iii) a motion to approve the New O&M Agreement is filed with the Bankruptcy Court, and (iv) the Plan and the Disclosure Statement are filed with the Bankruptcy Court. |

[11] Capitalized terms used but not defined in this paragraph (including all subparagraphs) have the meanings given to such terms in the RSA.

[12] Capitalized terms used but not defined in this chart have the meanings given to such terms in the RSA.

26841489.1

| | |
|---|---|
| 11:59 p.m. (EST) on the date (x) that is five (5) days after the Petition Date | unless the Bankruptcy Court has entered the Interim Cash Collateral Order, in a form reasonably satisfactory to Cobra. |
| 11:59 p.m. (EST) on the date (x) that is thirty-five (35) days after the Petition Date | unless the Bankruptcy Court has entered the Interim Cash Collateral Order on a final basis in a form reasonably satisfactory to Cobra. |
| 11:59 p.m. (EST) on the date that is sixty (60) days after the Petition Date | unless the Bankruptcy Court has entered the Disclosure Statement Order and an order authorizing and approving the New O&M Agreement. |
| 11:59 p.m. (EST) on the date that is one hundred twenty (120) days after the Petition Date | unless the Bankruptcy Court has entered the Confirmation Order. |
| 11:59 p.m. (EST) on the date that is one hundred fifty (150) days after the Petition Date (as such date may be extended pursuant to Section 8.14 of the RSA, the "**Outside Date**") | unless the Company has substantially consummated the Plan pursuant to its terms. |

52. Prior to entry into the RSA, on May 11, 2020, the Debtor sent a request letter (the "**Capital Call Request**") to TSEH II, requesting a capital contribution of $475 million to fully satisfy the DOE Debt and provide the Debtor with access to additional working capital without the need to commence a chapter 11 case. The Debtor viewed this as necessary because the DOE indicated it would not agree to a compromise of the DOE Debt other than pursuant to the terms of the Plan. CEI responded on May 17, 2020 and indicated that if the relevant upstream requests were made of it, it was willing to initiate a process within CEI for approval of the funding of CEI's pro rata share of the Capital Call Request, provided it receive confirmation of certain matters, including (i) that all members were willing to fund their pro rata share; (ii) that if the contribution were made, the new capital would be used to fully satisfy amounts owing to the DOE and that the United States would provide releases of all claims held by the United States related to or arising from the Project; and (iii) that all parties would undertake, as a condition to funding, a restructuring of the Project. SR CSP, on the other hand, responded to the Capital Call Request on May 16, 2020 and again on May 18, 2020, and essentially questioned the Debtor's good faith in

26841489.1

making the request while also making various information requests relating to the request. On May 21, 2020, the Debtor responded to each of SR CSP and CEI, provided certain of the requested information, and asked that each confirm by May 26, 2020, whether it intended to cause the requested capital contribution and provide evidence of their financial wherewithal to do so. Neither party, however, responded. Thus, entry into the RSA became the Debtor's only viable option to address the issues it faced.

53. **Postpetition Financing.** The Debtor's Cash Collateral is its sole source of funding for its operations and the costs of administering the Chapter 11 Case. The DOE has consented to the Debtor's use of Cash Collateral, subject to the terms of the Cash Collateral Orders (as defined below). As a result, the Debtor does not believe that entry into a debtor in possession financing facility is necessary at this time. The DOE's consent is based, in part, on CEI's agreement (the "**Cobra Backstop Agreement**") to reimburse the DOE for certain postpetition expenses, in the event the restructuring is not consummated due to, among other things, the failure to achieve the milestones set forth in the RSA. This agreement is embodied in an agreement between the DOE and CEI, which will be included within the Plan Supplement that is being filed with the Court.

