## <u>EXHIBIT B</u>

**Disclosure Statement Blackline**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | x | |
| In re: | : | Chapter 11 |
| | : | |
| TONOPAH SOLAR ENERGY, LLC, | : | Case No. 20-11884 (KBO) |
| | : | |
| Debtor.[1] | : | |
| | : | |
| | : | |
| | x | |

## AMENDED DISCLOSURE STATEMENT FOR
## CHAPTER 11 PLAN FOR TONOPAH SOLAR ENERGY, LLC

> **THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL FROM, BUT HAS NOT BEEN APPROVED BY, THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL AFTER A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Edmon L. Morton (No. 3856)
Matthew B. Lunn (No. 4119)
Allison S. Mielke (No. 5934)
Jared W. Kochenash (No. 6557)

Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:     (302) 571-6600
Fax:     (302) 571-1253
Email: mlunn@ycst.com
          emorton@ycst.com
          amielke@ycst.com
          jkochenash@ycst.com

WILLKIE FARR & GALLAGHER LLP

Matthew A. Feldman (admitted pro hac vice pending)
Paul V. Shalhoub (admitted pro hac vice pending)
Andrew S. Mordkoff (admitted pro hac vice pending)
Ciara A. Copell (admitted pro hac vice pending)

787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
mfeldman@willkie.com
pshalhoub@willkie.com
amordkoff@willkie.com
ccopell@willkie.com

---

[1]     The Debtor in this chapter 11 case, along with the business address and the last four (4) digits of the Debtor's federal tax identification number is: Tonopah Solar Energy, LLC, 11 Gabbs Pole Line Road, Tonopah, NV 89049 (1316)

*Proposed Co-Counsel to the Debtor*
*and Debtor in Possession*

Dated: ~~July 30~~September 2, 2020

# TABLE OF CONTENTS

ARTICLE I INTRODUCTION ................................................................................1

    A.    General.................................................................................................1
    B.    Confirmation of the Plan......................................................................5
    C.    Treatment and Classification of Claims and Interests; Impairment......6
    D.    Confirmation Hearing ..........................................................................1

ARTICLE II GENERAL INFORMATION REGARDING THE DEBTOR ................1

    A.    Voting; Holders of Claims Entitled to Vote ........................................1
    B.    The Debtor's Business .........................................................................3
    C.    Operation and Maintenance Agreements...............................................8
    D.    The Debtor's Prepetition Capital Structure.......................................~~8~~9
    E.    Events Leading to the Chapter 11 Case ...........................................~~10~~11
    F.    The Debtor's Goals in the Chapter 11 Case.....................................~~13~~14

ARTICLE III THE CHAPTER 11 CASE .............................................................14

    A.    General Case Background...................................................................14
    B.    Employment and Compensation of Professionals ............................~~14~~15
    C.    "First Day" Motions and Related Applications ................................~~14~~15
    D.    Exclusivity ........................................................................................16

ARTICLE IV SUMMARY OF THE PLAN ........................................................~~16~~17

    A.    Overview of the Plan .......................................................................~~17~~18
    B.    Classification and Treatment of Claims and Interests .....................~~17~~18
    C.    Executory Contracts and Unexpired Leases ....................................~~23~~24
    D.    Implementation of the Plan................................................................28
    E.    Effect of Confirmation .......................................................................32

ARTICLE V VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION
             OF THE PLAN ............................................................................39

    A.    General...............................................................................................39
    B.    Parties in Interest Entitled to Vote ..................................................~~39~~40
    C.    Classes Impaired and Entitled to Vote Under the Plan....................~~39~~40
    D.    Voting Procedures and Requirements...............................................~~40~~41
    E.    Acceptance of Plan ..........................................................................~~41~~42
    F.    Confirmation Without Necessary Acceptances; Cramdown ............~~42~~43
    G.    Classification.....................................................................................~~43~~44

ARTICLE VI FEASIBILITY AND BEST INTERESTS OF CREDITORS ..............44

    A.    Best Interests Test .............................................................................44
    B.    Liquidation Analysis ........................................................................~~44~~45

C.      Application of the Best Interests Test ...............................................4546

D.      Feasibility ..........................................................................................4546

ARTICLE VII SECURITIES LAW MATTERS ....................................................4647

A.      Bankruptcy Code Exemptions from Registration Requirements ......4647

ARTICLE VIII CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO
        VOTING ............................................................................................4748

A.      Certain Bankruptcy Law Considerations ..........................................4748

B.      Risks Related to Debtor's Ongoing Operations during the Case ......4950

C.      Financing Risks for the Reorganized Debtor .....................................5051

### Appendices and Exhibits

Appendix A    Chapter 11 Plan for Tonopah Solar Energy, LLC
Appendix B    Liquidation Analysis
Appendix C    Financial Projections

Exhibit 1      Restructuring Support Agreement

# ARTICLE I

# INTRODUCTION

## A.        General

Tonopah Solar Energy, LLC (the "**Debtor**" or "**TSE**"), as debtor in possession in the chapter 11 case pending before the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), administered under Case No. 20-[ ]20-11884 (KBO), submits this disclosure statement (as may be amended, altered, modified, revised or supplemented from time to time, the "**Disclosure Statement**") pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**"), in connection with the solicitation of votes on the *Amended Chapter 11 Plan for Tonopah Solar Energy, LLC* (the "**Plan**"), a copy of which is attached hereto as Appendix A.

Capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Plan; provided, that any capitalized term used herein that is not defined herein or in the Plan, but is defined in the Bankruptcy Code or the Bankruptcy Rules, will have the meaning given to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

This Disclosure Statement is designed to provide holders of Claims entitled to vote on the Plan with adequate information to make an informed decision about whether to vote to accept or reject the Plan. This Disclosure Statement sets forth certain information regarding the Debtor's prepetition capital structure and business operations, important developments leading to the commencement of the chapter 11 case, and important developments that have occurred during this chapter 11 case.  This Disclosure Statement also describes terms and provisions of the Plan, including certain effects of confirmation of the Plan, certain risk factors associated with the Plan, potential alternatives to the Plan, the manner in which distributions will be made under the Plan if the Plan is confirmed and becomes effective, and related matters.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

The Plan and this Disclosure Statement are the result of months of extensive and vigorous negotiations among the Debtor, the U.S. Department of Energy ("**DOE**"), the U.S. Department of Justice ("**DOJ**") and ACS Servicios Comunicaciones y Energía S.L. ("**ACS**"), Cobra Thermosolar Plants, Inc. ("**CPI**") and Cobra Energy Investment, LLC ("**CEI**", and together with ACS and CPI, "**Cobra**").  The culmination of these negotiations was entry into the Restructuring Support Agreement (the "**Restructuring Support Agreement**"), upon which the Plan is premised, by and among the Debtor and Cobra.  The Restructuring Support Agreement provides for the restructuring of the Debtor through the filing of the chapter 11 case with the Bankruptcy Court and the confirmation of the Plan.  The Debtor firmly believes the Restructuring Support Agreement puts the Debtor on firm footing to prosecute the chapter 11 case expeditiously to conclusion.

The Plan contemplates a restructuring that provides for, among other things: (a) a $200 million cash payment, plus potential deferred payments pursuant to the terms of a $100 million contingent note to be guaranteed by ACS, to the DOE, acting through the Secretary of Energy on

the Effective Date of the Plan (the "**Effective Date**"), with Cobra funding the Debtor's obligations under the Plan through new debt financing and an equity contribution to be provided on the Effective Date; (b) mutual releases by the Debtor, Cobra, and the DOE of all Claims on the terms set forth in the Plan; (c) Cobra or an affiliate thereof to own 100% of the Company as one of the conditions of and upon the Effective Date; and (d) the unimpairment of all other Claims, as set forth in the Plan.  As a result of the restructuring, the Debtor will emerge from bankruptcy with a significantly deleveraged balance sheet and free of costly, uncertain and time-consuming litigations with Cobra.

HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTOR ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(C) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE PARTIES IN INTEREST IN THE CHAPTER 11 CASE WITH "ADEQUATE INFORMATION" (AS DEFINED IN THE BANKRUPTCY CODE) SO THAT THOSE CREDITORS WHO ARE ENTITLED TO VOTE WITH RESPECT TO THE PLAN CAN MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.

THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH, NOR REVIEWED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**"), AND THE SECURITIES TO BE ISSUED ON OR AFTER THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH THE SEC UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR WITH ANY OTHER SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC, ANY OTHER SECURITIES REGULATORY AUTHORITY, OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC, NOR ANY OTHER SECURITIES REGULATORY AUTHORITY, NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THE DEBTOR BELIEVES THAT THE ISSUANCE OF THE SECURITIES UNDER THE PLAN WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE EXEMPTION PROVIDED BY SECTION 4(A)(2) OF THE SECURITIES ACT AND RULE 506 OF REGULATION D PROMULGATED THEREUNDER.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY

NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PERSON IS AUTHORIZED BY THE DEBTOR IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS AND SCHEDULES ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO IN THE DISCLOSURE STATEMENT AND/OR PLAN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR.  ALTHOUGH THE DEBTOR WILL MAKE AVAILABLE TO ALL PARTIES ENTITLED TO VOTE ON THE PLAN SUCH ADDITIONAL INFORMATION AS MAY BE REQUIRED BY APPLICABLE LAW PRIOR TO THE VOTING DEADLINE, THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ALL SUMMARIES THEREOF.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN OR THE APPLICABLE PLAN DOCUMENTS AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE APPLICABLE PLAN DOCUMENTS ARE CONTROLLING.  THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN WILL CONSTITUTE AN ADMISSION OF ANY LIABILITY BY ANY PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS OR INTERESTS.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS BASED PRIMARILY ON THE CURRENT EXPECTATIONS OF THE DEBTOR AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AFFECTING THE FINANCIAL CONDITION OF THE DEBTOR'S BUSINESS. IN PARTICULAR, STATEMENTS USING WORDS SUCH AS "MAY," "MIGHT," "WILL," "COULD," "WOULD," "SHOULD," "EXPECT," "INTEND," "PLAN," "ANTICIPATE," "BELIEVE," "ESTIMATE," "PROJECT," "POTENTIAL," "CONTINUE," "SEEK TO" AND "ONGOING," AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS.  THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW UNDER ARTICLE VIII IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS.  CONSEQUENTLY, THE PROJECTED

26971921.1

FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN SHOULD NOT BE REGARDED AS REPRESENTATIONS BY THE DEBTOR, ITS ADVISORS OR ANY OTHER PERSON THAT THE PROJECTED FINANCIAL CONDITIONS OR RESULTS OF OPERATIONS CAN OR WILL BE ACHIEVED. EXCEPT AS OTHERWISE REQUIRED BY LAW, THE DEBTOR DOES NOT UNDERTAKE ANY OBLIGATION TO UPDATE OR REVISE PUBLICLY ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE FOLLOWING APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN (INCLUDING THE COMPROMISES AND SETTLEMENTS PROVIDED FOR IN THE PLAN), CERTAIN STATUTORY PROVISIONS AND CERTAIN DOCUMENTS RELATING TO THE PLAN. ALTHOUGH THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE AND PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF, OR ARE INCONSISTENT WITH, THE PLAN, SUCH STATUTES, OR SUCH DOCUMENTS. TO THE EXTENT THERE IS ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN FOR ALL PURPOSES.

THIS DISCLOSURE STATEMENT WILL NOT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS TO ANY PERSON OR ENTITY THAT MAY RESULT FROM CONSUMMATION OF THE PLAN OR THE TRANSACTIONS CONTEMPLATED BY THE PLAN. AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT AND THE STATEMENTS MADE HEREIN NEITHER WILL CONSTITUTE NOR BE CONSTRUED AS AN ADMISSION, STIPULATION, WAIVER, EVIDENCE OR FINDING OF FACT, BUT RATHER A STATEMENT OR STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

The Plan contemplates the reorganization of the Debtor and the resolution of all outstanding Claims against, and Interests in, the Debtor. The Plan is the product of extensive, arm's-length negotiations among the Debtor, the DOE, the DOJ and Cobra. The Debtor believes the Plan is reflective of these good faith negotiations and will treat Holders of Claims and Interests in an economic and fair manner. The Debtor believes that the Plan appropriately distributes value among its stakeholders in accordance with the Bankruptcy Code's priority scheme.

All exhibits to the Plan will be filed with the Bankruptcy Court and will be available for review, free of charge, at **https://dm.epiq11.com/Tonopah** not later than ten (10) days before the Voting Deadline (defined herein).  Copies of all Exhibits to the Plan also may be obtained, free of charge, from Epiq Corporate Restructuring, LLC (the "**Voting Agent**") by calling 1-866-897-6433 (Toll Free U.S. and Canada) or 1-646-282-2500 (International), or by emailing tabulation@epiqglobal.com with a reference to "Tonopah" in the subject line.

In addition, if you are a holder of a Claim entitled to vote on the Plan and did not receive a ballot, received a damaged ballot or lost your ballot, or if you have any questions concerning the procedures for voting on the Plan, please contact the Voting Agent by calling 1-866-897-6433 (Toll Free U.S. and Canada) or 1-646-282-2500 (International), or by emailing tabulation@epiqglobal.com with a reference to "Tonopah" in the subject line.

### B.    Confirmation of the Plan

#### 1.    *Requirements*

The requirements for Confirmation of the Plan are set forth in section 1129 of the Bankruptcy Code. The requirements for approval of the Disclosure Statement are set forth in section 1125 of the Bankruptcy Code.

#### 2.    *Approval of the Plan and Confirmation Hearing*

To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code.

#### 3.    *Only Impaired Classes Vote*

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan.  Generally, a claim or interest is impaired under a plan if the Holder's legal, equitable or contractual rights are changed under such plan.  In addition, if the Holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such Holders are not entitled to vote on such plan.

Under the Plan, only the DOE, as the holder of Prepetition Note Claim, in Class 3 is entitled to vote on the Plan.

Under the Plan, Holders of Claims and Interests in Classes 1, 2, and 4 are unimpaired and, therefore, deemed to accept the Plan.  Holders of Interests in Class 5 are impaired, will not receive or retain any distributions or interests under the Plan on account of such Interests, and deemed to have rejected the Plan.

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO THE DOE, AS THE HOLDER OF CLAIMS IN CLASS 3.

## C.    Treatment and Classification of Claims and Interests; Impairment

1.    *Treatment of Administrative Expense Claims and Priority Tax Claims*

a)    Administrative Expense Claims

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, or as otherwise expressly provided in the Plan, on the applicable Distribution Date, or as soon thereafter as is reasonably practicable, the holder of such Allowed Administrative Expense Claim shall receive Cash from the Debtor in an amount equal to such Allowed Claim; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor, as debtor in possession, shall be paid by the Debtor in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities.

Claims for adequate protection which expressly constitute Allowed claims under the Cash Collateral Order shall be deemed Allowed Administrative Expense Claims to the extent payable under the Cash Collateral Order or the Plan, without the necessity of filing a proof of claim with respect thereto, and, shall be paid in full on the Effective Date or as is reasonably practicable as set forth in the Plan without the need to file a proof of such Claims with the Bankruptcy Court in accordance with the Plan and without further order of the Bankruptcy Court.

b)    Professional Fee Claims

Except to the extent that the applicable holder of an Allowed Professional Fee Claim agrees to less favorable treatment with the Debtor, or as otherwise expressly set forth in the Plan, each holder of a Professional Fee Claim shall be paid in full in Cash pursuant to the Plan.

c)    Priority Tax Claims

Except to the extent that the applicable holder of an Allowed Priority Tax Claim has been paid by the Debtor before the Effective Date, or the Debtor and such holder agree to less favorable treatment by the Debtor, each holder of an Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, at the option of the Debtor (a) payment in full in Cash made on or as soon as reasonably practicable after the later of the (i) Effective Date and (ii) first Distribution Date occurring at least 20 calendar days after the date such Claim is Allowed, (b) regular installment payments in accordance with section 1129(a)(9)(C) of the Bankruptcy Code or (c) such other amounts and in such other manner as may be determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

The Reorganized Debtor shall have the right, in its sole discretion, to pay any Allowed Priority Tax Claim or any remaining balance of an Allowed Priority Tax Claim (together with accrued but unpaid interest) in full at any time on or after the Effective Date without premium or penalty.