54. More particularly, pursuant to the Cobra Backstop Agreement, Cobra has delivered to the Collateral Agent, for the benefit of DOE, a standby letter of credit in the aggregate stated amount of $23,150,000 (the "**Settlement Letter of Credit**"). Pursuant to the Cobra Backstop Agreement, following DOJ's affirmative vote to accept the Plan, Cobra is required to deliver an additional standby letter of credit from an issuing bank acceptable to DOE with a total face value of $176,850,000 (the "**Final Letter of Credit**"), which amount represents the difference between the aggregate stated amount of the Settlement Letter of Credit and $200,000,000, which

is the amount of the cash payment to be made to DOE on the Effective Date. The Cobra Backstop Agreement further provides that the Collateral Agent is entitled to draw on the Settlement Letter of Credit in an amount equal to the aggregate Reimbursable Post-Petition Costs (as defined in the Cobra Backstop Agreement) up to the date of draw in the event Cobra materially breaches its obligations under the RSA or the Cobra Backstop Agreement, to the extent such breach is not timely cured, or a case milestone as set out in the RSA is not timely achieved other than due to any action or inaction by the Collateral Agent, DOE, DOJ, or any other agency, division, or department of the United States of America other than the Court or the United States Trustee for the District of Delaware. Further, in the event Cobra materially breaches its obligations under the Cobra Backstop Agreement or the RSA following DOJ's affirmative vote to accept the Plan, the Cobra Backstop Agreement provides that the Collateral Agent is entitled to draw on the Settlement Letter of Credit and the Final Letter of Credit in full.

55. Relatedly, ACS has delivered a promissory note to the Collateral Agent, for the benefit of DOE, in the face amount of $176,850,000 (the "**ACS Note**"). The ACS Note becomes immediately due and owing to the Collateral Agent in the event Cobra fails to timely deliver to the Collateral Agent the Final Letter of Credit in accordance with the Cobra Backstop Agreement. In addition, Cobra's failure to timely deliver the Final Letter of Credit to the Collateral Agent would give the Collateral Agent the right to immediately draw on the Settlement Letter of Credit in full.

## J. The Debtor's Goals in the Chapter 11 Case

56. The Debtor has commenced the Chapter 11 Case to effectuate a consensual financial restructuring pursuant to the terms of the Plan. As a result of the Restructuring, the Debtor will emerge from the Chapter 11 Case with a reduced debt burden that is better aligned with its present and future operating prospects. The Debtor is well-positioned to emerge quickly

from chapter 11 with a renewed focus on obtaining full operational capacity. To that end, the Debtor intends to seek prompt confirmation of the Plan.

## II. FACTS IN SUPPORT OF FIRST DAY MOTIONS

57. To ensure a smooth transition of the Debtor's business operations into chapter 11, the Debtor has requested various types of relief in the First Day Motions filed concurrently with this Declaration. Specifically, the Debtor has filed the following pleadings:

(a) Debtor's Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 105(A), 361, 362, 363, 507, and 552, Bankruptcy Rules 2002, 4001, and 9014, and Local Rule 4001-2 (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(B)(2), and (IV) Granting Related Relief (the "**Cash Collateral Motion**")

(b) Debtor's Motion for Interim and Final Orders (I) Authorizing the Debtor to (A) Continue to Maintain Its Cash Management System, Including Bank Accounts and Business Forms, (B) Honor Certain Prepetition Obligations Related Thereto; (II) Waiving (A) Certain Operating Guidelines, and (B) Section 345(b) Deposit and Investment Requirements; and (III) Granting Related Relief (the "**Cash Management Motion**");

(c) Debtor's Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 503(b)(9), 1107(a), and 1108 of the Bankruptcy Code, (I) Authorizing the Debtor to Pay Certain Prepetition Claims of (A) Critical Vendors and Service Providers and (B) Certain Vendors Entitled to Administrative Expense Priority Under Section 503(b)(9) of the Bankruptcy Code; and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto (the "**Critical Vendor Motion**");

(d) Debtor's Application for an Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent Effective as of the Petition Date (the "**Section 156(c) Application**");

(e) Debtor's Motion for Entry of Interim and Final Orders (I) Approving the Debtor's Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Services, (III) Approving the Debtor's Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief (the "**Utilities Motion**");

(f) Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Prepetition Sales, Use, and Franchise Taxes and Similar Taxes and Fees, (II) Authorizing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Made Relating to the Foregoing, and (III) Scheduling Final Hearing (the "**Tax Motion**");

(g) Debtor's Motion for Entry of an Order Authorizing Rejection of Operations and Maintenance Agreement (the "**Rejection Motion**"). The Rejection Motion will not be heard at the first day hearing.