2.    *Classification of Other Claims and Interests*

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for all purposes, including as set forth herein. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date. Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended and superseded, may be adjusted or expunged on the official claims register without a claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

Except as otherwise specifically provided for in the Plan, the Confirmation Order or other order of the Bankruptcy Court, or required by applicable non-bankruptcy law, in no event shall any Holder of an Allowed Claim be entitled to receive payments that in the aggregate exceed the Allowed amount of such Holder's Claim.

**Summary of Classification and Treatment of**
**Claims and Interests in the Debtor**

**THE PROJECTED RECOVERIES SET FORTH IN THE**
**TABLE BELOW ARE ESTIMATES ONLY AND ARE**
**THEREFORE SUBJECT TO CHANGE.**

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including related to the Claims reconciliation process.  Actual recoveries may vary widely within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by Creditors.  The projected recoveries are based on information available to the Debtor as of the date hereof and reflect the Debtor's estimates as of the date hereof only.  In addition to the cautionary notes contained elsewhere in the Disclosure Statement, it is underscored that the Debtor makes no representation as to the accuracy of these recovery estimates.  The Debtor expressly disclaims any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  For a summary of the treatment of each Class of Claims and Interests, see Article IV, "Summary of the Plan," below.

| Class | Designation | Plan Treatment of Allowed Claims and Interests | Status | Entitled to Vote | Estimated Allowed Amount of Claim | Projected Recovery Under the Plan |
|---|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a different treatment, on the applicable Distribution Date, each holder of an Allowed Priority Non-Tax Claim shall receive Cash from the Debtor in an amount equal to such Allowed Claim. | Unimpaired | No (deemed to accept) | $0 | 100% |
| 2 | Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, on the applicable Distribution Date, or as soon as reasonably practicable thereafter, each holder of an Allowed Other Secured Claim shall each receive, subject to the terms of the Plan, in full and final satisfaction, settlement, release and discharge of its Allowed Other Secured Claim, at the election of the Debtor: (i) Cash in an amount equal to such Allowed Other Secured Claim; or (ii) such other treatment that will render such Allowed Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that Other Secured Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, in the discretion of the Debtor without further notice to or order of the Bankruptcy Court.<br><br>Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final satisfaction of such Allowed Other Secured Claim is made as provided in the Plan.  On the full payment or other satisfaction of each Allowed Other Secured Claim in accordance with | Unimpaired | No (deemed to accept) | $481,863 | 100% |

26971921.3

| Class | Designation | Plan Treatment of Allowed Claims and Interests | Status | Entitled to Vote | Estimated Allowed Amount of Claim | Projected Recovery Under the Plan |
|---|---|---|---|---|---|---|
| | | the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person. | | | | |
| 3 | Prepetition Note Claims | On the Effective Date, or as soon as reasonably practicable thereafter, the holder of the Allowed Prepetition Note Claims shall receive, subject to the terms of the Plan, in full and final satisfaction, settlement, release and discharge of its Allowed Prepetition Note Claims, (a) $200 million in Cash (which shall be satisfied by DOE by a draw on the Cobra Backstop Letter of Credit) and (b) all rights and obligations under the Exit Contingent Note. | Impaired | Yes | $434,684,702 | 47-71%[2] |
| 4 | General Unsecured Claims | Except to the extent that a holder of a General Unsecured Claim agrees to different treatment, each holder of an Allowed General Unsecured Claim shall receive treatment that: (i) leaves unaltered the legal, equitable, or contractual rights to which the holder of such Allowed General Unsecured Claim is entitled; or (ii) otherwise | Unimpaired | No (deemed to accept) | $770,000 | 100% |

---

[2]    The range of projected recovery under the Plan on account of the Prepetition Note Claim is based upon (i) in the low case of 47%, no payments being made by Reorganized TSE under the Exit Contingent Note, and (ii) in the high case of 71%, $100 million of payments being made by Reorganized TSE under the Exit Contingent Note over time (with no discount for present value).  There is no guarantee that any payments will be required to be made by Reorganized TSE under the Exit Contingent Note, which will depend upon, among other things, the terms of new power purchase agreements entered into by Reorganized TSE.  A copy of the Exit Contingent Note will be included in the Plan Supplement.

26971921.1

| Class | Designation | Plan Treatment of Allowed Claims and Interests | Status | Entitled to Vote | Estimated Allowed Amount of Claim | Projected Recovery Under the Plan |
|---|---|---|---|---|---|---|
| | | leaves such Allowed General Unsecured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code. | | | | |
| 5 | Existing Interests | Existing Interests shall be discharged, cancelled, released and extinguished, and holders thereof shall not receive or retain any distribution under the Plan on account of such Existing Interests. | Impaired | No (deemed to reject) | $420,779,227 | 0% |

### D.    Confirmation Hearing

Following the Petition Date, the Bankruptcy Court will schedule a hearing to consider Confirmation of the Plan (the "**Confirmation Hearing**").  Parties in interest will have the opportunity to object to the Confirmation of the Plan at the Confirmation Hearing.

THE DEBTOR URGES ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.

## ARTICLE II

## GENERAL INFORMATION REGARDING THE DEBTOR

### A.    Voting; Holders of Claims Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are Impaired and not deemed to have rejected a plan are entitled to vote to accept or reject a plan.  Generally, a claim or interest is Impaired under the Plan if the holder's legal, equitable or contractual rights are altered under such plan.  Classes of claims or equity interests under a chapter 11 plan in which the holders of claims or equity interests are Unimpaired are deemed to have accepted such plan and are not entitled to vote to accept or reject the proposed plan.  In addition, classes of claims or equity interests in which the holders of claims or equity interests will not receive or retain any property on account of their claims or equity interests are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims held by non-insiders that cast ballots for acceptance or rejection of such plan (such vote, the "**Requisite Acceptances**").  **Your vote to accept or reject the Plan is important.**  The Bankruptcy Code requires as a condition to confirmation of a plan that each class that is Impaired and entitled to vote under a plan vote to accept such plan, unless the provisions of section 1129(b) of the Bankruptcy Code are met.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtor reserves the right to amend the Plan (subject to the prior written consent of Cobra) and/or to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the non-acceptance of a plan by one or more Impaired classes of claims or interests, so long as at least one Impaired class of claims or interests, excluding the votes of insiders, votes to accept the plan.  Under Section 1129(b) of the Bankruptcy Code, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for the purpose of voting on the Plan (a "**Ballot**").  This Disclosure Statement, the Exhibits attached hereto, and the Plan and related documents are the only materials the Debtor is providing to creditors for their use in determining whether to vote to accept or reject the Plan, and such materials may not be relied upon or used for any purpose other than to vote to accept or reject the Plan.  If you

believe that you are entitled to vote to accept or reject the Plan and you did not receive a Ballot, please consult with your counsel and/or contact the Voting Agent by calling 1-866-897-6433 (Toll Free U.S. and Canada) or 1-646-282-2500 (International), or by emailing **tabulation@epiqglobal.com** with a reference to "Tonopah" in the subject line, or at the address listed below.

Please complete, execute and return your Ballot(s) (a) in the provided postage prepaid envelope, (b) via electronic mail to tabulation@epiqglobal.com or (c) by first class mail, overnight courier or hand delivery to:

### If by First Class Mail:

Tonopah Solar Energy, LLC Ballot Processing Center
c/o Epiq Corporate Restructuring, LLC
P.O. Box 4422
Beaverton, OR 97076-4422

### If by Overnight Courier or Overnight Mail:

Tonopah Solar Energy, LLC Ballot Processing Center
c/o Epiq Corporate Restructuring, LLC
10300 SW Allen Boulevard
Beaverton, OR 97005

PLEASE REFER TO THE INSTRUCTIONS ACCOMPANYING THE BALLOTS FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT YOUR BALLOT IS PROPERLY AND TIMELY SUBMITTED SUCH THAT YOUR VOTE MAY BE COUNTED.

TO BE COUNTED, YOUR PROPERLY COMPLETED BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY <u>RECEIVED</u> BY THE VOTING AGENT NO LATER THAN [●]**5:00 P.M.**, **EASTERN TIME, ON** [●] **OCTOBER 13, 2020** (**the** "**Voting Deadline**") UNLESS THE DEADLINE IS EXTENDED BY THE DEBTOR WITH THE CONSENT OF COBRA. YOUR BALLOT MAY BE SENT VIA THE PROVIDED POSTAGE PREPAID ENVELOPE, ELECTRONIC MAIL, FIRST CLASS MAIL, OVERNIGHT COURIER OR HAND DELIVERY, AS INSTRUCTED IN THE BALLOT.

The Ballots have been specifically designed for the purpose of soliciting votes on the Plan from the Classes entitled to vote with respect thereto. Accordingly, in voting on the Plan, please use only the Ballot(s) sent to you with this Disclosure Statement or provided by the Voting Agent. If you require an additional Ballot, please contact the Voting Agent and request a replacement and/or supplemental Ballot.

The only impaired Class under the Plan that is entitled to vote is Class 3, which consists of Prepetition Note Claims. The DOE is the holder of the Prepetition Note Claims.

All properly completed Ballots received prior to the Voting Deadline will be counted for purposes of determining whether a voting Class of Impaired Claims has accepted the Plan. The Voting Agent will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Classes entitled to vote.

THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN REPRESENTS THE BEST OPPORTUNITY TO MAXIMIZE VALUE FOR THE DEBTOR'S STAKEHOLDERS AND CONSTITUENTS AND STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

## B. The Debtor's Business

### 1. Overview of the Project

The Debtor owns and operates a net 110-megawatt concentrated solar energy power plant (the "**Power Plant**") located near Tonopah in Nye County, Nevada. The Power Plant is also known as the Crescent Dunes Solar Energy Project (the "**Project**"). The Project is the first utility-scale concentrated solar power plant in the United States to be fully integrated with energy storage technology. The Power Plant uses solar power technology to concentrate and convert sunlight into heat energy, which is stored and converted, through a series of heat exchangers, to generate high-pressure steam. Specifically, the Power Plant includes 10,347 heliostats (mirror assemblies) that collect and focus the sun's thermal energy to heat molten salt flowing through an approximately 640-foot tall solar power tower (the "**Receiver Tower**"). The Power Plant converts solar energy to heat energy by concentrating sunlight on the Receiver Tower, where molten salt is super-heated to a design temperature of 1050° F to create a source of heat energy. Upon exiting the Receiver Tower, this molten salt is maintained in a vessel, the hot salt tank, before it is transmitted to the other areas of the Power Plant. The balance of the Power Plant then relies on conventional technology to convert the heat energy to high-pressurized steam through a steam generation system, which powers a turbine that creates electricity for sale. At the time of its construction, the Power Plant was unique among solar energy plants for many reasons, including its use of a non-degradable energy storage technology that can produce electricity at night, in the absence of sunlight.

Until October 2019, the electricity generated by the Power Plant was sold exclusively to the Nevada Power Company, d/b/a NV Energy ("**NVE**"), under that certain *Long-Term Firm Portfolio Energy Credit and Renewable Power Purchase Agreement* dated November 4, 2009 (as amended, the "**PPA**"), which, as discussed below, was terminated by NVE in the fall of 2019. The Debtor's sole source of revenue was the sale of power under the PPA.

The Debtor is currently managed by officers supplied by FTI, whose actions are overseen and directed by the Debtor's board of managers. The Debtor also obtains operational support from third party contractors. The Debtor's operating agreement prevents it from directly employing personnel. Therefore, as of the Petition Date, the Debtor has no employees of its own.

Due to certain issues with a critical plant component, discussed below, the Power Plant is not currently generating any electricity; thus, it is not generating any revenue from the sale of electricity.  The Debtor's vendors and contractors are working to fix structural issues that would allow the Debtor to recommence operations.

2.    *History of TSE and the Crescent Dunes Solar Energy Project*

TSE was formed in February 2008 by SolarReserve, Inc. ("**SolarReserve**") to develop a solar energy power plant in the Nevada desert that would utilize a molten salt receiver to generate power.  The Project was to be the first utility-scale solar project of its kind in the United States to store energy as heat in the form of molten salt, effectively functioning as a giant battery, with the capability to generate electricity at night.  The Project's design was an innovative solution to the core limitation of renewable energy sources such as solar and wind—their intermittency.  TSE also anticipated that the Project would generate at least 600 construction jobs and 45 permanent jobs, and would avoid the release of nearly 279,000 metric tons of carbon dioxide into the atmosphere annually that would have been produced if conventional electricity generation technologies were used.

The development of the Project was dependent on identifying (a) a construction company to assume the risks associated with the required turnkey fixed-price engineering, procurement and construction contract, and (b) a utility to purchase the Power Plant's renewable, clean power that would be generated by a solar energy power plant under a long-term power purchase agreement.  After extensive negotiation and a protracted regulatory approval process, TSE found a purchaser in NVE, and, in November 2009, it entered into the PPA.  The PPA initially contemplated that TSE would build the Power Plant, and, upon completion, NVE would be the exclusive offtake purchaser of the power generated by the Power Plant.  The following month, SolarReserve applied for a loan guarantee from DOE, and TSE executed a contract (the "**EPC Contract**") with CPI to provide engineering, procurement and construction services in connection with the Project (at an initial fixed price amount of $766.4 million) in 2011.  TSE obtained equity investments from SolarReserve, CEI, which is an affiliate of ACS and Banco Santander, S.A.

TSE and the DOE executed that certain *Loan Guarantee Agreement*, dated as of September 23, 2011, between the DOE and the DOE (as amended, the "**LGA**") in an authorized amount of up to $737 million, whereby the DOE guaranteed the project loan made to TSE by the Federal Financing Bank (the "**FFB**").  The initial amount of the loan guarantee was approximately $692 million.  As is typically the case in project loan documents, the LGA expressly provided that, the financing thereunder was conditioned upon the effectiveness of the PPA, which would provide the sole source of operating cash flow to service the project loan.  The Debtor does not believe that the Project would have been financed without, among other factors, the execution of the PPA and NVE's consequent commitment to purchase power generated by the Project at a price greater than $135 per megawatt hour (the "**PPA Purchase Price**").

As one of the conditions to guaranteeing the project loan and entering into the LGA, and as is common in the renewable energy industry, the DOE—as project lender—required the execution of the *Consent and Agreement* dated October 23, 2011 (the "**Direct Agreement**"), by

26971921.1

- 4 -

and among TSE, NVE and PNC Bank, National Association d/b/a Midland Loan Services, a division of PNC Bank, National Association, as collateral agent (the "**Collateral Agent**"), to memorialize certain rights of the Collateral Agent on behalf of the senior secured lender in connection with the PPA.  The Direct Agreement creates privity between and among the then-exclusive purchaser of the power generated by the Power Plant (NVE), the supplier of the power (TSE) and the Collateral Agent, and provides for specific PPA-related rights in favor of the Collateral Agent (for the benefit of the DOE), including additional protections for the Collateral Agent as it relates to the PPA, particularly in the event of a PPA default resulting in its possible termination.[3]

In accordance with the EPC Contract, CPI agreed to complete construction of the Project by a date certain at a fixed price and to secure "Provisional Acceptance" of the Project before tendering a "turnkey" power plant to TSE.  As set forth in the EPC Contract, CPI further agreed to pay both liquidated damages and certain contractually-defined damages in the event that the Power Plant did not generate specific minimum levels of electricity and satisfy other specified performance criteria.  TSE has alleged that CPI failed to perform under, and is in breach of, the EPC Contract.  CPI has vigorously denied such allegations.  These allegations are the subject of a pending arbitration proceeding between CPI and TSE, described below.

The Power Plant commenced commercial operations and production in November 2015 and achieved "Provisional Acceptance" in December 2016.[4]

In December 2016, Capital One, N.A. ("**Capital One**") acquired a tax equity stake in TSE's immediate parent and sole member, Tonopah Solar Energy Holdings II, LLC ("**TSEH II**").  As of the date of that investment, Capital One's capital account balance was $47.25 million.