(h) Debtor's Motion for Entry of an Order Authorizing the Debtor to Enter into Operation and Maintenance Agreement (the "**Approval Motion**"). The Approval Motion will not be heard at the first day hearing.

**A. Cash Collateral Motion[13]**

58. An immediate and critical need exists for the Debtor to use Cash Collateral as it is the Debtor's only source of funding for working capital, the costs of operation and maintenance of the Power Plant, and the costs and expenses of administering the Chapter 11 Case. The Debtor's ability to maintain liquidity through the use of Cash Collateral is vital to maximize the value of the Debtor's assets.

59. With access to Cash Collateral, I do not believe that the Debtor's entry into a debtor in possession financing facility will be necessary. Absent authority to immediately use Cash Collateral, the Debtor, its creditors, and the estate would suffer irreparable harm because the Debtor would have no choice but to immediately cease critical repair work on the Power Plant, which is essential for the Debtor to recommence operations, effectuate and implement the restructuring proposed through the Plan and, ultimately, maximize the value of its estate for the benefit of all stakeholders.

[13] Capitalized terms used but not defined in this section have the meanings given to them in the Cash Collateral Motion.

60. Through the Cash Collateral Motion, the Debtor requests that the Court enter the Cash Collateral Orders:

(a) authorizing the Debtor to use Cash Collateral in accordance with the 13-week cash-flow forecast attached to the Cash Collateral Motion as Exhibit B (the "**Budget**"), subject to the Permitted Variances;

(b) vacating the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and conditions of the Cash Collateral Orders;

(c) granting the Prepetition Secured Parties, as of the Petition Date and in accordance with the Cash Collateral Orders, adequate protection in the form of (i) the Prepetition Secured Parties Adequate Protection Liens, (ii) the Prepetition Secured Parties Adequate Protection Superpriority Claims, (iii) current payment of accrued and unpaid prepetition and postpetition interest at the non-default rate, which such interest shall be paid in kind by being capitalized and added to the outstanding principal balance of the Prepetition Secured Obligations (after which time such capitalized interest shall be treated as a portion of the outstanding principal balance of the Prepetition Secured Obligations for all purposes of the Prepetition Financing Documents, including without limitation the accrual of interest thereon at the interest rates specified therein), and (iv) payment of certain specified postpetition payments due to the Prepetition Secured Parties and reimbursable fees and expenses;

(d) scheduling the Final Hearing, pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, to be held no later than thirty (30) calendar days after the Petition Date to consider entry of the Final Order;

(e) waiving, upon entry of the Final Order, certain rights of the Debtor to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code;

(f) subject to entry of the Final Order, granting adequate protection liens on the proceeds and property recovered in respect of the Debtor's claims and causes of action arising under chapter 5 of the Bankruptcy Code or any other state or federal law;

(g) waiving any applicable stay (including under Bankruptcy Rule 6004) to allow the Interim Order to become immediately effective; and

(h) granting certain related relief.

61. I believe that the terms of the use of the Cash Collateral are fair and reasonable to the Debtor and appropriate under the circumstances, and that the relief requested in

26841489.1

the Cash Collateral Motion is both necessary and in the best interests of the Debtor's estate and its creditors. Also, as explained above, the proposed use of Cash Collateral will provide the Debtor with necessary liquidity to fund and continue operations during the Chapter 11 Case.