In October 2016, the Power Plant ceased operations due to a leak in the hot salt tank.  Following its repair, the Power Plant resumed generating electricity in July 2017 and remained operational until early April 2019, at which time the discovery of a second leak in the hot salt tank required the Power Plant to cease operations again.  As the contractor under the EPC Contract, CPI has analyzed the root cause of the leak and is currently repairing the hot salt tank in an effort to resume Power Plant operations.

As of the Petition Date, the repair process is ongoing, the hot salt tank remains non-operational, and the Power Plant is not generating any electricity.  However, CPI has invested many millions of dollars to insure that the plant operates reliably once it re-enters operations. It is in the process of addressing the two major sources of unreliability—the heat exchangers and

---

[3]   It is common in the renewable energy industry, and often a required condition of funding from secured lenders, that the parties to a power purchase agreement enter into a direct agreement with the secured lender to afford the secured lender sufficient protection and comfort in connection with their project loan.

[4]   Despite the commencement of commercial operations and production, the construction of the Power Plant was never completed.  CPI failed to meet its contractually obligated deadlines to construct the Power Plant, which required repeated amendment to the EPC Contract.  In fact, Provisional Acceptance was only achieved by amendment of the EPC Contract; that amendment specifically stated that CPI had failed to complete construction of the Power Plant.  For the avoidance of doubt, CPI vigorously opposes the preceding characterization.

the hot salt tank—and it has delivered a schedule that anticipates the resumption of operations in the near term.  While there have been certain delays in the recommissioning schedule as a result of supply chain effects created by COVID-19, these delays do not significantly jeopardize the timeline of the resumption of operations.  The operational and financial effects of the remediation that is being conducted by CPI are reflected in the "Financial Projections" set forth in Appendix C hereto.

Cobra's new role as contractor under the New O&M Agreement will create alignment between the owner (which Cobra will become on emergence), the EPC Contract, and the O&M provider.  This alignment enhances efficiency as there will be significant knowledge transfer that would not otherwise be available between parties who are at odds with one another.  Even prior to the transition of full ownership, there will be efficiencies gained in knowledge sharing, procurement, and alignment when the EPC Contractor and the O&M contractor are affiliates.

3.      *Litigation between TSE and CPI*

In November 2017, CPI commenced an arbitration proceeding against TSE (the "**ICC Arbitration**") under the Rules of Arbitration of the International Court of Arbitration of the International Chamber of Commerce.  CPI alleges, without limitation and in general terms, that TSE breached the EPC Contract by, among other things, (i) impermissibly controlling the performance testing process under the EPC Contract referred to as the "Continuous Performance Measurement" (the "**CPM**"); (ii) unilaterally altering the main software infrastructure of the Power Plant during the CPM period; (iii) wrongfully denying access to information and the Power Plant itself necessary to conduct the CPM; and (iv) wrongfully calculating and claiming entitlement to contractually-defined damages referred to in the EPC Contract as "CPM Payments"[5] (collectively, the "**CPI Arbitration Claims**").[6]  TSE vigorously denies these allegations.

In February 2018, TSE filed its Answer in the ICC Arbitration, asserting numerous counterclaims against CPI (the "**TSE Arbitration Claims**").  The TSE Arbitration Claims include, without limitation and in general terms, that (a) CPI breached the EPC Contract by failing to (i) deliver the guaranteed electricity output from the Power Plant, (ii) engineer, procure and construct the agreed upon Power Plant, and (iii) make certain critical payments and remediate in a timely manner various defects in the work it performed at the Power Plant; and  (b) CPI's conduct has amounted to bad faith and/or gross negligence.[7]  CPI vigorously denies these allegations.

---

[5]     Since shortly after the transfer of care, custody, and control of the Power Plant from Cobra to TSE in December 2016, TSE has received CPM Payments from Cobra pursuant to a performance shortfall provision included in the EPC Contract, which requires Cobra to compensate TSE for the Power Plant's failure to meet specific contractual performance criteria. Cobra has disputed such CPM Payments.

[6]     The information provided in this paragraph is intended to provide a general summary of the CPI Arbitration Claims.  CPI's full allegations are set forth in the documents filed by CPI in the ICC Arbitration.

[7]     The information provided in this paragraph is intended to provide a general summary of the TSE Arbitration Claims.  TSE's full allegations are set forth in the documents filed by TSE in the ICC Arbitration.

Prior to a scheduled hearing on the merits of these claims, TSE filed in December 2019 a supplemental statement of counterclaims, wherein it alleged claims for breach of contract, breach of the covenant of good faith and fair dealing, interference with contractual relations, and fraud (collectively, the "**Supplemental Claims**").[8]  CPI vigorously denies all of these allegations.

The hearing on a subset of the CPI Arbitration Claims and TSE Arbitration Claims was slated for January 2020; however, this hearing was postponed due to the unexpected illness of one of the arbitrators.  On March 23, 2020, CPI and TSE agreed to a 60-day stay of the ICC Arbitration proceedings, as the parties continued extensive negotiations regarding the Plan, including a consensual resolution of the claims in the ICC Arbitration.  The arbitration panel granted the requested stay on March 24, 2020.  On May 11, 2020, the arbitration panel granted an additional 60-day extension until July 25, 2020.  On July 22, 2020, the panel granted a further extension until September 25, 2020.  If the ICC Arbitration proceeds, TSE and CPI are both seeking damages pursuant to and/or for breach of the EPC Contract and as may be available under applicable law.  The Plan, if confirmed, would resolve all of the claims pursued by both parties in the ICC Arbitration.

4.    *The Independent Managers Join the Board*

As of the commencement of the ICC Arbitration, the Board of Managers of TSE included two managers appointed by SolarReserve and one independent manager.  In accordance with the *Second Amended and Restated Limited Liability Company Agreement of Tonopah Solar Energy, LLC*, dated as of May 22, 2018, and as a result of certain conflicts of interest that arose between Cobra and SolarReserve in connection with the management of the Power Plant and the overall corporate governance of TSE, TSEH II appointed two independent managers unaffiliated with Cobra and SolarReserve—Mark Manski and Joseph A. Bondi—to the Board of Managers of TSE (the "**Independent Managers**") and replaced one of the two SolarReserve-appointed managers with a manager nominated by Cobra.

Among other duties, the Independent Managers were vested with the authority to review, evaluate and recommend key decisions to the full Board of Managers regarding the management of the Power Plant to the extent that conflicting interests of SolarReserve and/or Cobra were implicated.

5.    *Hot Salt Tank Leak*

In late March 2019, a significant leak in the hot salt tank was discovered, which required TSE to halt all power-generating operations at the Power Plant in early April 2019.  The molten salt was removed from the hot salt tank, and CPI began repairing the tank.  TSE and CPI disagree on the root cause of the leak and which party bears responsibility for the leak.  For as long as the Power Plant remains non-operational, TSE is not selling any power and is not generating any revenue.

---

[8]    The information provided in this paragraph is intended to provide a general summary of the Supplemental Claims.  TSE's full allegations are set forth in the documents filed by TSE in the ICC Arbitration.

6.    *DOE Notices Events of Default and Replaces Non-Independent Managers*

By letter dated September 17, 2019, the DOE sent TSE a Notice of Events of Default (the "**DOE Default Notice**").  In the DOE Default Notice, the DOE alleges that TSE is in default under several provisions of the LGA.

In connection with the DOE Default Notice, the DOE—through the Collateral Agent—exercised certain proxy rights over TSEH II's sole member interest in TSE under that certain *Equity Pledge Agreement* dated October 21, 2011, by and between TSEH II and the Collateral Agent (the "**Equity Pledge Agreement**") and the Irrevocable Proxy granted by TSEH II to the Collateral Agent pursuant thereto.  Specifically, the DOE alleged that all of TSEH II's rights in respect of "voting, consensus and other powers of ownership pertaining to the Pledged Collateral" vested in the Collateral Agent, as provided for in the Equity Pledge Agreement following the occurrence and during the continuance of an Event of Default under the LGA.

Exercising these powers, the Collateral Agent executed a *Written Consent of the Sole Member of Tonopah Solar Energy, LLC*, effective as of September 17, 2019, which removed the two non-Independent Managers, who were representatives of the indirect equity holders SolarReserve and Cobra, respectively.  In their place, the DOE appointed two individuals with significant restructuring and turnaround experience—Anna Phillips and Charles Reardon (the "**Successor Managers**").  As a result, the TSE Board of Managers as of the Petition Date consists of the two Successor Managers and the two Independent Managers, who have voted unanimously to authorize the filing of the Chapter 11 Case.

## C.    Operation and Maintenance Agreements

Under that certain Operation and Maintenance Agreement between the Debtor and PIC Group, Inc. ("**PIC**"), dated as of September 20, 2011 (the "**O&M Contract**"), PIC provides certain operational and maintenance services for the Debtor at the Power Plant including, but not limited to: (a) developing a work force through hiring and training; (b) operating the Power Plant in a clean, safe and efficient manner in accordance with the O&M Contract and certain budgets and industry practices; (c) maintaining records such as operating logs, manuals, and reports; (d) maintaining and calibrating tools and instruments; (e) implementing and updating certain environmental programs; (f) performing general preventative maintenance; (g) interfacing with certain regulatory bodies; (h) maintaining permits and licenses; and (i) undertaking those activities customarily performed by an operating and maintenance contractor for a power plant.

As the future owner and operator of the Power Plant, and as further discussed below, a condition of Cobra's support for the RSA and the proposed transaction, CEI has requested, and the Debtor has agreed, to seek approval of the transfer of operations and maintenance of the Power Plant from PIC to CEI within thirty-five (35) days of the Petition Date.  To effectuate the transfer of operations to CEI, the Debtor has entered into a new operation and maintenance agreement (the "**Operating Agreement**") between the Debtor and a CEI affiliate, Cobra Industrial Services, Inc. ("**CIS**"), which is subject to approval of the Court and pursuant to which CIS will provide administrative, maintenance, and operating services under terms that are substantially similar to those in the O&M Contract.  Accordingly, the Debtor will no longer

require the services provided by PIC under the O&M Contract once the Operating Agreement is approved by the Court.

### D. The Debtor's Prepetition Capital Structure

As of the Petition Date, the Debtor has outstanding debt obligations in the aggregate amount of over $432 million, including accrued and unpaid interest and applicable late charges, consisting primarily of TSE's obligations to the DOE under the LGA and the other Prepetition Financing Documents.

After receiving the DOE Default Notice in September 2019, the Debtor failed to make another payment subsequent payments of principal and interest scheduled for June 22, 2020. On June 29, 2020, and DOE delivered a supplemental notice of event notices of events of default for the missed payment on October 16, 2019 and June 29, 2020.

### 1. *Secured Claims*

#### a) Loan Guarantee Agreement

On September 23, 2011, in connection with the Project, TSE entered into the LGA with the DOE to guaranty the funding of up to $737 million to TSE by the FFB (the "**DOE Loan**"). The DOE Loan is secured by substantially all of TSE's assets, including the Project, TSE's rights under its major contracts (including the EPC Contract), and all cash maintained in DOE controlled accounts, but subject to permitted liens and specified excluded assets.  The DOE Loan is further secured by, among other collateral, an equity pledge from TSEH II of its sole member interest in TSE in favor of the Collateral Agent pursuant to the Equity Pledge Agreement (through which DOE appointed the Successor Managers).  The DOE Loan accrues interest at an approximate weighted average rate of 2.9% per annum and matures in December 2036.

As of the Petition Date, the approximate principal amount outstanding under the DOE Loan is $425 million and the accrued and unpaid interest under the DOE Loan is approximately $7.4 million.

#### b) Litigation Claims

As noted above, TSE and CPI assert significant claims against one another in the ICC Arbitration.  In the event that CPI were to prevail in the ICC Arbitration, CPI may be entitled to a significant claim against TSE's bankruptcy estate.

In addition to the ICC Arbitration, TSE is a defendant in two interrelated civil actions commenced in Nevada state court by a Project subcontractor, Brahma Group, Inc. ("**Brahma**"), in respect of which Brahma is seeking contractual damages in excess of $13 million. Brahma initially filed a lien (the "**Lien**") against the Project with respect to one of the civil actions, which was bonded by CPI.  Subsequently, Brahma filed an identical civil action in a separate Nevada state court, which was removed to the federal district court in Nevada on September 9, 2018. Brahma moved to foreclose on the Lien (the "**Lien Action**"). In conjunction with the Lien Action, a subcontractor of Brahma, H&E Equipment, filed a companion lien action against TSE (the "**Subcontractor Lien Action**" and together with the Lien Action, the "**Pending Lien**

- 9 -

**Actions**"), which was also bonded by CPI. TSE successfully appealed the state court's decision to proceed with the Pending Lien Actions, and they are now stayed pending the decision of the federal district court on the underlying claim.

Further, a subcontractor, Nooter Eriksen ("**Nooter**"), initiated a proceeding in Nye County, Nevada, against TSE, as a co-defendant alongside Solar Reserve, LLC ("**SR LLC**"),[9] a subcontractor to the Project, and Liberty Moly, LLC, an easement provider.  Upon information and belief, Nooter Eriksen provided certain materials to SR LLC that SR LLC deployed on the Project.  TSE paid SR LLC for these materials; however, according to the complaint filed, SR LLC never paid Nooter.  As it relates to TSE, Nooter is suing to foreclose on a lien that it has placed on the Project.  TSE has filed an answer in this action and is awaiting further scheduling.

Additionally, SolarReserve CSP Holdings, LLC ("**SR CSP**") in the fall of 2019 brought an action ( the "**Books and Records Action**") against TSE in the Delaware Court of Chancery (the "**Court of Chancery**") for breach of contract in respect of TSE's alleged failure to provide access to the books and records of the company (the "**Breach of Contract Claim**").  TSE filed an answer on February 24, 2020.  A bench trial took place on May 13, 2020.  On July 24, 2020, the Court of Chancery issued a memorandum opinion resolving the Books and Records Action in TSE's favor.

Finally, SR CSP brought an action against the Debtor in the Delaware Court of Chancery on October 2, 2019.  SR CSP initially sought to name a manager to the Debtor's board, and, in an amended complaint filed on November 5, 2019, SR CSP instead sought equitable dissolution of the Debtor.  The Debtor filed a motion to dismiss the complaint on December 16, 2019.  On March 18, 2020, the Delaware Court of Chancery granted TSE's motion and dismissed the action in its entirety.  SR CSP has filed an appeal.  SR CSP filed an opening brief on June 2, 2020, and TSE filed a reply brief on July 2, 2020.

In addition to the actions set forth above, SR CSP and CMB Infrastructure Investment Group IX, LP ("**CMB**") asserted in their objection to approval of the Disclosure Statement that the Disclosure Statement failed to describe "CMB's filed action in Nevada."  Although the Debtor has not been served or provided with a copy of this action, and therefore cannot describe the claims asserted, the Debtor discloses CMB's allegations that an action has been filed.  The Debtor understands this action may relate to a *qui tam* action against it that has been commenced, but the Debtor has not been provided with a copy of that action.

c)      Non-Litigation Unsecured Claims and Equity

The Debtor has approximately sixty (60) known unsecured creditors that are believed to hold claims totaling in excess of $2.8 million in the aggregate.  Those creditors include trade claimants and other routine, ordinary course creditors, certain of which are deemed by TSE to be critical vendors as described more fully below.

---

[9]     In addition, on December 31, 2019, SolarReserve commenced an assignment for the benefit of creditors in the State of California.

All of the equity interests in TSE are owned by TSEH II.  The equity interests in TSEH II are divided into two classes: Class A Units[10] held solely by Capital One, as "Tax Equity Investor" and Class B Units owned by Tonopah Solar Energy Holdings I, LLC ("TSEH I").  TSEH I is owned indirectly by Banco Santander (26.8%) and directly by Tonopah Solar Investments, LLC (73.2%).  Tonopah Solar Investments, LLC is owned by CEI (50%), and SR CSP (50%).

### E.      Events Leading up to the Chapter 11 Case

A series of events, set off by the March 2019 leak of the hot salt tank, necessitated the filing of the Chapter 11 Case.

### 1.      *Hot Salt Tank*

As set forth above, the hot salt tank—an essential component in the operation of the Power Plant—experienced a leak in late March 2019.  Consequently, the Power Plant has been unable to produce any electricity since April 2019, and the Debtor has not generated any revenue through the sale of power since that time.  Its only source of cash inflow has been the CPM Payments, which have now ended.