**B. Cash Management Motion**

62. The Debtor's business requires the collection, payment, and transfer of funds through numerous bank accounts. In the ordinary course of business and prior to the Petition Date, the Debtor maintained a cash management system (the "**Cash Management System**") comprising thirty-three (33) bank accounts (the "**Bank Accounts**") maintained at PNC Bank, National Association ("**PNC**" and collectively with any other bank at which the Debtor may hold accounts, the "**Banks**").[14]

63. The Cash Management System was maintained in accordance with that certain *Collateral Agency and Account Agreement* (the "**Agency Agreement**") among the Debtor, the U.S. Department of Energy ("**DOE**"), and Midland Loan Services, a division of PNC (in its capacity as collateral agent for the senior secured obligations owing to the DOE, the "**Collateral Agent**"). In connection with the Agency Agreement, the Debtor is required to maintain its existing Bank Accounts at PNC. The Agency Agreement additionally requires the Debtor to maintain accounts for various purposes, although many of the Bank Accounts have a $0 balance or have never been used. The Bank Accounts comprise the following accounts (the "**Restricted Accounts**"):

(a) **Project Revenue Account.** The Debtor maintains an account (the "**Project Revenue Account**") for the deposit of revenues from operations, and transfers are made from the Project Revenue Account to various other Bank Accounts.

[14] A list of the Bank Accounts is attached hereto as **<u>Exhibit C</u>**, and a flow chart illustrating the movement of cash among the Bank Accounts is attached hereto as **<u>Exhibit D</u>**.

26841489.1

(b) **Operating Account.** The Debtor maintains an operating account used to pay operational costs and expenses.

(c) **Operating Reserve Account.** The Debtor maintains an account that holds funds that are reserved to secure any shortfall in the operating account.

(d) **Debt Service Accounts**. The Debtor maintains two accounts to service prepetition debt: one is used to service debt obligations (the "**Debt Service Payment Account**"), while a related account is used to secure any shortfall in the Debt Service Payment Account.

(e) **Loss Proceeds Account.** The Debtor maintains an account to collect amounts paid by insurers, reinsurers, and governmental authorities, as applicable, to be held pursuant to the terms of the Agency Agreement.

(f) **Other Accounts.** As of the Petition Date, approximately seventeen (17) of the Bank Accounts have a $0 balance. The eight (8) remaining Bank Accounts generally hold nominal funds from grant proceeds, contract damages or residual loan draws, or are used as reserve accounts for future expenses outside of the ordinary course of business.

64. The Restricted Accounts are restricted pursuant to the Agency Agreement, and the Debtor must submit requests for withdrawals or transfers of funds, with withdrawals or transfers subject to the approval of the DOE and the satisfaction of certain other conditions. The Debtor is limited to no more than three requests for fund withdrawals or transfers per month, subject to limited exceptions. Historically, the Debtor processes payments from these accounts once per month, and often must transfer funds between accounts to process payments.

65. In addition to the Restricted Accounts, the Debtor maintains two Bank Accounts at PNC, which each hold *de minimis* funds (the "**DACA Accounts**").[15] The DACA Accounts are subject to a deposit account control agreement among the Debtor, PNC, and the

[15] The Debtor has deposited $7,000 in one such account to provide adequate assurance of payment for future services to utility providers, as described in the *Debtor's Motion for Interim and Final Orders, Pursuant to Sections 105(a) and 366 of the Bankruptcy Code, (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedure for Determining Additional Adequate Assurance of Payment, and (IV) Granting Related Relief, Including Setting a Final Hearing Related Thereto*, filed concurrently herewith.

DOE, pursuant to which the DOE maintains a security interest in and lien upon the funds maintained in the accounts. The Debtor maintains exclusive access to the DACA Accounts, subject to certain conditions, and may access funds in such accounts without the express consent of the DOE.

66. The funds in each of the Bank Accounts serves as collateral for the prepetition loan guaranteed and serviced by the DOE. On a postpetition basis, the Debtor's use of its cash and the Bank Accounts will be subject to the terms of an order authorizing the Debtor to use cash collateral.[16]

67. In light of the Debtor's need to maintain its Bank Accounts and cash management functions, I believe that the relief requested in the Cash Management Motion is both necessary and in the best interests of the Debtor's estates and its creditors.