### 2.      *Termination of the PPA*

In the ten years that have passed since the execution of the PPA, the market price of renewable energy has dropped to a level that is significantly below the PPA Purchase Price (an escalating figure beginning at $135 per megawatt hour, which had reached approximately $139 per megawatt hour at the time the PPA terminated).  Eager to free itself from the long-term obligation to purchase site-specific power generated at the Power Plant at a price it no longer viewed as economic, NVE capitalized on the operational difficulties at the Project and served a notice of default under the PPA on January 1, 2019 ("**NVE Default Notice**").

Upon receipt of the NVE Default Notice, TSE, along with CPI, worked diligently to cure the potential event of default alleged in the NVE Default Notice within the applicable cure periods.  Nevertheless, on October 4, 2019, the PPA was terminated with respect to all parties.

Since the termination of the PPA, CPI has continued with repair activities at the Power Plant, and TSE has investigated options for replacing the terminated PPA with a similar offtake contract.  Given the shifts in the market dynamics since the execution of the PPA nearly ten years ago, there is not an equivalent PPA available today nor is there a PPA that would permit TSE to satisfy the repayment of the DOE Loan and satisfy its own operating costs even if the Power Plant were operational.

---

[10]    The Class A Units representing the equity interests do not have voting rights with respect to the appointment of the managing member, but there are certain reserved actions for which the consent of the holders of both the Class A Units and the Class B Units is required.

3.      *Restructuring Support Agreement*

In early 2020, facing liquidity issues, the Debtor, Cobra, and DOE began discussions regarding the compromise and settlement of the DOE's claims for an agreed-upon reduced amount.  Ultimately, following months of extensive arm's-length negotiations, the Debtor, CEI, and DOE agreed in principle to implement the terms of a de-leveraging transaction through a pre-negotiated chapter 11 plan that also involved the settlement of the ICC Arbitration.

On July 29, 2020, the Debtor and Cobra entered into that certain *Restructuring Support Agreement* (as may be amended, the "**RSA**"), pursuant to which, among other things: (a) the DOE shall receive, in full and complete satisfaction of the Debtor's outstanding obligations under the Loan Documents (as defined in the LGA), a payment of $200 million in cash upon the Effective Date of the Plan (as defined therein), plus a $100 million contingent note to be guaranteed by Cobra, with Cobra funding the Debtor's obligations under the Plan through new debt financing and cash to be provided on the Effective Date of the Plan; (b) the security interests granted under the Security Documents (as such term is defined in the LGA) shall be released; (c) the parties shall mutually release each other from all Claims (as defined in the Plan) on the terms set forth in the Plan; (d) Cobra or an affiliate thereof shall own 100% of the company upon completion of the restructuring; and (e) all other claims shall remain unimpaired as set forth in the Plan.  Pursuant to the Plan, it is contemplated that all claims, other than the DOE's, will be either paid in full on the Effective Date or otherwise rendered unimpaired.

The RSA may be terminated in the event of certain breaches by the parties thereto and upon the occurrence of certain events (each an "**RSA Milestone**" and collectively, the "**RSA Milestones**"), including, for example, the failure to meet specified milestones relating to the filing, confirmation, and consummation of the Plan.  A summary of certain RSA Milestones is below:

| RSA Milestone Termination Events[11] | |
|---|---|
| 11:59 p.m. (EST) on the date that is two (2) Business Days after the RSA is executed | unless (i) the Bankruptcy Case is commenced in the Bankruptcy Court, (ii) a motion to reject the O&M Contract is filed with the Bankruptcy Court (iii) a motion to approve the New O&M Agreement is filed with the Bankruptcy Court, and (iv) the Plan and the Disclosure Statement are filed with the Bankruptcy Court. |
| 11:59 p.m. (EST) on the date (x) that is five (5) days after the Petition Date | unless the Bankruptcy Court has entered the Interim Cash Collateral Order, in a form reasonably satisfactory to Cobra. |
| 11:59 p.m. (EST) on the date (x) that is thirty-five (35) days after the Petition Date | unless the Bankruptcy Court has entered the Interim Cash Collateral Order on a final basis in a form reasonably satisfactory to Cobra. |
| 11:59 p.m. (EST) on the date that is sixty (60) | unless the Bankruptcy Court has entered the |

---

[11] Capitalized terms used but not defined in this chart have the meanings given to such terms in the RSA.

26971921.1

| days after the Petition Date | Disclosure Statement Order and an order authorizing and approving the New O&M Agreement. |
| 11:59 p.m. (EST) on the date that is one hundred twenty (120) days after the Petition Date | unless the Bankruptcy Court has entered the Confirmation Order. |
| 11:59 p.m. (EST) on the date that is one hundred fifty (150) days after the Petition Date (as such date may be extended pursuant to Section 8.14 of the RSA, the "**Outside Date**") | unless the Company has substantially consummated the Plan pursuant to its terms. |

Prior to entry into the RSA, on May 11, 2020, the Debtor sent a request letter (the "**Capital Call Request**") to TSEH II, requesting a capital contribution of $475 million to fully satisfy the DOE Debt and provide the Debtor with access to additional working capital without the need to commence a chapter 11 case. The Debtor viewed this as necessary because the DOE indicated it would not agree to a compromise of the DOE Debt other than pursuant to the terms of the Plan. CEI responded on May 17, 2020, and indicated that if the relevant upstream requests were made of it, it was willing to initiate a process within CEI for approval of the funding of CEI's pro rata share of the Capital Call Request, provided it receive confirmation of certain matters, including (i) that all members were willing to fund their pro rata share; (ii) that if the contribution were made, the new capital would be used to fully satisfy amounts owing to the DOE and that the United States would provide releases of all claims held by the United States related to or arising from the Project; and (iii) that all parties would undertake, as a condition to funding, a restructuring of the Project. SR CSP, on the other hand, responded to the Capital Call Request on May 16, 2020 and again on May 18, 2020, and essentially questioned the Debtor's good faith in making the request while also making various information requests relating to the request. On May 21, 2020, the Debtor responded to each of SR CSP and CEI, provided certain of the requested information, and asked that each confirm by May 26, 2020, whether it intended to cause the requested capital contribution and provide evidence of their financial wherewithal to do so. Neither party, however, responded. Thus, entry into the RSA became the Debtor's only viable option to address the issues it faced.

4.    *Postpetition Financing.*

The Debtor's Cash Collateral is its sole source of funding for its operations and the costs of administering the Chapter 11 Case. The DOE has consented to the Debtor's use of Cash Collateral, subject to the terms of the Cash Collateral Orders (as defined below). As a result, the Debtor does not believe that entry into a debtor in possession financing facility is necessary at this time. The DOE's consent is based, in part, on Cobra's agreement (the "**Backstop Agreement**") to reimburse the DOE for certain postpetition expenses, in the event the restructuring is not consummated due to, among other things, the failure to achieve the milestones set forth in the RSA. This agreement is embodied in an agreement between the DOE and Cobra, which will be included within the Plan Supplement that is being filed with the Court.

More particularly, pursuant to the Backstop Agreement, Cobra has delivered to the Collateral Agent, for the benefit of DOE, a standby letter of credit in the aggregate stated amount

- 13 -

of $23,150,000 (the "**Settlement Letter of Credit**").  Pursuant to the Backstop Agreement, following DOJ's affirmative vote to accept the Plan, Cobra is required to deliver an additional standby letter of credit from an issuing bank acceptable to DOE with a total face value of $176,850,000 (the "**Final Letter of Credit**"), which amount represents the difference between the aggregate stated amount of the Settlement Letter of Credit and $200,000,000, which is the amount of the cash payment to be made to DOE on the Effective Date. The Backstop Agreement further provides that the Collateral Agent is entitled to draw on the Settlement Letter of Credit in an amount equal to the aggregate Reimbursable Post-Petition Costs (as defined in the Backstop Agreement) up to the date of draw in the event Cobra materially breaches its obligations under the RSA or the Backstop Agreement, to the extent such breach is not timely cured, or a case milestone as set out in the RSA is not timely achieved other than due to any action or inaction by the Collateral Agent, DOE, DOJ, or any other agency, division, or department of the United States of America other than the Court or the United States Trustee for the District of Delaware. Further, in the event Cobra materially breaches its obligations under the Backstop Agreement or the RSA following DOJ's affirmative vote to accept the Plan, the Backstop Agreement provides that the Collateral Agent is entitled to draw on the Settlement Letter of Credit and the Final Letter of Credit in full.

Relatedly, ACS has delivered a promissory note to the Collateral Agent, for the benefit of DOE, in the face amount of $176,850,000 (the "**ACS Note**").  The ACS Note becomes immediately due and owing to the Collateral Agent in the event Cobra fails to timely deliver to the Collateral Agent the Final Letter of Credit in accordance with the Backstop Agreement.  In addition, Cobra's failure to timely deliver the Final Letter of Credit to the Collateral Agent would give the Collateral Agent the right to immediately draw on the Settlement Letter of Credit in full.

###### F.        The Debtor's Goals in the Chapter 11 Case

The Debtor has commenced the Chapter 11 Case to effectuate a consensual financial restructuring pursuant to the terms of the Plan.  As a result of the Restructuring, the Debtor will emerge from the Chapter 11 Case with a reduced debt burden that is better aligned with its present and future operating prospects.  The Debtor is well-positioned to emerge quickly from chapter 11 with a renewed focus on obtaining full operational capacity.  To that end, the Debtor intends to seek prompt confirmation of the Plan.

## ARTICLE III

## THE CHAPTER 11 CASE

###### A.        General Case Background

On the date hereof, the Debtor filed a voluntary petition in the Bankruptcy Court for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business and manage its properties as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  As of the date hereof, no request has been made for the appointment of a trustee or examiner in the Chapter 11 Case.

### B.    Employment and Compensation of Professionals

Prior to the Petition Date, to assist the Debtor in carrying out its duties as debtor in possession, and to otherwise represent its interests in the Chapter 11 Case, the Debtor retained the following professionals subject to Bankruptcy Court approval:

- Willkie Farr & Gallagher LLP ("**Willkie**") as bankruptcy co-counsel;

- Young Conaway Stargatt & Taylor, LLP ("**Young Conaway**") as bankruptcy co-counsel;

- Wilson Sonsini Goodrich & Rosati ("**Wilson Sonsini**") as special corporate counsel;

- FTI Consulting as interim manager;

- Houlihan Lokey as valuation expert; and

- Epiq Corporate Restructuring, LLC as claims and noticing agent and administrative advisor.

### C.    "First Day" Motions and Related Applications

To minimize the possible disruption to the Debtor upon the filing of this chapter 11 case, among other reasons, on the Petition Date, the Debtor ~~has~~ filed ~~concurrently herewith~~ the following motions with the Bankruptcy Court:

a.    Debtor's Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363, 507, and 552, Bankruptcy Rules 2002, 4001, and 9014, and Local Rule 4001-2 (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b)(2), and (IV) Granting Related Relief (the "**Cash Collateral Motion**");

b.    Debtor's Motion for Interim and Final Orders (I) Authorizing the Debtor to (A) Continue to Maintain Its Cash Management System, Including Bank Accounts and Business Forms, (B) Honor Certain Prepetition Obligations Related Thereto; (II) Waiving (A) Certain Operating Guidelines, and (B) Section 345(b) Deposit and Investment Requirements; and (III) Granting Related Relief (the "**Cash Management Motion**");

c.    Debtor's Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 503(b)(9), 1107(a), and 1108 of the Bankruptcy Code, (I) Authorizing the Debtor to Pay Certain Prepetition Claims of (A) Critical Vendors and Service Providers and (B) Certain Vendors Entitled to Administrative Expense Priority Under Section 503(b)(9) of the Bankruptcy Code; and (II) Authorizing Banks to Honor and Process Check and

- 15 -

Electronic Transfer Requests Related Thereto (the "**Critical Vendor Motion**");

d.    Debtor's Application for an Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent Effective as of the Petition Date (the "**Section 156(c) Application**");

e.    Debtor's Motion for Entry of Interim and Final Orders (I) Approving the Debtor's Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Services, (III) Approving the Debtor's Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief (the "**Utilities Motion**");

f.    Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Prepetition Sales, Use, and Franchise Taxes and Similar Taxes and Fees, (II) Authorizing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Made Relating to the Foregoing, and (III) Scheduling Final Hearing (the "**Tax Motion**").

g.    Debtor's Motion for Entry of an Order Authorizing Rejection of Operations and Maintenance Agreement (the "**Rejection Motion**").  The Rejection Motion will not be heard as a first day motion, but rather when scheduled by the Court.

h.    Debtor's Motion for Entry of an Order Approving the New Operations and Maintenance Agreement (the "**Approval Motion**").  The Approval Motion will not be heard as a first day motion, but rather when scheduled by the Court.

**D.    Exclusivity**

Under the Bankruptcy Code, a debtor has the exclusive right to file a plan or plans for an initial period of 120 days from the date on which the debtor filed its bankruptcy petition.  If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the Petition Date to solicit acceptances of its plan. During these exclusive periods, no other party in interest may file a competing plan. A court may extend these periods upon request of a party in interest and "for cause."

The Debtor's initial exclusive filing period expires on [    ]November 27, 2020, and the Debtor's initial exclusive solicitation period expires on [    ]January 26, 2020.

# ARTICLE IV

# SUMMARY OF THE PLAN

The Debtor believes that the Plan is in the best interests of the Debtor and its estate. Through the Plan, Holders of Allowed Claims will obtain a recovery from the Debtor's estates equal to or greater than the that they would receive if the Debtor's assets were liquidated under chapter 7 of the Bankruptcy Code and consummation of the Plan will maximize the recovery of the Holders of Allowed Claims.

The consummation of a plan is the principal objective of a chapter 11 case. A plan sets forth the means for treating Claims against, and Interests in, a debtor. Confirmation of a plan makes the plan binding upon the debtor, any issuer of securities under the plan and any creditor of, or equity Holder in, the debtor, whether or not such creditor or equity Holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.

Subject to certain limited exceptions and other than as provided in the Plan itself or the Confirmation Order, a Confirmation Order discharges the debtor from any debt that arose prior to the Effective Date and substitutes therefor the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual and equitable rights of the Holders of Claims or Interests in certain classes are to remain unaltered by the reorganization effectuated by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, a debtor need not solicit votes from the Holders of Claims or Interests in such classes. A chapter 11 plan may also specify that certain classes will not receive any distribution of property or retain any Claim or Interest against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any class that receives a distribution of property under the plan but are impaired will be solicited to vote to accept or reject the plan.

Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan. To satisfy the requirements of section 1125 of the Bankruptcy Code, the Debtor is submitting this Disclosure Statement to Holders of Claims against the Debtor who are entitled to vote to accept or reject the Plan.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN. THIS SECTION IS QUALIFIED IN ITS ENTIRETY BY AND IS SUBJECT TO THE PLAN AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN.

STATEMENTS AS TO THE RATIONALE UNDERLYING THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN ARE NOT INTENDED TO, AND SHALL NOT, WAIVE, COMPROMISE OR LIMIT ANY RIGHTS, CLAIMS OR CAUSES OF ACTION IN THE EVENT THE PLAN IS NOT CONFIRMED.

The classification and treatment of Claims and Interests; treatment of Executory Contracts and Unexpired Leases; and effect of Confirmation, including the release, injunction and related provisions, are summarized below. For all other provisions relating to the Plan, including acceptance or rejection of the Plan; implementation of the Plan; provisions governing distributions; provisions regarding governance of the Reorganized Debtor; conditions precedent to Confirmation and effectiveness of the Plan; modification, revocation or withdrawal of the Plan and retention of jurisdiction, please refer to the Plan attached hereto as Appendix A.

## A.    Overview of the Plan

The Plan provides for, among other things:

- A $200 million cash payment, plus a $100 million contingent note to be guaranteed by Cobra, with Cobra funding the Company's obligations under the Plan through new debt financing and cash to be provided on the Effective Date of the Plan;

- Mutual releases of Claims on the terms set forth in the Plan;

- Release of claims held by third parties on the terms set forth in the Plan;

- Dismissal of the ICC Arbitration;

- Cobra or a Cobra Designee to own 100% of the Company upon the Effective Date;

- the unimpairment of all other Claims, as set forth in the Plan.