**C. Critical Vendor Motion**

68. The Debtor has determined, in an exercise of its business judgment, that its continued receipt of certain goods and services is necessary to ensure that there are no disruptions to the Debtor's business operations, and to preserve and maximize the value of the Debtor's estate. In addition, various third parties may be able to assert liens against certain of the Debtor's assets, or may possess administrative claims pursuant to section 503(b)(9) of the Bankruptcy Code. The Debtor's business and the success of the Chapter 11 Case depends on the Debtor's ability to retain its vendors to maintain, repair, and operate the Power Plant to commence generation of electricity and achieve full operational capacity. Accordingly, I believe that the relief requested in the Critical

---

[16] Concurrently with the filing of the Motion, the Debtor also filed the *Debtor's Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363, 507, and 552, Bankruptcy Rules 2002, 4001, and 9014, and Local Rule 4001-2 (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured parties, (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b)(2), and (IV) Granting Related Relief*, seeking authority to use cash collateral during the pendency of the Chapter 11 Case.

Vendor Motion, including authority to pay up to $2.5 million to the Critical Vendors on account of prepetition claims, is both necessary and in the best interests of the Debtor's estates and its creditors.

**D. Section 156(c) Application**

69. Prior to the selection of Epiq Corporate Restructuring, LLC ("**Epiq**") as claims and noticing agent, the Debtor obtained and reviewed engagement proposals from at least three reputable claims and noticing agents to ensure selection through a competitive process. I believe, based on all engagement proposals obtained and reviewed, that Epiq's rates are competitive and reasonable.

70. In view of the number of anticipated claimants and the complexity of the Debtor's business, I believe that the appointment of Epiq as claims and noticing agent is both necessary and in the best interests of the Debtor's estate and its creditors.

**E. Utilities Motion**

71. In connection with the operation of its business and the management of the Power Plant, the Debtor obtains electricity, telephone, water, waste disposal, and other similar services (collectively, the "**Utility Services**") from several utility companies (collectively, the "**Utility Companies**"). Among other things, the Debtor requests that the Court: (i) prohibit the Utility Companies from altering, refusing, or discontinuing the Utility Services on account of pre-petition invoices, including the making of demands for security deposits or accelerated payment terms; (ii) determine that the Debtor has provided each of the Utility Companies with "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code, based on the Debtor's establishment of a segregated account in the amount of $7,000, which equals 50% of the Debtor's estimated monthly cost of the Utility Services subsequent to the Petition

Date;[17] and (iii) establish procedures for determining additional adequate assurance of future payment, if any, and authorizing the Debtor to provide additional adequate assurance of future payment to the Utility Companies.

72. Uninterrupted Utility Services are essential to the Debtor's business operations and the overall success of the Chapter 11 Case. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtor's business operations could be severely disrupted. Accordingly, it is essential that the Utility Services continue uninterrupted during the Chapter 11 Case. I believe that the relief requested in the Utilities Motion is in the best interest of the Debtor and its estate, will not harm unsecured creditors, and may reduce harm and administrative expense to the Debtor's estate.

**F. Tax Motion**

73. In the ordinary course of business, the Debtor incurs or collects and remits certain taxes, including sales, use, property, commerce, and various other similar taxes, fees, charges, and assessments (the "**Taxes and Fees**"). The Debtor remits such Taxes and Fees to various federal, state, and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies (the "**Taxing Authorities**").

74. Any regulatory dispute or delinquency that impacts the Debtor's ability to conduct business could have a wide-ranging and adverse effect on the Debtor's operations as a whole, as described further in the Taxes Motion. I believe that payment of prepetition Taxes and Fees in an amount not to exceed $280,000 is in the best interest of the Debtor and its estate, will

[17] The Debtor's primary utility provider, NV Energy, holds a deposit significantly in excess of the Debtor's approximate two-week cost for such provider's utility services. As such, the Debtor has not dedicated any additional funds to NV Energy in the Utility Deposit.

not harm unsecured creditors, and may reduce harm and administrative expense to the Debtor's estate.

75. I have reviewed each of the First Day Motions (including the exhibits and schedules thereto). The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the type of relief sought in each of the First Day Motions: (i) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption to its business operations; and (ii) is in the best interests of the Debtor and its stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 30th day of July, 2020.

Tonopah Solar Energy, LLC,
Debtor and Debtor in Possession

By: */s/ Justin D. Pugh*
Justin D. Pugh
Treasurer

26841489.1

# **EXHIBIT A**

## **Organizational Chart**

# TSE Ownership Structure