## B.    Classification and Treatment of Claims and Interests

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a Debtor's creditors and equity Interest Holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Expense Claims and Priority Tax Claims, which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified). The Debtor also is required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtor into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each Claim or Interest of a particular class unless the Claim Holder or Interest Holder agrees to a less favorable treatment of its claim or interest.  The Debtor believes that it has complied with such standard.  If the Bankruptcy Court finds otherwise, however, it could deny Confirmation of the Plan if the Holders of Claims and Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

The Debtor believes that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law.

It is possible that a Holder of a Claim or Interest may challenge the Debtor's classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  If such a situation develops, the Debtor intends, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its Confirmation.  Any such reclassification could materially adversely affect Holders of Claims and Interests by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan. EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM OR INTERESTS AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM OR INTEREST PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM OR INTEREST REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

Any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by Creditors. The projected recoveries are based on information available to the Debtor as of the date hereof and reflect the Debtor's views as of the date hereof only.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below. The Debtor believes that the consideration, if any, provided under the Plan to Holders of Claims and Interests reflects an appropriate resolution of the Claims and Interests, taking into account the differing nature and priority of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

1.    *Administrative Expense Claims, Priority Tax Claims and Statutory Fees*

a)    Administrative Expense Claims

(i)    <u>Treatment of Administrative Expense Claims</u>

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, or as otherwise expressly provided herein, on the later of (i) the Effective Date, or as soon thereafter as is reasonably practicable, or (ii) the date on which an

Administrative Expense Claim is Allowed, the holder of such Allowed Administrative Expense Claim shall receive Cash from the Debtor in an amount equal to such Allowed Claim; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor, as debtor in possession, shall be paid by the Debtor in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities.

Claims for adequate protection under the Cash Collateral Order shall be deemed Allowed Administrative Expense Claims to the extent payable under the Cash Collateral Order or the Plan, without the necessity of filing a proof of claim with respect thereto, and shall be paid in full on the Effective Date or as is reasonably practicable as set forth in Section 3.1 of the Plan without the need to file a proof of such Claims with the Bankruptcy Court in accordance with Section 3.2(a) of the Plan and without further order of the Bankruptcy Court.

b)      Professional Fee Claims

Except to the extent that the applicable holder of an Allowed Professional Fee Claim agrees to less favorable treatment with the Debtor, or as otherwise expressly set forth in the Plan, each holder of a Professional Fee Claim shall be paid in full in Cash pursuant to Section 3.2 of the Plan.

(i)      Fee Applications

All requests for payment of Professional Fee Claims must be filed with the Bankruptcy Court by the date that is 60 calendar days after the Effective Date; provided that if any Professional Person is unable to file its own request with the Bankruptcy Court, such Professional Person may deliver an original, executed copy and an electronic copy to the Debtor's attorneys and the Debtor at least three Business Days before the deadline, and the Debtor's attorneys shall file such request with the Bankruptcy Court. The objection deadline relating to a request for payment of Professional Fee Claims shall be 4:00 p.m. (prevailing Eastern Time) on the date that is 30 days after filing such request, and a hearing on such request, if necessary, shall be held no later than 30 calendar days after the objection deadline. Distributions on account of Allowed Professional Fee Claims shall be made as soon as reasonably practicable after such Claims become Allowed.

(ii)      Post-Effective Date Fees

Upon the Effective Date, any requirement that Professional Persons comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtor may employ and pay all Professional Persons without any further notice to, action by or order or approval of the Bankruptcy Court or any other party.

(iii)      Fee Escrow Account

On the Effective Date, the Debtor shall establish and fund the Fee Escrow Account. The Debtor shall fund the Fee Escrow Account with Cash equal to the Debtor's good faith estimate of

the Allowed Professional Fee Claims.  Funds held in the Fee Escrow Account shall not be considered property of the Debtor's Estate or property of the Debtor, but shall revert to the Debtor only after all Allowed Professional Fee Claims have been paid in full.  Fees owing to the applicable holder of an Allowed Professional Fee Claim shall be paid in Cash to such holder from funds held in the Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid under a Final Order authorizing interim compensation of Professional Persons; provided, that the Debtor's obligations with respect to Allowed Professional Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account.  To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of accrued Allowed Professional Fee Claims, each holder of an Allowed Professional Fee Claim shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with Section 3.2 of the Plan.  No Liens, claims, or interests shall encumber the Fee Escrow Account in any way.

(iv)    U.S. Trustee Fees

The Debtor shall pay all outstanding U.S. Trustee Fees on an ongoing basis on the date such U.S. Trustee Fees become due, until such time as a final decree is entered closing the Chapter 11 Case, or the Chapter 11 Case is converted or dismissed, or the Bankruptcy Court orders otherwise.

(v)    Treatment of Priority Tax Claims

Except to the extent that the applicable holder of an Allowed Priority Tax Claim has been paid by the Debtor before the Effective Date, or the Debtor and such holder agree to less favorable treatment by the Debtor, each holder of an Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, at the option of the Debtor (a) payment in full in Cash made on or as soon as reasonably practicable after the later of the Effective Date and the first Distribution Date occurring at least 20 calendar days after the date such Claim is Allowed, (b) regular installment payments in accordance with section 1129(a)(9)(C) of the Bankruptcy Code or (c) such other amounts and in such other manner as may be determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

The Debtor shall have the right, in its sole discretion, to pay any Allowed Priority Tax Claim or any remaining balance of an Allowed Priority Tax Claim (together with accrued but unpaid interest) in full at any time on or after the Effective Date without premium or penalty.

2.    *Classification of Claims and Interests*

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for all purposes, including as set forth herein. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date. Any Claim

or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the official claims register without a claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

Except as otherwise specifically provided for in the Plan, the Confirmation Order or other order of the Bankruptcy Court, or required by applicable non-bankruptcy law, in no event shall any Holder of an Allowed Claim be entitled to receive payments that in the aggregate exceed the Allowed amount of such Holder's Claim.

a)    Treatment of Claims Against and Interests in the Debtor

(i)    <u>Class 1 – Priority Non-Tax Claims</u>

The legal, equitable and contractual rights of the holders of Priority Non-Tax Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a different treatment, on the applicable Distribution Date, each holder of an Allowed Priority Non-Tax Claim shall receive Cash from the Debtor in an amount equal to such Allowed Claim.

(ii)    <u>Class 2 – Other Secured Claims</u>

The legal, equitable and contractual rights of the holders of Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each holder of an Allowed Other Secured Claim shall each receive, subject to the terms of the Plan, in full and final satisfaction, settlement, release and discharge of its Allowed Other Secured Claim, at the election of the Debtor:

(a)    Cash in an amount equal to such Allowed Other Secured Claim; or

(b)    such other treatment that will render such Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code;

<u>provided</u>, <u>however</u>, that Other Secured Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, in the discretion of the Debtor without further notice to or order of the Bankruptcy Court.

Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final satisfaction of such Allowed Other Secured Claim is made as provided in the Plan.  On the full payment or other satisfaction of each Allowed Other Secured Claim in accordance with the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or

action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

(iii)    Class 3 – Prepetition Note Claims

The Prepetition Note Claims shall be Allowed under the Plan and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection or any other challenges under any applicable law or regulation by any Person.  On the Effective Date, DOE, as the holder of the Allowed Prepetition Note Claims, shall receive, subject to the terms of the Plan, in full and final satisfaction, settlement, release and discharge of its Allowed Prepetition Note Claims, (a) $200 million in Cash (which shall be satisfied by DOE by a draw on the Cobra Backstop Letter of Credit) and (b) all rights and obligations under the Exit Contingent Note.  On the Effective Date, the Debtor shall also pay in full in Cash all outstanding fees and expenses incurred by the Prepetition Collateral Agent to the extent due and owing under the Collateral Agency Agreement.

Upon payment of the~~$200~~ $200 million in Cash provided in § 5.3(a) of the Plan, the delivery of the executed Exit Contingent Note to DOE, and the payment in full in Cash of all outstanding fees and expenses of the Prepetition Collateral Agent as provided in § 5.3(a) of the Plan: (i) the Loan Servicer (on DOE's behalf) shall conclusively be deemed to have provided written direction to the Prepetition Collateral Agent to release all Collateral it holds on behalf of the Secured Parties and to release all Liens thereon for the benefit of the Secured Parties; and (ii) the Loan Servicer shall conclusively be deemed to have certified to the Prepetition Collateral Agent that the Discharge Date under the Collateral Agency Agreement has occurred.  On the Effective Date, and upon (x) payment of the $200 Million in Cash provided in § 5.3(a) of the Plan, (y) the delivery of the executed Exit Contingent Note to DOE, and (z) payment of all outstanding fees and expenses of the Prepetition Collateral Agent in full in Cash as provided in § 5.3(a) of the Plan, the Prepetition Collateral Agent shall release to the Debtor all Collateral held for the benefit of the Secured Parties and any Liens on the Collateral held for the benefit of the Secured Parties.  The Debtor shall pay all reasonable fees and expenses incurred by the Collateral Agent in complying with the previous sentence on or as soon as reasonably practicable after the Effective Date.  Upon the release of the Collateral held by the Prepetition Collateral Agent for the benefit of the Secured Parties and the release of all Liens on the Prepetition Collateral held for the benefit of the Secured Parties, the duties, responsibilities, and obligations of the Prepetition Collateral Agent under the Collateral Agency Agreement shall terminate.

(iv)    Class 4 – General Unsecured Claims

General Unsecured Claims are unimpaired Claims.  Except to the extent that a holder of a General Unsecured Claim agrees to different treatment, each holder of an Allowed General Unsecured Claim shall receive treatment that: (i) leaves unaltered the legal, equitable, or contractual rights to which the holder of such Allowed General Unsecured Claim is entitled; or (ii) otherwise leaves such Allowed General Unsecured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.

(v)    Class 5 – Existing Interests

Existing Interests shall be discharged, cancelled, released and extinguished, and holders thereof shall not receive or retain any distribution under the Plan on account of such Existing Interests.

**C.    Executory Contracts and Unexpired Leases**

The Bankruptcy Code requires a debtor to assume or reject all Executory Contracts and Unexpired Leases. The Debtor's proposed treatment of all Executory Contracts and Unexpired Leases under the Plan are summarized below.

1.    *General Treatment*

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases of the Debtor shall be deemed assumed except that: (a) any executory contracts and unexpired leases that previously have been assumed, assumed and assigned, or rejected pursuant to a Final Order of the Bankruptcy Court shall be treated as provided in such Final Order; (b) any executory contracts and unexpired leases listed on the Schedule of Rejected Contracts and Leases shall be deemed rejected as of the Effective Date; and (c) all executory contracts and unexpired leases that are the subject of a separate motion to assume or reject under section 365 of the Bankruptcy Code pending on the Effective Date shall be treated as provided for in the Final Order resolving such motion.  Rejection of any executory contract or unexpired lease pursuant to the Plan or otherwise will not constitute a termination of obligations owed to the Debtor under such contract or lease that survive breach under applicable law.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments and rejections described in Section 10.1 of the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to Section 10.1 of the Plan shall revest in and be fully enforceable by the Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable federal law.  Nothing contained in the Plan or the listing of a document on the Schedule of Rejected Contracts and Leases, or the Cure Schedule shall constitute an admission by the Debtor that such document is an executory contract or an unexpired lease or that the Debtor or its successors and assigns has any liability thereunder.

2.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

All Claims arising from the rejection of executory contracts or unexpired leases, if evidenced by a timely filed proof of claim, will be treated as General Unsecured Claims.  In the event that the rejection of an executory contract or unexpired lease by the Debtor pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtor or its properties or interests in property or its agents, successors or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtor on or before the date that is thirty (30) days after the effective date of such

rejection (which may be the Effective Date, the date on which the Debtor rejects the applicable contract or lease as provided in Section 10.1 of the Plan, or pursuant to an order of the Bankruptcy Court).

        3.     *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

(a)     Except to the extent that less favorable treatment has been agreed to by the non-Debtor party or parties to each such executory contract or unexpired lease to be assumed or assumed and assigned pursuant to the Plan, any monetary defaults arising under such executory contract or unexpired lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the appropriate amount (the "**Cure Amount**") in full in Cash on the later of: (i) the Effective Date; (ii) thirty (30) days after the date of entry of a Final Order providing for the assumption, or the assumption and assignment, of such executory contract or unexpired lease; or (iii) the date on which any Cure Dispute relating to such Cure Amount has been resolved (either consensually or through judicial decision).

(b)     With respect to any executory contract or unexpired lease to be assumed or assumed and assigned pursuant to Section 10.1 of the Plan, the Debtor shall file a schedule (a "**Cure Schedule**") with the Plan Supplement setting forth the Cure Amount, if any, for each executory contract or unexpired lease to be assumed or assumed and assigned by the Debtor.

(c)     In the event of a dispute (each, a "**Cure Dispute**") regarding: (i) the Cure Amount; (ii) the ability of the Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assumed and assigned; or (iii) any other matter pertaining to the proposed assumption or assumption and assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving such Cure Dispute and approving the assumption or assumption and assignment. To the extent a Cure Dispute relates solely to the Cure Amount, the Debtor may assume and/or assume and assign the applicable contract or lease prior to the resolution of the Cure Dispute. To the extent the Cure Dispute is resolved or determined against the Debtor, the Debtor may reject the applicable executory contract or unexpired lease after such determination, and the counterparty may thereafter file a proof of claim in the manner set forth in Section 10.2 of the Plan.

        4.     *Effect of Confirmation Order on Assumption, Assumption and Assignment, and Rejection.*

Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute entry of an order by the Bankruptcy Court pursuant to sections 365(a) and 1123(b) of the Bankruptcy Code approving the assumptions, assumptions and assignments and rejections described in Article X of the Plan and determining that: (a) with respect to such rejections, such rejected executory contracts and unexpired leases are burdensome and that the rejection therein is in the best interests of the Estate; (b) with respect to such assumptions, to the extent necessary, that the Debtor has (i) cured, or provided adequate assurance that the Debtor will promptly cure, any default in accordance with section 365(b)(1)(A) of the Bankruptcy Code, (ii) compensated or provided adequate assurance that it or an Affiliate will promptly compensate the counterparty for any actual pecuniary loss to such

party resulting from such default, and (iii) provided adequate assurance of future performance under such executory contract or unexpired lease; and (c) with respect to any assignment, to the extent necessary, that the Debtor or the proposed assignee has (i) cured, or provided adequate assurance that it or an Affiliate will promptly cure, any default in accordance with section 365(b)(1)(A) of the Bankruptcy Code, (ii) compensated or provided adequate assurance that the Debtor or the proposed assignee will promptly compensate the counterparty for any actual pecuniary loss to such party resulting from such default, and (iii) that "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) by the assignee has been demonstrated and no further adequate assurance is required. Assumption of any executory contract or unexpired lease and satisfaction of the Cure Amounts shall result in the full discharge, release and satisfaction of any claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date such executory contract or unexpired lease is assumed. Each executory contract and unexpired lease assumed pursuant to Article X of the Plan shall revest in and be fully enforceable by the Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable federal law. To the maximum extent permitted by law, to the extent any provision in any executory contract or unexpired lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such executory contract or unexpired lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto. Any party that fails to timely file a Cure Dispute on the basis that consent to assume or assume and assign the applicable executory contract or unexpired lease is a condition to such assumption or assumption and assignment, shall be deemed to have consented to the assumption or assumption and assignment, as applicable, of such contract or unexpired lease.

5.      *Permits, Licenses, Easements and Similar Interests*

Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute entry of an order by the Bankruptcy Court pursuant to sections 365(a) and 1123(b) of the Bankruptcy Code approving the assumptions of all permits, licenses, easements and similar interests unless any of the foregoing has been previously rejected or is rejected under the Plan or otherwise. To the extent permitted under applicable law, the Debtor shall be authorized, on and after the Effective Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtor, and pursuant to the terms of the Confirmation Order, all such licenses, permits, registrations, and governmental authorizations or approvals shall be deemed to be assumed by the Debtor as of the Effective Date. To the extent provided by section 525 of the Bankruptcy Code, and subject to entry of the Confirmation Order, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Debtor on account of the filing or pendency of the chapter 11 case or the consummation of the transactions contemplated under the Plan.

To the maximum extent permitted by law, any provision that purports to restrict or prevent the assumption or assignment of any such permit, license, easement or similar interest or is breached or deemed breached by the assumption or assignment of any such permit, license, easement or similar interest (including any "change of control" provision) shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such permit, license, easement or similar interest or to exercise other default-related rights with respect thereto.  Any party that fails to timely file a Cure Dispute on the basis that consent to assume or assume and assign the applicable permit, license, easement or similar interest is a condition to such assumption or assumption and assignment, shall be deemed to have consented to such assumption or assumption and assignment.

6.    <em>Assumption of Directors and Officers Insurance Policies</em>

To the extent that the D&O Liability Insurance Policies issued to, or entered into by, the Debtor prior to the Petition Date constitute executory contracts, notwithstanding anything in the Plan to the contrary, the Debtor shall be deemed to have assumed all of its unexpired D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtor's foregoing assumption of each of the D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair or otherwise modify any advancement, indemnity or other obligations of the D&O Liability Insurance Policies.

In addition, after the Effective Date, the Debtor shall not terminate or otherwise reduce the coverage under any of the D&O Liability Insurance Policies with respect to conduct occurring prior thereto, and all directors, managers and officers of the Debtor who served in such capacity at any time prior to the Effective Date shall be entitled from the applicable insurers to the full benefits of any such policy for the full term of such policy regardless of whether such directors, managers and officers remain in such positions after the Effective Date.

On or before the Effective Date, the Debtor shall purchase and maintain directors, managers, officers and employee liability tail coverage for the six year period following the Effective Date on terms no less favorable than the Debtor's existing director, manager, officer and employee coverage and with an aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing director, officer, manager and employee coverage upon placement.  From and after the Effective Date, reasonable directors, managers and officers insurance policies shall remain in place in the ordinary course.

7.    <em>Assumption of Certain Indemnification Obligations</em>

Each Indemnification Obligation to a current or former director, officer, manager or employee who was employed by the Debtor in such capacity on or after the Petition Date (including, for the avoidance of doubt, the members of the board of directors, board of managers or equivalent body of the Debtor at any time) shall be deemed assumed effective as of the Effective Date.  Each Indemnification Obligation that is deemed assumed pursuant to the Plan shall (a) remain in full force and effect, (b) not be modified, reduced, discharged, impaired or otherwise affected in any way, (c) be deemed and treated as an executory contract pursuant to

sections 365 and 1123 of the Bankruptcy Code regardless of whether or not proofs of claim have been filed with respect to such obligations and (d) survive Unimpaired and unaffected irrespective of whether such indemnification is owed for an act or event occurring before, on or after the Petition Date.

Any obligations of the Debtor (whether pursuant to its certificate of formation, operating agreement, limited liability company agreement, other organizational documents, board resolutions, member resolutions, indemnification agreements, employment contracts, policy of providing employee indemnification, applicable state law, specific agreement in respect of any claims, demands, suits, causes of action or proceedings against such Persons or agreements, including amendments, or otherwise) entered into at any time prior to the Effective Date, to indemnify, reimburse or limit the liability of the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers and other professionals of the Debtor, as applicable, in each case, based upon any act or omission related to such Persons' service with, for or on behalf of the Debtor prior to the Effective Date with respect to all present and future actions, suits and proceedings relating to the Debtor shall survive the Confirmation Order and, except as set forth in the Plan, remain unaffected thereby, and shall not be discharged, irrespective of whether such defense, indemnification, reimbursement or limitation of liability accrued or is owed in connection with an occurrence before or after the Petition Date. Any Claim based on the Debtor's obligations set forth in Section 10.7 of the Plan shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code. The provision for indemnification obligations shall not apply to or cover any Causes of Action against a Person that result in a Final Order determining that such Person seeking indemnification is liable for fraud, willful misconduct, gross negligence, bad faith, self-dealing or breach of the duty of loyalty.

In connection with the foregoing, on the Effective Date, the Debtor shall establish and fund the Indemnification Escrow Account with Cash equal to $2,500,000. Funds held in the Indemnification Escrow Account shall not be considered property of the Debtor's Estate, property of the Debtor and, to the extent such obligations are not satisfied by the Debtor or under any applicable D&O Liability Insurance Policy, such funds shall be utilized by the Debtor to satisfy the Debtor's obligations under Section 10.7 of the Plan. Funds remaining in the Indemnification Escrow Account after six (6) years, if any, shall revert to and become property of the Debtor; provided, that (i) the Debtor's obligations under Section 10.7 of the Plan shall not be limited by nor deemed limited to the balance of the funds held in the Indemnification Escrow Account, and (ii) such reversion shall not take place unless and until any claims that have been asserted and are covered by the Indemnification Escrow Account have been resolved. No Liens, claims or interests shall encumber the Indemnification Escrow Account in any way.

**D.    Implementation of the Plan**

1.    *Continued Existence and Vesting of Assets in Reorganized TSE.*

(a)    Except as otherwise provided in the Plan, the Debtor shall continue to exist after the Effective Date as Reorganized TSE in accordance with the laws of the State of Delaware and pursuant to the Amended Constituent Documents for the purposes of satisfying its obligations under the Plan and the continuation of its business. On or after the Effective Date, Reorganized

- 28 -

TSE, in its discretion, may take such action as permitted by applicable law and the Amended Constituent Documents as Reorganized TSE may determine is reasonable and appropriate.

(b)     Except as otherwise provided in the Plan, on and after the Effective Date, all property of the Estate, wherever located, including all claims, rights and Causes of Action, and any property, wherever located, acquired by the Debtor under or in connection with the Plan, shall vest in Reorganized TSE free and clear of all Claims, Liens, charges, other encumbrances and Interests.  On and after the Effective Date, Reorganized TSE may operate its business and may use, acquire and dispose of property, wherever located, and prosecute, compromise or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, Reorganized TSE may pay the charges that it incurs on or after the Effective Date for Professional Persons' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

(c)     On the Effective Date or as soon as reasonably practicable thereafter, Reorganized TSE may take all actions that may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of formation, merger, consolidation, conversion, dissolution, or other organizational documents pursuant to applicable state law; and (4) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

2.     *Issuance of New Common Units to Cobra*

In consideration for Cobra's commitments and undertakings under the Plan, the New Common Units shall be issued on the Effective Date and distributed to Cobra (or a Cobra Designee) on the Effective Date or as soon as practicable thereafter, in accordance with the Plan and the terms of the Amended Constituent Documents.  All of the New Common Units issuable in accordance with the Plan, when issued, shall be duly authorized, validly issued, fully paid, and non-assessable.  The issuance of the New Common Units is authorized without the need for any further limited liability company, or other similar action and without any further action by any holder of an Allowed Claim or Interest.

The New Common Units will not be listed on a national securities exchange, Reorganized TSE will not be a reporting company under the Securities Exchange Act, and Reorganized TSE shall not be required to and will not file reports with the SEC or any other governmental entity after the Effective Date.

3.      *Plan Value of New Common Units*

For purposes of the Plan, the New Common Units shall have an aggregate deemed value equal to $100 million.  Such deemed value is equal to the amount that will be drawn by DOE on the Cobra Backstop Letter of Credit pursuant to Section 5.3 of the Plan less the $100 million term loan component of the Exit Credit Facility.

4.      *Working Capital Commitment*

Under the Exit Credit Facility, Cobra (or a Cobra Designee) shall provide Reorganized TSE with up to $50 million to fund the working capital and other needs of Reorganized TSE.

5.      *Exit Credit Facility, Exit Contingent Note and New O&M Agreement*

On the Effective Date, Reorganized TSE shall be authorized to enter into the Exit Credit Facility Agreement, Exit Contingent Note, and the Amended Constituent Documents without the need for any further limited liability company or other similar action.  The entry of the Confirmation Order shall be deemed approval of the Exit Credit Facility Agreement, Exit Contingent Note, and the Amended Constituent Documents, and authorization for Reorganized TSE to enter into and execute the Exit Credit Facility Agreement, Exit Contingent Note, and the Amended Constituent Documents requiring execution and delivery by Reorganized TSE.

The obligations arising under the Exit Credit Facility Documents shall be secured by a senior priority perfected security interest in substantially all present and after acquired property and proceeds thereof of Reorganized TSE, subject to any exceptions and materiality thresholds acceptable to Cobra, as lender under the Exit Credit Facility Agreement. The Debtor is authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary or desirable to establish and further evidence perfection of any Liens and security interests granted to secure the obligations under the Exit Credit Facility Documents under the provisions of any applicable federal, state, provincial, or other law (whether domestic or foreign) (it being understood that perfection shall occur automatically by virtue of the occurrence of the Effective Date, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

6.      *Cancellation of Existing Securities and Agreements*

Except for the purpose of evidencing a right to distribution under the Plan, and except as otherwise set forth in the Plan, on the Effective Date, the Prepetition Note Financing Documents shall be deemed cancelled, discharged and of no further force or effect.  The DOE, as holder of the Allowed Prepetition Note Claims, shall have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.

7.    *Cancellation of Liens Pursuant to Cash Collateral Order*

On the Effective Date, the Cash Collateral Order, including the use of cash collateral thereunder, shall be terminated.  All Liens and security interests granted to secure obligations pursuant to the Cash Collateral Order shall be terminated and of no further force or effect, without the need for further Court approval, action or order.  Reorganized TSE shall be entitled to take any action necessary to effectuate the discharge of any Lien under the Cash Collateral Order.

8.    *Board of Managers*

(a)    On the Effective Date, the board of managers of Reorganized TSE shall consist of five (5) individuals selected by Cobra, who shall be reasonably acceptable to the Debtor, and identified in the Plan Supplement to be filed with the Bankruptcy Court.

(b)    Unless reappointed pursuant to Section 7.6(a) of the Plan, the members of the board of managers of the Debtor prior to the Effective Date shall have no continuing obligations to the Debtor in their capacities as such on and after the Effective Date and each such member shall be deemed to have resigned or shall otherwise cease to be a manager of the Debtor on the Effective Date.  Commencing on the Effective Date, each of the managers of the Debtor shall serve pursuant to the terms of the Amended Constituent Documents and be replaced or removed in accordance therewith.

9.    *Organizational and Other Action*

(a)    The Debtor shall serve on the U.S. Trustee quarterly reports of its disbursements until such time as a final decree is entered closing the Chapter 11 Case or the Chapter 11 Case is converted or dismissed, or the Bankruptcy Court orders otherwise.  Any deadline for filing Administrative Expense Claims shall not apply to U.S. Trustee Fees.

(b)    On the Effective Date, the Amended Constituent Documents and any other applicable amended and restated limited liability company or other organizational documents of the Debtor shall be deemed authorized in all respects.

(c)    Any action under the Plan to be taken by or required of the Debtor, including the adoption or amendment of its certificate of formation, limited liability company agreement or other organizational document, the issuance of limited liability company membership interests, securities and instruments, or the selection of officers or managers, shall be authorized and approved in all respects, without any requirement of further action by the Debtor's equity holders, holders of partnership interests, sole member, board of managers, or similar body, as applicable.

(d)    The Debtor shall be authorized to execute, deliver, file, and record such documents (including the Plan Documents), contracts, instruments, releases and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan, without the necessity of any further Bankruptcy Court, limited liability company, board or member approval or action.  In addition, the selection of the Persons who will serve as the initial managers, officers and managers of Reorganized TSE as of the

Effective Date shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the board of managers or equity holders of the applicable Reorganized TSE.

10.    *Comprehensive Settlement of Claims and Controversies*

Pursuant to Bankruptcy Rule 9019 and in consideration for the Plan Distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims and Causes of Action relating to the rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any Plan Distribution on account thereof.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are: (a) in the best interest of the Debtor, its Estate and its property and stakeholders; and (b) fair, equitable and reasonable.

11.    *Transactions Authorized Under Plan*

On and after the Effective Date, the Debtor and Reorganized TSE, as applicable, shall be authorized to take such actions as may be necessary or appropriate to implement the transactions contemplated by the Plan and the other Plan Documents.

12.    *Approval of Plan Documents*

The solicitation of votes with respect to the Plan shall be deemed a solicitation for the approval of the Plan Documents and all transactions contemplated thereunder.  Entry of the Confirmation Order shall constitute approval of the Plan Documents and such transactions.  On the Effective Date, the Debtor and Reorganized TSE, as applicable, shall be authorized to enter into, file, execute and/or deliver each of the Plan Documents and any other agreement or instrument issued in connection with any Plan Document without the necessity of any further corporate, board, shareholder, manager, or similar action.

13.    *Dismissal of the ICC Arbitration*

Within three (3) Business Days of the Effective Date, Reorganized TSE and Cobra shall jointly request the dismissal with prejudice of the ICC Arbitration.

**E.    Effect of Confirmation**

Article XII of the Plan sets forth the effect of Confirmation of the Plan. The below summarizes, among other things, the Debtor's proposed release, discharge and injunction provisions.

1.    *Binding Effect*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, the Debtor and inure to the benefit of

and be binding on such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

2.      *Discharge of Claims Against and Interests in the Debtor*

Upon the Effective Date and in consideration of the Plan Distributions, except as otherwise provided in the Plan or Confirmation Order (including with respect to Claims left unimpaired by the Plan), each Person that is a holder (as well as any trustees and agents for or on behalf of such Person) of a Claim or Interest shall be deemed to have forever waived, released, and discharged the Debtor, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities that arose prior to the Effective Date.  Except as otherwise provided in the Plan, upon the Effective Date, all such holders of Claims and Interests shall be forever precluded and enjoined, pursuant to sections 105, 524, 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtor or any property, wherever located, of the Estate.

3.      *Term of Pre-Confirmation Injunctions or Stays*

Unless otherwise provided in the Plan, all injunctions or stays provided in the Chapter 11 Case arising prior to the Confirmation Date in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

4.      *Injunction Against Interference with Plan*

Upon the entry of the Confirmation Order, all holders of Claims and Interests and other Persons, along with their respective present or former Affiliates, employees, agents, officers, directors, or principals, shall be enjoined from taking any actions, whether in the United States or elsewhere, to interfere with the implementation or consummation of the Plan.  Moreover, Bankruptcy Code section 1141(c) provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests (except as otherwise provided in the Plan or the Confirmation Order).  As such, to the fullest extent permissible under applicable law, no Person holding a Claim or Interest may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Person under the Plan.  As of the Confirmation Date, to the fullest extent permissible under applicable law, all Persons are precluded and barred from asserting against any property to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, Interests, or other action or remedy based on any act, omission, transaction, or other activity that occurred before the Confirmation Date except as expressly provided in the Plan or the Confirmation Order.

5.      *Injunction*

(a)      Except as otherwise specifically provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons or Entities who have held, hold or may hold Claims against and/or Interests in the Debtor or the Estate, and all other parties in interest, along with their present or former employees, agents, officers, directors, principals, representatives and Affiliates are, with respect to any such Claims

26971921.1

- 33 -

or Interests, permanently enjoined after the Confirmation Date from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, its Estate or any of its property, wherever located, or any direct or indirect transferee of any property, wherever located, of, or direct or indirect successor in interest to, any of the foregoing Persons or any property, wherever located, of any such transferee or successor; (ii) enforcing, levying, attaching (including any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtor, or its Estate or any of its property, wherever located, or any direct or indirect transferee of any property, wherever located, of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property, wherever located, of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor or its Estate or any of its property, wherever located, or any direct or indirect transferee of any property, of, or successor in interest to, any of the foregoing Persons; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law (including, without limitation, commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan) to the fullest extent permitted by applicable law, or (v) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtor or its Estate, or against the property or interests in property of the Debtor or its Estate, with respect to any such Claim or Interest.  Such injunction shall extend to any successors or assignees of the Debtor and its properties and interest in properties; provided, however, that nothing contained in the Plan shall preclude such Persons from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of the Plan.

(b)    By accepting Plan Distributions, each holder of an Allowed Claim or Interest will be deemed to have specifically consented to the injunctions set forth in Section 12.5 of the Plan.

**6.**    ***Releases***

a)    **<u>Releases by the Debtor</u>**

***Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Confirmation Order, on and after the Effective Date, for good and valuable consideration, including their cooperation and contributions to the Chapter 11 Case, the Released Parties (other than the Debtor) shall be deemed released and discharged by the Debtor and its Estate from any and all Claims, obligations, debts, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity or otherwise, whether for tort, fraud, contract, violations of federal or state laws or otherwise, including the ICC Arbitration and the Avoidance Actions; Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that the Debtor, its Estate could have asserted in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity or that any holder of a Claim or Interest or other Entity could have asserted derivatively for or on behalf of the Debtor, or its Estate, based on, relating to or in any manner arising from, in***

26971921.1

*whole or in part, the Debtor;  its Estate; the purchase, sale or rescission of the purchase or sale of any security of the Debtor; the Crescent Dunes Solar Energy Project; the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan; the business or contractual arrangements between the Debtor and any Released Party (excluding any assumed executory contract or lease); the restructuring of Claims and Interests prior to or in the Chapter 11 Case; the negotiation, formulation or preparation of the Plan, the RSA, the Disclosure Statement, the Plan Supplement, the Chapter 11 Case, or, in each case, related agreements, instruments, or other documents or upon any other related act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date.*

*b)       Debtor and Cobra Releases. The Debtor and Cobra only unconditionally and irrevocably release the DOE and the Prepetition Collateral Agent, and each of their respective financial advisors and attorneys, for any claims or Causes of Action arising out of or related to the Prepetition Note Claim and/or the Crescent Dunes Solar Energy Project.*

*c)       DOE Releases. DOE only unconditionally and irrevocably releases the Debtor and Cobra, and each of their respective financial advisors and attorneys, from (i) the Prepetition Note Claim and (ii) any claims or Causes of Action arising out of or relating to the Prepetition Note Claim and/or the Crescent Dunes Solar Energy Project.*

*Notwithstanding anything to the contrary in the Plan, including section 12.6(a), without conceding the existence or merits thereof, neither the above paragraphs nor the Plan releases: (i) any civil, criminal or administrative liability arising under Title 26 of the United States Code (the Internal Revenue Code); (ii) any criminal liability; (iii) any liability under subchapter III of chapter 37 of Title 31 of the United States Code; (iv) any liability that is based on conduct in violation of antitrust laws; (v) any claim of any agency of the United States of America other than DOE; and (vi) the Debtor's and Cobra's obligations under Section 5.3(b) of the Plan regarding the Prepetition Note Claim.*

*d)       Releases by the Third Party Releasing Parties.  Except as otherwise specifically provided in the Plan or the Confirmation Order, on and after the Effective Date, for good and valuable consideration, including the obligations of the Debtor under the Plan, the Plan Consideration and other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, each Third Party Releasing Party who affirmatively opts to grant the releases set forth in the Plan shall be deemed to have consented to the Plan and the restructuring embodied therein for all purposes, and shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity or otherwise, whether for tort, fraud, contract, violations of federal or state laws or otherwise, including the ICC Arbitration and the Avoidance Actions, Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that such Third Party Releasing Party could have asserted (whether individually or collectively), based on, relating to or in any manner arising from, in whole or in part, the*

**Debtor; the Estate; the Chapter 11 Case; the purchase, sale or rescission of the purchase or sale of any security of the Debtor; the Crescent Dunes Solar Energy Project; the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan; the business or contractual arrangements between the Debtor and any Released Party (excluding any assumed executory contract or lease); the restructuring of Claims and Interests prior to or in the Chapter 11 Case; the negotiation, formulation or preparation of the Plan, the Restructuring Support Agreement, the Disclosure Statement, the Plan Supplement, the Prepetition Note Documents, or the Plan or the Disclosure Statement, or, in each case, related agreements, instruments or other documents, or upon any other related act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; _provided_, that any party that ~~affirmatively opts out of~~ chooses not to opt in to the releases contained in the Plan shall not receive the benefit of the releases set forth in the Plan (even if for any reason otherwise entitled).  Notwithstanding anything contained in the Plan to the contrary, the foregoing release shall not release any obligation of any party under the Plan, or any other document, instrument, or agreement executed to implement the Plan.**

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval~~, pursuant to Bankruptcy Rule 9019,~~ of the releases described in the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute its finding that each release described in the Plan is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (ii) in the best interests of the Debtor and all Third Party Releasing Parties; (ii) fair, equitable and reasonable; (iv) given and made after due notice and opportunity for hearing; and (v) a bar to the Debtor and all Third Party Releasing Parties asserting any claim, Cause of Action or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

7.    *Waiver of Limitations on Releases of Unknown Claims.*

**Each of the Debtor, the Third Party Releasing Parties and DOE agree to acknowledge that the releases contained in Sections 12.6(a), 12.6(b), 12.6(c) and 12.6(d) will extend to and release claims that such parties do not know or expect to exist at the time of the release, which, if known, might have affected the decision to enter into the release and which such parties will be deemed to waive, and will waive and relinquish to the fullest extent permitted by law, any and all provisions, rights, and benefits conferred by any law of the United States of America or any state or territory thereof, or principle of common law, which governs or limits a person's release of unknown claims that such parties will deemed to waive, and will waive and relinquish, to the fullest extent permitted by law, the provisions, rights, and benefits of Section 1542 of the California Civil Code, which provides as follows:**

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

**The Debtor, the Third Party Releasing Parties and DOE will also be deemed to waive any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States of America, or principle of common law, which is similar, comparable, or equivalent to California Civil Code Section 1542. Such parties shall be deemed to acknowledge that they may discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of the releases given in Sections 12.6(a), 12.6(b), 12.6(c) and 12.6(d), but that it is the intention of such parties to fully, finally, and forever settle and release with prejudice any and all claims, including any and all unknown claims, without regard to the subsequent discovery or existence of additional or different facts. Such parties expressly agree that any fraudulent inducement or similar claims that could be premised on unknown facts or facts that are subsequently discovered are included within the definition of unknown claims.**

8.    *Exculpation and Limitation of Liability*

On the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, for good and valuable consideration, to the maximum extent permissible under applicable law, none of the Exculpated Parties shall have or incur any liability to any holder of any Claim or Interest or any other Person for any act or omission occurring prior to the Effective Date in connection with, or arising out of, the Debtor's restructuring, including the negotiation, implementation and execution of the Plan, the Plan Supplement, the Chapter 11 Case, the Prepetition Note Documents, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, including all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all activities leading to the promulgation and confirmation of the Plan except for gross negligence or willful misconduct,

each as determined by a Final Order of the Bankruptcy Court. ~~For purposes of the foregoing, it is expressly understood that any act or omission effected with the approval of the Bankruptcy Court conclusively will be deemed not to constitute gross negligence or willful misconduct unless the approval of the Bankruptcy Court was obtained by fraud or misrepresentation, and in all respects, the applicable Persons shall be entitled to rely on the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Case, the Plan, and administration thereof.~~ The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

9.     *Injunction Related to Releases and Exculpation*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities released in or encompassed by Section 12.6 of the Plan. The Debtor is expressly authorized hereby to seek to enforce such injunction.

10.     *Retention of Causes of Action/Reservation of Rights*

(a)     Except as expressly provided in the Plan or in the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtor or the Estate may have, or that the Debtor may choose to assert on behalf of its Estate, under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, (i) any and all Causes of Action or claims against any Person or Entity, to the extent such Person or Entity asserts a crossclaim, counterclaim and/or claim for setoff that seeks affirmative relief against the Debtor, its officers, directors or representatives or (ii) the turnover of any property of the Estate to the Debtor.

(b)     Except as expressly provided in the Plan or in the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtor had immediately prior to the Petition Date or the Effective Date against or regarding any Claim left Unimpaired by the Plan. The Debtor shall have, retain, reserve and be entitled to commence, assert and pursue all such rights and Causes of Action as fully as if the Chapter 11 Case had not been commenced, and all of the Debtor's legal and equitable rights respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Case had not been commenced.

(c)     Except as expressly provided in the Plan or in the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to release any post-Effective

Date obligations of any party under the Plan, or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

11.    *Retention of United States Causes of Action/Reservation of Rights*

Except with respect to the releases provided by DOE pursuant to Section 12.6(c) of the Plan, nothing discharges or releases the Debtor or any non-debtor from any right, claim, liability or cause of action of the United States or any State, or impairs the ability of the United States or any State to pursue any claim, liability, right, defense, or cause of action against any Debtor or non-debtor. Contracts, purchase orders, agreements, leases, covenants, guaranties, indemnifications, operating rights agreements or other interests of or with the United States or any State shall be, subject to any applicable legal or equitable rights or defenses of the Debtor under applicable non-bankruptcy law, paid, treated, determined and administered in the ordinary course of business as if the Debtor's bankruptcy case was never filed and the Debtor shall comply with all applicable non-bankruptcy law.  Except with respect to (i) the releases provided by DOE pursuant to Section 12.6(c) of the Plan and (ii) the Prepetition Note Claim, all claims, liabilities, rights, causes of action, or defenses of or to the United States or any State shall survive the Chapter 11 Case as if it had not been commenced and be determined in the ordinary course of business, including in the manner and by the administrative or judicial tribunals in which such rights, defenses, claims, liabilities, or causes of action would have been resolved or adjudicated if the Chapter 11 Case had not been commenced; *provided*, that nothing in the Plan Documents shall alter any legal or equitable rights or defenses of the Debtor under non-bankruptcy law with respect to any such claim, liability, or cause of action, except with respect to (i) the Prepetition Note Claim and (ii) any claims or Causes of Action released by the DOE pursuant to Section 12.6(c) of the Plan.  Without limiting the foregoing, for the avoidance of doubt, nothing shall: (i) require the United States or any State to file any proofs of claim or administrative expense claims in the Chapter 11 Case for any right, claim, liability, defense, or cause of action; (ii) affect or impair the exercise of the United States' or any State's police and regulatory powers against the Debtor or any non-debtor; (iii) be interpreted to set cure amounts or to require the United States or any State to novate or otherwise consent to the transfer of any federal or state contracts, purchase orders, agreements, leases, covenants, guaranties, indemnifications, operating rights agreements or other interests; (iv) except with respect to the Prepetition Note Claim, affect or impair the United States' or any State's rights and defenses of setoff and recoupment, or ability to assert setoff or recoupment against the Debtor and such rights and defenses are expressly preserved; (v) constitute an approval or consent by the United States or any State without compliance with all applicable legal requirements and approvals under non-bankruptcy law; or (vi) relieve any party from compliance with all licenses and permits issued by governmental units in accordance with non-bankruptcy law.

26971921.1

## ARTICLE V

## VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE PLAN

### A.       General

The following is a brief summary of the Plan Confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or consult their own attorneys.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation hearing. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

Section 1129 of the Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtor, including that (i) the Plan has classified Claims in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Plan has been proposed in good faith and not by any means forbidden by law; (iv) the disclosure required by section 1125 of the Bankruptcy Code has been made; (v) the Plan has been accepted by the requisite votes of Holders of Claims (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code); (vi) the Plan is feasible and Confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor unless such liquidation or reorganization is proposed in the Plan; (vii) the Plan is in the "best interests" of all Holders of Claims in an impaired Class by providing to such Holders on account of their Claims property of a value, as of the Effective Date, that is not less than the amount that such Holders would receive or retain in a chapter 7 liquidation, unless each Holder of a Claim in such Class has accepted the Plan and (viii) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date. The Debtor believes that the Plan satisfies section 1129 of the Bankruptcy Code.

### B.       Parties in Interest Entitled to Vote

Pursuant to the Bankruptcy Code, only Classes of Claims that are "impaired" (as defined in section 1124 of the Bankruptcy Code) and receiving a distribution under the Plan are entitled to vote to accept or reject the Plan.  A Class is impaired if the legal, equitable or contractual rights to which the Claims of that Class entitled the Holders of such Claims are modified, other than by curing defaults and reinstating the Claims.  Classes that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan.  In addition, Classes that receive no distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.

### C.       Classes Impaired and Entitled to Vote Under the Plan

The following Classes are impaired under the Plan and entitled to vote on the Plan:

| Class | Designation | Status | Voting Rights |
|-------|-------------|--------|---------------|
| 3 | Prepetition Note Claims | Impaired | Entitled to Vote |

In general, if a Claim or Interest is unimpaired under a plan, section 1126(f) of the Bankruptcy Code deems the Holder of such Claim or Interest to have accepted the plan, and thus the Holders of Claims in such unimpaired Classes are not entitled to vote on the plan. Because Classes 1, 2, and 4 are unimpaired under the Plan, the Holders of Claims and Interests in these Classes are not entitled to vote and conclusively deemed to have accepted the Plan.

The Holders of Interests in Class 5 are conclusively presumed to have rejected the Plan because they are not receiving a distribution or retaining any interest under the Plan on account of such Interests.

### D.    Voting Procedures and Requirements

The Bankruptcy Court can confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code. One of these technical requirements is that the Bankruptcy Court find, among other things, that the Plan has been accepted by the requisite votes of all Classes of impaired Claims and Interests unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes.

If you have any questions about (i) the procedures for voting your Claim or with respect to the packet of materials that you have received or (ii) the amount of your Claim, please contact the Debtor's Solicitation and Claims Agent at 1-866-897-6433 (Toll Free U.S. and Canada) or 1-646-282-2500 (International). If you wish to obtain (at no charge) an additional copy of the Plan, this Disclosure Statement or other solicitation documents, you can obtain them from the Debtor's case information website (located at https://dm.epiq11.com/Tonopah) or by requesting a copy from the Debtor's Solicitation and Claims Agent via email at **tabulation@epiqglobal.com** with a reference to "Tonopah" in the subject line, or via telephone at 1-866-897-6433 (Toll Free U.S. and Canada) or 1-646-282-2500 (International)

1.    *Ballots*

The DOE, as the holder of Class 3 Claims, is the only Holder of Claims voting on the Plan.  In voting for or against the Plan, please use (i) only the Ballot sent to you with this Disclosure Statement or (ii) the online electronic ballot portal.

2.    *Submitting Ballots*

If you are entitled to vote to accept or reject the Plan, you should read carefully, complete and submit your Ballot in accordance with the instructions below.

To be counted, all Ballots must be properly executed, completed and delivered by:

(i) first-class mail (using the reply envelope provided in the solicitation package or otherwise), (ii) overnight courier, (iii) personal delivery or (iv) the online electronic ballot portal (as described on the Ballot), in each case so that they are

actually received **NO LATER THAN** [  ]**5:00 P.M. (ET) ON OCTOBER 13, 2020** (the "**Voting Deadline**") by the Solicitation and Claims Agent. If you are submitting a Ballot via first-class mail, overnight courier or personal delivery, it should be sent to:

> **If by First Class Mail:**
>
> Tonopah Solar Energy, LLC Ballot Processing Center
> c/o Epiq Corporate Restructuring, LLC
> P.O. Box 4422
> Beaverton, OR 97076-4422
>
> **If by Overnight Courier or Overnight Mail:**
>
> Tonopah Solar Energy, LLC Ballot Processing Center
> c/o Epiq Corporate Restructuring, LLC
> 10300 SW Allen Boulevard
> Beaverton, OR 97005

Delivery of a Ballot to the Solicitation and Claims Agent by facsimile or any other electronic means (other than as expressly provided therein) shall not be valid.

Ballots received after the Voting Deadline will not be counted by the Debtor in connection with the Debtor's request for Confirmation of the Plan. The method of delivery of Ballots to be sent to the Solicitation and Claims Agent is at the election and risk of each Holder of a Claim or Interest. Except as otherwise provided in the Plan, such delivery will be deemed made only when the Ballot is underlined actually received by the Solicitation and Claims Agent. In all cases, sufficient time should be allowed to assure timely delivery. For submissions via first-class mail, overnight courier or personal delivery, original executed Ballots are required.  Delivery of a Ballot to the Solicitation and Claims Agent by facsimile, email or any other electronic means (other than as expressly provided therein) will not be accepted. No Ballot should be sent to the Debtor, their agents (other than the Solicitation and Claims Agent), any administrative agent (unless specifically instructed to do so) or the Debtor's financial or legal advisors, and if so sent will not be counted.  If no Holders of Claims in a particular Class that is entitled to vote on the Plan vote to accept or reject the Plan, then such Class shall be deemed to accept the Plan.

E.    **Acceptance of Plan**

As a condition to Confirmation, the Bankruptcy Code requires that each class of impaired claims vote to accept a plan, except under certain circumstances. *See* "Confirmation Without Necessary Acceptances; Cramdown" below.  A class of claims or interests that is unimpaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is impaired unless the plan (i) leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the Holder of such claim or interest or (ii) cures any default, reinstates the original terms of the obligation and does

not otherwise alter the legal, equitable or contractual rights to which the claim or interest entitles the Holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class as acceptance by Holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class; only those Holders that are eligible to vote and that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met. Thus, a class of claims will have voted to accept a plan only if two-thirds in amount and a majority in number that actually vote cast their ballots in favor of acceptance. Under section 1126(d) of the Bankruptcy Code, a class of interests has accepted a plan if Holders of such interests holding at least two-thirds in amount that actually vote have voted to accept the plan. Holders of claims or interests who fail to vote are not counted as either accepting or rejecting a plan.

In addition to these voting requirements, section 1129 of the Bankruptcy Code requires that a plan be accepted by each Holder of a claim or interest in an impaired class or that the plan otherwise be found by a court to be in the best interests of each Holder of a claim or interest in such class. See "Best Interests Test" below. Moreover, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests set forth in section 1129(b) of the Bankruptcy Code discussed below. See "Confirmation Without Necessary Acceptances; Cramdown" below.

### F.    Confirmation Without Necessary Acceptances; Cramdown

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for Confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims or interests, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (i) "does not discriminate unfairly" and (ii) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests.

A plan "does not discriminate unfairly" if (i) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the non-accepting class and (ii) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Debtor believes that, under the Plan, all impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests that are similarly situated, if any, and no class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Debtor believes that the Plan does not discriminate unfairly as to any impaired Class of Claims or Interests.

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable." In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity Holders, as follows:

(1)    Secured Creditors.  Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and such liens on proceeds to receive treatment consistent with clause (i) or (ii) above.

(2)    Unsecured Creditors. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the Holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(3)    Equity Interests. Either (i) each Holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such Holder is entitled, the fixed redemption price to which such Holder is entitled or the value of the interest or (ii) the Holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan.

As discussed above, the Debtor believes that the distributions provided under the Plan satisfy the absolute priority rule, where required.

### G.    Classification

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divides the different claims (excluding administrative claims) against, and equity interests in, a debtor into separate classes based upon their legal nature. Pursuant to section 1122 of the Bankruptcy Code, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  The Debtor believes that the Plan classifies all Claims and Interests in compliance with the provisions of the Bankruptcy Code because valid business, factual and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan. Accordingly, the classification of Claims and Interests in the Plan complies with section 1122 of the Bankruptcy Code.

## ARTICLE VI

## FEASIBILITY AND BEST INTERESTS OF CREDITORS

### A.    Best Interests Test

As noted above, even if a plan is accepted by the Holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all Holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the Effective Date, that is not less than the amount that such Holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code (the "**Best Interests Test**").

To calculate the probable distribution to Holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a Debtor's assets if its chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the Debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan.  If the hypothetical liquidation distribution to Holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the Holders of claims or interests in such impaired class.

### B.    Liquidation Analysis

Amounts that a Holder of Claims and Interests in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the liquidation analysis of the Debtor prepared by the Debtor's management with the assistance of its advisors (the "**Liquidation Analysis**"), which is attached hereto as Appendix B.

As described in Appendix B, the Debtor developed the Liquidation Analysis based on the unaudited book values as of June 30, 2020, unless otherwise noted in the Liquidation Analysis.

As described in the Liquidation Analysis, underlying the analysis is a number of estimates and assumptions that, although developed and considered reasonable by the Debtor's management and advisors, are inherently subject to uncertainties and contingencies beyond the control of the Debtor and its management. The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, the values reflected in the Liquidation Analysis might not be realized if the Debtor were, in fact, to undergo a liquidation.

One such assumption is the use of the $186.3 million EPC Contract liquidated damages cap to calculate recoveries in the Liquidation Analysis.  Under the EPC Contract, that liquidated

damages cap is triggered if the plant underperforms by 20% or more.  As a result of the uncertainty of litigation (with regard to both the claims initially raised by Cobra against the Debtor and the Debtor's counterclaims against Cobra), the cost of litigation, and the timeline for recovery under a litigation scenario, the Debtor, in consultation with its advisors, determined in its business judgment that the maximum liquidated damages figure was the appropriate recovery estimate under each scenario in the Liquidation Analysis.

This Liquidation Analysis is solely for the purposes of (i) providing "adequate information" under section 1125 of the Bankruptcy Code to enable the Holders of Claims and Interests entitled to vote under the Plan to make an informed judgment about the Plan and (i) providing the Bankruptcy Court with appropriate support for the satisfaction of the "Best Interests Test" pursuant to section 1129(a)(7) of the Bankruptcy Code, and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtor.

Events and circumstances occurring subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. The Debtor and Reorganized Debtor do not intend to and do not undertake any obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing or arising after the date the Liquidation Analysis is initially filed or to reflect the occurrence of unanticipated events. Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of the actual results that will occur.

In deciding whether to vote to accept or reject the Plan, Holders of Claims or Interests must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

### C.    Application of the Best Interests Test

The Debtor believes that the Plan satisfies the Best Interests Test for Class 3.  As the Plan and Appendix B indicate, confirmation of the Plan will provide each Holder of an Allowed Claim in an Impaired Class with a recovery that is equal to or greater than the value of any distributions if the chapter 11 case were converted to a case under chapter 7 of the Bankruptcy Code.

### D.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to confirmation, that the Bankruptcy Court find that confirmation is not likely to be followed by the liquidation of the Debtor or the need for further financial reorganization, unless such liquidation is contemplated by the Plan.  For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtor, with the assistance of its advisors, has analyzed the ability of the Reorganized Debtor to meet its obligations under the Plan and to retain sufficient liquidity and capital resources to conduct its business.  As part of this analysis, the Debtor has prepared the financial projections, as set forth in Appendix C (the "**Financial Projections**").

As noted in <u>Appendix C</u>, the Financial Projections present information with respect to the Reorganized Debtor.  These Financial Projections do not reflect the full impact of "fresh start reporting" in accordance with American Institute of Certified Public Accountants Statement of Position 90-7 "Financial Reporting by Entities in Reorganization under the Bankruptcy Code." Fresh start reporting may have a material impact on the analysis.

The Debtor has prepared the Financial Projections solely for the purpose of providing "adequate information" under section 1125 of the Bankruptcy Code to enable the Holders of Claims and Interests entitled to vote under the Plan to make an informed judgment about the Plan and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtor.

In addition to the cautionary notes contained elsewhere in this Disclosure Statement and in the Financial Projections, it is underscored that the Debtor makes no representation as to the accuracy of the Financial Projections or its ability to achieve the projected results. Many of the assumptions on which the Financial Projections are based are subject to significant uncertainties. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the financial results.  Therefore, the actual results achieved throughout the Projection Period (as defined in the Financial Projections) may vary from the Financial Projections, and the variations may be material.  Also as noted above, the Financial Projections currently do not reflect the full impact of any "fresh start reporting," and its impact on the Reorganized Debtor's "Balance Sheet" and prospective "Results of Operations" may be material. All Holders of Claims in the Impaired Classes are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of, and voting on, the Plan.

## ARTICLE VII

## SECURITIES LAW MATTERS

### A.    Bankruptcy Code Exemptions from Registration Requirements

The Debtor believes that, pursuant to section 4(a)(2) of the Securities Act and Rule 506 of Regulation D promulgated thereunder, the issuance of the New Common Units is exempt from the registration requirements of the Securities Act and any State or local law requiring registration for offer or sale of a security.

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under Section 4(a)(2) of the Securities Act.  The Debtors believes that the New Common Units will be issuable without registration under the Securities Act in reliance upon the exemption from registration provided under Section 4(a)(2) of the Securities Act and Rule 506 of Regulation D because only "accredited investors" (as defined in Rule 501(a) of Regulation D under the Securities Act) or "qualified institutional buyers" within the meaning of Rule 144A will be eligible to purchase the New Common Units.

Any securities issued in reliance on Section 4(a)(2) or Regulation D will be "restricted securities" that may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. Under Rule 144, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144. A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period unless certain current public information regarding the issuer is not available at the time of sale, in which case the non-affiliate may resell after a one-year holding period. An affiliate may resell restricted securities after the applicable holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale, and notice requirements of Rule 144..

## ARTICLE VIII

## CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A.    Certain Bankruptcy Law Considerations

1.    *General.*

While the Debtor believes that the Chapter 11 Case will be of relatively short duration, the Debtor cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the Chapter 11 Case, it is impossible to predict with certainty the amount of time that the Debtor may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have a material adverse effect on the Debtor.  A delay in the bankruptcy proceedings will also involve additional expense and may divert some of the attention of the Debtor's management away from its business.

2.    *Plan Confirmation.*

The Debtor can make no assurances that it will receive the requisite acceptances to confirm that Plan or that the conditions to Confirmation will be satisfied or waived. Further, if the requisite acceptances are not received, the Debtor may seek to accomplish an alternative restructuring and obtain acceptances to an alternative plan of reorganization for the Debtor, or

otherwise, that may not have the support of the Holders of Claims and/or may be required to liquidate the Estate under chapter 7 or 11 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Holders of Claims as those proposed in the Plan.

Even if the Debtor receives the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan.  If the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could nevertheless decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.  Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Interests ultimately would receive in a subsequent plan of reorganization.

3.    *Objections to Classification of Claims.*

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Interests in, the Debtor.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  The Debtor believes that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtor could seek (i) to modify the Plan to provide for whatever classification might be required for Confirmation and (ii) to use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.

Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could materially adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires resolicitation, the Debtor could, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.

4.    *Risk of Termination of the Restructuring Support Agreement.*

The Restructuring Support Agreement contains certain provisions that give the Debtor and Cobra the ability to terminate the Restructuring Support Agreement if various conditions are not satisfied. Termination of the Restructuring Support Agreement could result in withdrawal of the Plan and a protracted chapter 11 case.

5.      *Risk of Nonoccurrence of the Effective Date.*

Although the Debtor believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

6.      *Failure to Consummate the Plan.*

As of the date of this Disclosure Statement, there can be no assurance that the conditions to consummation of the Plan will be satisfied or waived.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and that the contemplated restructuring will be completed.

7.      *Risk of Litigation.*

Certain of the Debtor's creditors or other stakeholders may bring litigation against the Debtor during the course of the Chapter 11 Case, the outcome of which is uncertain. Although the Debtor believes that the Plan satisfies all of the requirements necessary for confirmation by the Court, creditors and other parties in interest may bring objections to challenge confirmation of the Plan.

8.      *Plan Releases May Not Be Approved.*

There can be no assurance that the Plan releases, as provided in Section 11 of the Plan, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a plan of reorganization that differs from the Plan or the Plan not being confirmed.

9.      *Regulatory Approvals.*

Consummation of the Plan is subject to various approvals, including approval by the Federal Energy Regulatory Commission and certain state and local governmental authorities. There can be no assurance that these approvals will be obtained or that efforts to gain such approvals will not substantially delay consummation of the Plan.

**B.      Risks Related to Debtor's Ongoing Operations during the Case**

1.      *The Reorganized Debtor may not be able to achieve their projected financial results.*

Actual financial results will be subject to a number of factors including TSE's ability to successfully restore operations at the Power Plant, general business and economic conditions, and other matters, many of which will be beyond the control of the Reorganized Debtor and may differ materially from the Financial Projections. If TSE is unable to resume operations at the Power Plant, the Reorganized Debtor will not be able to meet the Financial Projections after the Effective Date. The Financial Projections represent management's view based on currently known facts, the successful Confirmation and implementation of the Plan and hypothetical assumptions regarding the Reorganized Debtor's future operations and ability to finance such operations; they do not guarantee the Reorganized Debtor's future financial performance.

2.      *The Debtor's Financial Projections are subject to inherent uncertainty due to the numerous assumptions upon which they are based.*

The Plan relies upon the Financial Projections that are based on numerous assumptions including, without limitation, the timing, Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtor, general business and economic conditions, competition, adequate financing, absence of material claims, the ability to make necessary capital expenditures, use of unrestricted cash, the ability to control future operating expenses, and other matters, many of which will be beyond the control of the Reorganized Debtor and some or all of which may not materialize.  Particular uncertainties with respect to the Reorganized Debtor's operations and financial results arise from the risks and uncertainties relating to when the Power Plant will become operational, the price at which it is able to sell the power that it produces, how much of such power can be off-loaded, and whether there will be additional equipment issues or operational difficulties that cause further shut downs of the Power Plant.

Because the actual results achieved throughout the periods covered by the Financial Projections may vary from the projected results, perhaps materially, the Financial Projections should not be relied upon as an assurance of the actual results that will occur.

Consequently, there can be no assurance that the results or developments contemplated by any plan of reorganization implemented will occur or, even if they do occur, that they will have the anticipated effects on the Reorganized Debtor and its business or operations. The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful execution of any plan of reorganization.

Except with respect to the Financial Projections and except as otherwise specifically and expressly stated herein, this Disclosure Statement and the Plan do not reflect any events that might occur subsequent to the date hereof. Such events could have a material impact on the information contained in this Disclosure Statement and the Plan. Neither the Debtor nor the Reorganized Debtor intend to update the Financial Projections. The Financial Projections therefore may not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Financial Projections.

3.      *Undue delay in confirmation.*

Although the Plan is designed to minimize the length of the Chapter 11 Case, it is impossible to predict with certainty the amount of time that the Debtor may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.

The continuation of the Chapter 11 Case, particularly if the Plan is not confirmed in the time frame currently contemplated, could materially increase costs to the Debtor.  If confirmation and consummation of the Plan do not occur expeditiously, the Chapter 11 Case could result in, among other things, increased costs for professional fees and other case expenses.

C.    **Financing Risks for the Reorganized Debtor**

1.    *The Reorganized Debtor may not be able to generate sufficient cash flow to meet its debt service and other obligations due to events beyond its control.*

The Reorganized Debtor's ability to generate cash flows from operations and to make scheduled payments on its anticipated indebtedness post-emergence will depend on its future financial performance. If the Reorganized Debtor is unable to service its indebtedness, it will require debt relief to meet the Financial Projections.  The Reorganized Debtor cannot provide any assurance that any of these alternative strategies could be affected on satisfactory terms, if at all, or that it would yield sufficient funds to make required payments on its indebtedness and continue operating.

2.    *The Power Plant is currently not operational.*

The Power Plant is not currently operational.  The Plan and related projections assume that the Power Plant will become operational by or about October 2020.  In the event that the Power Plant is not operational by that date, the Debtor's ability to satisfy its obligations under the Exit Agreement will be adversely affected and the Financial Projections may not be achieved.

3.    *The Exit Contingent Note*

The Plan also contemplates the Debtor's entry into a contingent promissory note (the "Exit Contingent Note") in the aggregate principal amount of $100 million, to be guaranteed by Cobra.  A substantially final form of the Exit Contingent Note is attached to the Plan as Schedule A.  The Reorganized Debtor cannot provide any assurance that any amounts ultimately will become payable under the Exit Contingent Note.

The Debtor believes that confirmation and consummation of the Plan are in the best interests of the Debtor, its Estate and its estate. The Plan provides for an equitable distribution to Holders of Claims. The Debtor believes that any alternative to confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in significant delay, litigation and additional costs, as well as a significant reduction to or elimination in the distributions to Holders of Claims in certain Classes. **Consequently, the Debtor urges all eligible Holders of impaired Claims entitled to vote on the Plan to vote to ACCEPT the Plan and to complete and submit their Ballots so that they will be RECEIVED by the Solicitation and Claims Agent on or before the Voting Deadline.**

Dated: ~~July 30~~September 2, 2020
Wilmington, Delaware

Respectfully submitted,

Tonopah Solar Energy, LLC

By:  */s/ Justin Pugh*
     Name: Justin Pugh
     Title: Treasurer