## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | x | |
| In re: | : | Chapter 11 |
| | : | |
| TONOPAH SOLAR ENERGY, LLC, | : | Case No. 20-11884 (KBO) |
| | : | |
| Debtor.[1] | : | |
| | : | |
| | x | |

## AMENDED DISCLOSURE STATEMENT FOR
## CHAPTER 11 PLAN FOR TONOPAH SOLAR ENERGY, LLC

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Edmon L. Morton (No. 3856)
Matthew B. Lunn (No. 4119)
Allison S. Mielke (No. 5934)
Jared W. Kochenash (No. 6557)

Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:    (302) 571-6600
Fax:    (302) 571-1253
Email: mlunn@ycst.com
        emorton@ycst.com
        amielke@ycst.com
        jkochenash@ycst.com

WILLKIE FARR & GALLAGHER LLP

Matthew A. Feldman (admitted *pro hac vice*)
Paul V. Shalhoub (admitted *pro hac vice*)
Andrew S. Mordkoff (admitted *pro hac vice*)
Ciara A. Copell (admitted *pro hac vice*)

787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
mfeldman@willkie.com
pshalhoub@willkie.com
amordkoff@willkie.com
ccopell@willkie.com

*Proposed Co-Counsel to the Debtor
and Debtor in Possession*

Dated: September 8, 2020

---

[1]    The Debtor in this chapter 11 case, along with the business address and the last four (4) digits of the Debtor's federal tax identification number is: Tonopah Solar Energy, LLC, 11 Gabbs Pole Line Road, Tonopah, NV 89049 (1316)

# TABLE OF CONTENTS

ARTICLE I INTRODUCTION ..............................................................................................1

    A.    General .........................................................................................................1
    B.    Confirmation of the Plan...............................................................................5
    C.    Treatment and Classification of Claims and Interests; Impairment........................6
    D.    Confirmation Hearing ....................................................................................4

ARTICLE II GENERAL INFORMATION REGARDING THE DEBTOR ................................4

    A.    Voting; Holders of Claims Entitled to Vote ......................................................4
    B.    The Debtor's Business...................................................................................6
    C.    Operation and Maintenance Agreements........................................................11
    D.    The Debtor's Prepetition Capital Structure.....................................................12
    E.    Events Leading to the Chapter 11 Case ..........................................................14
    F.    The Debtor's Goals in the Chapter 11 Case.....................................................17

ARTICLE III THE CHAPTER 11 CASE .............................................................................18

    A.    General Case Background..............................................................................18
    B.    Employment and Compensation of Professionals ..............................................18
    C.    "First Day" Motions and Related Applications ................................................18
    D.    Exclusivity .................................................................................................19

ARTICLE IV SUMMARY OF THE PLAN ..........................................................................20

    A.    Overview of the Plan ...................................................................................21
    B.    Classification and Treatment of Claims and Interests ..........................................21
    C.    Executory Contracts and Unexpired Leases .....................................................27
    D.    Implementation of the Plan...........................................................................32
    E.    Effect of Confirmation .................................................................................36

ARTICLE V VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION
           OF THE PLAN .......................................................................................42

    A.    General......................................................................................................42
    B.    Parties in Interest Entitled to Vote ................................................................43
    C.    Classes Impaired and Entitled to Vote Under the Plan........................................43
    D.    Voting Procedures and Requirements...............................................................44
    E.    Acceptance of Plan ......................................................................................45
    F.    Confirmation Without Necessary Acceptances; Cramdown .................................46
    G.    Classification...............................................................................................47

ARTICLE VI FEASIBILITY AND BEST INTERESTS OF CREDITORS ...............................47

    A.    Best Interests Test ......................................................................................47
    B.    Liquidation Analysis....................................................................................48

i

C.      Application of the Best Interests Test ....................................................................49
D.      Feasibility................................................................................................................49

ARTICLE VII SECURITIES LAW MATTERS.........................................................................50

A.      Bankruptcy Code Exemptions from Registration Requirements...........................50

ARTICLE VIII CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO
            VOTING .......................................................................................................51

A.      Certain Bankruptcy Law Considerations ...............................................................51
B.      Risks Related to Debtor's Ongoing Operations during the Case...........................53
C.      Financing Risks for the Reorganized Debtor.........................................................54

**<u>Appendices and Exhibits</u>**

Appendix A    Chapter 11 Plan for Tonopah Solar Energy, LLC
Appendix B    Liquidation Analysis
Appendix C    Financial Projections

Exhibit 1      Restructuring Support Agreement

# ARTICLE I

# INTRODUCTION

## A.    General

Tonopah Solar Energy, LLC (the "**Debtor**" or "**TSE**"), as debtor in possession in the chapter 11 case pending before the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), administered under Case No. 20-11884 (KBO), submits this disclosure statement (as may be amended, altered, modified, revised or supplemented from time to time, the "**Disclosure Statement**") pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**"), in connection with the solicitation of votes on the *Amended Chapter 11 Plan for Tonopah Solar Energy, LLC* (the "**Plan**"), a copy of which is attached hereto as Appendix A.

Capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Plan; provided, that any capitalized term used herein that is not defined herein or in the Plan, but is defined in the Bankruptcy Code or the Bankruptcy Rules, will have the meaning given to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

This Disclosure Statement is designed to provide holders of Claims entitled to vote on the Plan with adequate information to make an informed decision about whether to vote to accept or reject the Plan. This Disclosure Statement sets forth certain information regarding the Debtor's prepetition capital structure and business operations, important developments leading to the commencement of the chapter 11 case, and important developments that have occurred during this chapter 11 case. This Disclosure Statement also describes terms and provisions of the Plan, including certain effects of confirmation of the Plan, certain risk factors associated with the Plan, potential alternatives to the Plan, the manner in which distributions will be made under the Plan if the Plan is confirmed and becomes effective, and related matters. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

The Plan and this Disclosure Statement are the result of months of extensive and vigorous negotiations among the Debtor, the U.S. Department of Energy ("**DOE**"), the U.S. Department of Justice ("**DOJ**") and ACS Servicios Comunicaciones y Energía S.L. ("**ACS**"), Cobra Thermosolar Plants, Inc. ("**CPI**") and Cobra Energy Investment, LLC ("**CEI**", and together with ACS and CPI, "**Cobra**"). The culmination of these negotiations was entry into the Restructuring Support Agreement (the "**Restructuring Support Agreement**"), upon which the Plan is premised, by and among the Debtor and Cobra. The Restructuring Support Agreement provides for the restructuring of the Debtor through the filing of the chapter 11 case with the Bankruptcy Court and the confirmation of the Plan. The Debtor firmly believes the Restructuring Support Agreement puts the Debtor on firm footing to prosecute the chapter 11 case expeditiously to conclusion.

The Plan contemplates a restructuring that provides for, among other things: (a) a $200 million cash payment, plus potential deferred payments pursuant to the terms of a $100 million contingent note to be guaranteed by ACS, to the DOE, acting through the Secretary of Energy on

the Effective Date of the Plan (the "**Effective Date**"), with Cobra funding the Debtor's obligations under the Plan through new debt financing and an equity contribution to be provided on the Effective Date; (b) mutual releases by the Debtor, Cobra, and the DOE of all Claims on the terms set forth in the Plan; (c) Cobra or an affiliate thereof to own 100% of the Company as one of the conditions of and upon the Effective Date; and (d) the unimpairment of all other Claims, as set forth in the Plan. As a result of the restructuring, the Debtor will emerge from bankruptcy with a significantly deleveraged balance sheet and free of costly, uncertain and time-consuming litigations with Cobra.

HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTOR ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(C) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE PARTIES IN INTEREST IN THE CHAPTER 11 CASE WITH "ADEQUATE INFORMATION" (AS DEFINED IN THE BANKRUPTCY CODE) SO THAT THOSE CREDITORS WHO ARE ENTITLED TO VOTE WITH RESPECT TO THE PLAN CAN MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.

THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH, NOR REVIEWED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**"), AND THE SECURITIES TO BE ISSUED ON OR AFTER THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH THE SEC UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR WITH ANY OTHER SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC, ANY OTHER SECURITIES REGULATORY AUTHORITY, OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC, NOR ANY OTHER SECURITIES REGULATORY AUTHORITY, NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THE DEBTOR BELIEVES THAT THE ISSUANCE OF THE SECURITIES UNDER THE PLAN WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE EXEMPTION PROVIDED BY SECTION 4(A)(2) OF THE SECURITIES ACT AND RULE 506 OF REGULATION D PROMULGATED THEREUNDER.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY

NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PERSON IS AUTHORIZED BY THE DEBTOR IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS AND SCHEDULES ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO IN THE DISCLOSURE STATEMENT AND/OR PLAN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR.  ALTHOUGH THE DEBTOR WILL MAKE AVAILABLE TO ALL PARTIES ENTITLED TO VOTE ON THE PLAN SUCH ADDITIONAL INFORMATION AS MAY BE REQUIRED BY APPLICABLE LAW PRIOR TO THE VOTING DEADLINE, THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ALL SUMMARIES THEREOF.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN OR THE APPLICABLE PLAN DOCUMENTS AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE APPLICABLE PLAN DOCUMENTS ARE CONTROLLING.  THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN WILL CONSTITUTE AN ADMISSION OF ANY LIABILITY BY ANY PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS OR INTERESTS.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS BASED PRIMARILY ON THE CURRENT EXPECTATIONS OF THE DEBTOR AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AFFECTING THE FINANCIAL CONDITION OF THE DEBTOR'S BUSINESS. IN PARTICULAR, STATEMENTS USING WORDS SUCH AS "MAY," "MIGHT," "WILL," "COULD," "WOULD," "SHOULD," "EXPECT," "INTEND," "PLAN," "ANTICIPATE," "BELIEVE," "ESTIMATE," "PROJECT," "POTENTIAL," "CONTINUE," "SEEK TO" AND "ONGOING," AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS.  THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW UNDER ARTICLE VIII IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS.  CONSEQUENTLY, THE PROJECTED

FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN SHOULD NOT BE REGARDED AS REPRESENTATIONS BY THE DEBTOR, ITS ADVISORS OR ANY OTHER PERSON THAT THE PROJECTED FINANCIAL CONDITIONS OR RESULTS OF OPERATIONS CAN OR WILL BE ACHIEVED. EXCEPT AS OTHERWISE REQUIRED BY LAW, THE DEBTOR DOES NOT UNDERTAKE ANY OBLIGATION TO UPDATE OR REVISE PUBLICLY ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE FOLLOWING APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN (INCLUDING THE COMPROMISES AND SETTLEMENTS PROVIDED FOR IN THE PLAN), CERTAIN STATUTORY PROVISIONS AND CERTAIN DOCUMENTS RELATING TO THE PLAN.  ALTHOUGH THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE AND PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF, OR ARE INCONSISTENT WITH, THE PLAN, SUCH STATUTES, OR SUCH DOCUMENTS.  TO THE EXTENT THERE IS ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN FOR ALL PURPOSES.

THIS DISCLOSURE STATEMENT WILL NOT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS TO ANY PERSON OR ENTITY THAT MAY RESULT FROM CONSUMMATION OF THE PLAN OR THE TRANSACTIONS CONTEMPLATED BY THE PLAN. AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT AND THE STATEMENTS MADE HEREIN NEITHER WILL CONSTITUTE NOR BE CONSTRUED AS AN ADMISSION, STIPULATION, WAIVER, EVIDENCE OR FINDING OF FACT, BUT RATHER A STATEMENT OR STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

The Plan contemplates the reorganization of the Debtor and the resolution of all outstanding Claims against, and Interests in, the Debtor.  The Plan is the product of extensive, arm's-length negotiations among the Debtor, the DOE, the DOJ and Cobra.  The Debtor believes the Plan is reflective of these good faith negotiations and will treat Holders of Claims and Interests in an economic and fair manner.  The Debtor believes that the Plan appropriately distributes value among its stakeholders in accordance with the Bankruptcy Code's priority scheme.

All exhibits to the Plan will be filed with the Bankruptcy Court and will be available for review, free of charge, at **https://dm.epiq11.com/Tonopah** not later than ten (10) days before the Voting Deadline (defined herein). Copies of all Exhibits to the Plan also may be obtained, free of charge, from Epiq Corporate Restructuring, LLC (the "**Voting Agent**") by calling 1-866-897-6433 (Toll Free U.S. and Canada) or 1-646-282-2500 (International), or by emailing tabulation@epiqglobal.com with a reference to "Tonopah" in the subject line.

In addition, if you are a holder of a Claim entitled to vote on the Plan and did not receive a ballot, received a damaged ballot or lost your ballot, or if you have any questions concerning the procedures for voting on the Plan, please contact the Voting Agent by calling 1-866-897-6433 (Toll Free U.S. and Canada) or 1-646-282-2500 (International), or by emailing tabulation@epiqglobal.com with a reference to "Tonopah" in the subject line.

### B.    Confirmation of the Plan

#### 1.    *Requirements*

The requirements for Confirmation of the Plan are set forth in section 1129 of the Bankruptcy Code. The requirements for approval of the Disclosure Statement are set forth in section 1125 of the Bankruptcy Code.

#### 2.    *Approval of the Plan and Confirmation Hearing*

To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code.

#### 3.    *Only Impaired Classes Vote*

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the Holder's legal, equitable or contractual rights are changed under such plan. In addition, if the Holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such Holders are not entitled to vote on such plan.

Under the Plan, only the DOE, as the holder of Prepetition Note Claim, in Class 3 is entitled to vote on the Plan.

Under the Plan, Holders of Claims and Interests in Classes 1, 2, and 4 are unimpaired and, therefore, deemed to accept the Plan. Holders of Interests in Class 5 are impaired, will not receive or retain any distributions or interests under the Plan on account of such Interests, and deemed to have rejected the Plan.

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO THE DOE, AS THE HOLDER OF CLAIMS IN CLASS 3.

**C.** **Treatment and Classification of Claims and Interests; Impairment**

1. *Treatment of Administrative Expense Claims and Priority Tax Claims*

a) Administrative Expense Claims

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, or as otherwise expressly provided in the Plan, on the applicable Distribution Date, or as soon thereafter as is reasonably practicable, the holder of such Allowed Administrative Expense Claim shall receive Cash from the Debtor in an amount equal to such Allowed Claim; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor, as debtor in possession, shall be paid by the Debtor in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities.

Claims for adequate protection which expressly constitute Allowed claims under the Cash Collateral Order shall be deemed Allowed Administrative Expense Claims to the extent payable under the Cash Collateral Order or the Plan, without the necessity of filing a proof of claim with respect thereto, and, shall be paid in full on the Effective Date or as is reasonably practicable as set forth in the Plan without the need to file a proof of such Claims with the Bankruptcy Court in accordance with the Plan and without further order of the Bankruptcy Court.

b) Professional Fee Claims

Except to the extent that the applicable holder of an Allowed Professional Fee Claim agrees to less favorable treatment with the Debtor, or as otherwise expressly set forth in the Plan, each holder of a Professional Fee Claim shall be paid in full in Cash pursuant to the Plan.

c) Priority Tax Claims

Except to the extent that the applicable holder of an Allowed Priority Tax Claim has been paid by the Debtor before the Effective Date, or the Debtor and such holder agree to less favorable treatment by the Debtor, each holder of an Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, at the option of the Debtor (a) payment in full in Cash made on or as soon as reasonably practicable after the later of the (i) Effective Date and (ii) first Distribution Date occurring at least 20 calendar days after the date such Claim is Allowed, (b) regular installment payments in accordance with section 1129(a)(9)(C) of the Bankruptcy Code or (c) such other amounts and in such other manner as may be determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

The Reorganized Debtor shall have the right, in its sole discretion, to pay any Allowed Priority Tax Claim or any remaining balance of an Allowed Priority Tax Claim (together with accrued but unpaid interest) in full at any time on or after the Effective Date without premium or penalty.

2.      *Classification of Other Claims and Interests*

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for all purposes, including as set forth herein. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date. Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the official claims register without a claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

Except as otherwise specifically provided for in the Plan, the Confirmation Order or other order of the Bankruptcy Court, or required by applicable non-bankruptcy law, in no event shall any Holder of an Allowed Claim be entitled to receive payments that in the aggregate exceed the Allowed amount of such Holder's Claim.

**Summary of Classification and Treatment of
Claims and Interests in the Debtor**

**THE PROJECTED RECOVERIES SET FORTH IN THE
TABLE BELOW ARE ESTIMATES ONLY AND ARE
THEREFORE SUBJECT TO CHANGE.**

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including related to the Claims reconciliation process.  Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by Creditors.  The projected recoveries are based on information available to the Debtor as of the date hereof and reflect the Debtor's estimates as of the date hereof only.  In addition to the cautionary notes contained elsewhere in the Disclosure Statement, it is underscored that the Debtor makes no representation as to the accuracy of these recovery estimates.  The Debtor expressly disclaims any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  For a summary of the treatment of each Class of Claims and Interests, see Article IV, "Summary of the Plan," below.

| Class | Designation | Plan Treatment of Allowed Claims and Interests | Status | Entitled to Vote | Estimated Allowed Amount of Claim | Projected Recovery Under the Plan |
|---|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a different treatment, on the applicable Distribution Date, each holder of an Allowed Priority Non-Tax Claim shall receive Cash from the Debtor in an amount equal to such Allowed Claim. | Unimpaired | No (deemed to accept) | $0 | 100% |
| 2 | Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, on the applicable Distribution Date, or as soon as reasonably practicable thereafter, each holder of an Allowed Other Secured Claim shall each receive, subject to the terms of the Plan, in full and final satisfaction, settlement, release and discharge of its Allowed Other Secured Claim, at the election of the Debtor: (i) Cash in an amount equal to such Allowed Other Secured Claim; or (ii) such other treatment that will render such Allowed Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that Other Secured Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, in the discretion of the Debtor without further notice to or order of the Bankruptcy Court.<br><br>Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final satisfaction of such Allowed Other Secured Claim is made as provided in the Plan.  On the full payment or other satisfaction of each Allowed Other Secured Claim in accordance with | Unimpaired | No (deemed to accept) | $481,863 | 100% |

| Class | Designation | Plan Treatment of Allowed Claims and Interests | Status | Entitled to Vote | Estimated Allowed Amount of Claim | Projected Recovery Under the Plan |
|---|---|---|---|---|---|---|
| | | the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person. | | | | |
| 3 | Prepetition Note Claims | On the Effective Date, or as soon as reasonably practicable thereafter, the holder of the Allowed Prepetition Note Claims shall receive, subject to the terms of the Plan, in full and final satisfaction, settlement, release and discharge of its Allowed Prepetition Note Claims, (a) $200 million in Cash (which shall be satisfied by DOE by a draw on the Cobra Backstop Letter of Credit) and (b) all rights and obligations under the Exit Contingent Note. | Impaired | Yes | $434,684,702 | 47-71%[2] |
| 4 | General Unsecured Claims | Except to the extent that a holder of a General Unsecured Claim agrees to different treatment, each holder of an Allowed General Unsecured Claim shall receive treatment that: (i) leaves unaltered the legal, equitable, or contractual rights to which the holder of such Allowed General Unsecured Claim is entitled; or (ii) otherwise | Unimpaired | No (deemed to accept) | $770,000 | 100% |

---

[2] The range of projected recovery under the Plan on account of the Prepetition Note Claim is based upon (i) in the low case of 47%, no payments being made by Reorganized TSE under the Exit Contingent Note, and (ii) in the high case of 71%, $100 million of payments being made by Reorganized TSE under the Exit Contingent Note over time (with no discount for present value). There is no guarantee that any payments will be required to be made by Reorganized TSE under the Exit Contingent Note, which will depend upon, among other things, the terms of new power purchase agreements entered into by Reorganized TSE. A copy of the Exit Contingent Note will be included in the Plan Supplement.

| Class | Designation | Plan Treatment of Allowed Claims and Interests | Status | Entitled to Vote | Estimated Allowed Amount of Claim | Projected Recovery Under the Plan |
|---|---|---|---|---|---|---|
| | | leaves such Allowed General Unsecured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code. | | | | |
| 5 | Existing Interests | Existing Interests shall be discharged, cancelled, released and extinguished, and holders thereof shall not receive or retain any distribution under the Plan on account of such Existing Interests. | Impaired | No (deemed to reject) | $420,779,227 | 0% |

### D.    Confirmation Hearing

Following the Petition Date, the Bankruptcy Court will schedule a hearing to consider Confirmation of the Plan (the "**Confirmation Hearing**").  Parties in interest will have the opportunity to object to the Confirmation of the Plan at the Confirmation Hearing.

THE DEBTOR URGES ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.

## ARTICLE II

## GENERAL INFORMATION REGARDING THE DEBTOR

### A.    Voting; Holders of Claims Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are Impaired and not deemed to have rejected a plan are entitled to vote to accept or reject a plan.  Generally, a claim or interest is Impaired under the Plan if the holder's legal, equitable or contractual rights are altered under such plan.  Classes of claims or equity interests under a chapter 11 plan in which the holders of claims or equity interests are Unimpaired are deemed to have accepted such plan and are not entitled to vote to accept or reject the proposed plan.  In addition, classes of claims or equity interests in which the holders of claims or equity interests will not receive or retain any property on account of their claims or equity interests are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims held by non-insiders that cast ballots for acceptance or rejection of such plan (such vote, the "**Requisite Acceptances**").  **Your vote to accept or reject the Plan is important.**  The Bankruptcy Code requires as a condition to confirmation of a plan that each class that is Impaired and entitled to vote under a plan vote to accept such plan, unless the provisions of section 1129(b) of the Bankruptcy Code are met.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtor reserves the right to amend the Plan (subject to the prior written consent of Cobra) and/or to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the non-acceptance of a plan by one or more Impaired classes of claims or interests, so long as at least one Impaired class of claims or interests, excluding the votes of insiders, votes to accept the plan.  Under Section 1129(b) of the Bankruptcy Code, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for the purpose of voting on the Plan (a "**Ballot**").  This Disclosure Statement, the Exhibits attached hereto, and the Plan and related documents are the only materials the Debtor is providing to creditors for their use in determining whether to vote to accept or reject the Plan, and such materials may not be relied upon or used for any purpose other than to vote to accept or reject the Plan.  If you

believe that you are entitled to vote to accept or reject the Plan and you did not receive a Ballot, please consult with your counsel and/or contact the Voting Agent by calling 1-866-897-6433 (Toll Free U.S. and Canada) or 1-646-282-2500 (International), or by emailing **tabulation@epiqglobal.com** with a reference to "Tonopah" in the subject line, or at the address listed below.

Please complete, execute and return your Ballot(s) (a) in the provided postage prepaid envelope, (b) via electronic mail to tabulation@epiqglobal.com or (c) by first class mail, overnight courier or hand delivery to:

<u>**If by First Class Mail:**</u>

Tonopah Solar Energy, LLC Ballot Processing Center
c/o Epiq Corporate Restructuring, LLC
P.O. Box 4422
Beaverton, OR 97076-4422

<u>**If by Overnight Courier or Overnight Mail**</u>:

Tonopah Solar Energy, LLC Ballot Processing Center
c/o Epiq Corporate Restructuring, LLC
10300 SW Allen Boulevard
Beaverton, OR 97005

PLEASE REFER TO THE INSTRUCTIONS ACCOMPANYING THE BALLOTS FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT YOUR BALLOT IS PROPERLY AND TIMELY SUBMITTED SUCH THAT YOUR VOTE MAY BE COUNTED.

TO BE COUNTED, YOUR PROPERLY COMPLETED BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY <u>RECEIVED</u> BY THE VOTING AGENT NO LATER THAN **5:00 P.M., EASTERN TIME, ON OCTOBER 13, 2020 (the "**<u>Voting Deadline</u>**"**) UNLESS THE DEADLINE IS EXTENDED BY THE DEBTOR WITH THE CONSENT OF COBRA. YOUR BALLOT MAY BE SENT VIA THE PROVIDED POSTAGE PREPAID ENVELOPE, ELECTRONIC MAIL, FIRST CLASS MAIL, OVERNIGHT COURIER OR HAND DELIVERY, AS INSTRUCTED IN THE BALLOT.

The Ballots have been specifically designed for the purpose of soliciting votes on the Plan from the Classes entitled to vote with respect thereto. Accordingly, in voting on the Plan, please use only the Ballot(s) sent to you with this Disclosure Statement or provided by the Voting Agent. If you require an additional Ballot, please contact the Voting Agent and request a replacement and/or supplemental Ballot.

The only impaired Class under the Plan that is entitled to vote is Class 3, which consists of Prepetition Note Claims. The DOE is the holder of the Prepetition Note Claims.

All properly completed Ballots received prior to the Voting Deadline will be counted for purposes of determining whether a voting Class of Impaired Claims has accepted the Plan. The Voting Agent will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Classes entitled to vote.

THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN REPRESENTS THE BEST OPPORTUNITY TO MAXIMIZE VALUE FOR THE DEBTOR'S STAKEHOLDERS AND CONSTITUENTS AND STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

### B.    The Debtor's Business

1.    *Overview of the Project*

The Debtor owns and operates a net 110-megawatt concentrated solar energy power plant (the "**Power Plant**") located near Tonopah in Nye County, Nevada.  The Power Plant is also known as the Crescent Dunes Solar Energy Project (the "**Project**").  The Project is the first utility-scale concentrated solar power plant in the United States to be fully integrated with energy storage technology.  The Power Plant uses solar power technology to concentrate and convert sunlight into heat energy, which is stored and converted, through a series of heat exchangers, to generate high-pressure steam.  Specifically, the Power Plant includes 10,347 heliostats (mirror assemblies) that collect and focus the sun's thermal energy to heat molten salt flowing through an approximately 640-foot tall solar power tower (the "**Receiver Tower**").  The Power Plant converts solar energy to heat energy by concentrating sunlight on the Receiver Tower, where molten salt is super-heated to a design temperature of 1050° F to create a source of heat energy.  Upon exiting the Receiver Tower, this molten salt is maintained in a vessel, the hot salt tank, before it is transmitted to the other areas of the Power Plant.  The balance of the Power Plant then relies on conventional technology to convert the heat energy to high-pressurized steam through a steam generation system, which powers a turbine that creates electricity for sale.  At the time of its construction, the Power Plant was unique among solar energy plants for many reasons, including its use of a non-degradable energy storage technology that can produce electricity at night, in the absence of sunlight.

Until October 2019, the electricity generated by the Power Plant was sold exclusively to the Nevada Power Company, d/b/a NV Energy ("**NVE**"), under that certain *Long-Term Firm Portfolio Energy Credit and Renewable Power Purchase Agreement* dated November 4, 2009 (as amended, the "**PPA**"), which, as discussed below, was terminated by NVE in the fall of 2019. The Debtor's sole source of revenue was the sale of power under the PPA.

The Debtor is currently managed by officers supplied by FTI, whose actions are overseen and directed by the Debtor's board of managers.  The Debtor also obtains operational support from third party contractors.  The Debtor's operating agreement prevents it from directly employing personnel.  Therefore, as of the Petition Date, the Debtor has no employees of its own.

Due to certain issues with a critical plant component, discussed below, the Power Plant is not currently generating any electricity; thus, it is not generating any revenue from the sale of electricity.  The Debtor's vendors and contractors are working to fix structural issues that would allow the Debtor to recommence operations.

2.      *History of TSE and the Crescent Dunes Solar Energy Project*

TSE was formed in February 2008 by SolarReserve, Inc. ("**SolarReserve**") to develop a solar energy power plant in the Nevada desert that would utilize a molten salt receiver to generate power.  The Project was to be the first utility-scale solar project of its kind in the United States to store energy as heat in the form of molten salt, effectively functioning as a giant battery, with the capability to generate electricity at night.  The Project's design was an innovative solution to the core limitation of renewable energy sources such as solar and wind—their intermittency.  TSE also anticipated that the Project would generate at least 600 construction jobs and 45 permanent jobs, and would avoid the release of nearly 279,000 metric tons of carbon dioxide into the atmosphere annually that would have been produced if conventional electricity generation technologies were used.

The development of the Project was dependent on identifying (a) a construction company to assume the risks associated with the required turnkey fixed-price engineering, procurement and construction contract, and (b) a utility to purchase the Power Plant's renewable, clean power that would be generated by a solar energy power plant under a long-term power purchase agreement.  After extensive negotiation and a protracted regulatory approval process, TSE found a purchaser in NVE, and, in November 2009, it entered into the PPA.  The PPA initially contemplated that TSE would build the Power Plant, and, upon completion, NVE would be the exclusive offtake purchaser of the power generated by the Power Plant.  The following month, SolarReserve applied for a loan guarantee from DOE, and TSE executed a contract (the "**EPC Contract**") with CPI to provide engineering, procurement and construction services in connection with the Project (at an initial fixed price amount of $766.4 million) in 2011.  TSE obtained equity investments from SolarReserve, CEI, which is an affiliate of ACS and Banco Santander, S.A.

TSE and the DOE executed that certain *Loan Guarantee Agreement*, dated as of September 23, 2011, between the Debtor and the DOE (as amended, the "**LGA**") in an authorized amount of up to $737 million, whereby the DOE guaranteed the project loan made to TSE by the Federal Financing Bank (the "**FFB**").  The initial amount of the loan guarantee was approximately $692 million.  As is typically the case in project loan documents, the LGA expressly provided that, the financing thereunder was conditioned upon the effectiveness of the PPA, which would provide the sole source of operating cash flow to service the project loan.  The Debtor does not believe that the Project would have been financed without, among other factors, the execution of the PPA and NVE's consequent commitment to purchase power generated by the Project at a price greater than $135 per megawatt hour (the "**PPA Purchase Price**").

As one of the conditions to guaranteeing the project loan and entering into the LGA, and as is common in the renewable energy industry, the DOE—as project lender—required the execution of the *Consent and Agreement* dated October 23, 2011 (the "**Direct Agreement**"), by

- 7 -

and among TSE, NVE and PNC Bank, National Association d/b/a Midland Loan Services, a division of PNC Bank, National Association, as collateral agent (the "**Collateral Agent**"), to memorialize certain rights of the Collateral Agent on behalf of the senior secured lender in connection with the PPA.  The Direct Agreement creates privity between and among the then-exclusive purchaser of the power generated by the Power Plant (NVE), the supplier of the power (TSE) and the Collateral Agent, and provides for specific PPA-related rights in favor of the Collateral Agent (for the benefit of the DOE), including additional protections for the Collateral Agent as it relates to the PPA, particularly in the event of a PPA default resulting in its possible termination.[3]

In accordance with the EPC Contract, CPI agreed to complete construction of the Project by a date certain at a fixed price and to secure "Provisional Acceptance" of the Project before tendering a "turnkey" power plant to TSE.  As set forth in the EPC Contract, CPI further agreed to pay both liquidated damages and certain contractually-defined damages in the event that the Power Plant did not generate specific minimum levels of electricity and satisfy other specified performance criteria.  TSE has alleged that CPI failed to perform under, and is in breach of, the EPC Contract.  CPI has vigorously denied such allegations.  These allegations are the subject of a pending arbitration proceeding between CPI and TSE, described below.

The Power Plant commenced commercial operations and production in November 2015 and achieved "Provisional Acceptance" in December 2016.[4]

In December 2016, Capital One, N.A. ("**Capital One**") acquired a tax equity stake in TSE's immediate parent and sole member, Tonopah Solar Energy Holdings II, LLC ("**TSEH II**").  As of the date of that investment, Capital One's capital account balance was $47.25 million.

In October 2016, the Power Plant ceased operations due to a leak in the hot salt tank.  Following its repair, the Power Plant resumed generating electricity in July 2017 and remained operational until early April 2019, at which time the discovery of a second leak in the hot salt tank required the Power Plant to cease operations again.  As the contractor under the EPC Contract, CPI has analyzed the root cause of the leak and is currently repairing the hot salt tank in an effort to resume Power Plant operations.

As of the Petition Date, the repair process is ongoing, the hot salt tank remains non-operational, and the Power Plant is not generating any electricity.  However, CPI has invested many millions of dollars to insure that the plant operates reliably once it re-enters operations. It is in the process of addressing the two major sources of unreliability—the heat exchangers and

---

[3]     It is common in the renewable energy industry, and often a required condition of funding from secured lenders, that the parties to a power purchase agreement enter into a direct agreement with the secured lender to afford the secured lender sufficient protection and comfort in connection with their project loan.

[4]     Despite the commencement of commercial operations and production, the construction of the Power Plant was never completed.  CPI failed to meet its contractually obligated deadlines to construct the Power Plant, which required repeated amendment to the EPC Contract.  In fact, Provisional Acceptance was only achieved by amendment of the EPC Contract; that amendment specifically stated that CPI had failed to complete construction of the Power Plant.  For the avoidance of doubt, CPI vigorously opposes the preceding characterization.

the hot salt tank—and it has delivered a schedule that anticipates the resumption of operations in the near term.  While there have been certain delays in the recommissioning schedule as a result of supply chain effects created by COVID-19, these delays do not significantly jeopardize the timeline of the resumption of operations.  The operational and financial effects of the remediation that is being conducted by CPI are reflected in the "Financial Projections" set forth in Appendix C hereto.

Cobra's new role as contractor under the New O&M Agreement will create alignment between the owner (which Cobra will become on emergence), the EPC Contract, and the O&M provider.  This alignment enhances efficiency as there will be significant knowledge transfer that would not otherwise be available between parties who are at odds with one another.  Even prior to the transition of full ownership, there will be efficiencies gained in knowledge sharing, procurement, and alignment when the EPC Contractor and the O&M contractor are affiliates.

3.    *Litigation between TSE and CPI*

In November 2017, CPI commenced an arbitration proceeding against TSE (the "**ICC Arbitration**") under the Rules of Arbitration of the International Court of Arbitration of the International Chamber of Commerce.  CPI alleges, without limitation and in general terms, that TSE breached the EPC Contract by, among other things, (i) impermissibly controlling the performance testing process under the EPC Contract referred to as the "Continuous Performance Measurement" (the "**CPM**"); (ii) unilaterally altering the main software infrastructure of the Power Plant during the CPM period; (iii) wrongfully denying access to information and the Power Plant itself necessary to conduct the CPM; and (iv) wrongfully calculating and claiming entitlement to contractually-defined damages referred to in the EPC Contract as "CPM Payments"[5] (collectively, the "**CPI Arbitration Claims**").[6]  TSE vigorously denies these allegations.

In February 2018, TSE filed its Answer in the ICC Arbitration, asserting numerous counterclaims against CPI (the "**TSE Arbitration Claims**").  The TSE Arbitration Claims include, without limitation and in general terms, that (a) CPI breached the EPC Contract by failing to (i) deliver the guaranteed electricity output from the Power Plant, (ii) engineer, procure and construct the agreed upon Power Plant, and (iii) make certain critical payments and remediate in a timely manner various defects in the work it performed at the Power Plant; and  (b) CPI's conduct has amounted to bad faith and/or gross negligence.[7]  CPI vigorously denies these allegations.

---

[5]    Since shortly after the transfer of care, custody, and control of the Power Plant from Cobra to TSE in December 2016, TSE has received CPM Payments from Cobra pursuant to a performance shortfall provision included in the EPC Contract, which requires Cobra to compensate TSE for the Power Plant's failure to meet specific contractual performance criteria. Cobra has disputed such CPM Payments.

[6]    The information provided in this paragraph is intended to provide a general summary of the CPI Arbitration Claims.  CPI's full allegations are set forth in the documents filed by CPI in the ICC Arbitration.

[7]    The information provided in this paragraph is intended to provide a general summary of the TSE Arbitration Claims.  TSE's full allegations are set forth in the documents filed by TSE in the ICC Arbitration.

Prior to a scheduled hearing on the merits of these claims, TSE filed in December 2019 a supplemental statement of counterclaims, wherein it alleged claims for breach of contract, breach of the covenant of good faith and fair dealing, interference with contractual relations, and fraud (collectively, the "**Supplemental Claims**").[8]  CPI vigorously denies all of these allegations.

The hearing on a subset of the CPI Arbitration Claims and TSE Arbitration Claims was slated for January 2020; however, this hearing was postponed due to the unexpected illness of one of the arbitrators.  On March 23, 2020, CPI and TSE agreed to a 60-day stay of the ICC Arbitration proceedings, as the parties continued extensive negotiations regarding the Plan, including a consensual resolution of the claims in the ICC Arbitration.  The arbitration panel granted the requested stay on March 24, 2020.  On May 11, 2020, the arbitration panel granted an additional 60-day extension until July 25, 2020.  On July 22, 2020, the panel granted a further extension until September 25, 2020.  If the ICC Arbitration proceeds, TSE and CPI are both seeking damages pursuant to and/or for breach of the EPC Contract and as may be available under applicable law.  The Plan, if confirmed, would resolve all of the claims pursued by both parties in the ICC Arbitration.

4.    *The Independent Managers Join the Board*

As of the commencement of the ICC Arbitration, the Board of Managers of TSE included two managers appointed by SolarReserve and one independent manager.  In accordance with the *Second Amended and Restated Limited Liability Company Agreement of Tonopah Solar Energy, LLC*, dated as of May 22, 2018, and as a result of certain conflicts of interest that arose between Cobra and SolarReserve in connection with the management of the Power Plant and the overall corporate governance of TSE, TSEH II appointed two independent managers unaffiliated with Cobra and SolarReserve—Mark Manski and Joseph A. Bondi—to the Board of Managers of TSE (the "**Independent Managers**") and replaced one of the two SolarReserve-appointed managers with a manager nominated by Cobra.

Among other duties, the Independent Managers were vested with the authority to review, evaluate and recommend key decisions to the full Board of Managers regarding the management of the Power Plant to the extent that conflicting interests of SolarReserve and/or Cobra were implicated.

5.    *Hot Salt Tank Leak*

In late March 2019, a significant leak in the hot salt tank was discovered, which required TSE to halt all power-generating operations at the Power Plant in early April 2019.  The molten salt was removed from the hot salt tank, and CPI began repairing the tank.  TSE and CPI disagree on the root cause of the leak and which party bears responsibility for the leak.  For as long as the Power Plant remains non-operational, TSE is not selling any power and is not generating any revenue.

---

[8]    The information provided in this paragraph is intended to provide a general summary of the Supplemental Claims.  TSE's full allegations are set forth in the documents filed by TSE in the ICC Arbitration.

6.     *DOE Notices Events of Default and Replaces Non-Independent Managers*

By letter dated September 17, 2019, the DOE sent TSE a Notice of Events of Default (the "**DOE Default Notice**").  In the DOE Default Notice, the DOE alleges that TSE is in default under several provisions of the LGA.

In connection with the DOE Default Notice, the DOE—through the Collateral Agent— exercised certain proxy rights over TSEH II's sole member interest in TSE under that certain *Equity Pledge Agreement* dated October 21, 2011, by and between TSEH II and the Collateral Agent (the "**Equity Pledge Agreement**") and the Irrevocable Proxy granted by TSEH II to the Collateral Agent pursuant thereto.  Specifically, the DOE alleged that all of TSEH II's rights in respect of "voting, consensus and other powers of ownership pertaining to the Pledged Collateral" vested in the Collateral Agent, as provided for in the Equity Pledge Agreement following the occurrence and during the continuance of an Event of Default under the LGA.

Exercising these powers, the Collateral Agent executed a *Written Consent of the Sole Member of Tonopah Solar Energy, LLC*, effective as of September 17, 2019, which removed the two non-Independent Managers, who were representatives of the indirect equity holders SolarReserve and Cobra, respectively.  In their place, the DOE appointed two individuals with significant restructuring and turnaround experience—Anna Phillips and Charles Reardon (the "**Successor Managers**").  As a result, the TSE Board of Managers as of the Petition Date consists of the two Successor Managers and the two Independent Managers, who have voted unanimously to authorize the filing of the Chapter 11 Case.

## C.     Operation and Maintenance Agreements

Under that certain Operation and Maintenance Agreement between the Debtor and PIC Group, Inc. ("**PIC**"), dated as of September 20, 2011 (the "**O&M Contract**"), PIC provides certain operational and maintenance services for the Debtor at the Power Plant including, but not limited to: (a) developing a work force through hiring and training; (b) operating the Power Plant in a clean, safe and efficient manner in accordance with the O&M Contract and certain budgets and industry practices; (c) maintaining records such as operating logs, manuals, and reports; (d) maintaining and calibrating tools and instruments; (e) implementing and updating certain environmental programs; (f) performing general preventative maintenance; (g) interfacing with certain regulatory bodies; (h) maintaining permits and licenses; and (i) undertaking those activities customarily performed by an operating and maintenance contractor for a power plant.

As the future owner and operator of the Power Plant, and as further discussed below, a condition of Cobra's support for the RSA and the proposed transaction, CEI has requested, and the Debtor has agreed, to seek approval of the transfer of operations and maintenance of the Power Plant from PIC to CEI within thirty-five (35) days of the Petition Date.  To effectuate the transfer of operations to CEI, the Debtor has entered into a new operation and maintenance agreement (the "**Operating Agreement**") between the Debtor and a CEI affiliate, Cobra Industrial Services, Inc. ("**CIS**"), which is subject to approval of the Court and pursuant to which CIS will provide administrative, maintenance, and operating services under terms that are substantially similar to those in the O&M Contract.  Accordingly, the Debtor will no longer

require the services provided by PIC under the O&M Contract once the Operating Agreement is approved by the Court.

### D.     The Debtor's Prepetition Capital Structure

As of the Petition Date, the Debtor has outstanding debt obligations in the aggregate amount of over $432 million, including accrued and unpaid interest and applicable late charges, consisting primarily of TSE's obligations to the DOE under the LGA and the other Prepetition Financing Documents.

After receiving the DOE Default Notice in September 2019, the Debtor failed to make subsequent payments of principal and interest, and DOE delivered supplemental notices of events of default on October 16, 2019 and June 29, 2020.

### 1.     *Secured Claims*

#### a)     Loan Guarantee Agreement

On September 23, 2011, in connection with the Project, TSE entered into the LGA with the DOE to guaranty the funding of up to $737 million to TSE by the FFB (the "**DOE Loan**"). The DOE Loan is secured by substantially all of TSE's assets, including the Project, TSE's rights under its major contracts (including the EPC Contract), and all cash maintained in DOE controlled accounts, but subject to permitted liens and specified excluded assets.  The DOE Loan is further secured by, among other collateral, an equity pledge from TSEH II of its sole member interest in TSE in favor of the Collateral Agent pursuant to the Equity Pledge Agreement (through which DOE appointed the Successor Managers).  The DOE Loan accrues interest at an approximate weighted average rate of 2.9% per annum and matures in December 2036.

As of the Petition Date, the approximate principal amount outstanding under the DOE Loan is $425 million and the accrued and unpaid interest under the DOE Loan is approximately $7.4 million.

#### b)     Litigation Claims

As noted above, TSE and CPI assert significant claims against one another in the ICC Arbitration.  In the event that CPI were to prevail in the ICC Arbitration, CPI may be entitled to a significant claim against TSE's bankruptcy estate.

In addition to the ICC Arbitration, TSE is a defendant in two interrelated civil actions commenced in Nevada state court by a Project subcontractor, Brahma Group, Inc. ("**Brahma**"), in respect of which Brahma is seeking contractual damages in excess of $13 million. Brahma initially filed a lien (the "**Lien**") against the Project with respect to one of the civil actions, which was bonded by CPI.  Subsequently, Brahma filed an identical civil action in a separate Nevada state court, which was removed to the federal district court in Nevada on September 9, 2018. Brahma moved to foreclose on the Lien (the "**Lien Action**"). In conjunction with the Lien Action, a subcontractor of Brahma, H&E Equipment, filed a companion lien action against TSE (the "**Subcontractor Lien Action**" and together with the Lien Action, the "**Pending Lien Actions**"), which was also bonded by CPI. TSE successfully appealed the state court's decision

- 12 -

to proceed with the Pending Lien Actions, and they are now stayed pending the decision of the federal district court on the underlying claim.

Further, a subcontractor, Nooter Eriksen ("**Nooter**"), initiated a proceeding in Nye County, Nevada, against TSE, as a co-defendant alongside Solar Reserve, LLC ("**SR LLC**"),[9] a subcontractor to the Project, and Liberty Moly, LLC, an easement provider.  Upon information and belief, Nooter Eriksen provided certain materials to SR LLC that SR LLC deployed on the Project.  TSE paid SR LLC for these materials; however, according to the complaint filed, SR LLC never paid Nooter.  As it relates to TSE, Nooter is suing to foreclose on a lien that it has placed on the Project.  TSE has filed an answer in this action and is awaiting further scheduling.

Additionally, SolarReserve CSP Holdings, LLC ("**SR CSP**") in the fall of 2019 brought an action ( the "**Books and Records Action**") against TSE in the Delaware Court of Chancery (the "**Court of Chancery**") for breach of contract in respect of TSE's alleged failure to provide access to the books and records of the company (the "**Breach of Contract Claim**").  TSE filed an answer on February 24, 2020.  A bench trial took place on May 13, 2020.  On July 24, 2020, the Court of Chancery issued a memorandum opinion resolving the Books and Records Action in TSE's favor.

Finally, SR CSP brought an action against the Debtor in the Delaware Court of Chancery on October 2, 2019.  SR CSP initially sought to name a manager to the Debtor's board, and, in an amended complaint filed on November 5, 2019, SR CSP instead sought equitable dissolution of the Debtor.  The Debtor filed a motion to dismiss the complaint on December 16, 2019.  On March 18, 2020, the Delaware Court of Chancery granted TSE's motion and dismissed the action in its entirety.  SR CSP has filed an appeal.  SR CSP filed an opening brief on June 2, 2020, and TSE filed a reply brief on July 2, 2020.

In addition to the actions set forth above, CMB Infrastructure Investment Group IX, LP and CMB Export, LLC (the "**CMB Parties**") filed proofs of claim on September 3, 2020, based upon a complaint filed on May 19, 2020 in the District Court, Clark County, Nevada, as amended,[10] alleging that the Debtor and Cobra engaged in conduct that amounted to Fraud (Count Three); Intentional Interference with Contractual Relations (Count Five); Aiding and Abetting Fraud (Count Four); Aiding and Abetting Interference with Contract (Count Six); Intentional Interference with Contractual Relations (Count Eight); and Aiding and Abetting Breach of Fiduciary Duty (Count Ten).  The CMB Parties are seeking damages in the amount of $90,000,000 plus interest and attorney's fees as a general unsecured claim in the Chapter 11 Case."

---

[9]    In addition, on December 31, 2019, SolarReserve commenced an assignment for the benefit of creditors in the State of California.

[10]    The Debtor expressly reserves all rights to assert that the filing of an amended complaint on September 1, 2020 was an act in violation of the automatic stay imposed by section 362 of the Bankruptcy Code and CMB reserves the right to dispute that any violation of the automatic occurred, as the existence of the bankruptcy proceeding was noted in the amended complaint.  Further, the Debtor reserves all rights including any defenses, claims and/or counterclaims with respect to such action.  The Debtor does not concede or otherwise acknowledge having been served with such complaint at any time prior to or during the pendency of the Chapter 11 Case.

c)    Non-Litigation Unsecured Claims and Equity

The Debtor has approximately sixty (60) known unsecured creditors that are believed to hold claims totaling in excess of $2.8 million in the aggregate.  Those creditors include trade claimants and other routine, ordinary course creditors, certain of which are deemed by TSE to be critical vendors as described more fully below.

All of the equity interests in TSE are owned by TSEH II.  The equity interests in TSEH II are divided into two classes: Class A Units[11] held solely by Capital One, as "Tax Equity Investor" and Class B Units owned by Tonopah Solar Energy Holdings I, LLC ("TSEH I"). TSEH I is owned indirectly by Banco Santander (26.8%) and directly by Tonopah Solar Investments, LLC (73.2%).  Tonopah Solar Investments, LLC is owned by CEI (50%), and SR CSP (50%).

### E.    Events Leading up to the Chapter 11 Case

A series of events, set off by the March 2019 leak of the hot salt tank, necessitated the filing of the Chapter 11 Case.

1.    *Hot Salt Tank*

As set forth above, the hot salt tank—an essential component in the operation of the Power Plant—experienced a leak in late March 2019.  Consequently, the Power Plant has been unable to produce any electricity since April 2019, and the Debtor has not generated any revenue through the sale of power since that time.  Its only source of cash inflow has been the CPM Payments, which have now ended.

2.    *Termination of the PPA*

In the ten years that have passed since the execution of the PPA, the market price of renewable energy has dropped to a level that is significantly below the PPA Purchase Price (an escalating figure beginning at $135 per megawatt hour, which had reached approximately $139 per megawatt hour at the time the PPA terminated).  Eager to free itself from the long-term obligation to purchase site-specific power generated at the Power Plant at a price it no longer viewed as economic, NVE capitalized on the operational difficulties at the Project and served a notice of default under the PPA on January 1, 2019 ("**NVE Default Notice**").

Upon receipt of the NVE Default Notice, TSE, along with CPI, worked diligently to cure the potential event of default alleged in the NVE Default Notice within the applicable cure periods.  Nevertheless, on October 4, 2019, the PPA was terminated with respect to all parties.

Since the termination of the PPA, CPI has continued with repair activities at the Power Plant, and TSE has investigated options for replacing the terminated PPA with a similar offtake contract.  Given the shifts in the market dynamics since the execution of the PPA nearly ten

---

[11]    The Class A Units representing the equity interests do not have voting rights with respect to the appointment of the managing member, but there are certain reserved actions for which the consent of the holders of both the Class A Units and the Class B Units is required.

years ago, there is not an equivalent PPA available today nor is there a PPA that would permit TSE to satisfy the repayment of the DOE Loan and satisfy its own operating costs even if the Power Plant were operational.

        3.    *Restructuring Support Agreement*

In early 2020, facing liquidity issues, the Debtor, Cobra, and DOE began discussions regarding the compromise and settlement of the DOE's claims for an agreed-upon reduced amount.  Ultimately, following months of extensive arm's-length negotiations, the Debtor, CEI, and DOE agreed in principle to implement the terms of a de-leveraging transaction through a pre-negotiated chapter 11 plan that also involved the settlement of the ICC Arbitration.

On July 29, 2020, the Debtor and Cobra entered into that certain *Restructuring Support Agreement* (as may be amended, the "**RSA**"), pursuant to which, among other things: (a) the DOE shall receive, in full and complete satisfaction of the Debtor's outstanding obligations under the Loan Documents (as defined in the LGA), a payment of $200 million in cash upon the Effective Date of the Plan (as defined therein), plus a $100 million contingent note to be guaranteed by Cobra, with Cobra funding the Debtor's obligations under the Plan through new debt financing and cash to be provided on the Effective Date of the Plan; (b) the security interests granted under the Security Documents (as such term is defined in the LGA) shall be released; (c) the parties shall mutually release each other from all Claims (as defined in the Plan) on the terms set forth in the Plan; (d) Cobra or an affiliate thereof shall own 100% of the company upon completion of the restructuring; and (e) all other claims shall remain unimpaired as set forth in the Plan.  Pursuant to the Plan, it is contemplated that all claims, other than the DOE's, will be either paid in full on the Effective Date or otherwise rendered unimpaired.

The RSA may be terminated in the event of certain breaches by the parties thereto and upon the occurrence of certain events (each an "**RSA Milestone**" and collectively, the "**RSA Milestones**"), including, for example, the failure to meet specified milestones relating to the filing, confirmation, and consummation of the Plan.  A summary of certain RSA Milestones is below:

| RSA Milestone Termination Events[12] | |
|---|---|
| 11:59 p.m. (EST) on the date that is two (2) Business Days after the RSA is executed | unless (i) the Bankruptcy Case is commenced in the Bankruptcy Court, (ii) a motion to reject the O&M Contract is filed with the Bankruptcy Court (iii) a motion to approve the New O&M Agreement is filed with the Bankruptcy Court, and (iv) the Plan and the Disclosure Statement are filed with the Bankruptcy Court. |
| 11:59 p.m. (EST) on the date (x) that is five (5) days after the Petition Date | unless the Bankruptcy Court has entered the Interim Cash Collateral Order, in a form reasonably satisfactory to Cobra. |

---

[12] Capitalized terms used but not defined in this chart have the meanings given to such terms in the RSA.

| 11:59 p.m. (EST) on the date (x) that is thirty-five (35) days after the Petition Date | unless the Bankruptcy Court has entered the Interim Cash Collateral Order on a final basis in a form reasonably satisfactory to Cobra. |
|---|---|
| 11:59 p.m. (EST) on the date that is sixty (60) days after the Petition Date | unless the Bankruptcy Court has entered the Disclosure Statement Order and an order authorizing and approving the New O&M Agreement. |
| 11:59 p.m. (EST) on the date that is one hundred twenty (120) days after the Petition Date | unless the Bankruptcy Court has entered the Confirmation Order. |
| 11:59 p.m. (EST) on the date that is one hundred fifty (150) days after the Petition Date (as such date may be extended pursuant to Section 8.14 of the RSA, the "**Outside Date**") | unless the Company has substantially consummated the Plan pursuant to its terms. |

Prior to entry into the RSA, on May 11, 2020, the Debtor sent a request letter (the "**Capital Call Request**") to TSEH II, requesting a capital contribution of $475 million to fully satisfy the DOE Debt and provide the Debtor with access to additional working capital without the need to commence a chapter 11 case. The Debtor viewed this as necessary because the DOE indicated it would not agree to a compromise of the DOE Debt other than pursuant to the terms of the Plan. CEI responded on May 17, 2020, and indicated that if the relevant upstream requests were made of it, it was willing to initiate a process within CEI for approval of the funding of CEI's pro rata share of the Capital Call Request, provided it receive confirmation of certain matters, including (i) that all members were willing to fund their pro rata share; (ii) that if the contribution were made, the new capital would be used to fully satisfy amounts owing to the DOE and that the United States would provide releases of all claims held by the United States related to or arising from the Project; and (iii) that all parties would undertake, as a condition to funding, a restructuring of the Project. SR CSP, on the other hand, responded to the Capital Call Request on May 16, 2020 and again on May 18, 2020, and essentially questioned the Debtor's good faith in making the request while also making various information requests relating to the request. On May 21, 2020, the Debtor responded to each of SR CSP and CEI, provided certain of the requested information, and asked that each confirm by May 26, 2020, whether it intended to cause the requested capital contribution and provide evidence of their financial wherewithal to do so. Neither party, however, responded. Thus, entry into the RSA became the Debtor's only viable option to address the issues it faced.

4.    *Postpetition Financing.*

The Debtor's Cash Collateral is its sole source of funding for its operations and the costs of administering the Chapter 11 Case.  The DOE has consented to the Debtor's use of Cash Collateral, subject to the terms of the Cash Collateral Orders (as defined below).  As a result, the Debtor does not believe that entry into a debtor in possession financing facility is necessary at this time.  The DOE's consent is based, in part, on Cobra's agreement (the "**Backstop Agreement**") to reimburse the DOE for certain postpetition expenses, in the event the restructuring is not consummated due to, among other things, the failure to achieve the milestones set forth in the RSA.  This agreement is embodied in an agreement between the DOE and Cobra, which will be included within the Plan Supplement that is being filed with the Court.

More particularly, pursuant to the Backstop Agreement, Cobra has delivered to the Collateral Agent, for the benefit of DOE, a standby letter of credit in the aggregate stated amount of $23,150,000 (the "**Settlement Letter of Credit**").  Pursuant to the Backstop Agreement, following DOJ's affirmative vote to accept the Plan, Cobra is required to deliver an additional standby letter of credit from an issuing bank acceptable to DOE with a total face value of $176,850,000 (the "**Final Letter of Credit**"), which amount represents the difference between the aggregate stated amount of the Settlement Letter of Credit and $200,000,000, which is the amount of the cash payment to be made to DOE on the Effective Date. The Backstop Agreement further provides that the Collateral Agent is entitled to draw on the Settlement Letter of Credit in an amount equal to the aggregate Reimbursable Post-Petition Costs (as defined in the Backstop Agreement) up to the date of draw in the event Cobra materially breaches its obligations under the RSA or the Backstop Agreement, to the extent such breach is not timely cured, or a case milestone as set out in the RSA is not timely achieved other than due to any action or inaction by the Collateral Agent, DOE, DOJ, or any other agency, division, or department of the United States of America other than the Court or the United States Trustee for the District of Delaware. Further, in the event Cobra materially breaches its obligations under the Backstop Agreement or the RSA following DOJ's affirmative vote to accept the Plan, the Backstop Agreement provides that the Collateral Agent is entitled to draw on the Settlement Letter of Credit and the Final Letter of Credit in full.

Relatedly, ACS has delivered a promissory note to the Collateral Agent, for the benefit of DOE, in the face amount of $176,850,000 (the "**ACS Note**").  The ACS Note becomes immediately due and owing to the Collateral Agent in the event Cobra fails to timely deliver to the Collateral Agent the Final Letter of Credit in accordance with the Backstop Agreement.  In addition, Cobra's failure to timely deliver the Final Letter of Credit to the Collateral Agent would give the Collateral Agent the right to immediately draw on the Settlement Letter of Credit in full.

## F.    The Debtor's Goals in the Chapter 11 Case

The Debtor has commenced the Chapter 11 Case to effectuate a consensual financial restructuring pursuant to the terms of the Plan.  As a result of the Restructuring, the Debtor will emerge from the Chapter 11 Case with a reduced debt burden that is better aligned with its present and future operating prospects.  The Debtor is well-positioned to emerge quickly from

- 17 -

chapter 11 with a renewed focus on obtaining full operational capacity. To that end, the Debtor intends to seek prompt confirmation of the Plan.

## ARTICLE III

## THE CHAPTER 11 CASE

### A.      General Case Background

On the date hereof, the Debtor filed a voluntary petition in the Bankruptcy Court for relief under chapter 11 of the Bankruptcy Code. The Debtor continues to operate its business and manage its properties as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. As of the date hereof, no request has been made for the appointment of a trustee or examiner in the Chapter 11 Case.

### B.      Employment and Compensation of Professionals

Prior to the Petition Date, to assist the Debtor in carrying out its duties as debtor in possession, and to otherwise represent its interests in the Chapter 11 Case, the Debtor retained the following professionals subject to Bankruptcy Court approval:

- Willkie Farr & Gallagher LLP ("**Willkie**") as bankruptcy co-counsel;

- Young Conaway Stargatt & Taylor, LLP ("**Young Conaway**") as bankruptcy co-counsel;

- Wilson Sonsini Goodrich & Rosati ("**Wilson Sonsini**") as special corporate counsel;

- FTI Consulting as interim manager;

- Houlihan Lokey as valuation expert; and

- Epiq Corporate Restructuring, LLC as claims and noticing agent and administrative advisor.

### C.      "First Day" Motions and Related Applications

To minimize the possible disruption to the Debtor upon the filing of this chapter 11 case, among other reasons, on the Petition Date, the Debtor filed the following motions with the Bankruptcy Court:

a.      Debtor's Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363, 507, and 552, Bankruptcy Rules 2002, 4001, and 9014, and Local Rule 4001-2 (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b)(2), and (IV) Granting Related Relief (the "**Cash Collateral Motion**");

b.  Debtor's Motion for Interim and Final Orders (I) Authorizing the Debtor to (A) Continue to Maintain Its Cash Management System, Including Bank Accounts and Business Forms, (B) Honor Certain Prepetition Obligations Related Thereto; (II) Waiving (A) Certain Operating Guidelines, and (B) Section 345(b) Deposit and Investment Requirements; and (III) Granting Related Relief (the "**Cash Management Motion**");

c.  Debtor's Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 503(b)(9), 1107(a), and 1108 of the Bankruptcy Code, (I) Authorizing the Debtor to Pay Certain Prepetition Claims of (A) Critical Vendors and Service Providers and (B) Certain Vendors Entitled to Administrative Expense Priority Under Section 503(b)(9) of the Bankruptcy Code; and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto (the "**Critical Vendor Motion**");

d.  Debtor's Application for an Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent Effective as of the Petition Date (the "**Section 156(c) Application**");

e.  Debtor's Motion for Entry of Interim and Final Orders (I) Approving the Debtor's Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Services, (III) Approving the Debtor's Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief (the "**Utilities Motion**");

f.  Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Prepetition Sales, Use, and Franchise Taxes and Similar Taxes and Fees, (II) Authorizing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Made Relating to the Foregoing, and (III) Scheduling Final Hearing (the "**Tax Motion**").

g.  Debtor's Motion for Entry of an Order Authorizing Rejection of Operations and Maintenance Agreement (the "**Rejection Motion**").  The Rejection Motion will not be heard as a first day motion, but rather when scheduled by the Court.

h.  Debtor's Motion for Entry of an Order Approving the New Operations and Maintenance Agreement (the "**Approval Motion**").  The Approval Motion will not be heard as a first day motion, but rather when scheduled by the Court.

## D.    Exclusivity

Under the Bankruptcy Code, a debtor has the exclusive right to file a plan or plans for an initial period of 120 days from the date on which the debtor filed its bankruptcy petition.  If a

debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the Petition Date to solicit acceptances of its plan. During these exclusive periods, no other party in interest may file a competing plan. A court may extend these periods upon request of a party in interest and "for cause."

The Debtor's initial exclusive filing period expires on November 27, 2020, and the Debtor's initial exclusive solicitation period expires on January 26, 2020.

## ARTICLE IV

## SUMMARY OF THE PLAN

The Debtor believes that the Plan is in the best interests of the Debtor and its estate. Through the Plan, Holders of Allowed Claims will obtain a recovery from the Debtor's estates equal to or greater than the that they would receive if the Debtor's assets were liquidated under chapter 7 of the Bankruptcy Code and consummation of the Plan will maximize the recovery of the Holders of Allowed Claims.

The consummation of a plan is the principal objective of a chapter 11 case.  A plan sets forth the means for treating Claims against, and Interests in, a debtor.  Confirmation of a plan makes the plan binding upon the debtor, any issuer of securities under the plan and any creditor of, or equity Holder in, the debtor, whether or not such creditor or equity Holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.

Subject to certain limited exceptions and other than as provided in the Plan itself or the Confirmation Order, a Confirmation Order discharges the debtor from any debt that arose prior to the Effective Date and substitutes therefor the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual and equitable rights of the Holders of Claims or Interests in certain classes are to remain unaltered by the reorganization effectuated by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan.  Accordingly, a debtor need not solicit votes from the Holders of Claims or Interests in such classes.  A chapter 11 plan may also specify that certain classes will not receive any distribution of property or retain any Claim or Interest against a debtor.  Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan.  Any class that receives a distribution of property under the plan but are impaired will be solicited to vote to accept or reject the plan.

Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan. To satisfy the requirements of section 1125 of the Bankruptcy Code, the Debtor is submitting this Disclosure Statement to Holders of Claims against the Debtor who are entitled to vote to accept or reject the Plan.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE

PLAN.  THIS SECTION IS QUALIFIED IN ITS ENTIRETY BY AND IS SUBJECT TO THE PLAN AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN.

STATEMENTS AS TO THE RATIONALE UNDERLYING THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN ARE NOT INTENDED TO, AND SHALL NOT, WAIVE, COMPROMISE OR LIMIT ANY RIGHTS, CLAIMS OR CAUSES OF ACTION IN THE EVENT THE PLAN IS NOT CONFIRMED.

The classification and treatment of Claims and Interests; treatment of Executory Contracts and Unexpired Leases; and effect of Confirmation, including the release, injunction and related provisions, are summarized below. For all other provisions relating to the Plan, including acceptance or rejection of the Plan; implementation of the Plan; provisions governing distributions; provisions regarding governance of the Reorganized Debtor; conditions precedent to Confirmation and effectiveness of the Plan; modification, revocation or withdrawal of the Plan and retention of jurisdiction, please refer to the Plan attached hereto as Appendix A.

## A.      Overview of the Plan

The Plan provides for, among other things:

- A $200 million cash payment, plus a $100 million contingent note to be guaranteed by Cobra, with Cobra funding the Company's obligations under the Plan through new debt financing and cash to be provided on the Effective Date of the Plan;

- Mutual releases of Claims on the terms set forth in the Plan;

- Release of claims held by third parties on the terms set forth in the Plan;

- Dismissal of the ICC Arbitration;

- Cobra or a Cobra Designee to own 100% of the Company upon the Effective Date;

- the unimpairment of all other Claims, as set forth in the Plan.

## B.      Classification and Treatment of Claims and Interests

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a Debtor's creditors and equity Interest Holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Expense Claims and Priority Tax Claims, which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified). The Debtor also is required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtor into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each Claim or Interest of a particular class unless the Claim Holder or Interest Holder agrees to a less favorable treatment of its claim or interest. The Debtor believes that it has complied with such standard. If the Bankruptcy Court finds otherwise, however, it could deny Confirmation of the Plan if the Holders of Claims and Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

The Debtor believes that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law.

It is possible that a Holder of a Claim or Interest may challenge the Debtor's classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If such a situation develops, the Debtor intends, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its Confirmation. Any such reclassification could materially adversely affect Holders of Claims and Interests by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan. EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM OR INTERESTS AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM OR INTEREST PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM OR INTEREST REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

Any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by Creditors. The projected recoveries are based on information available to the Debtor as of the date hereof and reflect the Debtor's views as of the date hereof only.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below. The Debtor believes that the consideration, if any, provided under the Plan to Holders of Claims and Interests reflects an appropriate resolution of the Claims and Interests, taking into account the differing nature and priority of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

1.      *Administrative Expense Claims, Priority Tax Claims and Statutory Fees*

a)      Administrative Expense Claims

(i)      <u>Treatment of Administrative Expense Claims</u>

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, or as otherwise expressly provided herein, on the later of (i) the Effective Date, or as soon thereafter as is reasonably practicable, or (ii) the date on which an Administrative Expense Claim is Allowed, the holder of such Allowed Administrative Expense Claim shall receive Cash from the Debtor in an amount equal to such Allowed Claim; <u>provided</u>, <u>however</u>, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor, as debtor in possession, shall be paid by the Debtor in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities.

Claims for adequate protection under the Cash Collateral Order shall be deemed Allowed Administrative Expense Claims to the extent payable under the Cash Collateral Order or the Plan, without the necessity of filing a proof of claim with respect thereto, and shall be paid in full on the Effective Date or as is reasonably practicable as set forth in Section 3.1 of the Plan without the need to file a proof of such Claims with the Bankruptcy Court in accordance with Section 3.2(a) of the Plan and without further order of the Bankruptcy Court.

b)      Professional Fee Claims

Except to the extent that the applicable holder of an Allowed Professional Fee Claim agrees to less favorable treatment with the Debtor, or as otherwise expressly set forth in the Plan, each holder of a Professional Fee Claim shall be paid in full in Cash pursuant to Section 3.2 of the Plan.

(i)      <u>Fee Applications</u>

All requests for payment of Professional Fee Claims must be filed with the Bankruptcy Court by the date that is 60 calendar days after the Effective Date; <u>provided</u> that if any Professional Person is unable to file its own request with the Bankruptcy Court, such Professional Person may deliver an original, executed copy and an electronic copy to the Debtor's attorneys and the Debtor at least three Business Days before the deadline, and the Debtor's attorneys shall file such request with the Bankruptcy Court.  The objection deadline relating to a request for payment of Professional Fee Claims shall be 4:00 p.m. (prevailing Eastern Time) on the date that is 30 days after filing such request, and a hearing on such request, if necessary, shall be held no later than 30 calendar days after the objection deadline. Distributions on account of Allowed Professional Fee Claims shall be made as soon as reasonably practicable after such Claims become Allowed.

(ii)     Post-Effective Date Fees

Upon the Effective Date, any requirement that Professional Persons comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtor may employ and pay all Professional Persons without any further notice to, action by or order or approval of the Bankruptcy Court or any other party.

(iii)     Fee Escrow Account

On the Effective Date, the Debtor shall establish and fund the Fee Escrow Account.  The Debtor shall fund the Fee Escrow Account with Cash equal to the Debtor's good faith estimate of the Allowed Professional Fee Claims.  Funds held in the Fee Escrow Account shall not be considered property of the Debtor's Estate or property of the Debtor, but shall revert to the Debtor only after all Allowed Professional Fee Claims have been paid in full.  Fees owing to the applicable holder of an Allowed Professional Fee Claim shall be paid in Cash to such holder from funds held in the Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid under a Final Order authorizing interim compensation of Professional Persons; provided, that the Debtor's obligations with respect to Allowed Professional Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account.  To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of accrued Allowed Professional Fee Claims, each holder of an Allowed Professional Fee Claim shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with Section 3.2 of the Plan.  No Liens, claims, or interests shall encumber the Fee Escrow Account in any way.

(iv)     U.S. Trustee Fees

The Debtor shall pay all outstanding U.S. Trustee Fees on an ongoing basis on the date such U.S. Trustee Fees become due, until such time as a final decree is entered closing the Chapter 11 Case or the Chapter 11 Case is converted or dismissed.

(v)     Treatment of Priority Tax Claims

Except to the extent that the applicable holder of an Allowed Priority Tax Claim has been paid by the Debtor before the Effective Date, or the Debtor and such holder agree to less favorable treatment by the Debtor, each holder of an Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, at the option of the Debtor (a) payment in full in Cash made on or as soon as reasonably practicable after the later of the Effective Date and the first Distribution Date occurring at least 20 calendar days after the date such Claim is Allowed, (b) regular installment payments in accordance with section 1129(a)(9)(C) of the Bankruptcy Code or (c) such other amounts and in such other manner as may be determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

The Debtor shall have the right, in its sole discretion, to pay any Allowed Priority Tax Claim or any remaining balance of an Allowed Priority Tax Claim (together with accrued but unpaid interest) in full at any time on or after the Effective Date without premium or penalty.

2.    *Classification of Claims and Interests*

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for all purposes, including as set forth herein. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date. Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the official claims register without a claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

Except as otherwise specifically provided for in the Plan, the Confirmation Order or other order of the Bankruptcy Court, or required by applicable non-bankruptcy law, in no event shall any Holder of an Allowed Claim be entitled to receive payments that in the aggregate exceed the Allowed amount of such Holder's Claim.

a)    Treatment of Claims Against and Interests in the Debtor

(i)    Class 1 – Priority Non-Tax Claims

The legal, equitable and contractual rights of the holders of Priority Non-Tax Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a different treatment, on the applicable Distribution Date, each holder of an Allowed Priority Non-Tax Claim shall receive Cash from the Debtor in an amount equal to such Allowed Claim.

(ii)    Class 2 – Other Secured Claims

The legal, equitable and contractual rights of the holders of Other Secured Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each holder of an Allowed Other Secured Claim shall each receive, subject to the terms of the Plan, in full and final satisfaction, settlement, release and discharge of its Allowed Other Secured Claim, at the election of the Debtor:

(a)    Cash in an amount equal to such Allowed Other Secured Claim; or

(b)    such other treatment that will render such Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code;

provided, however, that Other Secured Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, in the discretion of the Debtor without further

notice to or order of the Bankruptcy Court.

Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final satisfaction of such Allowed Other Secured Claim is made as provided in the Plan.  On the full payment or other satisfaction of each Allowed Other Secured Claim in accordance with the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

<div align="center">(iii)   <u>Class 3 – Prepetition Note Claims</u></div>

The Prepetition Note Claims shall be Allowed under the Plan and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection or any other challenges under any applicable law or regulation by any Person.  On the Effective Date, DOE, as the holder of the Allowed Prepetition Note Claims, shall receive, subject to the terms of the Plan, in full and final satisfaction, settlement, release and discharge of its Allowed Prepetition Note Claims, (a) $200 million in Cash (which shall be satisfied by DOE by a draw on the Cobra Backstop Letter of Credit) and (b) all rights and obligations under the Exit Contingent Note.  On the Effective Date, the Debtor shall also pay in full in Cash all outstanding fees and expenses incurred by the Prepetition Collateral Agent to the extent due and owing under the Collateral Agency Agreement.

Upon payment of the $200 million in Cash provided in § 5.3(a) of the Plan, the delivery of the executed Exit Contingent Note to DOE, and the payment in full in Cash of all outstanding fees and expenses of the Prepetition Collateral Agent as provided in § 5.3(a) of the Plan: (i) the Loan Servicer (on DOE's behalf) shall conclusively be deemed to have provided written direction to the Prepetition Collateral Agent to release all Collateral it holds on behalf of the Secured Parties and to release all Liens thereon for the benefit of the Secured Parties; and (ii) the Loan Servicer shall conclusively be deemed to have certified to the Prepetition Collateral Agent that the Discharge Date under the Collateral Agency Agreement has occurred.  On the Effective Date, and upon (x) payment of the $200 Million in Cash provided in § 5.3(a) of the Plan, (y) the delivery of the executed Exit Contingent Note to DOE, and (z) payment of all outstanding fees and expenses of the Prepetition Collateral Agent in full in Cash as provided in § 5.3(a) of the Plan, the Prepetition Collateral Agent shall release to the Debtor all Collateral held for the benefit of the Secured Parties and any Liens on the Collateral held for the benefit of the Secured Parties.  The Debtor shall pay all reasonable fees and expenses incurred by the Collateral Agent in complying with the previous sentence on or as soon as reasonably practicable after the Effective Date.  Upon the release of the Collateral held by the Prepetition Collateral Agent for the benefit of the Secured Parties and the release of all Liens on the Prepetition Collateral held for the benefit of the Secured Parties, the duties, responsibilities, and obligations of the Prepetition Collateral Agent under the Collateral Agency Agreement shall terminate.

(iv)    <u>Class 4 – General Unsecured Claims</u>

General Unsecured Claims are unimpaired Claims.  Except to the extent that a holder of a General Unsecured Claim agrees to different treatment, each holder of an Allowed General Unsecured Claim shall receive treatment that: (i) leaves unaltered the legal, equitable, or contractual rights to which the holder of such Allowed General Unsecured Claim is entitled; or (ii) otherwise leaves such Allowed General Unsecured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.

(v)    <u>Class 5 – Existing Interests</u>

Existing Interests shall be discharged, cancelled, released and extinguished, and holders thereof shall not receive or retain any distribution under the Plan on account of such Existing Interests.

**C.    Executory Contracts and Unexpired Leases**

The Bankruptcy Code requires a debtor to assume or reject all Executory Contracts and Unexpired Leases. The Debtor's proposed treatment of all Executory Contracts and Unexpired Leases under the Plan are summarized below.

1.    *General Treatment*

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases of the Debtor shall be deemed assumed except that: (a) any executory contracts and unexpired leases that previously have been assumed, assumed and assigned, or rejected pursuant to a Final Order of the Bankruptcy Court shall be treated as provided in such Final Order; (b) any executory contracts and unexpired leases listed on the Schedule of Rejected Contracts and Leases shall be deemed rejected as of the Effective Date; and (c) all executory contracts and unexpired leases that are the subject of a separate motion to assume or reject under section 365 of the Bankruptcy Code pending on the Effective Date shall be treated as provided for in the Final Order resolving such motion.  Rejection of any executory contract or unexpired lease pursuant to the Plan or otherwise will not constitute a termination of obligations owed to the Debtor under such contract or lease that survive breach under applicable law.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments and rejections described in Section 10.1 of the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to Section 10.1 of the Plan shall revest in and be fully enforceable by the Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable federal law.  Nothing contained in the Plan or the listing of a document on the Schedule of Rejected Contracts and Leases, or the Cure Schedule shall constitute an admission by the Debtor that such document is an executory contract or an unexpired lease or that the Debtor or its successors and assigns has any liability thereunder.

2.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

All Claims arising from the rejection of executory contracts or unexpired leases, if evidenced by a timely filed proof of claim, will be treated as General Unsecured Claims.  In the event that the rejection of an executory contract or unexpired lease by the Debtor pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtor or its properties or interests in property or its agents, successors or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtor on or before the date that is thirty (30) days after the effective date of such rejection (which may be the Effective Date, the date on which the Debtor rejects the applicable contract or lease as provided in Section 10.1 of the Plan, or pursuant to an order of the Bankruptcy Court).

3.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

(a)      Except to the extent that less favorable treatment has been agreed to by the non-Debtor party or parties to each such executory contract or unexpired lease to be assumed or assumed and assigned pursuant to the Plan, any monetary defaults arising under such executory contract or unexpired lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the appropriate amount (the "**Cure Amount**") in full in Cash on the later of: (i) the Effective Date; (ii) thirty (30) days after the date of entry of a Final Order providing for the assumption, or the assumption and assignment, of such executory contract or unexpired lease; or (iii) the date on which any Cure Dispute relating to such Cure Amount has been resolved (either consensually or through judicial decision).

(b)      With respect to any executory contract or unexpired lease to be assumed or assumed and assigned pursuant to Section 10.1 of the Plan, the Debtor shall file a schedule (a "**Cure Schedule**") with the Plan Supplement setting forth the Cure Amount, if any, for each executory contract or unexpired lease to be assumed or assumed and assigned by the Debtor.

(c)      In the event of a dispute (each, a "**Cure Dispute**") regarding: (i) the Cure Amount; (ii) the ability of the Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assumed and assigned; or (iii) any other matter pertaining to the proposed assumption or assumption and assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving such Cure Dispute and approving the assumption or assumption and assignment.  To the extent a Cure Dispute relates solely to the Cure Amount, the Debtor may assume and/or assume and assign the applicable contract or lease prior to the resolution of the Cure Dispute.  To the extent the Cure Dispute is resolved or determined against the Debtor, the Debtor may reject the applicable executory contract or unexpired lease after such determination, and the counterparty may thereafter file a proof of claim in the manner set forth in Section 10.2 of the Plan.

4.      *Effect of Confirmation Order on Assumption, Assumption and Assignment, and Rejection.*

Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute entry of an order by the Bankruptcy Court pursuant to sections 365(a) and 1123(b) of the Bankruptcy Code approving the assumptions, assumptions and assignments and rejections described in Article X of the Plan and determining that: (a) with respect to such rejections, such rejected executory contracts and unexpired leases are burdensome and that the rejection therein is in the best interests of the Estate; (b) with respect to such assumptions, to the extent necessary, that the Debtor has (i) cured, or provided adequate assurance that the Debtor will promptly cure, any default in accordance with section 365(b)(1)(A) of the Bankruptcy Code, (ii) compensated or provided adequate assurance that it or an Affiliate will promptly compensate the counterparty for any actual pecuniary loss to such party resulting from such default, and (iii) provided adequate assurance of future performance under such executory contract or unexpired lease; and (c) with respect to any assignment, to the extent necessary, that the Debtor or the proposed assignee has (i) cured, or provided adequate assurance that it or an Affiliate will promptly cure, any default in accordance with section 365(b)(1)(A) of the Bankruptcy Code, (ii) compensated or provided adequate assurance that the Debtor or the proposed assignee will promptly compensate the counterparty for any actual pecuniary loss to such party resulting from such default, and (iii) that "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) by the assignee has been demonstrated and no further adequate assurance is required. Assumption of any executory contract or unexpired lease and satisfaction of the Cure Amounts shall result in the full discharge, release and satisfaction of any claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date such executory contract or unexpired lease is assumed. Each executory contract and unexpired lease assumed pursuant to Article X of the Plan shall revest in and be fully enforceable by the Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable federal law.  To the maximum extent permitted by law, to the extent any provision in any executory contract or unexpired lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such executory contract or unexpired lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto. Any party that fails to timely file a Cure Dispute on the basis that consent to assume or assume and assign the applicable executory contract or unexpired lease is a condition to such assumption or assumption and assignment, shall be deemed to have consented to the assumption or assumption and assignment, as applicable, of such contract or unexpired lease.

5.      *Permits, Licenses, Easements and Similar Interests*

Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute entry of an order by the Bankruptcy Court pursuant to sections 365(a) and 1123(b) of the Bankruptcy Code approving the assumptions of all permits, licenses,

easements and similar interests unless any of the foregoing has been previously rejected or is rejected under the Plan or otherwise.  To the extent permitted under applicable law, the Debtor shall be authorized, on and after the Effective Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtor, and pursuant to the terms of the Confirmation Order, all such licenses, permits, registrations, and governmental authorizations or approvals shall be deemed to be assumed by the Debtor as of the Effective Date.  To the extent provided by section 525 of the Bankruptcy Code, and subject to entry of the Confirmation Order, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Debtor on account of the filing or pendency of the chapter 11 case or the consummation of the transactions contemplated under the Plan.

To the maximum extent permitted by law, any provision that purports to restrict or prevent the assumption or assignment of any such permit, license, easement or similar interest or is breached or deemed breached by the assumption or assignment of any such permit, license, easement or similar interest (including any "change of control" provision) shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such permit, license, easement or similar interest or to exercise other default-related rights with respect thereto.  Any party that fails to timely file a Cure Dispute on the basis that consent to assume or assume and assign the applicable permit, license, easement or similar interest is a condition to such assumption or assumption and assignment, shall be deemed to have consented to such assumption or assumption and assignment.

6.    *Assumption of Directors and Officers Insurance Policies*

To the extent that the D&O Liability Insurance Policies issued to, or entered into by, the Debtor prior to the Petition Date constitute executory contracts, notwithstanding anything in the Plan to the contrary, the Debtor shall be deemed to have assumed all of its unexpired D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtor's foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair or otherwise modify any advancement, indemnity or other obligations of the D&O Liability Insurance Policies.

In addition, after the Effective Date, the Debtor shall not terminate or otherwise reduce the coverage under any of the D&O Liability Insurance Policies with respect to conduct occurring prior thereto, and all directors, managers and officers of the Debtor who served in such capacity at any time prior to the Effective Date shall be entitled from the applicable insurers to the full benefits of any such policy for the full term of such policy regardless of whether such directors, managers and officers remain in such positions after the Effective Date.

On or before the Effective Date, the Debtor shall purchase and maintain directors, managers, officers and employee liability tail coverage for the six year period following the Effective Date on terms no less favorable than the Debtor's existing director, manager, officer and employee coverage and with an aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing director, officer, manager and employee

coverage upon placement. From and after the Effective Date, reasonable directors, managers and officers insurance policies shall remain in place in the ordinary course.

7.   *Assumption of Certain Indemnification Obligations*

Each Indemnification Obligation to a current or former director, officer, manager or employee who was employed by the Debtor in such capacity on or after the Petition Date (including, for the avoidance of doubt, the members of the board of directors, board of managers or equivalent body of the Debtor at any time) shall be deemed assumed effective as of the Effective Date. Each Indemnification Obligation that is deemed assumed pursuant to the Plan shall (a) remain in full force and effect, (b) not be modified, reduced, discharged, impaired or otherwise affected in any way, (c) be deemed and treated as an executory contract pursuant to sections 365 and 1123 of the Bankruptcy Code regardless of whether or not proofs of claim have been filed with respect to such obligations and (d) survive Unimpaired and unaffected irrespective of whether such indemnification is owed for an act or event occurring before, on or after the Petition Date.

Any obligations of the Debtor (whether pursuant to its certificate of formation, operating agreement, limited liability company agreement, other organizational documents, board resolutions, member resolutions, indemnification agreements, employment contracts, policy of providing employee indemnification, applicable state law, specific agreement in respect of any claims, demands, suits, causes of action or proceedings against such Persons or agreements, including amendments, or otherwise) entered into at any time prior to the Effective Date, to indemnify, reimburse or limit the liability of the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers and other professionals of the Debtor, as applicable, in each case, based upon any act or omission related to such Persons' service with, for or on behalf of the Debtor prior to the Effective Date with respect to all present and future actions, suits and proceedings relating to the Debtor shall survive the Confirmation Order and, except as set forth in the Plan, remain unaffected thereby, and shall not be discharged, irrespective of whether such defense, indemnification, reimbursement or limitation of liability accrued or is owed in connection with an occurrence before or after the Petition Date. Any Claim based on the Debtor's obligations set forth in Section 10.7 of the Plan shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code. The provision for indemnification obligations shall not apply to or cover any Causes of Action against a Person that result in a Final Order determining that such Person seeking indemnification is liable for fraud, willful misconduct, gross negligence, bad faith, self-dealing or breach of the duty of loyalty.

In connection with the foregoing, on the Effective Date, the Debtor shall establish and fund the Indemnification Escrow Account with Cash equal to $2,500,000. Funds held in the Indemnification Escrow Account shall not be considered property of the Debtor's Estate, property of the Debtor and, to the extent such obligations are not satisfied by the Debtor or under any applicable D&O Liability Insurance Policy, such funds shall be utilized by the Debtor to satisfy the Debtor's obligations under Section 10.7 of the Plan. Funds remaining in the Indemnification Escrow Account after six (6) years, if any, shall revert to and become property of the Debtor; provided, that (i) the Debtor's obligations under Section 10.7 of the Plan shall not be limited by nor deemed limited to the balance of the funds held in the Indemnification Escrow

Account, and (ii) such reversion shall not take place unless and until any claims that have been asserted and are covered by the Indemnification Escrow Account have been resolved.  No Liens, claims or interests shall encumber the Indemnification Escrow Account in any way.

**D.     Implementation of the Plan**

1.     *Continued Existence and Vesting of Assets in Reorganized TSE.*

(a)     Except as otherwise provided in the Plan, the Debtor shall continue to exist after the Effective Date as Reorganized TSE in accordance with the laws of the State of Delaware and pursuant to the Amended Constituent Documents for the purposes of satisfying its obligations under the Plan and the continuation of its business.  On or after the Effective Date, Reorganized TSE, in its discretion, may take such action as permitted by applicable law and the Amended Constituent Documents as Reorganized TSE may determine is reasonable and appropriate.

(b)     Except as otherwise provided in the Plan, on and after the Effective Date, all property of the Estate, wherever located, including all claims, rights and Causes of Action, and any property, wherever located, acquired by the Debtor under or in connection with the Plan, shall vest in Reorganized TSE free and clear of all Claims, Liens, charges, other encumbrances and Interests.  On and after the Effective Date, Reorganized TSE may operate its business and may use, acquire and dispose of property, wherever located, and may prosecute, compromise or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, Reorganized TSE may pay the charges that it incurs on or after the Effective Date for Professional Persons' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

(c)     On the Effective Date or as soon as reasonably practicable thereafter, Reorganized TSE may take all actions that may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of formation, merger, consolidation, conversion, dissolution, or other organizational documents pursuant to applicable state law; and (4) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

2.     *Issuance of New Common Units to Cobra*

In consideration for Cobra's commitments and undertakings under the Plan, the New Common Units shall be issued on the Effective Date and distributed to Cobra (or a Cobra Designee) on the Effective Date or as soon as practicable thereafter, in accordance with the Plan

and the terms of the Amended Constituent Documents.  All of the New Common Units issuable in accordance with the Plan, when issued, shall be duly authorized, validly issued, fully paid, and non-assessable.  The issuance of the New Common Units is authorized without the need for any further limited liability company, or other similar action and without any further action by any holder of an Allowed Claim or Interest.

The New Common Units will not be listed on a national securities exchange, Reorganized TSE will not be a reporting company under the Securities Exchange Act, and Reorganized TSE shall not be required to and will not file reports with the SEC or any other governmental entity after the Effective Date.

### 3.    *Plan Value of New Common Units*

For purposes of the Plan, the New Common Units shall have an aggregate deemed value equal to $100 million.  Such deemed value is equal to the amount that will be drawn by DOE on the Cobra Backstop Letter of Credit pursuant to Section 5.3 of the Plan less the $100 million term loan component of the Exit Credit Facility.

### 4.    *Working Capital Commitment*

Under the Exit Credit Facility, Cobra (or a Cobra Designee) shall provide Reorganized TSE with up to $50 million to fund the working capital and other needs of Reorganized TSE.

### 5.    *Exit Credit Facility, Exit Contingent Note and New O&M Agreement*

On the Effective Date, Reorganized TSE shall be authorized to enter into the Exit Credit Facility Agreement, Exit Contingent Note, and the Amended Constituent Documents without the need for any further limited liability company or other similar action.  The entry of the Confirmation Order shall be deemed approval of the Exit Credit Facility Agreement, Exit Contingent Note, and the Amended Constituent Documents, and authorization for Reorganized TSE to enter into and execute the Exit Credit Facility Agreement, Exit Contingent Note, and the Amended Constituent Documents requiring execution and delivery by Reorganized TSE.

The obligations arising under the Exit Credit Facility Documents shall be secured by a senior priority perfected security interest in substantially all present and after acquired property and proceeds thereof of Reorganized TSE, subject to any exceptions and materiality thresholds acceptable to Cobra, as lender under the Exit Credit Facility Agreement. The Debtor is authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary or desirable to establish and further evidence perfection of any Liens and security interests granted to secure the obligations under the Exit Credit Facility Documents under the provisions of any applicable federal, state, provincial, or other law (whether domestic or foreign) (it being understood that perfection shall occur automatically by virtue of the occurrence of the Effective Date, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

6.    *Cancellation of Existing Securities and Agreements*

Except for the purpose of evidencing a right to distribution under the Plan, and except as otherwise set forth in the Plan, on the Effective Date, the Prepetition Note Financing Documents shall be deemed cancelled, discharged and of no further force or effect.  The DOE, as holder of the Allowed Prepetition Note Claims, shall have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.

7.    *Cancellation of Liens Pursuant to Cash Collateral Order*

On the Effective Date, the Cash Collateral Order, including the use of cash collateral thereunder, shall be terminated.  All Liens and security interests granted to secure obligations pursuant to the Cash Collateral Order shall be terminated and of no further force or effect, without the need for further Court approval, action or order.  Reorganized TSE shall be entitled to take any action necessary to effectuate the discharge of any Lien under the Cash Collateral Order.

8.    *Board of Managers*

(a)    On the Effective Date, the board of managers of Reorganized TSE shall consist of five (5) individuals selected by Cobra, who shall be reasonably acceptable to the Debtor, and identified in the Plan Supplement to be filed with the Bankruptcy Court.

(b)    Unless reappointed pursuant to Section 7.6(a) of the Plan, the members of the board of managers of the Debtor prior to the Effective Date shall have no continuing obligations to the Debtor in their capacities as such on and after the Effective Date and each such member shall be deemed to have resigned or shall otherwise cease to be a manager of the Debtor on the Effective Date.  Commencing on the Effective Date, each of the managers of the Debtor shall serve pursuant to the terms of the Amended Constituent Documents and be replaced or removed in accordance therewith.

9.    *Organizational and Other Action*

(a)    The Debtor shall serve on the U.S. Trustee quarterly reports of its disbursements until such time as a final decree is entered closing the Chapter 11 Case or the Chapter 11 Case is converted or dismissed, or the Bankruptcy Court orders otherwise.  Any deadline for filing Administrative Expense Claims shall not apply to U.S. Trustee Fees.

(b)    On the Effective Date, the Amended Constituent Documents and any other applicable amended and restated limited liability company or other organizational documents of the Debtor shall be deemed authorized in all respects.

(c)    Any action under the Plan to be taken by or required of the Debtor, including the adoption or amendment of its certificate of formation, limited liability company agreement or other organizational document, the issuance of limited liability company membership interests, securities and instruments, or the selection of officers or managers, shall be authorized and approved in all respects, without any requirement of further action by the Debtor's equity

- 34 -

holders, holders of partnership interests, sole member, board of managers, or similar body, as applicable.

(d)     The Debtor shall be authorized to execute, deliver, file, and record such documents (including the Plan Documents), contracts, instruments, releases and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan, without the necessity of any further Bankruptcy Court, limited liability company, board or member approval or action.  In addition, the selection of the Persons who will serve as the initial managers, officers and managers of Reorganized TSE as of the Effective Date shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the board of managers or equity holders of the applicable Reorganized TSE.

10.     *Comprehensive Settlement of Claims and Controversies*

Pursuant to Bankruptcy Rule 9019 and in consideration for the Plan Distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims and Causes of Action relating to the rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any Plan Distribution on account thereof.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are: (a) in the best interest of the Debtor, its Estate and its property and stakeholders; and (b) fair, equitable and reasonable.

11.     *Transactions Authorized Under Plan*

On and after the Effective Date, the Debtor and Reorganized TSE, as applicable, shall be authorized to take such actions as may be necessary or appropriate to implement the transactions contemplated by the Plan and the other Plan Documents.

12.     *Approval of Plan Documents*

The solicitation of votes with respect to the Plan shall be deemed a solicitation for the approval of the Plan Documents and all transactions contemplated thereunder.  Entry of the Confirmation Order shall constitute approval of the Plan Documents and such transactions.  On the Effective Date, the Debtor and Reorganized TSE, as applicable, shall be authorized to enter into, file, execute and/or deliver each of the Plan Documents and any other agreement or instrument issued in connection with any Plan Document without the necessity of any further corporate, board, shareholder, manager, or similar action.

13.     *Dismissal of the ICC Arbitration*

Within three (3) Business Days of the Effective Date, Reorganized TSE and Cobra shall jointly request the dismissal with prejudice of the ICC Arbitration.

E.    **Effect of Confirmation**

Article XII of the Plan sets forth the effect of Confirmation of the Plan. The below summarizes, among other things, the Debtor's proposed release, discharge and injunction provisions.

1.    *Binding Effect*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, the Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

2.    *Discharge of Claims Against and Interests in the Debtor*

Upon the Effective Date and in consideration of the Plan Distributions, except as otherwise provided in the Plan or Confirmation Order (including with respect to Claims left unimpaired by the Plan), each Person that is a holder (as well as any trustees and agents for or on behalf of such Person) of a Claim or Interest shall be deemed to have forever waived, released, and discharged the Debtor, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities that arose prior to the Effective Date.  Except as otherwise provided in the Plan, upon the Effective Date, all such holders of Claims and Interests shall be forever precluded and enjoined, pursuant to sections 105, 524, 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtor or any property, wherever located, of the Estate.

3.    *Term of Pre-Confirmation Injunctions or Stays*

Unless otherwise provided in the Plan, all injunctions or stays provided in the Chapter 11 Case arising prior to the Confirmation Date in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

4.    *Injunction Against Interference with Plan*

Upon the entry of the Confirmation Order, all holders of Claims and Interests and other Persons, along with their respective present or former Affiliates, employees, agents, officers, directors, or principals, shall be enjoined from taking any actions, whether in the United States or elsewhere, to interfere with the implementation or consummation of the Plan.  Moreover, Bankruptcy Code section 1141(c) provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests (except as otherwise provided in the Plan or the Confirmation Order).  As such, to the fullest extent permissible under applicable law, no Person holding a Claim or Interest may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Person under the Plan.  As of the Confirmation Date, to the fullest extent permissible under applicable law, all Persons are precluded and barred from asserting against any property to be

distributed under the Plan any Claims, rights, Causes of Action, liabilities, Interests, or other action or remedy based on any act, omission, transaction, or other activity that occurred before the Confirmation Date except as expressly provided in the Plan or the Confirmation Order.

       5.    *Injunction*

      (a)    Except as otherwise specifically provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons or Entities who have held, hold or may hold Claims against and/or Interests in the Debtor or the Estate, and all other parties in interest, along with their present or former employees, agents, officers, directors, principals, representatives and Affiliates are, with respect to any such Claims or Interests, permanently enjoined after the Confirmation Date from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, its Estate or any of its property, wherever located, or any direct or indirect transferee of any property, wherever located, of, or direct or indirect successor in interest to, any of the foregoing Persons or any property, wherever located, of any such transferee or successor; (ii) enforcing, levying, attaching (including any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtor, or its Estate or any of its property, wherever located, or any direct or indirect transferee of any property, wherever located, of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property, wherever located, of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor or its Estate or any of its property, wherever located, or any direct or indirect transferee of any property, of, or successor in interest to, any of the foregoing Persons; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law (including, without limitation, commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan) to the fullest extent permitted by applicable law, or (v) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtor or its Estate, or against the property or interests in property of the Debtor or its Estate, with respect to any such Claim or Interest.  Such injunction shall extend to any successors or assignees of the Debtor and its properties and interest in properties; provided, however, that nothing contained in the Plan shall preclude such Persons from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of the Plan.

      (b)    By accepting Plan Distributions, each holder of an Allowed Claim or Interest will be deemed to have specifically consented to the injunctions set forth in Section 12.5 of the Plan.

      **6.**    *Releases*

      *a)*    <u>***Releases by the Debtor***</u>

***Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Confirmation Order, on and after the Effective Date, for good and valuable consideration, including their cooperation and contributions to the***

*Chapter 11 Case, the Released Parties (other than the Debtor) shall be deemed released and discharged by the Debtor and its Estate from any and all Claims, obligations, debts, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity or otherwise, whether for tort, fraud, contract, violations of federal or state laws or otherwise, including the ICC Arbitration and the Avoidance Actions; Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that the Debtor, its Estate could have asserted in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity or that any holder of a Claim or Interest or other Entity could have asserted derivatively for or on behalf of the Debtor, or its Estate, based on, relating to or in any manner arising from, in whole or in part, the Debtor;  its Estate; the purchase, sale or rescission of the purchase or sale of any security of the Debtor; the Crescent Dunes Solar Energy Project; the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan; the business or contractual arrangements between the Debtor and any Released Party (excluding any assumed executory contract or lease); the restructuring of Claims and Interests prior to or in the Chapter 11 Case; the negotiation, formulation or preparation of the Plan, the RSA, the Disclosure Statement, the Plan Supplement, the Chapter 11 Case, or, in each case, related agreements, instruments, or other documents or upon any other related act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date.*

   *b)    Debtor and Cobra Releases. The Debtor and Cobra only unconditionally and irrevocably release the DOE and the Prepetition Collateral Agent, and each of their respective financial advisors and attorneys, for any claims or Causes of Action arising out of or related to the Prepetition Note Claim and/or the Crescent Dunes Solar Energy Project.*

   *c)    DOE Releases. DOE only unconditionally and irrevocably releases the Debtor and Cobra, and each of their respective financial advisors and attorneys, from (i) the Prepetition Note Claim and (ii) any claims or Causes of Action arising out of or relating to the Prepetition Note Claim and/or the Crescent Dunes Solar Energy Project.*

   *Notwithstanding anything to the contrary in the Plan, including section 12.6(a), without conceding the existence or merits thereof, neither the above paragraphs nor the Plan releases: (i) any civil, criminal or administrative liability arising under Title 26 of the United States Code (the Internal Revenue Code); (ii) any criminal liability; (iii) any liability under subchapter III of chapter 37 of Title 31 of the United States Code; (iv) any liability that is based on conduct in violation of antitrust laws; (v) any claim of any agency of the United States of America other than DOE; and (vi) the Debtor's and Cobra's obligations under Section 5.3(b) of the Plan regarding the Prepetition Note Claim.*

   *d)    Releases by the Third Party Releasing Parties.  Except as otherwise specifically provided in the Plan or the Confirmation Order, on and after the Effective Date, for good and valuable consideration, including the obligations of the Debtor under the Plan, the Plan Consideration and other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, each Third Party Releasing*

*Party who affirmatively opts to grant the releases set forth in the Plan shall be deemed to have consented to the Plan and the restructuring embodied therein for all purposes, and shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity or otherwise, whether for tort, fraud, contract, violations of federal or state laws or otherwise, including the ICC Arbitration and the Avoidance Actions, Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that such Third Party Releasing Party could have asserted (whether individually or collectively), based on, relating to or in any manner arising from, in whole or in part, the Debtor; the Estate; the Chapter 11 Case; the purchase, sale or rescission of the purchase or sale of any security of the Debtor; the Crescent Dunes Solar Energy Project; the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan; the business or contractual arrangements between the Debtor and any Released Party (excluding any assumed executory contract or lease); the restructuring of Claims and Interests prior to or in the Chapter 11 Case; the negotiation, formulation or preparation of the Plan, the Restructuring Support Agreement, the Disclosure Statement, the Plan Supplement, the Prepetition Note Documents, or the Plan or the Disclosure Statement, or, in each case, related agreements, instruments or other documents, or upon any other related act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided, that any party that chooses not to opt in to the releases contained in the Plan shall not receive the benefit of the releases set forth in the Plan (even if for any reason otherwise entitled).  Notwithstanding anything contained in the Plan to the contrary, the foregoing release shall not release any obligation of any party under the Plan, or any other document, instrument, or agreement executed to implement the Plan.*

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases described in the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute its finding that each release described in the Plan is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (ii) in the best interests of the Debtor and all Third Party Releasing Parties; (iii) fair, equitable and reasonable; (iv) given and made after due notice and opportunity for hearing; and (v) a bar to the Debtor and all Third Party Releasing Parties asserting any claim, Cause of Action or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

7.      *Waiver of Limitations on Releases of Unknown Claims.*

**Each of the Debtor, the Third Party Releasing Parties and DOE agree to acknowledge that the releases contained in Sections 12.6(a), 12.6(b), 12.6(c) and 12.6(d) will extend to and release claims that such parties do not know or expect to exist at the time of the release, which, if known, might have affected the decision to enter into the release and which such parties will be deemed to waive, and will waive and relinquish to the fullest extent permitted by law, any and all provisions, rights, and benefits conferred by any law of the United States of America or any state or territory thereof, or principle of common law, which governs or limits a person's release of unknown claims that such parties will deemed to waive, and will waive and relinquish, to the fullest extent permitted by law, the provisions, rights, and benefits of Section 1542 of the California Civil Code, which provides as follows:**

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

**The Debtor, the Third Party Releasing Parties and DOE will also be deemed to waive any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States of America, or principle of common law, which is similar, comparable, or equivalent to California Civil Code Section 1542. Such parties shall be deemed to acknowledge that they may discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of the releases given in Sections 12.6(a), 12.6(b), 12.6(c) and 12.6(d), but that it is the intention of such parties to fully, finally, and forever settle and release with prejudice any and all claims, including any and all unknown claims, without regard to the subsequent discovery or existence of additional or different facts. Such parties expressly agree that any fraudulent inducement or similar claims that could be premised on unknown facts or facts that are subsequently discovered are included within the definition of unknown claims.**

8.      *Exculpation and Limitation of Liability*

On the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, for good and valuable consideration, to the maximum extent permissible under applicable law, none of the Exculpated Parties shall have or incur any liability to any holder of any Claim or Interest or any other Person for any act or omission occurring prior to the Effective Date in connection with, or arising out of the Debtor's restructuring, including the negotiation, implementation and execution of the Plan, the Plan Supplement, the Chapter 11 Case, the Prepetition Note Documents, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, including all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all activities leading to the promulgation and confirmation of the Plan except for gross negligence or willful misconduct,

- 40 -

each as determined by a Final Order of the Bankruptcy Court. The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

9.    *Injunction Related to Releases and Exculpation*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities released in or encompassed by Section 12.6 of the Plan. The Debtor is expressly authorized hereby to seek to enforce such injunction.

10.    *Retention of Causes of Action/Reservation of Rights*

(a)    Except as expressly provided in the Plan or in the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtor or the Estate may have, or that the Debtor may choose to assert on behalf of its Estate, under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, (i) any and all Causes of Action or claims against any Person or Entity, to the extent such Person or Entity asserts a crossclaim, counterclaim and/or claim for setoff that seeks affirmative relief against the Debtor, its officers, directors or representatives or (ii) the turnover of any property of the Estate to the Debtor.

(b)    Except as expressly provided in the Plan or in the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtor had immediately prior to the Petition Date or the Effective Date against or regarding any Claim left Unimpaired by the Plan. The Debtor shall have, retain, reserve and be entitled to commence, assert and pursue all such rights and Causes of Action as fully as if the Chapter 11 Case had not been commenced, and all of the Debtor's legal and equitable rights respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Case had not been commenced.

(c)    Except as expressly provided in the Plan or in the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to release any post-Effective Date obligations of any party under the Plan, or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

11.    *Retention of United States Causes of Action/Reservation of Rights*

Except with respect to the releases provided by DOE pursuant to Section 12.6(c) of the Plan, nothing discharges or releases the Debtor or any non-debtor from any right, claim, liability

or cause of action of the United States or any State, or impairs the ability of the United States or any State to pursue any claim, liability, right, defense, or cause of action against any Debtor or non-debtor. Contracts, purchase orders, agreements, leases, covenants, guaranties, indemnifications, operating rights agreements or other interests of or with the United States or any State shall be, subject to any applicable legal or equitable rights or defenses of the Debtor under applicable non-bankruptcy law, paid, treated, determined and administered in the ordinary course of business as if the Debtor's bankruptcy case was never filed and the Debtor shall comply with all applicable non-bankruptcy law.  Except with respect to (i) the releases provided by DOE pursuant to Section 12.6(c) of the Plan and (ii) the Prepetition Note Claim, all claims, liabilities, rights, causes of action, or defenses of or to the United States or any State shall survive the Chapter 11 Case as if it had not been commenced and be determined in the ordinary course of business, including in the manner and by the administrative or judicial tribunals in which such rights, defenses, claims, liabilities, or causes of action would have been resolved or adjudicated if the Chapter 11 Case had not been commenced; *provided*, that nothing in the Plan Documents shall alter any legal or equitable rights or defenses of the Debtor under non-bankruptcy law with respect to any such claim, liability, or cause of action, except with respect to (i) the Prepetition Note Claim and (ii) any claims or Causes of Action released by the DOE pursuant to Section 12.6(c) of the Plan.  Without limiting the foregoing, for the avoidance of doubt, nothing shall: (i) require the United States or any State to file any proofs of claim or administrative expense claims in the Chapter 11 Case for any right, claim, liability, defense, or cause of action; (ii) affect or impair the exercise of the United States' or any State's police and regulatory powers against the Debtor or any non-debtor; (iii) be interpreted to set cure amounts or to require the United States or any State to novate or otherwise consent to the transfer of any federal or state contracts, purchase orders, agreements, leases, covenants, guaranties, indemnifications, operating rights agreements or other interests; (iv) except with respect to the Prepetition Note Claim, affect or impair the United States' or any State's rights and defenses of setoff and recoupment, or ability to assert setoff or recoupment against the Debtor and such rights and defenses are expressly preserved; (v) constitute an approval or consent by the United States or any State without compliance with all applicable legal requirements and approvals under non-bankruptcy law; or (vi) relieve any party from compliance with all licenses and permits issued by governmental units in accordance with non-bankruptcy law.

## ARTICLE V

## VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE PLAN

### A.    General

The following is a brief summary of the Plan Confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or consult their own attorneys.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation hearing. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

Section 1129 of the Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtor, including that (i) the Plan has classified Claims in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Plan has been proposed in good faith and not by any means forbidden by law; (iv) the disclosure required by section 1125 of the Bankruptcy Code has been made; (v) the Plan has been accepted by the requisite votes of Holders of Claims (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code); (vi) the Plan is feasible and Confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor unless such liquidation or reorganization is proposed in the Plan; (vii) the Plan is in the "best interests" of all Holders of Claims in an impaired Class by providing to such Holders on account of their Claims property of a value, as of the Effective Date, that is not less than the amount that such Holders would receive or retain in a chapter 7 liquidation, unless each Holder of a Claim in such Class has accepted the Plan and (viii) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date. The Debtor believes that the Plan satisfies section 1129 of the Bankruptcy Code.

### B.    Parties in Interest Entitled to Vote

Pursuant to the Bankruptcy Code, only Classes of Claims that are "impaired" (as defined in section 1124 of the Bankruptcy Code) and receiving a distribution under the Plan are entitled to vote to accept or reject the Plan. A Class is impaired if the legal, equitable or contractual rights to which the Claims of that Class entitled the Holders of such Claims are modified, other than by curing defaults and reinstating the Claims. Classes that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan. In addition, Classes that receive no distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.

### C.    Classes Impaired and Entitled to Vote Under the Plan

The following Classes are impaired under the Plan and entitled to vote on the Plan:

| Class | Designation | Status | Voting Rights |
|-------|-------------|--------|---------------|
| 3 | Prepetition Note Claims | Impaired | Entitled to Vote |

In general, if a Claim or Interest is unimpaired under a plan, section 1126(f) of the Bankruptcy Code deems the Holder of such Claim or Interest to have accepted the plan, and thus the Holders of Claims in such unimpaired Classes are not entitled to vote on the plan. Because Classes 1, 2, and 4 are unimpaired under the Plan, the Holders of Claims and Interests in these Classes are not entitled to vote and conclusively deemed to have accepted the Plan.

The Holders of Interests in Class 5 are conclusively presumed to have rejected the Plan because they are not receiving a distribution or retaining any interest under the Plan on account of such Interests.

### D.   Voting Procedures and Requirements

The Bankruptcy Court can confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code. One of these technical requirements is that the Bankruptcy Court find, among other things, that the Plan has been accepted by the requisite votes of all Classes of impaired Claims and Interests unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes.

If you have any questions about (i) the procedures for voting your Claim or with respect to the packet of materials that you have received or (ii) the amount of your Claim, please contact the Debtor's Solicitation and Claims Agent at 1-866-897-6433 (Toll Free U.S. and Canada) or 1-646-282-2500 (International). If you wish to obtain (at no charge) an additional copy of the Plan, this Disclosure Statement or other solicitation documents, you can obtain them from the Debtor's case information website (located at https://dm.epiq11.com/Tonopah) or by requesting a copy from the Debtor's Solicitation and Claims Agent via email at **tabulation@epiqglobal.com** with a reference to "Tonopah" in the subject line, or via telephone at 1-866-897-6433 (Toll Free U.S. and Canada) or 1-646-282-2500 (International)

#### 1.   *Ballots*

The DOE, as the holder of Class 3 Claims, is the only Holder of Claims voting on the Plan.  In voting for or against the Plan, please use (i) only the Ballot sent to you with this Disclosure Statement or (ii) the online electronic ballot portal.

#### 2.   *Submitting Ballots*

If you are entitled to vote to accept or reject the Plan, you should read carefully, complete and submit your Ballot in accordance with the instructions below.

To be counted, all Ballots must be properly executed, completed and delivered by:

(i) first-class mail (using the reply envelope provided in the solicitation package or otherwise), (ii) overnight courier, (iii) personal delivery or (iv) the online electronic ballot portal (as described on the Ballot), in each case so that they are actually received **NO LATER THAN 5:00 P.M. (ET) ON OCTOBER 13, 2020** (the "**Voting Deadline**") by the Solicitation and Claims Agent. If you are submitting a Ballot via first-class mail, overnight courier or personal delivery, it should be sent to:

**If by First Class Mail:**

Tonopah Solar Energy, LLC Ballot Processing Center
c/o Epiq Corporate Restructuring, LLC
P.O. Box 4422
Beaverton, OR 97076-4422

**If by Overnight Courier or Overnight Mail:**

Tonopah Solar Energy, LLC Ballot Processing Center
c/o Epiq Corporate Restructuring, LLC
10300 SW Allen Boulevard
Beaverton, OR 97005

Delivery of a Ballot to the Solicitation and Claims Agent by facsimile or any other electronic means (other than as expressly provided therein) shall not be valid.

Ballots received after the Voting Deadline will not be counted by the Debtor in connection with the Debtor's request for Confirmation of the Plan. The method of delivery of Ballots to be sent to the Solicitation and Claims Agent is at the election and risk of each Holder of a Claim or Interest. Except as otherwise provided in the Plan, such delivery will be deemed made only when the Ballot is <u>actually received</u> by the Solicitation and Claims Agent. In all cases, sufficient time should be allowed to assure timely delivery. For submissions via first-class mail, overnight courier or personal delivery, original executed Ballots are required.  Delivery of a Ballot to the Solicitation and Claims Agent by facsimile, email or any other electronic means (other than as expressly provided therein) will not be accepted. No Ballot should be sent to the Debtor, their agents (other than the Solicitation and Claims Agent), any administrative agent (unless specifically instructed to do so) or the Debtor's financial or legal advisors, and if so sent will not be counted.  If no Holders of Claims in a particular Class that is entitled to vote on the Plan vote to accept or reject the Plan, then such Class shall be deemed to accept the Plan.

E.      **Acceptance of Plan**

As a condition to Confirmation, the Bankruptcy Code requires that each class of impaired claims vote to accept a plan, except under certain circumstances. *See* "Confirmation Without Necessary Acceptances; Cramdown" below.  A class of claims or interests that is unimpaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is impaired unless the plan (i) leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the Holder of such claim or interest or (ii) cures any default, reinstates the original terms of the obligation and does not otherwise alter the legal, equitable or contractual rights to which the claim or interest entitles the Holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class as acceptance by Holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class; only those Holders that are eligible to vote and that actually vote

to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met. Thus, a class of claims will have voted to accept a plan only if two-thirds in amount and a majority in number that actually vote cast their ballots in favor of acceptance. Under section 1126(d) of the Bankruptcy Code, a class of interests has accepted a plan if Holders of such interests holding at least two-thirds in amount that actually vote have voted to accept the plan. Holders of claims or interests who fail to vote are not counted as either accepting or rejecting a plan.

In addition to these voting requirements, section 1129 of the Bankruptcy Code requires that a plan be accepted by each Holder of a claim or interest in an impaired class or that the plan otherwise be found by a court to be in the best interests of each Holder of a claim or interest in such class. See "Best Interests Test" below. Moreover, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests set forth in section 1129(b) of the Bankruptcy Code discussed below. See "Confirmation Without Necessary Acceptances; Cramdown" below.

## F.    Confirmation Without Necessary Acceptances; Cramdown

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for Confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims or interests, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (i) "does not discriminate unfairly" and (ii) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests.

A plan "does not discriminate unfairly" if (i) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the non-accepting class and (ii) no class receives payments in excess of that which it is legally entitled to receive for its claims or interest. The Debtor believes that, under the Plan, all impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests that are similarly situated, if any, and no class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Debtor believes that the Plan does not discriminate unfairly as to any impaired Class of Claims or Interests.

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable." In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity Holders, as follows:

(1)    Secured Creditors. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured

creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and such liens on proceeds to receive treatment consistent with clause (i) or (ii) above.

(2)     Unsecured Creditors. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the Holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(3)     Equity Interests. Either (i) each Holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such Holder is entitled, the fixed redemption price to which such Holder is entitled or the value of the interest or (ii) the Holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan.

As discussed above, the Debtor believes that the distributions provided under the Plan satisfy the absolute priority rule, where required.

### G.     Classification

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divides the different claims (excluding administrative claims) against, and equity interests in, a debtor into separate classes based upon their legal nature. Pursuant to section 1122 of the Bankruptcy Code, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtor believes that the Plan classifies all Claims and Interests in compliance with the provisions of the Bankruptcy Code because valid business, factual and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan. Accordingly, the classification of Claims and Interests in the Plan complies with section 1122 of the Bankruptcy Code.

### ARTICLE VI

### FEASIBILITY AND BEST INTERESTS OF CREDITORS

### A.     Best Interests Test

As noted above, even if a plan is accepted by the Holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all Holders of claims or interests that are impaired by that plan and that have not accepted the

plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the Effective Date, that is not less than the amount that such Holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code (the "**Best Interests Test**").

To calculate the probable distribution to Holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a Debtor's assets if its chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the Debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to Holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the Holders of claims or interests in such impaired class.

### B.   Liquidation Analysis

Amounts that a Holder of Claims and Interests in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the liquidation analysis of the Debtor prepared by the Debtor's management with the assistance of its advisors (the "**Liquidation Analysis**"), which is attached hereto as Appendix B.

As described in Appendix B, the Debtor developed the Liquidation Analysis based on the unaudited book values as of June 30, 2020, unless otherwise noted in the Liquidation Analysis.

As described in the Liquidation Analysis, underlying the analysis is a number of estimates and assumptions that, although developed and considered reasonable by the Debtor's management and advisors, are inherently subject to uncertainties and contingencies beyond the control of the Debtor and its management. The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, the values reflected in the Liquidation Analysis might not be realized if the Debtor were, in fact, to undergo a liquidation.

One such assumption is the use of the $186.3 million EPC Contract liquidated damages cap to calculate recoveries in the Liquidation Analysis. Under the EPC Contract, that liquidated damages cap is triggered if the plant underperforms by 20% or more. As a result of the uncertainty of litigation (with regard to both the claims initially raised by Cobra against the Debtor and the Debtor's counterclaims against Cobra), the cost of litigation, and the timeline for recovery under a litigation scenario, the Debtor, in consultation with its advisors, determined in its business judgment that the maximum liquidated damages figure was the appropriate recovery estimate under each scenario in the Liquidation Analysis.

This Liquidation Analysis is solely for the purposes of (i) providing "adequate information" under section 1125 of the Bankruptcy Code to enable the Holders of Claims and Interests entitled to vote under the Plan to make an informed judgment about the Plan and (i) providing the Bankruptcy Court with appropriate support for the satisfaction of the "Best Interests Test" pursuant to section 1129(a)(7) of the Bankruptcy Code, and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtor.

Events and circumstances occurring subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. The Debtor and Reorganized Debtor do not intend to and do not undertake any obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing or arising after the date the Liquidation Analysis is initially filed or to reflect the occurrence of unanticipated events. Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of the actual results that will occur.

In deciding whether to vote to accept or reject the Plan, Holders of Claims or Interests must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

### C.      Application of the Best Interests Test

The Debtor believes that the Plan satisfies the Best Interests Test for Class 3.  As the Plan and Appendix B indicate, confirmation of the Plan will provide each Holder of an Allowed Claim in an Impaired Class with a recovery that is equal to or greater than the value of any distributions if the chapter 11 case were converted to a case under chapter 7 of the Bankruptcy Code.

### D.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to confirmation, that the Bankruptcy Court find that confirmation is not likely to be followed by the liquidation of the Debtor or the need for further financial reorganization, unless such liquidation is contemplated by the Plan.  For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtor, with the assistance of its advisors, has analyzed the ability of the Reorganized Debtor to meet its obligations under the Plan and to retain sufficient liquidity and capital resources to conduct its business.  As part of this analysis, the Debtor has prepared the financial projections, as set forth in Appendix C (the "**Financial Projections**").

As noted in Appendix C, the Financial Projections present information with respect to the Reorganized Debtor.  These Financial Projections do not reflect the full impact of "fresh start reporting" in accordance with American Institute of Certified Public Accountants Statement of Position 90-7 "Financial Reporting by Entities in Reorganization under the Bankruptcy Code." Fresh start reporting may have a material impact on the analysis.

The Debtor has prepared the Financial Projections solely for the purpose of providing "adequate information" under section 1125 of the Bankruptcy Code to enable the Holders of Claims and Interests entitled to vote under the Plan to make an informed judgment about the Plan and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtor.

In addition to the cautionary notes contained elsewhere in this Disclosure Statement and in the Financial Projections, it is underscored that the Debtor makes no representation as to the accuracy of the Financial Projections or its ability to achieve the projected results. Many of the assumptions on which the Financial Projections are based are subject to significant uncertainties. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the financial results. Therefore, the actual results achieved throughout the Projection Period (as defined in the Financial Projections) may vary from the Financial Projections, and the variations may be material. Also as noted above, the Financial Projections currently do not reflect the full impact of any "fresh start reporting," and its impact on the Reorganized Debtor's "Balance Sheet" and prospective "Results of Operations" may be material. All Holders of Claims in the Impaired Classes are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of, and voting on, the Plan.

## ARTICLE VII

## SECURITIES LAW MATTERS

### A.    Bankruptcy Code Exemptions from Registration Requirements

The Debtor believes that, pursuant to section 4(a)(2) of the Securities Act and Rule 506 of Regulation D promulgated thereunder, the issuance of the New Common Units is exempt from the registration requirements of the Securities Act and any State or local law requiring registration for offer or sale of a security.

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under Section 4(a)(2) of the Securities Act. The Debtors believes that the New Common Units will be issuable without registration under the Securities Act in reliance upon the exemption from registration provided under Section 4(a)(2) of the Securities Act and Rule 506 of Regulation D because only "accredited investors" (as defined in Rule 501(a) of Regulation D under the Securities Act) or "qualified institutional buyers" within the meaning of Rule 144A will be eligible to purchase the New Common Units.

Any securities issued in reliance on Section 4(a)(2) or Regulation D will be "restricted securities" that may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. Under Rule 144, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144. A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding

period unless certain current public information regarding the issuer is not available at the time of sale, in which case the non-affiliate may resell after a one-year holding period. An affiliate may resell restricted securities after the applicable holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale, and notice requirements of Rule 144..

## ARTICLE VIII

### CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A.    Certain Bankruptcy Law Considerations

#### 1.    *General.*

While the Debtor believes that the Chapter 11 Case will be of relatively short duration, the Debtor cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the Chapter 11 Case, it is impossible to predict with certainty the amount of time that the Debtor may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have a material adverse effect on the Debtor.  A delay in the bankruptcy proceedings will also involve additional expense and may divert some of the attention of the Debtor's management away from its business.

#### 2.    *Plan Confirmation.*

The Debtor can make no assurances that it will receive the requisite acceptances to confirm that Plan or that the conditions to Confirmation will be satisfied or waived. Further, if the requisite acceptances are not received, the Debtor may seek to accomplish an alternative restructuring and obtain acceptances to an alternative plan of reorganization for the Debtor, or otherwise, that may not have the support of the Holders of Claims and/or may be required to liquidate the Estate under chapter 7 or 11 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Holders of Claims as those proposed in the Plan.

Even if the Debtor receives the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan.  If the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could

nevertheless decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.  Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Interests ultimately would receive in a subsequent plan of reorganization.

3.       *Objections to Classification of Claims.*

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Interests in, the Debtor.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  The Debtor believes that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtor could seek (i) to modify the Plan to provide for whatever classification might be required for Confirmation and (ii) to use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.

Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could materially adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires resolicitation, the Debtor could, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.

4.       *Risk of Termination of the Restructuring Support Agreement.*

The Restructuring Support Agreement contains certain provisions that give the Debtor and Cobra the ability to terminate the Restructuring Support Agreement if various conditions are not satisfied. Termination of the Restructuring Support Agreement could result in withdrawal of the Plan and a protracted chapter 11 case.

5.       *Risk of Nonoccurrence of the Effective Date.*

Although the Debtor believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

6.      *Failure to Consummate the Plan.*

As of the date of this Disclosure Statement, there can be no assurance that the conditions to consummation of the Plan will be satisfied or waived.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and that the contemplated restructuring will be completed.

7.      *Risk of Litigation.*

Certain of the Debtor's creditors or other stakeholders may bring litigation against the Debtor during the course of the Chapter 11 Case, the outcome of which is uncertain. Although the Debtor believes that the Plan satisfies all of the requirements necessary for confirmation by the Court, creditors and other parties in interest may bring objections to challenge confirmation of the Plan.

8.      *Plan Releases May Not Be Approved.*

There can be no assurance that the Plan releases, as provided in Section 11 of the Plan, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a plan of reorganization that differs from the Plan or the Plan not being confirmed.

9.      *Regulatory Approvals.*

Consummation of the Plan is subject to various approvals, including approval by the Federal Energy Regulatory Commission and certain state and local governmental authorities. There can be no assurance that these approvals will be obtained or that efforts to gain such approvals will not substantially delay consummation of the Plan.

**B.      Risks Related to Debtor's Ongoing Operations during the Case**

1.      *The Reorganized Debtor may not be able to achieve their projected financial results.*

Actual financial results will be subject to a number of factors including TSE's ability to successfully restore operations at the Power Plant, general business and economic conditions, and other matters, many of which will be beyond the control of the Reorganized Debtor and may differ materially from the Financial Projections. If TSE is unable to resume operations at the Power Plant, the Reorganized Debtor will not be able to meet the Financial Projections after the Effective Date. The Financial Projections represent management's view based on currently known facts, the successful Confirmation and implementation of the Plan and hypothetical assumptions regarding the Reorganized Debtor's future operations and ability to finance such operations; they do not guarantee the Reorganized Debtor's future financial performance.

2.      *The Debtor's Financial Projections are subject to inherent uncertainty due to the numerous assumptions upon which they are based.*

The Plan relies upon the Financial Projections that are based on numerous assumptions including, without limitation, the timing, Confirmation and consummation of the Plan in

accordance with its terms, the anticipated future performance of the Reorganized Debtor, general business and economic conditions, competition, adequate financing, absence of material claims, the ability to make necessary capital expenditures, use of unrestricted cash, the ability to control future operating expenses, and other matters, many of which will be beyond the control of the Reorganized Debtor and some or all of which may not materialize.  Particular uncertainties with respect to the Reorganized Debtor's operations and financial results arise from the risks and uncertainties relating to when the Power Plant will become operational, the price at which it is able to sell the power that it produces, how much of such power can be off-loaded, and whether there will be additional equipment issues or operational difficulties that cause further shut downs of the Power Plant.

Because the actual results achieved throughout the periods covered by the Financial Projections may vary from the projected results, perhaps materially, the Financial Projections should not be relied upon as an assurance of the actual results that will occur.

Consequently, there can be no assurance that the results or developments contemplated by any plan of reorganization implemented will occur or, even if they do occur, that they will have the anticipated effects on the Reorganized Debtor and its business or operations. The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful execution of any plan of reorganization.

Except with respect to the Financial Projections and except as otherwise specifically and expressly stated herein, this Disclosure Statement and the Plan do not reflect any events that might occur subsequent to the date hereof. Such events could have a material impact on the information contained in this Disclosure Statement and the Plan. Neither the Debtor nor the Reorganized Debtor intend to update the Financial Projections. The Financial Projections therefore may not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Financial Projections.

    3.      *Undue delay in confirmation.*

Although the Plan is designed to minimize the length of the Chapter 11 Case, it is impossible to predict with certainty the amount of time that the Debtor may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.

The continuation of the Chapter 11 Case, particularly if the Plan is not confirmed in the time frame currently contemplated, could materially increase costs to the Debtor.  If confirmation and consummation of the Plan do not occur expeditiously, the Chapter 11 Case could result in, among other things, increased costs for professional fees and other case expenses.

C.      **Financing Risks for the Reorganized Debtor**

    1.      *The Reorganized Debtor may not be able to generate sufficient cash flow to meet its debt service and other obligations due to events beyond its control.*

The Reorganized Debtor's ability to generate cash flows from operations and to make scheduled payments on its anticipated indebtedness post-emergence will depend on its future

financial performance. If the Reorganized Debtor is unable to service its indebtedness, it will require debt relief to meet the Financial Projections.  The Reorganized Debtor cannot provide any assurance that any of these alternative strategies could be affected on satisfactory terms, if at all, or that it would yield sufficient funds to make required payments on its indebtedness and continue operating.

<p style="text-align:center">2.      <em>The Power Plant is currently not operational.</em></p>

The Power Plant is not currently operational.  The Plan and related projections assume that the Power Plant will become operational by or about October 2020.  In the event that the Power Plant is not operational by that date, the Debtor's ability to satisfy its obligations under the Exit Agreement will be adversely affected and the Financial Projections may not be achieved.

<p style="text-align:center">3.      <em>The Exit Contingent Note</em></p>

The Plan also contemplates the Debtor's entry into a contingent promissory note (the "Exit Contingent Note") in the aggregate principal amount of $100 million, to be guaranteed by Cobra.  A substantially final form of the Exit Contingent Note is attached to the Plan as Schedule A.  The Reorganized Debtor cannot provide any assurance that any amounts ultimately will become payable under the Exit Contingent Note.

The Debtor believes that confirmation and consummation of the Plan are in the best interests of the Debtor and its estate. The Plan provides for an equitable distribution to Holders of Claims. The Debtor believes that any alternative to confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in significant delay, litigation and additional costs, as well as a significant reduction to or elimination in the distributions to Holders of Claims in certain Classes. **Consequently, the Debtor urges all eligible Holders of impaired Claims entitled to vote on the Plan to vote to ACCEPT the Plan and to complete and submit their Ballots so that they will be RECEIVED by the Solicitation and Claims Agent on or before the Voting Deadline.**

Dated: September 8, 2020
Wilmington, Delaware

<div style="margin-left:40%">

Respectfully submitted,

Tonopah Solar Energy, LLC


By: <em>/s/ Justin Pugh</em>
      Name: Justin Pugh
      Title: Treasurer

</div>

**<u>Appendix A</u>**

**Chapter 11 Plan**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| TONOPAH SOLAR ENERGY, LLC, | Case No. 20-11884 (KBO) |
| Debtor.[1] | |

**AMENDED CHAPTER 11 PLAN FOR TONOPAH SOLAR ENERGY, LLC**

---

[1]    The debtor in this chapter 11 case, along with the last four digits of its Employer Identification Number, is Tonopah Solar Energy, LLC (1316).  The Debtor's mailing address is 11 Gabbs Pole Line Road, Tonopah, NV 89049.

27008590.1

Dated:      September 8, 2020

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Edmon L. Morton (No. 3856)
Matthew B. Lunn (No. 4119)
Allison S. Mielke (No. 5934)
Jared W. Kochenash (No. 6557)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
emorton@ycst.com
mlunn@ycst.com
amielke@ycst.com
jkochenash@ycst.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Matthew A. Feldman (admitted *pro hac vice*)
Paul V. Shalhoub (admitted *pro hac vice*)
Andrew S. Mordkoff (admitted *pro hac vice*)
Ciara A. Copell (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
mfeldman@willkie.com
pshalhoub@willkie.com
amordkoff@willkie.com
ccopell@willkie.com

*Co-Counsel for the Debtor and Debtor in Possession*

# TABLE OF CONTENTS

**Page**

ARTICLE I.

DEFINITIONS AND INTERPRETATION ........................................................5

ARTICLE II.

CERTAIN INTER-CREDITOR AND INTER-DEBTOR ISSUES ..................16

 **2.1.** *Settlement of Certain Inter-Creditor Issues.* .........................................16

ARTICLE III.

ADMINISTRATIVE EXPENSE CLAIMS,
PROFESSIONAL FEE CLAIMS, U.S. TRUSTEE FEES AND
PRIORITY TAX CLAIMS .................................................................16

 **3.1.** *Administrative Expense Claims.* ...........................................................17

 **3.2.** *Professional Fee Claims.* ......................................................................18

 **3.3.** *U.S. Trustee Fees.* ...............................................................................19

 **3.4.** *Priority Tax Claims.* .............................................................................19

ARTICLE IV.

CLASSIFICATION OF CLAIMS AND INTERESTS .....................................20

 **4.1.** *Classification of Claims and Interests.* ..................................................20

 **4.2.** *Unimpaired Classes of Claims.* .............................................................20

 **4.3.** *Impaired Classes of Claims.* .................................................................20

 **4.4.** *Separate Classification of Other Secured Claims.* ..................................21

ARTICLE V.

TREATMENT OF CLAIMS AND INTERESTS .............................................21

 **5.1.** *Priority Non-Tax Claims (Class 1).* .......................................................21

 **5.2.** *Other Secured Claims (Class 2).* ...........................................................21

 **5.3.** *Prepetition Note Claims (Class 3).* .......................................................22

 **5.4.** *General Unsecured Claims (Class 4).* ....................................................23

 **5.5.** *Existing Interests (Class 5).* ..................................................................23

ARTICLE VI.

ACCEPTANCE OR REJECTION OF
THE PLAN; EFFECT OF REJECTION BY ONE
OR MORE CLASSES OF CLAIMS OR INTERESTS ....................................23

6.1.    *Class Acceptance Requirement.* ...............................................................23

6.2.    *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or
        "Cramdown."* ...........................................................................................23

6.3.    *Elimination of Vacant Classes.* ...............................................................24

ARTICLE VII.

MEANS FOR IMPLEMENTATION ...................................................24

7.1.    *Continued Existence and Vesting of Assets in Reorganized TSE.*.....................24

7.2.    *Issuance of New Common Units to Cobra* ...............................................25

7.3.    *Plan Value of New Common Units* ...........................................................25

7.4.    *Working Capital Commitment* ...............................................................25

7.5.    *Exit Credit Facility Agreement, Exit Contingent Note* ...............................25

7.6.    *Cancellation of Existing Securities and Agreements.* ...............................26

7.7.    *Cancellation of Liens Pursuant to Cash Collateral Order.* ...............................26

7.8.    *Board of Managers.* ...............................................................................26

7.9.    *Organizational and Other Action.* ...........................................................27

7.10.   *Comprehensive Settlement of Claims and Controversies.*...................................27

7.11.   *Transactions Authorized under Plan* .......................................................27

7.12.   *Approval of Plan Documents*....................................................................28

7.13.   *Dismissal of the ICC Arbitration* .............................................................28

ARTICLE VIII.

DISTRIBUTIONS .......................................................................28

8.1.    *Distributions.* ..........................................................................................28

8.2.    *No Postpetition Interest on Claims.*...........................................................28

8.3.    *Date of Distributions.* ............................................................................28

8.4.    *Distribution Record Date.* ......................................................................28

8.5.    *Disbursing Agent.*...................................................................................29

8.6.    *Delivery of Distributions.* .......................................................................30

8.7.    *Satisfaction of Claims.* ...........................................................................30

| | | |
|---|---|---|
| **8.8.** | *Manner of Payment Under Plan.* | 30 |
| **8.9.** | *No Distribution in Excess of Amount of Allowed Claim.* | 30 |
| **8.10.** | *Exemption from Securities Laws.* | 31 |
| **8.11.** | *Setoffs and Recoupments.* | 31 |
| **8.12.** | *Withholding and Reporting Requirements.* | 31 |

ARTICLE IX.

PROCEDURES FOR RESOLVING CLAIMS ........32

| | | |
|---|---|---|
| **9.1.** | *Disputed Claims.* | 32 |
| **9.2.** | *Objections to Claims.* | 32 |
| **9.3.** | *Estimation of Claims* | 33 |
| **9.4.** | *Expenses Incurred on or After the Effective Date.* | 33 |

ARTICLE X.

EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........33

| | | |
|---|---|---|
| **10.1.** | *General Treatment.* | 33 |
| **10.2.** | *Claims Based on Rejection of Executory Contracts or Unexpired Leases.* | 34 |
| **10.3.** | *Cure of Defaults for Assumed or Assumed and Assigned Executory Contracts and Unexpired Leases.* | 34 |
| **10.4.** | *Effect of Confirmation Order on Assumption, Assumption and Assignment, and Rejection.* | 35 |
| **10.5.** | *Permits, Licenses, Easements and Similar Interests* | 36 |
| **10.6.** | *Assumption of Directors and Officers Insurance Policies* | 36 |
| **10.7.** | *Assumption of Certain Indemnification Obligations* | 37 |

ARTICLE XI.

CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ........38

| | | |
|---|---|---|
| **11.1.** | *Conditions Precedent to the Effective Date.* | 38 |
| **11.2.** | *Satisfaction and Waiver of Conditions Precedent.* | 39 |
| **11.3.** | *Effect of Failure of Conditions Precedent to the Effective Date.* | 40 |

ARTICLE XII.

EFFECT OF CONFIRMATION ........40

| | | |
|---|---|---|
| **12.1.** | *Binding Effect.* | 40 |

**12.2.** *Discharge of Claims Against and Interests in the Debtor.* ...................................40

**12.3.** *Term of Pre-Confirmation Injunctions or Stays.* ................................................41

**12.4.** *Injunction Against Interference with Plan.* .......................................................41

**12.5.** *Injunction.* ....................................................................................................41

**12.6.** *Releases.* .......................................................................................................42

**12.7.** *Waiver of Limitations on Releases of Unknown Claims.* .....................................44

**12.8.** *Exculpation and Limitation of Liability.* ...........................................................45

**12.9.** *[Reserved.]* ...................................................................................................

**12.10.** *Retention of Causes of Action/Reservation of Rights.* .......................................45

**12.11** *Retention of United States Causes of Action/Reservation of Rights.* ..................46

ARTICLE XIII.

RETENTION OF JURISDICTION ....................................................................47

ARTICLE XIV. 49

MISCELLANEOUS PROVISIONS .............................................................................49

**14.1.** *Exemption from Certain Transfer Taxes.* ..........................................................49

**14.2.** *Termination of Professionals.* .........................................................................49

**14.3.** *Amendments.* .................................................................................................50

**14.4.** *Revocation or Withdrawal of this Plan.* ............................................................50

**14.5.** *Allocation of Plan Distributions Between Principal and Interest.* .......................50

**14.6.** *Severability.* ..................................................................................................50

**14.7.** *Governing Law.* .............................................................................................51

**14.8.** *Section 1125(e) of the Bankruptcy Code.* .........................................................51

**14.9.** *Inconsistency.* ...............................................................................................51

**14.10.** *Time.* ..........................................................................................................51

**14.11.** *Exhibits.* ......................................................................................................51

**14.12.** *Notices.* .......................................................................................................51

**14.13.** *Filing of Additional Documents.* .....................................................................52

**14.14.** *Reservation of Rights.* ...................................................................................52

## INTRODUCTION[2]

Tonopah Solar Energy, LLC proposes the following chapter 11 plan under section 1121(c) of the Bankruptcy Code for the resolution of the outstanding claims against, and equity interests in, the Debtor.  Capitalized terms used in this Plan and not otherwise defined shall have the meanings ascribed to such terms in Article I of this Plan.

## ARTICLE I.
## DEFINITIONS AND INTERPRETATION

### A.    Definitions.

The following terms shall have the meanings set forth below (such meanings to be equally applicable to both the singular and plural):

**1.1**    *Administrative Bar Date* has the meaning set forth in Section 3.2(a) of this Plan.

**1.2**    *Administrative Expense Claim* means any right to payment constituting a cost or expense of administration of the Chapter 11 Case of the kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code (other than a Professional Fee Claim or fees owed pursuant to 28 U.S.C. § 1930) incurred during the period from the Petition Date to the Effective Date, including: (a) any actual and necessary costs and expenses of preserving the Estate, any actual and necessary costs and expenses of operating the Debtor's business, and any indebtedness or obligations incurred or assumed by the Debtor during the Chapter 11 Case; and (b) any payment to be made under this Plan to cure a default under an assumed, or assumed and assigned, executory contract or unexpired lease.

**1.3**    *Affiliate* means, with respect to any Person, all Persons directly, or indirectly through one or more intermediaries, Controlling, Controlled by, or under common Control with such Person.

**1.4**    *Allowed* means, with respect to a Claim or Interest under this Plan, a Claim or Interest that is an Allowed Claim or an Allowed _____ Claim or an Allowed Interest.

**1.5**    *Allowed Claim or Allowed _____ Claim* (with respect to a specific type of Claim, if specified) means: (a) any Claim (or a portion thereof) as to which no action to dispute, disallow, deny or otherwise limit recovery with respect thereto, or alter the priority thereof (including a claim objection), has been timely commenced within the applicable period of limitation fixed by this Plan or applicable law, or, if an action to dispute, disallow, deny, equitably subordinate or otherwise limit recovery with respect thereto, or alter priority thereof, has been timely commenced, to the extent such Claim has been allowed (whether in whole or in part) by a Final Order of a court of competent jurisdiction with respect to the subject matter; or (b) any Claim or portion thereof that is allowed (i) in any contract, instrument, or other agreement entered into in connection with the Plan, (ii) pursuant to the terms of the Plan, (iii) by

---

[2]    All capitalized terms used but not defined herein have the meanings set forth in Article I.

Final Order of the Bankruptcy Court, or (iv) with respect to an Administrative Expense Claim only (x) that was incurred by the Debtor in the ordinary course of business during the Chapter 11 Case to the extent due and owing without defense, offset, recoupment or counterclaim of any kind, and (y) that is not otherwise disputed.

**1.6**    ***Amended Constituent Documents*** means, on or after the Effective Date, collectively, the New LLC Agreement, any amended and restated certificate of formation or other organizational document, as applicable, of Reorganized TSE, substantially final forms of which will be filed as part of the Plan Supplement.

**1.7**    ***Avoidance Actions*** means any and all avoidance, recovery, subordination or other claims, actions or remedies that may be brought by or on behalf of the Debtor or its Estate or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, 547 through and including 553 and 724(a) of the Bankruptcy Code.

**1.8**    ***Backstop Agreement*** means that certain letter agreement, dated as of July 29, 2020, between Cobra and the Prepetition Secured Parties (as defined in the Cash Collateral Order) regarding Settlement Letter of Credit; Backstop of Post-Petition Costs and Expenses.

**1.9**    ***Ballot*** means the form approved by the Bankruptcy Court and distributed to holders of impaired Claims entitled to vote on the Plan to be used to indicate their acceptance or rejection of the Plan.

**1.10**    ***Bankruptcy Code*** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Case.

**1.11**    ***Bankruptcy Court*** means the United States Bankruptcy Court for the District of Delaware, or any other court exercising competent jurisdiction over the Chapter 11 Case or any proceeding therein.

**1.12**    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure, as promulgated by the Supreme Court of the United States under section 2075 of title 28 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Case, and any local rules of the Bankruptcy Court.

**1.13**    ***Business Day*** means any day other than a Saturday, Sunday or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

**1.14**    ***Cash*** means the legal currency of the United States and equivalents thereof.

**1.15**    ***Cash Collateral*** has the meaning set forth in section 363(a) of the Bankruptcy Code.

**1.16**    ***Cash Collateral Order*** means, collectively, the interim and final orders authorizing the Debtor's use of Cash Collateral [Docket Nos. __ and __].

**1.17**    *Causes of Action* means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (i) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (ii) the right to object to or otherwise contest Claims or equity interests; (iii) Avoidance Actions and any and all claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (iv) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

**1.18**    *Chapter 11 Case* means the case under chapter 11 of the Bankruptcy Code commenced by the Debtor on the Petition Date in the Bankruptcy Court and captioned *In re Tonopah Solar Energy, LLC*, Case No. 20-11884 (KBO).

**1.19**    *Claim* means any "claim" as defined in section 101(5) of the Bankruptcy Code against the Debtor or property of the Debtor, including any Claim arising after the Petition Date.

**1.20**    *Claims Agent* means Epiq Corporate Restructuring, LLC, or any other entity approved by the Bankruptcy Court to act as the Debtor's claims and noticing agent pursuant to 28 U.S.C. §156(c).

**1.21**    *Claims Objection Deadline* means 11:59 p.m. (prevailing Eastern Time) on the 180th calendar day after the Effective Date, subject to further extensions and/or exceptions as may be ordered by the Bankruptcy Court.

**1.22**    *Class* means each category of Claims or Interests established under Article IV of the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

**1.23**    *Cobra* means, collectively, ACS Servicios Comunicaciones y Energía S.L., Cobra Thermosolar Plants, Inc. and Cobra Energy Investment, LLC.

**1.24**    *Cobra Backstop Letter of Credit* means, collectively, the Settlement Letter of Credit and the Final Letter of Credit (each as defined in the Backstop Agreement).

**1.25**    *Cobra Designee* means an Affiliate of Cobra designated by Cobra in writing prior to the Effective Date and reasonably acceptable to the Debtor.

**1.26**    *Collateral* means any property or interest in property of the Estate subject to a Lien to secure the payment or performance of a Claim, which Lien has not been avoided or is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law.

**1.27**    *Collateral Agency Agreement* means that Collateral Agency And Accounts Agreement, dated as of September 23, 2011 by and among (i) Tonopah Solar Energy, LLC, a limited liability

-7-

company established in the State of Delaware; (ii) the U.S. Department of Energy, acting by and through the Secretary of Energy, as loan servicer; and (iii) PNC Bank, National Association, a national banking association, as the collateral agent for the Secured Parties (in such capacity, together with its successors and permitted assigns).

**1.28** *Confirmation Date* means the date on which the Court enters the Confirmation Order on the docket of the Chapter 11 Case.

**1.29** *Confirmation Hearing* means a hearing to be held by the Bankruptcy Court regarding confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

**1.30** *Confirmation Order* means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance reasonably acceptable to the Debtor, Cobra and DOE.

**1.31** *Control* (including the terms "controlling," "controlled by," and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of an equity interest, by contract, or otherwise.

**1.32** *Crescent Dunes Solar Energy Project* means the 110-MW concentrating solar power project near Tonopah, Nevada, including the funding, financing, refinancing, design, engineering, contracting, construction, operation, performance, management, function, maintenance, inspection, monitoring, testing, warranties and repairs of the project.

**1.33** *Cure Amount* has the meaning set forth in Section 10.3(a) of this Plan.

**1.34** *Cure Dispute* has the meaning set forth in Section 10.3(c) of this Plan.

**1.35** *Cure Schedule* has the meaning set forth in Section 10.3(b) of this Plan.

**1.36** *D&O Liability Insurance Policies* means all insurance policies for directors', managers' and officers' liability (including employment practices liability and fiduciary liability) maintained by the Debtor prior to the Effective Date, including as such policies may extend to employees, and any such policies that are "tail" policies.

**1.37** *Debtor* means (a) prior to the Effective Date, Tonopah Solar Energy, LLC and (b) on and following the Effective Date, Reorganized TSE.

**1.38** *Debtor's Case Information Website* has the meaning set forth in Article I, Section C.

**1.39** *Reserved*.

**1.40** *Reserved.*

**1.41** *Disallowed* means a finding or conclusion of law of the Bankruptcy Court in a Final Order, or provision in this Plan or the Confirmation Order, disallowing a Claim.

**1.42**    ***Disbursing Agent*** means, as applicable, the Debtor or the entity designated by the Debtor to distribute the Plan Consideration.

**1.43**    ***Disclosure Statement*** means the disclosure statement that relates to this Plan, including all exhibits and schedules annexed thereto or referred to therein (in each case, as it or they may be amended, modified, or supplemented from time to time).

**1.44**    ***Disclosure Statement Hearing*** means a hearing held by the Bankruptcy Court to consider approval of the Disclosure Statement as containing adequate information as required by section 1125 of the Bankruptcy Code, as the same may be adjourned or continued from time to time.

**1.45**    ***Disclosure Statement Order*** means an order of the Bankruptcy Court approving the Disclosure Statement as having adequate information in accordance with section 1125 of the Bankruptcy Code, which shall be in form and substance reasonably acceptable to the Debtor, Cobra and DOE.

**1.46**    ***Disputed*** means, with respect to a Claim or Interest, that portion (including, when appropriate, the whole) of such Claim or Interest that: (a) is the subject of an objection or request for estimation filed in the Bankruptcy Court which has not been withdrawn or overruled by a Final Order; and/or (b) is otherwise disputed by the Debtor in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by Final Order.  To the extent a Claim or Interest is held by a holder that is or may be liable to the Debtor or the Estate on account of a Cause of Action, such Claim or Interest shall be Disputed unless and until the Cause of Action has been settled or withdrawn or has been determined by a Final Order.

**1.47**    ***Distribution Date*** means any date on which Plan Distributions are made.

**1.48**    ***Distribution Record Date*** means, with respect to all Classes for which Plan Distributions are to be made, the Effective Date.

**1.49**    ***DOE*** means the United States Department of Energy, acting directly or through the United States Department of Justice.

**1.50**    ***Effective Date*** means the date specified by the Debtor in a notice filed with the Bankruptcy Court as the date on which the Plan shall take effect, which date shall be the first Business Day on which all of the conditions set forth in Section 11.1 of this Plan have been satisfied or waived in accordance with the terms hereof and no stay of the Confirmation Order is in effect.

**1.51**    ***Entity*** shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

**1.52**    ***EPC Contract*** means that certain Contract for the Engineering, Procurement and Construction of the net-110MW Nominal Capacity Thermosolar Electrical Generation Facility in Tonopah, Nevada, USA by and between the Debtor and Cobra Thermosolar Plants, Inc., dated as of September 20, 2011, as thereafter from time to time amended.

**1.53**   *Estate* means the estate created in the Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

**1.54**   *Estimation Order* means an order or orders of the Bankruptcy Court estimating for voting and/or distribution purposes (under section 502(c) of the Bankruptcy Code) the allowed amount of any Claim.  The defined term Estimation Order includes the Confirmation Order if the Confirmation Order grants the same relief that would have been granted in a separate Estimation Order.

**1.55**   *Exculpated Parties* means, except for Solar Reserve Parties, collectively and solely in their capacity as such, the Debtor and each of its current and former officers and managers (<u>provided</u>, that a former officer and/or manager shall only be an Exculpated Party if such officer or manager served in such capacity as of the Petition Date), principals, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and all other retained Professional Persons.

**1.56**   *Existing Interests* means all existing Interests that are outstanding immediately prior to the Effective Date.

**1.57**   *Exit Contingent Note* means a contingent promissory note in the aggregate principal amount of $100 million, and related letter agreement,  the final forms of which shall be contained in the Plan Supplement in form and substance acceptable to the Debtor, Cobra, and DOE.  The payments under the Exit Contingent Note shall be guaranteed by Cobra.

**1.58**   *Exit Contingent Note Guarantee* means a guarantee agreement, the final form of which shall be contained in the Plan Supplement in form and substance acceptable to the Debtor, Cobra and DOE, pursuant to which Cobra unconditionally guarantees Reorganized TSE's obligations to DOE under the Exit Contingent Note.

**1.59**   *Exit Credit Facility* means, collectively, (i) a $100 million first lien term loan and (ii) an up to $50 million working capital facility, made pursuant to the Exit Credit Facility Agreement.

**1.60**   *Exit Credit Facility Agent* means the entity, if any, that serves as the administrative, collateral, and/or other agent under the Exit Credit Facility Agreement.

**1.61**   *Exit Credit Facility Agreement* means that certain credit agreement (as amended, modified or supplemented from time to time) in respect of the Exit Credit Facility by and among Reorganized TSE and Cobra (or a Cobra Designee), a copy of which shall be contained in the Plan Supplement in form and substance acceptable to the Debtor and Cobra.  The principal terms of the Exit Credit Facility Agreement are set forth on Schedule A hereto.

**1.62**   *Exit Credit Facility Documents* means the Exit Credit Facility Agreement and all other related agreements, notes, certificates, documents, and instruments, and all exhibits, schedules, and annexes thereto entered into in connection with the Exit Credit Facility Agreement, with terms and conditions acceptable to the Debtor and Cobra (in each case, as amended, modified, or supplemented from time to time).

**1.63**    *Fee Escrow Account* means an interest-bearing account in an amount equal to the total estimated amount of unpaid Professional Fee Claims and funded by the Debtor on the Effective Date.

**1.64**    *Final Order* means an order, ruling or judgment of the Bankruptcy Court or in the applicable court of competent jurisdiction, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing shall then be pending or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; provided, that no order or judgment shall fail to be a Final Order solely because of the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure has been or may be filed with respect to such order or judgment; provided, further, that no order or judgment shall fail to be a Final Order solely because of the susceptibility of a Claim to a challenge under section 502(j) of the Bankruptcy Code.

**1.65**    *General Unsecured Claim* means any Claim other than: (a) a Professional Fee Claim; (b) a Prepetition Note Claim; (c) U.S. Trustee Fees; (d) an Administrative Expense Claim; (e) a Priority Tax Claim; (f) a Priority Non-Tax Claim; and (g) an Other Secured Claim.

**1.66**    *Governmental Unit* means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

**1.67**    *ICC Arbitration* means the arbitration pending before the Arbitral Tribunal constituted under the Rules of Arbitration of the International Court of Arbitration of the International Chamber of Commerce, captioned Cobra Thermosolar Plants, Inc. (USA) v. Tonopah Solar Energy, LLC (USA), Case No. 23247/MK.

**1.68**    *Impaired* means, when used in reference to a Class, any Class that is impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.69**    *Indemnification Escrow Account* means an interest-bearing account in an amount equal to $2.5 million, funded by the Debtor on the Effective Date, for the purpose of satisfying the Debtor's obligations under Section 10.7 of this Plan.

**1.70**    *Indemnification Obligations* means any obligation of the Debtor to indemnify managers, officers or employees of the Debtor who served in such capacity and were employed on or after the Petition Date with respect to or based upon any act or omission taken or omitted in any of such capacities, or for or on behalf of the Debtor, whether pursuant to agreement, the Debtor's certificate of formation, operating agreement, limited liability company agreement, or similar corporate or other documents or other applicable contract or law in effect as of the Effective Date.

-11-

**1.71**  *Interest* means (i) the interest (whether legal, equitable, contractual or otherwise) of any holders of any class of equity securities of the Debtor, represented by shares of common or preferred stock, limited liability company interests, limited partnership interests or other instruments evidencing a direct or indirect ownership interest in the Debtor, whether or not certificated, transferable, voting or denominated "stock" or a similar security, or any option, warrant or right, contractual or otherwise, to acquire any such interest and (ii) any Claim arising from rescission of a purchase or sale of such interests or rights, or of an Affiliate of the Debtor, for damages arising from the purchase or sale of such interests or rights, or for the reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

**1.72**  *Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

**1.73**  *Loan Guarantee Agreement* means that certain Loan Guarantee Agreement between the Debtor, as borrower, and DOE as Guarantor and Loan Servicer, dated as of September 23, 2011, as amended, modified, or supplemented from time to time.

**1.74**  *New Common Units* means new limited liability company interests in Reorganized TSE. There shall be 100 New Common Units in Reorganized TSE as of the Effective Date.

**1.75**  *New LLC Agreement* means the limited liability company agreement of Reorganized TSE, which shall be substantially in the form to be included in the Plan Supplement.

**1.76**  *New O&M Agreement* means the new operation and maintenance agreement attached to the RSA.

**1.77**  *Other Secured Claim* means any Secured Claim against the Debtor other than a Prepetition Note Claim.

**1.78**  *Person* means any individual, corporation, partnership, association, indenture trustee, limited liability company, cooperative, organization, joint stock company, joint venture, estate, fund, trust, unincorporated organization, Governmental Unit or any political subdivision thereof, or any other entity or organization of whatever nature.

**1.79**  *Petition Date* means July 30, 2020.

**1.80**  *Plan* means this chapter 11 plan proposed by the Debtor, including the Plan Supplement, all applicable exhibits, supplements, appendices and schedules hereto and to the Plan Supplement, either in its present form or as the same may be altered, amended or modified from time to time in accordance with the provisions of the Bankruptcy Code, the Bankruptcy Rules and the terms hereof.

**1.81**  *Plan Consideration* means, with respect to any Class of Claims entitled to distributions under this Plan, one or more of Cash, New Common Units, or rights and obligations under and with respect to the Exit Credit Facility, the Exit Contingent Note, or the Exit Contingent Note Guarantee as the case may be.

-12-

**1.82**    ***Plan Distribution*** means the distribution of Plan Consideration under the Plan.

**1.83**    ***Plan Documents*** means the applicable documents, other than the Plan, to be executed, delivered, assumed, and/or performed in connection with the consummation of the Plan, including the Exit Credit Facility Documents, the Exit Contingent Note, the Exit Contingent Note Guarantee, the Amended Constituent Documents, the documents to be included in the Plan Supplement and any and all exhibits to the Plan and the Disclosure Statement, each of which shall be in form and substance acceptable to the Debtor, Cobra, and DOE.

**1.84**    ***Plan Supplement*** means the supplemental appendix to this Plan (as may be amended, modified and/or supplemented) which the Debtor shall file by seven (7) days prior to the deadline to vote to accept or reject this Plan (provided that the Debtor may amend, supplement, or otherwise modify the Plan Supplement prior to the Confirmation Hearing and/or in accordance with the Plan), which may contain, among other things, draft forms, signed copies, or summaries of material terms, as the case may be, of the following: (a) Amended Constituent Documents; (b) the list of proposed officers and managers of Reorganized TSE; (c) the Schedule of Rejected Contracts and Leases; (d) the Exit Credit Facility Agreement; (e) the Exit Contingent Note; (f) the Exit Contingent Note Guarantee; (g) the New O&M Agreement; (h) form of Confirmation Order; (i) the RSA; (j) the Cobra Backstop Letter of Credit; (k) amendment no. 4 to the EPC Contract; (l) the Backstop Agreement; and (m) any additional documents filed with the Bankruptcy Court before the Effective Date as additional Plan Documents and/or amendments to the Plan Supplement, each of which shall be in form and substance acceptable to the Debtor and Cobra.

**1.85**    ***Prepetition Collateral Agent*** means PNC Bank, National Association (d/b/a Midland Loan Services, a division of PNC Bank, National Association), in its capacity as collateral agent under the Collateral Agency Agreement.

**1.86**    ***Prepetition Note*** means that certain Future Advance Promissory Note No. 2 in the original principal amount of $455,693,000 payable to the Federal Financing Bank (as may be amended, modified, or supplemented from time to time).

**1.87**    ***Prepetition Note Claim*** means any Claim or Cause of Action arising under the Prepetition Note and the Prepetition Note Purchase Agreement, the Loan Guarantee Agreement, and any other Prepetition Note Financing Documents or Prepetition Security Documents.  The Prepetition Note Claims are Allowed Claims under the Plan.

**1.88**    ***Prepetition Note Financing Documents*** means "Financing Documents" as such term is defined in the Loan Guarantee Agreement.

**1.89**    ***Prepetition Note Purchase Agreement*** means that certain Note Purchase Agreement, dated September 23, 2011, among the Company, the Federal Financing Bank, and DOE.

**1.90**    ***Prepetition Security Documents*** means the "Security Documents," as defined in the Loan Guarantee Agreement.

**1.91** *Priority Non-Tax Claim* means any Claim, other than an Administrative Expense Claim, a Professional Fee Claim, a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

**1.92** *Priority Tax Claim* means any Claim of a Governmental Unit of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.93** *Professional Fee Claims* means an Administrative Expense Claim of a Professional Person against the Debtor for compensation for services rendered or reimbursement of costs, expenses or other charges and disbursements incurred during the period from the Petition Date up to, and including, the Effective Date.

**1.94** *Professional Person(s)* means all Persons retained by order of the Bankruptcy Court in connection with the Chapter 11 Case, pursuant to sections 327 or 328 of the Bankruptcy Code, and including any professional or other Person seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 503(b)(3) or 503(b)(4) of the Bankruptcy Code, excluding any ordinary course professionals retained pursuant to an order of the Bankruptcy Court or otherwise.

**1.95** *Released Parties* means, except for Solar Reserve Parties (unless such Solar Reserve Parties affirmatively opt to grant the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they grant the releases provided in the Plan), (a) the Debtor, (b) Cobra, (c) the Prepetition Collateral Agent, (d) the Third Party Releasing Parties, and (e) each of the foregoing's respective current and former parents, Affiliates and subsidiaries, predecessors, successors, and assigns, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

**1.96** *Reorganized TSE* means Tonopah Solar Energy, LLC or any successor thereto by merger, consolidation, or otherwise, on and after the Effective Date, which, for the avoidance of doubt, shall be a limited liability company.

**1.97** *"RSA"* means that certain *Restructuring Support Agreement*, dated as of July 29, 2020, by and between the Debtor and Cobra.

**1.98** *Schedule of Rejected Contracts and Leases* means a schedule of the contracts and leases to be rejected by the Debtor pursuant to section 365 of the Bankruptcy Code and Article X hereof, which may be the Cure Schedule. The Schedule of Rejected Contracts and Leases shall be filed as part of the Plan Supplement and may be amended from time to time, and shall be acceptable to the Debtor and Cobra.

**1.99** *Secured Claim* means a Claim: (a) that is secured by a valid, perfected and enforceable Lien on Collateral, to the extent of the value of the Claim holder's interest in such Collateral as of the Confirmation Date; or (b) to the extent that the holder thereof has a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

**1.100**  ***Secured Parties*** shall have the meaning ascribed to such term in the Collateral Agency Agreement.

**1.101**  ***Securities Act*** means the Securities Act of 1933, as amended and the Exchange Act of 1934, as amended.

**1.102**  ***Solar Reserve Parties*** means SolarReserve CSP Finance, LLC and SolarReserve CSP Holdings, LLC and their respective Affiliates, shareholders, successors and assigns, current and former officers and managers, principals, members, partners, managers, employees, agents, advisory board members, advisors and professionals, and such other persons and entities identified in the Plan Supplement.

**1.103**  ***Third Party Releasing Parties*** means, collectively, all Persons with a Claim, including a Cause of Action, against and/or Interest in the Debtor or related to the Crescent Dunes Solar Energy Project who (i) are deemed to accept the Plan and who affirmatively opt in to the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt to grant the releases provided in the Plan (provided, that Cobra and its Affiliates shall be deemed to consent to such releases), and (ii) are deemed to reject the Plan and who affirmatively opt in to the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt to grant the releases provided in the Plan, and (iii) each of the foregoing's respective current and former parents, Affiliates and subsidiaries, predecessors, successors, and assigns, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

**1.104**  ***Unimpaired*** means any Claim or Interest that is not Impaired.

**1.105**  ***U.S. Trustee*** means the United States Trustee for Region 3.

**1.106**  ***U.S. Trustee Fees*** means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

### B.    Interpretation; Application of Definitions and Rules of Construction.

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein.  Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural.  Whenever this Plan uses the term "including," such reference will be deemed to mean "including, without limitation."  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.  Except for section 102(5) of the Bankruptcy Code, the rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Plan.  The captions and headings in this Plan are for

27008590.1

convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns.

## C.    Appendices and Plan Documents.

All Plan Documents and appendices to the Plan are incorporated into the Plan by reference and are a part of the Plan as if set forth in full herein.  The documents contained in the exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.  Holders of Claims and Interests may inspect a copy of the Plan Documents, once filed, in the Office of the Clerk of the Bankruptcy Court during normal business hours, or via the Claims Agent's website at https://dm.epiq11.com/tonopah (the "***Debtor's Case Information Website***") or obtain a copy of any of the Plan Documents by a written request sent to the Claims Agent at the following address:

> Tonopah Solar Energy, LLC
> c/o Epiq Corporate Restructuring, LLC
> P.O. Box 4422
> Beaverton, OR 97076-4422
> Toll-Free U.S. and Canada Phone:  (866) 897-6433
> International Phone:  (646) 282-2500

## ARTICLE II.

## CERTAIN INTER-CREDITOR AND INTER-DEBTOR ISSUES

### 2.1.    *Settlement of Certain Inter-Creditor Issues.*

In consideration for the Plan Distributions and other benefits provided under the Plan, the treatment of Claims and Interests under this Plan represents, among other things, the settlement and compromise of certain potential inter-creditor disputes.

## ARTICLE III.

## ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL FEE CLAIMS, U.S. TRUSTEE FEES AND PRIORITY TAX CLAIMS

All Claims and Interests, except Administrative Expense Claims, Professional Fee Claims, fees owed pursuant to 28 U.S.C § 1930 and Priority Tax Claims, are placed in the Classes set forth in Article IV below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, U.S. Trustee Fees and Priority Tax Claims have not been classified, and the holders thereof are not entitled to vote on this Plan. A Claim or Interest is placed in a particular Class only to the extent that such Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code.  However, a Claim or Interest is placed in a particular Class for the purpose of receiving Plan Distributions only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest and has not been paid, released or otherwise settled prior to the Effective Date.

3.1.    ***Administrative Expense Claims.***

(a)    <u>Time for Filing Administrative Expense Claims</u>.

The holder of an Administrative Expense Claim, other than the holder of:

(i)    an Administrative Expense Claim that has been Allowed on or before the Effective Date;

(ii)    an Administrative Expense Claim for an expense or liability incurred and payable in the ordinary course of business by the Debtor;

(iii)    an Administrative Expense Claim on account of fees and expenses incurred on or after the Petition Date by ordinary course professionals retained by the Debtor pursuant to an order of the Bankruptcy Court;

(iv)    a Claim for adequate protection arising under the Cash Collateral Order; or

(v)    a claim for Cure Amounts

(and, for the avoidance of doubt, other than a holder of a Professional Fee Claim, a holder of a claim arising pursuant to 11 U.S.C. § 503(b)(1)(D), or with respect to fees owed pursuant to 28 U.S.C. § 1930) must file with the Bankruptcy Court and serve on the Debtor, the Claims Agent, and the U.S. Trustee, proof of such Administrative Expense Claim **within thirty (30) days after the Effective Date** (the "***Administrative Bar Date***").  Such proof of Administrative Expense Claim must include at a minimum: (i) the name of the Debtor and the exact amount asserted to be owed by the Debtor; (ii) the name of the holder of the Administrative Expense Claim; (iii) the asserted amount of the Administrative Expense Claim; (iv) the basis of the Administrative Expense Claim; and (v) supporting documentation for the Administrative Expense Claim. **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISCHARGED.**  A notice setting forth the Administrative Bar Date will be (i) filed on the Bankruptcy Court's docket and served with the notice of the Effective Date and (ii) posted on the Debtor's Case Information Website.  No other notice of the Administrative Bar Date will be provided.

(b)    Treatment of Administrative Expense Claims.

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, or as otherwise expressly provided herein, on the later of (i) the Effective Date, or as soon thereafter as is reasonably practicable, or (ii) the date on which an Administrative Expense Claim is Allowed, the holder of such Allowed Administrative Expense Claim shall receive Cash from the Debtor in an amount equal to such Allowed Claim; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor, as debtor in possession, shall be paid by the Debtor in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities.

Claims for adequate protection under the Cash Collateral Order shall be deemed Allowed Administrative Expense Claims to the extent payable under the Cash Collateral Order or this Plan, without the necessity of filing a proof of claim with respect thereto, and shall be paid in full on the Effective Date or as is reasonably practicable as set forth herein without the need to file a proof of such Claims with the Bankruptcy Court in accordance with Section 3.2 hereof and without further order of the Bankruptcy Court.

**3.2.    *Professional Fee Claims.***

Except to the extent that the applicable holder of an Allowed Professional Fee Claim agrees to less favorable treatment with the Debtor, or as otherwise expressly set forth in this Plan, each holder of a Professional Fee Claim shall be paid in full in Cash pursuant to this Section 3.2.

(a)    Fee Applications

All requests for payment of Professional Fee Claims must be filed with the Bankruptcy Court by the date that is 60 calendar days after the Effective Date; provided that if any Professional Person is unable to file its own request with the Bankruptcy Court, such Professional Person may deliver an original, executed copy and an electronic copy to the Debtor's attorneys and the Debtor at least three Business Days before the deadline, and the Debtor's attorneys shall file such request with the Bankruptcy Court.  The objection deadline relating to a request for payment of Professional Fee Claims shall be 4:00 p.m. (prevailing Eastern Time) on the date that is 30 days after filing such request, and a hearing on such request, if necessary, shall be held no later than 30 calendar days after the objection deadline. Distributions on account of Allowed Professional Fee Claims shall be made as soon as reasonably practicable after such Claims become Allowed.

(b)    Post-Effective Date Fees

Upon the Effective Date, any requirement that Professional Persons comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for

services rendered after such date shall terminate, and the Debtor may employ and pay all Professional Persons without any further notice to, action by or order or approval of the Bankruptcy Court or any other party.

(c)    Fee Escrow Account

On the Effective Date, the Debtor shall establish and fund the Fee Escrow Account.  The Debtor shall fund the Fee Escrow Account with Cash equal to the Debtor's good faith estimate of the Allowed Professional Fee Claims.  Funds held in the Fee Escrow Account shall not be considered property of the Debtor's Estate or property of the Debtor, but shall revert to the Debtor only after all Allowed Professional Fee Claims have been paid in full.  Fees owing to the applicable holder of an Allowed Professional Fee Claim shall be paid in Cash to such holder from funds held in the Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid under a Final Order authorizing interim compensation of Professional Persons; provided, that the Debtor's obligations with respect to Allowed Professional Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account. To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of accrued Allowed Professional Fee Claims, each holder of an Allowed Professional Fee Claim shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with Section 3.2 of this Plan.  No Liens, claims, or interests shall encumber the Fee Escrow Account in any way.

### 3.3.    *U.S. Trustee Fees.*

The Debtor shall pay all outstanding U.S. Trustee Fees on an ongoing basis on the date such U.S. Trustee Fees become due, until such time as a final decree is entered closing the Chapter 11 Case or the Chapter 11 Case is converted or dismissed.

### 3.4.    *Priority Tax Claims.*

Except to the extent that the applicable holder of an Allowed Priority Tax Claim has been paid by the Debtor before the Effective Date, or the Debtor and such holder agree to less favorable treatment by the Debtor, each holder of an Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, at the option of the Debtor (a) payment in full in Cash made on or as soon as reasonably practicable after the later of the Effective Date and the first Distribution Date occurring at least 20 calendar days after the date such Claim is Allowed, (b) regular installment payments in accordance with section 1129(a)(9)(C) of the Bankruptcy Code or (c) such other amounts and in such other manner as may be determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

The Debtor shall have the right, in its sole discretion, to pay any Allowed Priority Tax Claim or any remaining balance of an Allowed Priority Tax Claim (together with accrued but unpaid interest) in full at any time on or after the Effective Date without premium or penalty.

# ARTICLE IV.
## CLASSIFICATION OF CLAIMS AND INTERESTS

**4.1.**    *Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Debtor, and specifies which Classes are: (a) impaired or unimpaired by this Plan; (b) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code; and (c) presumed to accept or reject this Plan.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Priority Non-Tax Claims | No | No |
| Class 2 | Other Secured Claims | No | No |
| Class 3 | Prepetition Note Claims | Yes | Yes |
| Class 4 | General Unsecured Claims | No | No |
| Class 5 | Existing Interests | Yes | No |

If a controversy arises regarding whether any Claim is properly classified under the Plan, the Bankruptcy Court shall, upon proper motion and notice, determine such controversy at the Confirmation Hearing.  If the Bankruptcy Court finds that the classification of any Claim is improper, then such Claim shall be reclassified and the Ballot previously cast by the holder of such Claim (if any) shall be counted in, and the Claim shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified, without the necessity of resoliciting any votes on the Plan.

**4.2.**    *Unimpaired Classes of Claims.*

The following Classes of Claims are unimpaired and, therefore, deemed to have accepted this Plan and are not entitled to vote on this Plan under section 1126(f) of the Bankruptcy Code:

(a)    Class 1: Class 1 consists of all Priority Non-Tax Claims.

(b)    Class 2: Class 2 consists of all Other Secured Claims.

(c)    Class 4:  Class 4 consists of General Unsecured Claims.

**4.3.**    *Impaired Classes of Claims.*

Class 3 consists of Prepetition Note Claims, is impaired and is entitled to vote on this Plan.  Class 5 consists of all Existing Interests, is impaired and is deemed to have rejected this Plan, and therefore, is not entitled to vote on this Plan under section 1126(g) of the Bankruptcy Code.

-20-

**4.4.** *Separate Classification of Other Secured Claims.*

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature, each Other Secured Claim, to the extent secured by a Lien on Collateral different than that securing any additional Other Secured Claims, shall be treated as being in a separate sub-Class for the purpose of receiving Plan Distributions.

## ARTICLE V.
## TREATMENT OF CLAIMS AND INTERESTS

**5.1.** *Priority Non-Tax Claims (Class 1).*

(a)   Treatment: The legal, equitable and contractual rights of the holders of Priority Non-Tax Claims are unaltered by this Plan.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a different treatment, on the applicable Distribution Date, each holder of an Allowed Priority Non-Tax Claim shall receive Cash from the Debtor in an amount equal to such Allowed Claim.

(b)   Voting: The Priority Non-Tax Claims are not impaired Claims.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Priority Non-Tax Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Allowed Priority Non-Tax Claims.

**5.2.** *Other Secured Claims (Class 2).*

(a)   Treatment: The legal, equitable and contractual rights of the holders of Other Secured Claims are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each holder of an Allowed Other Secured Claim shall each receive, subject to the terms of the Plan, in full and final satisfaction, settlement, release and discharge of its Allowed Other Secured Claim, at the election of the Debtor:

(i)   Cash in an amount equal to such Allowed Other Secured Claim; or

(ii)   such other treatment that will render such Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code;

provided, however, that Other Secured Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, in the discretion of the Debtor without further notice to or order of the Bankruptcy Court.

Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final satisfaction of such Allowed Other Secured Claim is made as provided herein.  On the full payment or other satisfaction of each Allowed Other Secured Claim in accordance with the Plan, the Liens

-21-

securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

(b)    Voting: The Other Secured Claims are not impaired Claims.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Other Secured Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Allowed Other Secured Claims.

### 5.3.    *Prepetition Note Claims (Class 3).*

(a)    Treatment:  The Prepetition Note Claims shall be Allowed under the Plan and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection or any other challenges under any applicable law or regulation by any Person.  On the Effective Date, DOE, as the holder of the Allowed Prepetition Note Claims, shall receive, subject to the terms of the Plan, in full and final satisfaction, settlement, release and discharge of its Allowed Prepetition Note Claims, (a) $200 million in Cash (which shall be satisfied by DOE by a draw on the Cobra Backstop Letter of Credit) and (b) all rights and obligations under the Exit Contingent Note.  On the Effective Date, the Debtor shall also pay in full in Cash all outstanding fees and expenses incurred by the Prepetition Collateral Agent to the extent due and owing under the Collateral Agency Agreement.

(b)    Upon payment of the $200 million in Cash provided in § 5.3(a) of this Plan, the delivery of the executed Exit Contingent Note to DOE, and the payment in full in Cash of all outstanding fees and expenses of the Prepetition Collateral Agent as provided in § 5.3(a) of the Plan: (i) the Loan Servicer (on DOE's behalf) shall conclusively be deemed to have provided written direction to the Prepetition Collateral Agent to release all Collateral it holds on behalf of the Secured Parties and to release all Liens thereon for the benefit of the Secured Parties; and (ii) the Loan Servicer shall conclusively be deemed to have certified to the Prepetition Collateral Agent that the Discharge Date under the Collateral Agency Agreement has occurred.  On the Effective Date, and upon (x) payment of the $200 Million in Cash provided in § 5.3(a) of the Plan, (y) the delivery of the executed Exit Contingent Note to DOE, and (z) payment of all outstanding fees and expenses of the Prepetition Collateral Agent in full in Cash as provided in § 5.3(a) of the Plan, the Prepetition Collateral Agent shall release to the Debtor all Collateral held for the benefit of the Secured Parties and any Liens on the Collateral held for the benefit of the Secured Parties.  The Debtor shall pay all reasonable fees and expenses incurred by the Collateral Agent in complying with the previous sentence on or as soon as reasonably practicable after the Effective Date.  Upon the release of the Collateral held by the Prepetition Collateral Agent for the benefit of the Secured Parties and the release of all Liens on the Prepetition Collateral held for the benefit of the Secured Parties, the duties, responsibilities, and obligations of the Prepetition Collateral Agent under the Collateral Agency Agreement shall terminate.

(c)     Voting:  The Prepetition Note Claims are impaired Claims.  The holder of such Claims is entitled to vote to accept or reject the Plan, and the votes of such holder will be solicited with respect to such Prepetition Note Claims.

### 5.4.     *General Unsecured Claims (Class 4).*

(a)     Treatment:  General Unsecured Claims are unimpaired Claims.  Except to the extent that a holder of a General Unsecured Claim agrees to different treatment, each holder of an Allowed General Unsecured Claim shall receive treatment that: (i) leaves unaltered the legal, equitable, or contractual rights to which the holder of such Allowed General Unsecured Claim is entitled; or (ii) otherwise leaves such Allowed General Unsecured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.

(b)     Voting:  The Allowed General Unsecured Claims are not impaired Claims. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed General Unsecured Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Allowed General Unsecured Claims.

### 5.5.     *Existing Interests (Class 5).*

(a)     Treatment:  Existing Interests shall be discharged, cancelled, released and extinguished, and holders thereof shall not receive or retain any distribution under the Plan on account of such Existing Interests.

(b)     Voting:  The Existing Interests are impaired Interests.  In accordance with section 1126(g) of the Bankruptcy Code, the holders of Existing Interests are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Existing Interests.

## ARTICLE VI.

## ACCEPTANCE OR REJECTION OF
## THE PLAN; EFFECT OF REJECTION BY ONE
## OR MORE CLASSES OF CLAIMS OR INTERESTS

### 6.1.     *Class Acceptance Requirement.*

A Class of Claims that is impaired under the Plan shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of holders of the Allowed Claims in such Class that have voted on the Plan.

### 6.2.     *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown."*

Because Class 5 is deemed to have rejected this Plan, the Debtor will request confirmation of this Plan, as it may be modified and amended from time to time, under section

1129(b) of the Bankruptcy Code with respect to such Class.  Subject to Sections 14.3 and 14.4 of this Plan, the Debtor reserves the right to revoke or withdraw this Plan or, if acceptable to the Debtor, Cobra and DOE, to alter, amend, or modify this Plan or, alter, amend, modify, revoke or withdraw any Plan Document, in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.  Subject to Sections 14.3 and 14.4 of this Plan (including the consent and consultation rights set forth therein), the Debtor also reserves the right to request confirmation of the Plan, as it may be modified, supplemented or amended from time to time, with respect to any Class that affirmatively votes to reject the Plan.

### 6.3.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that is impaired and is entitled to vote on the Plan that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed as of the date of the deadline for voting to accept or reject the Plan shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

## ARTICLE VII.
## MEANS FOR IMPLEMENTATION

### 7.1.    *Continued Existence and Vesting of Assets in Reorganized TSE.*

(a)    Except as otherwise provided in this Plan, the Debtor shall continue to exist after the Effective Date as Reorganized TSE in accordance with the laws of the State of Delaware and pursuant to the Amended Constituent Documents for the purposes of satisfying its obligations under the Plan and the continuation of its business.  On or after the Effective Date, Reorganized TSE, in its discretion, may take such action as permitted by applicable law and the Amended Constituent Documents as Reorganized TSE may determine is reasonable and appropriate.

(b)    Except as otherwise provided in this Plan, on and after the Effective Date, all property of the Estate, wherever located, including all claims, rights and Causes of Action, and any property, wherever located, acquired by the Debtor under or in connection with this Plan, shall vest in Reorganized TSE free and clear of all Claims, Liens, charges, other encumbrances and Interests.  On and after the Effective Date, Reorganized TSE may operate its business and may use, acquire and dispose of property, wherever located, and prosecute, compromise or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order.  Without limiting the foregoing, Reorganized TSE may pay the charges that it incurs on or after the Effective Date for Professional Persons' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

(c)    On the Effective Date or as soon as reasonably practicable thereafter, Reorganized TSE may take all actions that may be necessary or appropriate to effectuate any

-24-

transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of formation, merger, consolidation, conversion, dissolution, or other organizational documents pursuant to applicable state law; and (4) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

**7.2.    *Issuance of New Common Units to Cobra***

In consideration for Cobra's commitments and undertakings under the Plan, the New Common Units shall be issued on the Effective Date and distributed to Cobra (or a Cobra Designee) on the Effective Date or as soon as practicable thereafter, in accordance with this Plan and the terms of the Amended Constituent Documents. All of the New Common Units issuable in accordance with this Plan, when issued, shall be duly authorized, validly issued, fully paid, and non-assessable. The issuance of the New Common Units is authorized without the need for any further limited liability company, or other similar action and without any further action by any holder of an Allowed Claim or Interest.

The New Common Units will not be listed on a national securities exchange, Reorganized TSE will not be a reporting company under the Securities Exchange Act, and Reorganized TSE shall not be required to and will not file reports with the SEC or any other governmental entity after the Effective Date.

**7.3.    *Plan Value of New Common Units***

For purposes of this Plan, the New Common Units shall have an aggregate deemed value equal to $100 million. Such deemed value is equal to the amount that will be drawn by DOE on the Cobra Backstop Letter of Credit pursuant to Section 5.3 of this Plan less the $100 million term loan component of the Exit Credit Facility.

**7.4.    *Working Capital Commitment***

Under the Exit Credit Facility, Cobra (or a Cobra Designee) shall provide Reorganized TSE with up to $50 million to fund the working capital and other needs of Reorganized TSE.

**7.5.    *Exit Credit Facility Agreement, Exit Contingent Note***

On the Effective Date, Reorganized TSE shall be authorized to enter into the Exit Credit Facility Agreement, Exit Contingent Note, and the Amended Constituent Documents without the need for any further limited liability company or other similar action. The entry of the Confirmation Order shall be deemed approval of the Exit Credit Facility Agreement, Exit

-25-

Contingent Note, and the Amended Constituent Documents, and authorization for Reorganized TSE to enter into and execute the Exit Credit Facility Agreement, Exit Contingent Note, and the Amended Constituent Documents requiring execution and delivery by Reorganized TSE.

The obligations arising under the Exit Credit Facility Documents shall be secured by a senior priority perfected security interest in substantially all present and after acquired property and proceeds thereof of Reorganized TSE, subject to any exceptions and materiality thresholds acceptable to Cobra, as lender under the Exit Credit Facility Agreement. The Debtor is authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary or desirable to establish and further evidence perfection of any Liens and security interests granted to secure the obligations under the Exit Credit Facility Documents under the provisions of any applicable federal, state, provincial, or other law (whether domestic or foreign) (it being understood that perfection shall occur automatically by virtue of the occurrence of the Effective Date, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 7.6. *Cancellation of Existing Securities and Agreements.*

Except for the purpose of evidencing a right to distribution under this Plan, and except as otherwise set forth herein, on the Effective Date, the Prepetition Note Documents shall be deemed cancelled, discharged and of no further force or effect.  DOE, as holder of the Allowed Prepetition Note Claims, shall have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan.

### 7.7. *Cancellation of Liens Pursuant to Cash Collateral Order.*

On the Effective Date, the Cash Collateral Order, including the use of cash collateral thereunder, shall be terminated.  All Liens and security interests granted to secure obligations pursuant to the Cash Collateral Order shall be terminated and of no further force or effect, without the need for further Court approval, action or order.  Reorganized TSE shall be entitled to take any action necessary to effectuate the discharge of any Lien under the Cash Collateral Order.

### 7.8. *Board of Managers.*

(a)    On the Effective Date, the board of managers of Reorganized TSE shall consist of five (5) individuals selected by Cobra, who shall be reasonably acceptable to the Debtor, and identified in the Plan Supplement to be filed with the Bankruptcy Court.

(b)    Unless reappointed pursuant to Section 7.8(a) hereof, the members of the board of managers of the Debtor prior to the Effective Date shall have no continuing obligations to the Debtor in their capacities as such on and after the Effective Date and each such member shall be deemed to have resigned or shall otherwise cease to be a manager of the Debtor on the Effective Date.  Commencing on the Effective Date, each of the managers of Reorganized TSE

-26-

shall serve pursuant to the terms of the Amended Constituent Documents and be replaced or removed in accordance therewith.

**7.9.    *Organizational and Other Action.***

(a)    The Debtor shall serve on the U.S. Trustee quarterly reports of its disbursements until such time as a final decree is entered closing the Chapter 11 Case or the Chapter 11 Case is converted or dismissed, or the Bankruptcy Court orders otherwise.

(b)    On the Effective Date, the Amended Constituent Documents and any other applicable amended and restated limited liability company or other organizational documents of the Debtor shall be deemed authorized in all respects.

(c)    Any action under the Plan to be taken by or required of the Debtor, including the adoption or amendment of its certificate of formation, limited liability company agreement or other organizational document, the issuance of limited liability company membership interests, securities and instruments, or the selection of officers or managers, shall be authorized and approved in all respects, without any requirement of further action by the Debtor's equity holders, sole member, board of managers, or similar body, as applicable.

(d)    The Debtor shall be authorized to execute, deliver, file, and record such documents (including the Plan Documents), contracts, instruments, releases and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan, without the necessity of any further Bankruptcy Court, limited liability company, board or member approval or action.  In addition, the selection of the Persons who will serve as the initial managers, officers and managers of Reorganized TSE as of the Effective Date shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the board of managers or equity holders of the applicable Reorganized TSE.

**7.10.    *Comprehensive Settlement of Claims and Controversies.***

In consideration for the Plan Distributions and other benefits provided under this Plan, the provisions of this Plan will constitute a good faith compromise and settlement of all Claims and Causes of Action relating to the rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any Plan Distribution on account thereof.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are: (a) in the best interest of the Debtor, its Estate and its property and stakeholders; and (b) fair, equitable and reasonable.

**7.11.    *Transactions Authorized under Plan***

On and after the Effective Date, the Debtor and Reorganized TSE, as applicable, shall be authorized to take such actions as may be necessary or appropriate to implement the transactions contemplated by the Plan and the other Plan Documents.

27008590.1

**7.12.**    *Approval of Plan Documents*

The solicitation of votes with respect to the Plan shall be deemed a solicitation for the approval of the Plan Documents and all transactions contemplated hereunder.  Entry of the Confirmation Order shall constitute approval of the Plan Documents and such transactions.  On the Effective Date, the Debtor and Reorganized TSE, as applicable, shall be authorized to enter into, file, execute and/or deliver each of the Plan Documents and any other agreement or instrument issued in connection with any Plan Document without the necessity of any further limited liability company, board, member, manager, or similar action.

**7.13.**    *Dismissal of the ICC Arbitration*

Within three (3) Business Days of the Effective Date, Reorganized TSE and Cobra shall jointly request the dismissal with prejudice of the ICC Arbitration.

## ARTICLE VIII.

## DISTRIBUTIONS

**8.1.**    *Distributions.*

The Disbursing Agent shall make all Plan Distributions to the applicable holders of Allowed Claims in accordance with the terms of this Plan.

**8.2.**    *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan or Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

**8.3.**    *Date of Distributions.*

Unless otherwise provided herein, any Plan Distributions and deliveries to be made hereunder shall be made on the Effective Date or as soon as reasonably practicable thereafter; provided, that the Debtor may utilize periodic Distribution Dates to the extent that use of a periodic Distribution Date does not delay payment of the Allowed Claim more than thirty (30) days.  In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**8.4.**    *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each of the Classes, as maintained by the Debtor or its agents, shall be deemed closed and there shall be no further changes in the record holders of any of the Claims

-28-

after the Distribution Record Date. Neither the Debtor nor the Disbursing Agent shall have any obligation to recognize any transfer of Claims occurring after the close of business on the Distribution Record Date. Additionally, with respect to payment of any Cure Amounts or any Cure Disputes in connection with the assumption and/or assignment of the Debtor's executory contracts and unexpired leases, neither the Debtor nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned or otherwise transferred its Claim for a Cure Amount.

### 8.5. *Disbursing Agent.*

(a)    Powers of Disbursing Agent.

The Disbursing Agent shall be empowered to: (i) effectuate all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (ii) make all applicable Plan Distributions or payments contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any order issued after the Effective Date), pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

(b)    Expenses Incurred by the Disbursing Agent on or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the Debtor, the amount of any reasonable and documented fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including reasonable attorney and other professional fees and expenses) of the Disbursing Agent shall be paid in Cash by the Debtor and will not be deducted from Plan Distributions made to holders of Allowed Claims by the Disbursing Agent. The foregoing fees and expenses shall be paid in the ordinary course, upon presentation of invoices to the Debtor.

In the event that the Disbursing Agent and the Debtor are unable to resolve a dispute with respect to the payment of the Disbursing Agent's fees, costs and expenses, the Disbursing Agent may elect to submit any such dispute to the Bankruptcy Court for resolution.

(c)    Bond.

The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Debtor. Furthermore, any such entity required to give a bond shall notify the Bankruptcy Court and the U.S. Trustee in writing before terminating any such bond that is obtained.

(d)   Cooperation with Disbursing Agent.

The Debtor shall use all commercially reasonable efforts to provide the Disbursing Agent with the amount of Claims and the identity and addresses of holders of Claims, in each case, as set forth in the Debtor's books and records.  The Debtor will cooperate in good faith with the Disbursing Agent to comply with the withholding and reporting requirements outlined in Section 8.16 of this Plan.

**8.6.   *Delivery of Distributions.***

Subject to the provisions contained in this Article VIII, the Disbursing Agent will issue, or cause to be issued, and authenticate, as applicable, all Plan Consideration, and subject to Bankruptcy Rule 9010 and except as provided in Section 8.3 of this Plan, make all Plan Distributions or payments to any holder of an Allowed Claim as and when required by this Plan at: (a) in the case of DOE, the address and in the manner notified to the Debtor by DOE in writing prior to the Effective Date; (b) the address of such holder on the books and records of the Debtor or its agents; or (c) the address in any written notice of address change delivered to the Debtor or the Disbursing Agent, including any addresses included on any filed proofs of Claim or transfers of Claim filed with the Bankruptcy Court.  In the event that any Plan Distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then current address of such holder, at which time or as soon as reasonably practicable thereafter such Plan Distribution shall be made to such holder without interest; provided, however, such Plan Distributions or payments shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of the later of 180 days from: (i) the Effective Date; and (ii) the first Distribution Date after such holder's Claim is first Allowed.

**8.7.   *Satisfaction of Claims.***

Unless otherwise specifically provided herein, any Plan Distributions and deliveries to be made on account of Allowed Claims hereunder shall be in complete settlement, satisfaction and discharge of such Allowed Claims.

**8.8.   *Manner of Payment Under Plan.***

Except as specifically provided herein, at the option of the Debtor, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtor.

**8.9.   *No Distribution in Excess of Amount of Allowed Claim.***

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Plan Distribution of a value in excess of the Allowed amount of such Claim.

**8.10.    *Exemption from Securities Laws.***

Pursuant to section 4(a)(2) of the Securities Act and Rule 506 of Regulation D promulgated thereunder, the issuance of the New Common Units is exempt from the registration requirements of the Securities Act and any State or local law requiring registration for offer or sale of a security.

**8.11.    *Setoffs and Recoupments.***

Except as expressly provided in this Plan, the Debtor may, but shall not be required to, pursuant to sections 553 and 558 of the Bankruptcy Code or applicable non-bankruptcy law, setoff and/or recoup against any Allowed Claim and any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights and Causes of Action of any nature that such Debtor may hold against the holder of such Allowed Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; provided, however, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver, abandonment or release by the Debtor or its successor of any and all claims, rights and Causes of Action that such Debtor or its successor may possess against the applicable holder; provided further, that, for the avoidance of doubt, the Debtor may not setoff and/or recoup any Allowed Claim, right, or Cause of Action that the Debtor may hold against Allowed Prepetition Note Claims or the Prepetition Collateral Agent.

**8.12.    *Withholding and Reporting Requirements.***

In connection with this Plan and all Plan Distributions hereunder, the Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Plan Distributions hereunder shall be subject to any such withholding and reporting requirements.  The Debtor shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of any Plan Distribution to generate sufficient funds to pay applicable withholding taxes or establishing any other mechanisms the Debtor or the Disbursing Agent believe are reasonable and appropriate, including requiring a holder of a Claim to submit appropriate tax and withholding certifications.  Notwithstanding any other provision of this Plan: (a) each holder of an Allowed Claim that is to receive a Plan Distribution under this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations on account of such distribution; and (b) no Plan Distributions shall be required to be made to or on behalf of such holder pursuant to this Plan unless and until such holder has made arrangements satisfactory to the Debtor for the payment and satisfaction of such tax obligations or has, to the Debtor's satisfaction, established an exemption therefrom.

## ARTICLE IX.
## PROCEDURES FOR RESOLVING CLAIMS

**9.1.**    *Disputed Claims.*

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the unimpaired status of all Allowed General Unsecured Claims under the Plan, except for holders of claims for rejection damages, which must file proofs of claim pursuant to Section 10.2 of the Plan, holders of Allowed General Unsecured Claims do not need to file proofs of Claim with the Bankruptcy Court, and the Debtor and the holders of Allowed General Unsecured Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Allowed General Unsecured Claims in the ordinary course of business; *provided*, that (unless expressly waived pursuant to the Plan) the Allowed amount of such Allowed General Unsecured Claims shall be subject to and shall not exceed the limitations under or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable.  If a holder of an Allowed General Unsecured Claim elects to file a proof of Claim with the Bankruptcy Court, such holder shall be deemed to have consented to the jurisdiction of the Bankruptcy Court for all purposes with respect to such Allowed General Unsecured Claim, and the Bankruptcy Court shall retain nonexclusive jurisdiction over all such Allowed General Unsecured Claims, which shall be resolved on a case-by-case basis through settlements, Claim objections (or, if necessary, through adversary proceedings), adjudication in a forum other than the Bankruptcy Court, or by withdrawal of the Allowed General Unsecured Claims by the holders of such Claims.  From and after the Effective Date, Reorganized TSE may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court. Disputed Claims shall not be entitled to any Plan Distributions unless and until they become Allowed Claims.

**9.2.**    *Objections to Claims.*

Any objections to Claims (other than Administrative Expense Claims) shall be served and filed on or before the later of: (a) the Claims Objection Deadline and (b) such other date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (a) hereof (for the avoidance of doubt, this objection deadline may be extended one or more times by the Bankruptcy Court).  Any Administrative Expense Claims filed after the Administrative Bar Date shall be deemed Disallowed and expunged in their entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtor, as applicable, unless the Person wishing to file such untimely Claim has received the Bankruptcy Court's authorization to do so.  Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the claimant if the objecting party effects service in any of the following manners:  (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) by first class mail, postage prepaid, on the signatory on the proof of claim as well as all other representatives identified in the proof of claim or any attachment thereto; or (c) if counsel has agreed to or is otherwise deemed to accept service, by first class mail, postage prepaid, on any counsel that has appeared on the claimant's behalf in the Chapter 11 Case (so long as such appearance has not been subsequently withdrawn).  From and after the Effective Date, the Debtor, in its sole discretion, shall have

-32-

exclusive authority to settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

**9.3.**    *Estimation of Claims*

The Debtor may request that the Bankruptcy Court enter an Estimation Order with respect to any Claim, pursuant to section 502(c) of the Bankruptcy Code, for purposes of determining the Allowed amount of such Claim regardless of whether any Person has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time (including during the pendency of any appeal with respect to the allowance or disallowance of such Claims). In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim for allowance or distribution purposes, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the objecting party may elect to pursue any supplemental proceedings to object to any ultimate allowance of such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, resolved or withdrawn by any mechanism approved by the Bankruptcy Court.

**9.4.**    *Expenses Incurred on or After the Effective Date.*

Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the Debtor, the amount of any reasonable fees and expenses incurred by any Professional Person or the Claims Agent on or after the Effective Date in connection with implementation of this Plan, including reconciliation of, objection to, and settlement of Claims, shall be paid in Cash by the Debtor.

## ARTICLE X.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**10.1.**    *General Treatment.*

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases of the Debtor shall be deemed assumed except that: (a) any executory contracts and unexpired leases that previously have been assumed, assumed and assigned, or rejected pursuant to a Final Order of the Bankruptcy Court shall be treated as provided in such Final Order; (b) any executory contracts and unexpired leases listed on the Schedule of Rejected Contracts and Leases shall be deemed rejected as of the Effective Date; and (c) all executory contracts and unexpired leases that are the subject of a separate motion to assume or reject under section 365 of the Bankruptcy Code pending on the Effective Date shall be treated as provided for in the Final Order resolving such motion. Rejection of any executory contract or unexpired lease pursuant to the Plan or otherwise will not constitute a termination of obligations owed to the Debtor under such contract or lease that survive breach under applicable law. Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions,

assumptions and assignments and rejections described in this Section 10.1 pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to this Section 10.1 shall revest in and be fully enforceable by the Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable federal law.  Nothing contained in this Plan or the listing of a document on the Schedule of Rejected Contracts and Leases, or the Cure Schedule shall constitute an admission by the Debtor that such document is an executory contract or an unexpired lease or that the Debtor or its successors and assigns has any liability thereunder.

**10.2.** *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

All Claims arising from the rejection of executory contracts or unexpired leases, if evidenced by a timely filed proof of claim, will be treated as General Unsecured Claims.  In the event that the rejection of an executory contract or unexpired lease by the Debtor pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtor or its properties or interests in property or its agents, successors or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtor on or before the date that is thirty (30) days after the effective date of such rejection (which may be the Effective Date, the date on which the Debtor rejects the applicable contract or lease as provided in Section 10.1 of this Plan, or pursuant to an order of the Bankruptcy Court).

**10.3.** *Cure of Defaults for Assumed or Assumed and Assigned Executory Contracts and Unexpired Leases.*

(a)    Except to the extent that less favorable treatment has been agreed to by the non-Debtor party or parties to each such executory contract or unexpired lease to be assumed or assumed and assigned pursuant to the Plan, any monetary defaults arising under such executory contract or unexpired lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the appropriate amount (the "***Cure Amount***") in full in Cash on the later of: (i) the Effective Date; (ii) thirty (30) days after the date of entry of a Final Order providing for the assumption, or the assumption and assignment, of such executory contract or unexpired lease; or (iii) the date on which any Cure Dispute relating to such Cure Amount has been resolved (either consensually or through judicial decision).

(b)    With respect to any executory contract or unexpired lease to be assumed or assumed and assigned pursuant to Section 10.1 of this Plan, the Debtor shall file a schedule (a "***Cure Schedule***") with the Plan Supplement setting forth the Cure Amount, if any, for each executory contract or unexpired lease to be assumed or assumed and assigned by the Debtor.

(c)    In the event of a dispute (each, a "***Cure Dispute***") regarding: (i) the Cure Amount; (ii) the ability of the Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assumed and assigned; or (iii) any other matter pertaining to the proposed

-34-

assumption or assumption and assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving such Cure Dispute and approving the assumption or assumption and assignment.  To the extent a Cure Dispute relates solely to the Cure Amount, the Debtor may assume and/or assume and assign the applicable contract or lease prior to the resolution of the Cure Dispute.  To the extent the Cure Dispute is resolved or determined against the Debtor, the Debtor may reject the applicable executory contract or unexpired lease after such determination, and the counterparty may thereafter file a proof of claim in the manner set forth in Section 10.2 of this Plan.

   **10.4.**   *Effect of Confirmation Order on Assumption, Assumption and Assignment, and Rejection.*

   Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute entry of an order by the Bankruptcy Court pursuant to sections 365(a) and 1123(b) of the Bankruptcy Code approving the assumptions, assumptions and assignments and rejections described in this Article X and determining that: (a) with respect to such rejections, such rejected executory contracts and unexpired leases are burdensome and that the rejection therein is in the best interests of the Estate; (b) with respect to such assumptions, to the extent necessary, that the Debtor has (i) cured, or provided adequate assurance that the Debtor will promptly cure, any default in accordance with section 365(b)(1)(A) of the Bankruptcy Code, (ii) compensated or provided adequate assurance that it or an Affiliate will promptly compensate the counterparty for any actual pecuniary loss to such party resulting from such default, and (iii) provided adequate assurance of future performance under such executory contract or unexpired lease; and (c) with respect to any assignment, to the extent necessary, that the Debtor or the proposed assignee has (i) cured, or provided adequate assurance that it or an Affiliate will promptly cure, any default in accordance with section 365(b)(1)(A) of the Bankruptcy Code, (ii) compensated or provided adequate assurance that the Debtor or the proposed assignee will promptly compensate the counterparty for any actual pecuniary loss to such party resulting from such default, and (iii) that "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) by the assignee has been demonstrated and no further adequate assurance is required.  Assumption of any executory contract or unexpired lease and satisfaction of the Cure Amounts shall result in the full discharge, release and satisfaction of any claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date such executory contract or unexpired lease is assumed.  Each executory contract and unexpired lease assumed pursuant to this Article X shall revest in and be fully enforceable by the Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable federal law.  To the maximum extent permitted by law, to the extent any provision in any executory contract or unexpired lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such executory contract or unexpired lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto. Any party that

-35-

fails to timely file a Cure Dispute on the basis that consent to assume or assume and assign the applicable executory contract or unexpired lease is a condition to such assumption or assumption and assignment, shall be deemed to have consented to the assumption or assumption and assignment, as applicable, of such contract or unexpired lease.

### 10.5.    *Permits, Licenses, Easements and Similar Interests*

Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute entry of an order by the Bankruptcy Court pursuant to sections 365(a) and 1123(b) of the Bankruptcy Code approving the assumptions of all permits, licenses, easements and similar interests unless any of the foregoing has been previously rejected or is rejected under the Plan or otherwise.  To the extent permitted under applicable law, the Debtor shall be authorized, on and after the Effective Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtor, and pursuant to the terms of the Confirmation Order, all such licenses, permits, registrations, and governmental authorizations or approvals shall be deemed to be assumed by the Debtor as of the Effective Date.  To the extent provided by section 525 of the Bankruptcy Code, and subject to entry of the Confirmation Order, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Debtor on account of the filing or pendency of the chapter 11 case or the consummation of the transactions contemplated under this Plan.

To the maximum extent permitted by law, any provision that purports to restrict or prevent the assumption or assignment of any such permit, license, easement or similar interest or is breached or deemed breached by the assumption or assignment of any such permit, license, easement or similar interest (including any "change of control" provision) shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such permit, license, easement or similar interest or to exercise other default-related rights with respect thereto.  Any party that fails to timely file a Cure Dispute on the basis that consent to assume or assume and assign the applicable permit, license, easement or similar interest is a condition to such assumption or assumption and assignment, shall be deemed to have consented to such assumption or assumption and assignment.

### 10.6.    *Assumption of Directors and Officers Insurance Policies*

To the extent that the D&O Liability Insurance Policies issued to, or entered into by, the Debtor prior to the Petition Date constitute executory contracts, notwithstanding anything in the Plan to the contrary, the Debtor shall be deemed to have assumed all of its unexpired D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtor's foregoing assumption of each of the D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair or otherwise modify any advancement, indemnity or other obligations of the D&O Liability Insurance Policies.

In addition, after the Effective Date, the Debtor shall not terminate or otherwise reduce the coverage under any of the D&O Liability Insurance Policies with respect to conduct occurring prior thereto, and all directors, managers and officers of the Debtor who served in such capacity at any time prior to the Effective Date shall be entitled from the applicable insurers to the full benefits of any such policy for the full term of such policy regardless of whether such directors, managers and officers remain in such positions after the Effective Date.

On or before the Effective Date, the Debtor shall purchase and maintain directors, managers, officers and employee liability tail coverage for the six year period following the Effective Date on terms no less favorable than the Debtor's existing director, manager, officer and employee coverage and with an aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing director, officer, manager, and employee coverage upon placement.  From and after the Effective Date, reasonable directors, managers and officers insurance policies shall remain in place in the ordinary course.

### 10.7.  *Assumption of Certain Indemnification Obligations*

Each Indemnification Obligation to a current or former director, officer, manager or employee who was employed by the Debtor in such capacity on or after the Petition Date (including, for the avoidance of doubt, the members of the board of directors, board of managers or equivalent body of the Debtor at any time) shall be deemed assumed effective as of the Effective Date.  Each Indemnification Obligation that is deemed assumed pursuant to the Plan shall (a) remain in full force and effect, (b) not be modified, reduced, discharged, impaired or otherwise affected in any way, (c) be deemed and treated as an executory contract pursuant to sections 365 and 1123 of the Bankruptcy Code regardless of whether or not proofs of claim have been filed with respect to such obligations and (d) survive Unimpaired and unaffected irrespective of whether such indemnification is owed for an act or event occurring before, on or after the Petition Date.

Any obligations of the Debtor (whether pursuant to its certificate of formation, operating agreement, limited liability company agreement, other organizational documents, board resolutions, member resolutions, indemnification agreements, employment contracts, policy of providing employee indemnification, applicable state law, specific agreement in respect of any claims, demands, suits, causes of action or proceedings against such Persons or agreements, including amendments, or otherwise) entered into at any time prior to the Effective Date, to indemnify, reimburse or limit the liability of the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers and other professionals of the Debtor, as applicable, in each case, based upon any act or omission related to such Persons' service with, for or on behalf of the Debtor prior to the Effective Date with respect to all present and future actions, suits and proceedings relating to the Debtor shall survive the Confirmation Order and, except as set forth herein, remain unaffected thereby, and shall not be discharged, irrespective of whether such defense, indemnification, reimbursement or limitation of liability accrued or is owed in connection with an occurrence before or after the Petition Date.  Any Claim based on the Debtor's obligations set forth in this Section 10.7 shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.  This provision for indemnification obligations shall not apply to or cover any

Causes of Action against a Person that result in a Final Order determining that such Person seeking indemnification is liable for fraud, willful misconduct, gross negligence, bad faith, self-dealing or breach of the duty of loyalty.

In connection with the foregoing, on the Effective Date, the Debtor shall establish and fund the Indemnification Escrow Account with Cash equal to $2,500,000. Funds held in the Indemnification Escrow Account shall not be considered property of the Debtor's Estate or property of the Debtor and, to the extent such obligations are not satisfied by the Debtor or under any applicable D&O Liability Insurance Policy, such funds shall be utilized by the Debtor to satisfy the Debtor's obligations under this Section 10.7. Funds remaining in the Indemnification Escrow Account after six (6) years, if any, shall revert to and become property of the Debtor; provided, that (i) the Debtor's obligations under this Section 10.7 shall not be limited by nor deemed limited to the balance of the funds held in the Indemnification Escrow Account, and (ii) such reversion shall not take place unless and until any claims that have been asserted and are covered by the Indemnification Escrow Account have been resolved. No Liens, claims or interests shall encumber the Indemnification Escrow Account in any way.

## ARTICLE XI.

## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

**11.1.** *Conditions Precedent to the Effective Date.*

The occurrence of the Effective Date is subject to:

(a)    the RSA remaining in full force and effect;

(b)    an order approving the New O&M Agreement, in form and substance reasonably acceptable to the Debtor and Cobra having been entered by the Bankruptcy Court and remaining in full force and effect;

(c)    the Disclosure Statement Order, in form and substance reasonably acceptable to the Debtor, Cobra and DOE having been entered by the Bankruptcy Court and remaining in full force and effect;

(d)    the Confirmation Order, in form and substance reasonably acceptable to the Debtor, Cobra, DOE and the Prepetition Collateral Agent, having become a Final Order and remaining in full force and effect;

(e)    the Plan Documents, including the Plan Supplement, in form and substance acceptable to the Debtor, Cobra, DOE and the Prepetition Collateral Agent, being filed with the Bankruptcy Court, executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtor that the Effective Date has occurred) contained therein having been satisfied or waived in accordance therewith;

-38-

(f)      a chapter 11 trustee, a responsible officer, or an examiner with enlarged powers relating to the operation of the businesses of the Debtor (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) not having been appointed in any of the Chapter 11 Case;

(g)      all material governmental, regulatory and third party approvals, authorizations, certifications, rulings, no-action letters, opinions, waivers and/or consents required in connection with the Plan, including all necessary consents or approvals of and any required registration or filing with or notice to, the Federal Trade Commission (in such case, solely with respect to the requirements of the Hart-Scott-Rodino Act), the Committee on Foreign Investment in the United States, the Bureau of Land Management, the Federal Communications Commission, and the Federal Energy Regulatory Commission, having been obtained or made, as applicable, and remaining in full force and effect, and there existing no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental instrumentality, which would prohibit the consummation of the Plan;

(h)      the Amended Constituent Documents, in form and substance acceptable to the Debtor and Cobra, shall have been filed with the applicable authorities of the relevant jurisdictions of formation and shall have become effective in accordance with such jurisdictions' limited liability company laws;

(i)      the Exit Credit Facility Agreement and Exit Contingent Note having been executed and delivered, and the DOE having received the $200 million cash payment provided for in Section 5.3 of the Plan; and

(j)      an amendment to the EPC Contract having been executed and delivered, such that, effective as of the Effective Date (i) each of the Total Liquidity Commitment, the Unfunded Liquidity Commitment and the Unfunded Additional Liquidity Commitment (each as defined in the EPC Contract) is reduced to zero, and (ii) all obligations of Contractor or under the Parent Guaranty (each as defined in the EPC Contract) under Section 8 of Amendment No. 1 to the EPC Contract or any other provision of the EPC Contract or any related agreement or document, are in each case, terminated.

### 11.2.    *Satisfaction and Waiver of Conditions Precedent.*

Except as otherwise provided herein, any actions taken on the Effective Date shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Any of the conditions set forth in Section 11.1 of this Plan may be waived in whole or in part, if acceptable to the Debtor, Cobra and DOE, without notice and a hearing, and the Debtor's benefits under any "mootness" doctrine shall be unaffected by any provision hereof.  The failure to satisfy or waive any condition may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any act, action, failure to act or inaction by the Debtor).  The failure of the Debtor to assert the non-satisfaction of any such conditions shall not be deemed a waiver of any other rights hereunder, and each such right shall be deemed an ongoing right that may be asserted or waived (as set forth herein) at any time or from time to time.

-39-

**11.3.** ***Effect of Failure of Conditions Precedent to the Effective Date.***

If all of the conditions to effectiveness have not been satisfied (as provided in Section 11.1 hereof) or duly waived (as provided in Section 11.2 hereof) and the Effective Date has not occurred on or before the first Business Day that is more than 150 days after the Confirmation Date, or by such later date as set forth by the Debtor, with the consent of Cobra and DOE, in a notice filed with the Bankruptcy Court prior to the expiration of such period, then, if reasonably acceptable to the Debtor, Cobra and DOE, the Debtor may file a motion to vacate the Confirmation Order.  Notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if all of the conditions to consummation set forth in Section 11.1 hereof are either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion.  If the Confirmation Order is vacated pursuant to this Section 11.3, this Plan (other than this Section 11.3) shall be null and void in all respects, the Confirmation Order shall be of no further force or effect, no Plan Distributions shall be made, the Debtor and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and upon such occurrence, nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims against or Interests in the Debtor; (b) prejudice in any manner the rights of the holder of any Claim against or Interest in the Debtor; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtor or any other Person with respect to any matter set forth in the Plan.

# ARTICLE XII.

## EFFECT OF CONFIRMATION

**12.1.** ***Binding Effect.***

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of this Plan shall bind any holder of a Claim against, or Interest in, the Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under this Plan and whether or not such holder has accepted this Plan.

**12.2.** ***Discharge of Claims Against and Interests in the Debtor.***

Upon the Effective Date and in consideration of the Plan Distributions, except as otherwise provided herein or in the Confirmation Order (including with respect to Claims left unimpaired by this Plan), each Person that is a holder (as well as any trustees and agents for or on behalf of such Person) of a Claim or Interest shall be deemed to have forever waived, released, and discharged the Debtor, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities that arose prior to the Effective Date.  Except as otherwise provided herein, upon the Effective Date, all such holders of Claims and Interests shall be forever precluded and enjoined, pursuant to sections 105, 524, 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim

27008590.1

against or terminated Interest in the Debtor or any property, wherever located, of the Estate.

### 12.3.    *Term of Pre-Confirmation Injunctions or Stays.*

Unless otherwise provided herein, all injunctions or stays provided in the Chapter 11 Case arising prior to the Confirmation Date in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

### 12.4.    *Injunction Against Interference with Plan.*

Upon the entry of the Confirmation Order, all holders of Claims and Interests and other Persons, along with their respective present or former Affiliates, employees, agents, officers, directors, or principals, shall be enjoined from taking any actions, whether in the United States or elsewhere, to interfere with the implementation or consummation of this Plan. Moreover, Bankruptcy Code section 1141(c) provides, among other things, that the property dealt with by this Plan is free and clear of all Claims and Interests (except as otherwise provided in this Plan or the Confirmation Order). As such, to the fullest extent permissible under applicable law, no Person holding a Claim or Interest may receive any payment from, or seek recourse against, any assets that are to be distributed under this Plan other than assets required to be distributed to that Person under this Plan. As of the Confirmation Date, to the fullest extent permissible under applicable law, all Persons are precluded and barred from asserting against any property to be distributed under this Plan any Claims, rights, Causes of Action, liabilities, Interests, or other action or remedy based on any act, omission, transaction, or other activity that occurred before the Confirmation Date except as expressly provided in this Plan or the Confirmation Order.

### 12.5.    *Injunction.*

(a)    **Except as otherwise specifically provided in this Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons or Entities who have held, hold or may hold Claims against and/or Interests in the Debtor or the Estate, and all other parties in interest, along with their present or former employees, agents, officers, directors, principals, representatives and Affiliates are, with respect to any such Claims or Interests, permanently enjoined after the Confirmation Date from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, its Estate or any of its property, wherever located, or any direct or indirect transferee of any property, wherever located, of, or direct or indirect successor in interest to, any of the foregoing Persons or any property, wherever located, of any such transferee or successor; (ii) enforcing, levying, attaching (including any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtor, or its Estate or any of its property, wherever located, or any direct or indirect transferee of any property, wherever located, of, or direct or indirect successor in interest to, any of the foregoing Persons, or**

-41-

any property, wherever located, of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor or its Estate or any of its property, wherever located, or any direct or indirect transferee of any property, of, or successor in interest to, any of the foregoing Persons; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan to the full extent permitted by applicable law (including, without limitation, commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan) to the fullest extent permitted by applicable law, or (v) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtor or its Estate, or against the property or interests in property of the Debtor or its Estate, with respect to any such Claim or Interest.  Such injunction shall extend to any successors or assignees of the Debtor and its properties and interest in properties; **provided**, **however**, that nothing contained herein shall preclude such Persons from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of this Plan including with respect to Claims left unimpaired by this Plan.

(b)    By accepting Plan Distributions, each holder of an Allowed Claim or Interest will be deemed to have specifically consented to the injunctions set forth in this Section 12.5.

12.6.    *Releases.*

(a)    **Releases by the Debtor.**  Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Confirmation Order, on and after the Effective Date, for good and valuable consideration, including their cooperation and contributions to the Chapter 11 Case, the Released Parties (other than the Debtor) shall be deemed released and discharged by the Debtor and its Estate from any and all Claims, obligations, debts, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity or otherwise, whether for tort, fraud, contract, violations of federal or state laws or otherwise, including the ICC Arbitration and the Avoidance Actions; Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that the Debtor, its Estate could have asserted in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity or that any holder of a Claim or Interest or other Entity could have asserted derivatively for or on behalf of the Debtor, or its Estate, based on, relating to or in any manner arising from, in whole or in part, the Debtor; its Estate; the purchase, sale or rescission of the purchase or sale of any security of the Debtor; the Crescent Dunes Solar Energy Project; the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan; the business or contractual arrangements between the Debtor and any Released Party (excluding any assumed executory contract or lease); the restructuring of Claims and Interests prior to or in the Chapter 11 Case; the negotiation, formulation or preparation of the Plan, the RSA, the Disclosure Statement, the Plan Supplement, the Chapter 11 Case, or, in each case, related agreements, instruments, or other documents or

-42-

upon any other related act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date.

(b)    **Debtor and Cobra Releases.**  The Debtor and Cobra only unconditionally and irrevocably release the DOE and the Prepetition Collateral Agent, and each of their respective financial advisors and attorneys, for any claims or Causes of Action arising out of or related to the Prepetition Note Claim and/or the Crescent Dunes Solar Energy Project.

(c)    **DOE Releases.**  DOE only unconditionally and irrevocably releases the Debtor and Cobra, and each of their respective financial advisors and attorneys, from (i) the Prepetition Note Claim and (ii) any claims or Causes of Action arising out of or relating to the Prepetition Note Claim and/or the Crescent Dunes Solar Energy Project.

Notwithstanding anything to the contrary in this Plan, including section 12.6(a), without conceding the existence or merits thereof, neither the above paragraphs nor the Plan releases: (i) any civil, criminal or administrative liability arising under Title 26 of the United States Code (the Internal Revenue Code); (ii) any criminal liability; (iii) any liability under subchapter III of chapter 37 of Title 31 of the United States Code; (iv) any liability that is based on conduct in violation of antitrust laws; (v) any claim of any agency of the United States of America other than DOE; and (vi) the Debtor's and Cobra's obligations under Section 5.3(b) of the Plan regarding the Prepetition Note Claim.

(d)    **Releases by the Third Party Releasing Parties.**  Except as otherwise specifically provided in this Plan or the Confirmation Order, on and after the Effective Date, for good and valuable consideration, including the obligations of the Debtor under this Plan, the Plan Consideration and other contracts, instruments, releases, agreements or documents executed and delivered in connection with this Plan, each Third Party Releasing Party who affirmatively opts to grant the releases set forth herein shall be deemed to have consented to this Plan and the restructuring embodied herein for all purposes, and shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity or otherwise, whether for tort, fraud, contract, violations of federal or state laws or otherwise, including the ICC Arbitration and the Avoidance Actions, Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that such Third Party Releasing Party could have asserted (whether individually or collectively), based on, relating to or in any manner arising from, in whole or in part, the Debtor; the Estate; the Chapter 11 Case; the purchase, sale or rescission of the purchase or sale of any security of the Debtor; the Crescent Dunes Solar Energy Project; the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan; the business or contractual arrangements between the Debtor and any Released Party (excluding any assumed executory contract or lease); the restructuring of Claims and Interests prior to or in the Chapter 11 Case; the negotiation, formulation or preparation of the Plan, the RSA, the

-43-

**Disclosure Statement, the Plan Supplement, the Prepetition Note Documents, or this Plan or the Disclosure Statement, or, in each case, related agreements, instruments or other documents, or upon any other related act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, any party that chooses not to opt in to the releases contained herein shall not receive the benefit of the releases set forth in the Plan (even if for any reason otherwise entitled).  Notwithstanding anything contained herein to the contrary, the foregoing release shall not release any obligation of any party under the Plan, or any other document, instrument, or agreement executed to implement the Plan.**

(e)     Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases described in the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute its finding that each release described in the Plan is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (ii) in the best interests of the Debtor and all Third Party Releasing Parties; (iii) fair, equitable and reasonable; (iv) given and made after due notice and opportunity for hearing; and (v) a bar to the Debtor and all Third Party Releasing Parties asserting any claim, Cause of Action or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

### 12.7.   *Waiver of Limitations on Releases of Unknown Claims.*

**Each of the Debtor, the Third Party Releasing Parties and DOE agree to acknowledge that the releases contained in Sections 12.6(a), 12.6(b), 12.6(c) and 12.6(d) will extend to and release claims that such parties do not know or expect to exist at the time of the release, which, if known, might have affected the decision to enter into the release and which such parties will be deemed to waive, and will waive and relinquish to the fullest extent permitted by law, any and all provisions, rights, and benefits conferred by any law of the United States of America or any state or territory thereof, or principle of common law, which governs or limits a person's release of unknown claims that such parties will deemed to waive, and will waive and relinquish, to the fullest extent permitted by law, the provisions, rights, and benefits of Section 1542 of the California Civil Code, which provides as follows:**

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

**The Debtor, the Third Party Releasing Parties and DOE will also be deemed to waive any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States of America, or principle of common law, which is similar, comparable, or equivalent to California Civil Code Section 1542.  Such parties shall be**

-44-

deemed to acknowledge that they may discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of the releases given in Sections 12.6(a), 12.6(b), 12.6(c) and 12.6(d), but that it is the intention of such parties to fully, finally, and forever settle and release with prejudice any and all claims, including any and all unknown claims, without regard to the subsequent discovery or existence of additional or different facts.  Such parties expressly agree that any fraudulent inducement or similar claims that could be premised on unknown facts or facts that are subsequently discovered are included within the definition of unknown claims.

### 12.8. *Exculpation and Limitation of Liability.*

On the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, for good and valuable consideration, to the maximum extent permissible under applicable law, none of the Exculpated Parties shall have or incur any liability to any holder of any Claim or Interest or any other Person for any act or omission occurring prior to the Effective Date in connection with, or arising out of the Debtor's restructuring, including the negotiation, implementation and execution of this Plan, the Plan Supplement, the Chapter 11 Case, the Prepetition Note Documents, the solicitation of votes for and the pursuit of confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, including all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all activities leading to the promulgation and confirmation of this Plan except for gross negligence or willful misconduct, each as determined by a Final Order of the Bankruptcy Court.  The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### 12.9. *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released pursuant to this Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities released in or encompassed by Sections 12.6 and 12.7 of this Plan.  The Debtor is expressly authorized hereby to seek to enforce such injunction.

### 12.10. *Retention of Causes of Action/Reservation of Rights.*

(a)    Except as expressly provided in this Plan or in the Confirmation Order, nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtor or the Estate may have, or that

-45-

the Debtor may choose to assert on behalf of its Estate, under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, (i) any and all Causes of Action or claims against any Person or Entity, to the extent such Person or Entity asserts a crossclaim, counterclaim and/or claim for setoff that seeks affirmative relief against the Debtor, its officers, directors or representatives or (ii) the turnover of any property of the Estate to the Debtor.

(b)        Except as expressly provided in this Plan or in the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtor had immediately prior to the Petition Date or the Effective Date against or regarding any Claim left Unimpaired by the Plan. The Debtor shall have, retain, reserve and be entitled to commence, assert and pursue all such rights and Causes of Action as fully as if the Chapter 11 Case had not been commenced, and all of the Debtor's legal and equitable rights respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Case had not been commenced.

(c)        Except as expressly provided in this Plan or in the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to release any post-Effective Date obligations of any party under the Plan, or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### 12.11   *Retention of United States Causes of Action/Reservation of Rights.*

Except with respect to the releases provided by DOE pursuant to Section 12.6(c) of the Plan, nothing discharges or releases the Debtor or any non-debtor from any right, claim, liability or cause of action of the United States or any State, or impairs the ability of the United States or any State to pursue any claim, liability, right, defense, or cause of action against any Debtor or non-debtor. Contracts, purchase orders, agreements, leases, covenants, guaranties, indemnifications, operating rights agreements or other interests of or with the United States or any State shall be, subject to any applicable legal or equitable rights or defenses of the Debtor under applicable non-bankruptcy law, paid, treated, determined and administered in the ordinary course of business as if the Debtor's bankruptcy case was never filed and the Debtor shall comply with all applicable non-bankruptcy law.  Except with respect to (i) the releases provided by DOE pursuant to Section 12.6(c) of the Plan and (ii) the Prepetition Note Claim, all claims, liabilities, rights, causes of action, or defenses of or to the United States or any State shall survive the Chapter 11 Case as if it had not been commenced and be determined in the ordinary course of business, including in the manner and by the administrative or judicial tribunals in which such rights, defenses, claims, liabilities, or causes of action would have been resolved or adjudicated if the Chapter 11 Case had not been commenced; *provided*, that nothing in the Plan Documents shall alter any legal or equitable rights or defenses of the Debtor under non-bankruptcy law with respect to any such claim, liability, or cause of action, except with respect to (i) the Prepetition Note Claim and (ii) any claims or Causes of Action released by the DOE pursuant to Section 12.6(c) of the Plan.  Without limiting the foregoing, for the avoidance of doubt, nothing shall: (i) require the United States or any State to file any proofs of claim or administrative expense claims in the Chapter 11 Case for any right, claim, liability, defense, or

-46-

cause of action; (ii) affect or impair the exercise of the United States' or any State's police and regulatory powers against the Debtor or any non-debtor; (iii) be interpreted to set cure amounts or to require the United States or any State to novate or otherwise consent to the transfer of any federal or state contracts, purchase orders, agreements, leases, covenants, guaranties, indemnifications, operating rights agreements or other interests; (iv) except with respect to the Prepetition Note Claim, affect or impair the United States' or any State's rights and defenses of setoff and recoupment, or ability to assert setoff or recoupment against the Debtor and such rights and defenses are expressly preserved; (v) constitute an approval or consent by the United States or any State without compliance with all applicable legal requirements and approvals under non-bankruptcy law; or (vi) relieve any party from compliance with all licenses and permits issued by governmental units in accordance with non-bankruptcy law.

## ARTICLE XIII.

## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction, to the fullest extent permissible under law, over all matters arising in, arising under, or related to the Chapter 11 Case for, among other things, the following purposes:

(a)    To hear and determine all matters relating to the assumption or rejection of executory contracts or unexpired leases, including whether a contract or lease is or was executory or expired, and the Cure Disputes resulting therefrom;

(b)    To hear and determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)    To hear and resolve any disputes arising from or relating to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004, or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)    To ensure that Plan Distributions to holders of Allowed Claims are accomplished as provided herein;

(e)    To consider Claims or the allowance, disallowance, liquidation, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim or Professional Fee Claim;

(f)    To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(g)    To issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or

any other order of the Bankruptcy Court (including, without limitation, with respect to releases, exculpations and indemnifications);

(h)    To hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)    To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(j)    To hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, the Disclosure Statement, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing (including without limitation the Plan Supplement and the Plan Documents); <u>provided</u> that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement shall be governed in accordance with the provisions of such documents;

(k)    To take any action and issue such orders, including any such action or orders as may be necessary after occurrence of the Effective Date and/or consummation of the Plan, as may be necessary to construe, enforce, implement, execute, and consummate this Plan, including any release or injunction provisions set forth herein, or to maintain the integrity of this Plan following consummation;

(l)    To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)    To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(n)    To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(o)    To resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Case, the Disclosure Statement Hearing, the Confirmation Hearing, the Administrative Bar Date, or the deadline for responding or objecting to a Cure Amount, for the purpose of determining whether a Claim or Interest is discharged hereunder, or for any other purpose;

(p)    To recover all assets of the Debtor and property of the Estate, wherever located;

-48-

(q)      To hear and determine any rights, claims or Causes of Action held by or accruing to the Debtor pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory; and

(r)      To enter a final decree closing the Chapter 11 Case.

As of the Effective Date, notwithstanding anything in this Article XIII to the contrary, the Exit Credit Facility Agreement shall be governed by the jurisdictional provisions therein.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Case, the provisions of this Article XIII shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XIV.

## MISCELLANEOUS PROVISIONS

### 14.1.    *Exemption from Certain Transfer Taxes.*

Pursuant to section 1146(a) of the Bankruptcy Code and to the fullest extent permitted by applicable law, (i) any issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under this Plan may not be taxed under any law imposing a stamp tax or similar tax and (ii) the consummation of sale transactions by the Debtor and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under this Plan, the sale by the Debtor of any owned property pursuant to section 363(b) of the Bankruptcy Code, and any assumption, assignment, and/or sale by the Debtor of its interests in unexpired leases of non-residential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, shall constitute a "transfer under a plan" and shall not be subject to any stamp or other similar tax.

### 14.2.    *Termination of Professionals.*

On the Effective Date, the engagement of each Professional Person retained by the Debtor shall be terminated without further order of the Bankruptcy Court or act of the parties; provided, however, such Professional Person shall be entitled to prosecute their respective Professional Fee Claims and represent their respective constituents with respect to applications for allowance and payment of such Professional Fee Claims and the Debtor shall be responsible for the reasonable and documented fees, costs and expenses associated with the prosecution of such Professional Fee Claims, subject to applicable law.  Nothing herein shall preclude the Debtor from engaging a former Professional Person on and after the Effective Date in the same capacity as such Professional Person was engaged prior to the Effective Date.

### 14.3. *Amendments.*

If acceptable to the Debtor, Cobra and DOE, this Plan may be amended, modified, or supplemented in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to this Plan, the Debtor may, if reasonably acceptable to the Debtor, Cobra and DOE, make appropriate technical adjustments, remedy any defect or omission or reconcile any inconsistencies in this Plan, the Plan Documents and/or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of this Plan, and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

### 14.4. *Revocation or Withdrawal of this Plan.*

The Debtor reserves the right to revoke, delay or withdraw this Plan prior to the Effective Date. If the Debtor revokes, delays or withdraws this Plan, in accordance with the preceding sentence, prior to the Effective Date, or if confirmation or consummation of the Plan does not occur, then: (a) this Plan (other than this Section 14.4) shall be null and void in all respects; (b) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in this Plan, assumption, assumption and assignment, or rejection of executory contracts or leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void; and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or any other Person, (ii) prejudice in any manner the rights of such Debtor or any other Person or (iii) constitute an admission of any sort by the Debtor or any other Person.

### 14.5. *Allocation of Plan Distributions Between Principal and Interest.*

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

### 14.6. *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor, with the consent of Cobra and DOE, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order

shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 14.7.   *Governing Law.*

Except to the extent that the Bankruptcy Code or other U.S. federal law is applicable, or to the extent a Plan Document or exhibit or schedule to the Plan provides otherwise, the rights, duties, and obligations arising under this Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof to the extent such principles would result in the application of the laws of any other jurisdiction.

### 14.8.   *Section 1125(e) of the Bankruptcy Code.*

The Debtor has, and upon confirmation of this Plan shall be deemed to have, solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and the Debtor and its Affiliates, agents, managers, officers, employees, advisors, and attorneys participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, solicitation and/or purchase of the securities offered and sold under this Plan, and therefore are not, and on account of such offer, issuance, sale, solicitation, and/or purchase will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or offer, issuance, sale, or purchase of the securities offered and sold under this Plan.

### 14.9.   *Inconsistency.*

In the event of any inconsistency among the Plan, the Disclosure Statement, the Plan Documents, any exhibit to the Plan or any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan shall govern.

### 14.10.   *Time.*

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.  If any payment, distribution, act or deadline under the Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date.

### 14.11.   *Exhibits.*

All exhibits to this Plan are incorporated and are a part of this Plan as if set forth in full herein.

### 14.12.   *Notices.*

27008590.1

In order to be effective, all notices, requests, and demands to or upon the Debtor shall be in writing (including by facsimile transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> Tonopah Solar Energy, LLC
> 11 Gabbs Pole Line Road
> Tonopah, NV 89049
> Attn:  Kayla Jensen
> kayla.jensen@crescentdunessolar.com
>
> with a copy to (which shall not constitute notice):
>
> Willkie Farr & Gallagher LLP
> 787 Seventh Ave.
> New York, NY 10019
> Attn:  Matthew A. Feldman, Paul V. Shalhoub, and Ciara A. Copell
> Fax:  (212) 728-8111
> Email:  mfeldman@willkie.com
> pshalhoub@willkie.com
> ccopell@willkie.com
>
> -and-
>
> Young Conaway Stargatt & Taylor LLP
> 1000 N. King St.
> Wilmington, DE 19801
> Attn:  Matthew B. Lunn and Edmon L. Morton
> Fax:  (302) 571-1253
> Email:  mlunn@ycst.com
> emorton@ycst.com

### 14.13.  *Filing of Additional Documents.*

On or before substantial consummation of the Plan, the Debtor shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 14.14.  *Reservation of Rights.*

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of this Plan, any statement or provision contained herein, or the taking of any action by the Debtor or Cobra with respect to this Plan shall be or shall be deemed to be, an admission or waiver of any rights of the Debtor or Cobra with respect to any Claims or Interests prior to the Effective Date.

-52-

Dated:   September 8, 2020
            Wilmington, Delaware

Respectfully submitted,


*/s/ Justin D. Pugh*
Justin D. Pugh
Treasurer

## Schedule A

**Exit Credit Facility Terms**

Below is a summary of the material terms of the Exit Credit Facility Agreement.  Mutually agreed terms and conditions not inconsistent with the below may be incorporated into the Exit Credit Facility Agreement.

| | |
|---|---|
| **Borrower** | Reorganized Tonopah Solar Energy, LLC |
| **Lenders** | ACS Servicios Comunicaciones y Energía S.L. ("**ACS**"), Cobra Thermosolar Plants, Inc. and Cobra Energy Investment, LLC, or such other entity or entities designated by Cobra and acceptable to the Borrower |
| **Facility** | Term loan totaling $100 million (the "**Term Loan**") and up to $50 million working capital facility (the "**Working Capital Facility**").  Amounts borrowed and prepaid or repaid may not be reborrowed. |
| **Security** | Valid and perfected first-priority liens on, and security interests in, substantially all existing and after-acquired property (tangible and intangible) of Reorganized TSE (subject to customary exceptions). |
| **Purpose and Availability** | The Term Loan shall be put in place on the Effective Date of the Plan to provide for repayment of $100 million to Cobra on account of its funding (through a draw on the Final Letter of Credit issued pursuant to the Cobra backstop letter) of the Borrower's obligations to DOE under the Plan.

The Working Capital Facility shall be put in place on the Effective Date of the Plan to provide Reorganized TSE with working capital on and following the Effective Date. |
| **Maturity Date** | Term Loan: Twenty (20) years from Effective Date of Plan.

Working Capital Facility: Five (5) years from the Effective Date. |
| **Interest Rate** | Both the Term Loan and the Working Capital Facility will bear interest at a rate of 2.9% on amounts outstanding, payable quarterly in arrears during the term.

During the term of the Term Loan, only interest shall be payable (no principal payments shall be required during this period). |
| **Optional Prepayments** | The Term Loan and the Working Capital Facility may be prepaid at any time in whole or in part, at the option of the Borrower, without premium or penalty. |

**<u>Appendix B</u>**

**Liquidation Analysis**

## LIQUIDATION ANALYSIS

The Debtor, with assistance from its financial and other advisors, has performed a hypothetical liquidation analysis ("**Liquidation Analysis**"), attached hereto as Exhibit 1, in connection with the Disclosure Statement[1] to which this Liquidation Analysis is attached as an exhibit for the purpose of evaluating whether the Plan meets the so-called "best interests" test under Section 1129(a)(7) of the Bankruptcy Code. Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date of the Plan, that is not less than the value such holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

The first step in determining whether the best interests test has been met is to determine the dollar amount that would be generated from the hypothetical liquidation of the Debtor's assets in the context of a chapter 7 liquidation case. The gross amount of cash available would be the sum of the proceeds from the disposition of the Debtor's assets and the cash held by the Debtor at the time of the commencement of the chapter 7 case. Such amount would then be reduced by the amount of: (a) any Claims secured by such assets; and (b) the costs and expenses of the liquidation and such additional administrative expenses that may result from the termination of the Debtor's business and the use of chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with Section 726 of the Bankruptcy Code.

Set forth on Exhibit 1 hereto is a Liquidation Analysis for the Debtor, assuming a hypothetical chapter 7 liquidation in which a Bankruptcy Court-appointed trustee liquidates the Debtor's assets. The Liquidation Analysis is based on certain assumptions discussed herein. Some assumptions in the Liquidation Analysis may not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtor's assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by independent accountants.

NEITHER THE DEBTOR NOR ITS ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

---

[1]   All capitalized terms used but not otherwise defined in this Liquidation Analysis have the meanings given to them in the accompanying Disclosure Statement.

**Basis of Presentation**

This Liquidation Analysis provides a range of estimated recoveries across a "low", "high" and "mid-point" assessment of estimated recovery values based upon a hypothetical liquidation of the Debtor's estate assuming that the Debtor converted its case from chapter 11 to chapter 7 on or about December 31, 2020 (the "**Conversion Date**"), and that the liquidation process lasts twelve months (the "**Liquidation Period**") following the appointment of a chapter 7 trustee.  Except as otherwise noted, the Debtor's balance sheet is forecasted from actual book values of the Debtor's assets and liabilities as of June 30, 2020.

It is assumed that, on the Conversion Date, creditors would elect or the Bankruptcy Court would appoint a chapter 7 trustee, who would sell or otherwise liquidate the Debtor's assets and distribute the cash proceeds, net of liquidation-related costs, to creditors in accordance with the Bankruptcy Code.

The Liquidation Analysis represents an estimate of recovery values and percentages based upon a hypothetical liquidation if the chapter 7 trustee were appointed by the Bankruptcy Court to convert assets into cash.  The determination of the hypothetical proceeds from the liquidation of assets is a highly uncertain process involving the extensive use of estimates and assumptions which, although considered reasonable by the Debtor's advisors and management, are inherently subject to uncertainties and contingencies beyond the control of the Debtor and its management.

The cessation of business in a liquidation is likely to trigger certain claims that otherwise would not exist under a Plan absent a liquidation.  Some of these claims could be significant and will be entitled to priority in payment over general unsecured claims.  Those priority claims would be paid before any liquidation proceeds would be made available to pay general unsecured claims.

As discussed herein, the claim amounts reflected in the Liquidation Analysis are the Debtor's best estimates and are subject to material revision.  While hypothetical recoveries under a "low," "high," and "mid-point" scenario have been provided, there can be no assurance that the liquidation would be completed in a limited time frame, nor is there any assurance that the recoveries assigned to the assets would in fact be realized.  Under section 704 of the Bankruptcy Code, an appointed trustee must, among other duties, collect and convert the property of the estate as expeditiously as is compatible with the best interests of the parties in interest.

**Liquidation Process**

The chapter 7 trustee's initial step would be to develop a liquidation plan to generate proceeds from the sale or other liquidation of assets for distribution to creditors.  The major components of the liquidation would include the following:

- costs related to the liquidation process, including fees payable to a chapter 7 trustee, as well as those fees which might be payable to attorneys and other professionals that such a

trustee may engage;

- other costs, including wind down expenses during the Liquidation Period;

- aggregation of all cash, redemption of letters of credit, and collection of cash deposits;

- generation of cash proceeds from completed and potential asset dispositions;

- resolution of the claims in the ICC Arbitration; and

- distribution of net proceeds generated to claimants in accordance with the absolute priority rule under chapter 7 of the Bankruptcy Code.

It is possible that in a chapter 7 case, the wind down expenses may be greater or less than the estimated amount. Such expenses are in part dependent on the ultimate length of the Liquidation Period.

**Distribution of Net Proceeds Under the Absolute Priority Rule**

Under a chapter 7 liquidation, all secured claims are required to be satisfied from the proceeds of the collateral securing such claims before any such proceeds would be distributed to any other creditors, subject to any agreed carve-out approved by the Court. This analysis assumes the application of the rule of absolute priority of distributions with respect to the remaining proceeds of the Debtor. Under that rule, no junior creditor receives any distribution until all senior creditors are paid in full. The costs, expenses and fees associated with the liquidation would be paid in full from the liquidation proceeds before the balance of the proceeds would be made available to pay chapter 11 administrative Claims, and then to pay priority Claims and then to pay unsecured Claims.

After consideration of the effects of a chapter 7 liquidation on the ultimate proceeds available for distribution to creditors, including (a) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to the chapter 7 trustee and its professional advisors and (b) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would likely prevail, **THE DEBTOR HAS DETERMINED THAT CONFIRMATION OF THE PLAN WILL PROVIDE ALL CREDITORS AND HOLDERS OF INTERESTS WITH A RECOVERY THAT IS NOT LESS THAN SUCH CREDITOR OR HOLDER WOULD RECEIVE PURSUANT TO A LIQUIDATION OF THE DEBTOR UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.**

<u>**General Assumptions**</u>

The Liquidation Analysis reflects estimates of the proceeds that might be realized through the liquidation of the Debtor in accordance with chapter 7 of the Bankruptcy Code. This analysis is based on the Debtor's asset balances available as of June 30, 2020, and includes forecasted estimates of value through the Conversion Date. The Liquidation Analysis assumes

that there would be pressure to complete the process within the Liquidation Period.  The Liquidation Period is assumed to allow the chapter 7 trustee to sell, liquidate or otherwise dispose of the Debtor's assets, resolve the ICC Arbitration as explained below, wind down activities, and make distributions to parties in interest.  Depending on actual circumstances, the Liquidation Period could be significantly longer, in which event wind down costs would increase and recoveries would likely decrease.

**The Liquidation Analysis is based upon a number of estimates and assumptions that, although developed by and considered reasonable by the management of the Debtor, are inherently subject to significant uncertainties, including contingencies beyond the control of the Debtor or its management.  The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE COMPANY WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY AND ADVERSELY FROM THOSE CONTAINED HEREIN.**

**This Liquidation Analysis was developed solely for purposes of the Disclosure Statement and Plan, and should not be used or relied on for any other purpose, including the purchase or sale of securities of, or claims or interests in, the Debtor.**

**Nothing contained in this hypothetical liquidation analysis is intended to be or constitutes a concession or admission of the Debtor.**

The following is a summary of the major assumptions underlying the Liquidation Analysis:

1. A chapter 7 trustee either would be elected by creditors or appointed by the Bankruptcy Court to administer the estate.  The chapter 7 trustee is independent and would be entitled to make all of his or her own decisions (subject to Bankruptcy Court approval as applicable) regarding the liquidation of the estate, hiring of professionals, the pursuit of Claims or litigation (including the ICC Arbitration), the payment of or objection to Claims, and the distribution of any ultimate dividend.  The chapter 7 trustee would be compensated in accordance with section 326 of the Bankruptcy Code.

2. The Liquidation Analysis is based on the Debtor's unaudited financial statements as of June 30, 2020 and other figures estimated by management.

3. This Liquidation Analysis assumes that all assets of the Debtor will be liquidated or otherwise disposed of during the Liquidation Period.  Although the Debtor believes a twelve-month period is sufficient to allow for an orderly liquidation, there can be no assurances made that all assets would be completely liquidated or disposed of during this time period.

4. This Liquidation Analysis assumes that all efforts to repair the hot salt tank and resume operations at the Power Plant will cease.  It is assumed that all non-operating assets would be disposed of through sale, liquidation, termination and/or abandonment, as

appropriate.  However, the Liquidation Analysis does not assume that the Project will undertake decommissioning and reclamation activities aside from those activities that are necessary for environmental, health, and safety purposes.

5. It is assumed that assets will be sold for cash or cash equivalents.

6. The amounts reflected in the Liquidation Analysis are based on the Debtor's estimate of administrative expenses that are expected to be incurred as a result of the hypothetical liquidation and the Debtor's estimate of Claims that would exist as of December 31, 2020.

7. Other than the assumed settlement of the ICC Arbitration claims discussed below, no recovery or related litigation costs have been attributed to any potential litigation or avoidance actions under the Bankruptcy Code, including potential preferences or fraudulent transfer actions due to, among other issues, the cost of such litigation, the uncertainty of the outcome and anticipated disputes regarding these matters.

8. The Liquidation Analysis does not include estimates for federal or state tax consequences that may be triggered upon the liquidation and sale of assets in the manner described above.  Such tax consequences could be material (including the allocation of all items of income and loss and, upon completion of all distributions, the recognition and allocation of cancellation of debt income to equity holders).

9. Distributions to creditors are assumed to occur on or around December 31, 2021.


**Specific Notes to Liquidation Analysis[2]**

*Gross Liquidation Proceeds*

A. Unrestricted Cash

Unrestricted cash at the Debtor is based on a balance of $286,000 as of June 30, 2020 with no projected change in balance through the Conversion Date.  Unrestricted cash consists of cash on deposit at a banking institution.  The Liquidation Analysis assumes unrestricted cash would be 100% recoverable in a chapter 7 scenario.

B. Restricted Cash

Restricted cash at the Debtor is based on a balance of $29.8 million as of June 30, 2020, reduced by $24.5 million through the Conversion Date pursuant to the Debtor's cash collateral budget.  Restricted cash consists of cash held in blocked accounts that are under the control of the collateral agent, PNC Bank, National Association, doing business as Midland Loan

---

[2]     The notes set forth below (and related pagination) correspond to the "Notes" column (and related pagination) set forth in the Liquidation Analysis.

Services Bank, National Association, a division of PNC.  The Liquidation Analysis assumes restricted cash would be 100% recoverable in a chapter 7 scenario.

## C. Accounts Receivable

Accounts receivable at the Debtor is based on a balance of $0 as of June 30, 2020, with no projected change in balance through the Conversion Date.  Accordingly, the Liquidation Analysis assumes that no amount would be recovered from accounts receivable in a chapter 7 scenario.

## D. Performance Liquidated Damages Claim and Warranty Claims

The Plan, if confirmed, would resolve all of the claims pursued by and between the Debtor, CPI, and CPI's affiliates in the ICC Arbitration.  The Liquidation Analysis assumes that the chapter 7 trustee would attempt to negotiate a consensual resolution of the claims in the ICC Arbitration in an amount equal to $186.3 million in favor of the Debtor.  This amount, which reflects the Performance Liquidated Damages portion of the TSE Arbitration Claims asserted in the ICC Arbitration, is less than the Prepetition Note Claim (before subtracting the substantial additional costs that would be associated with litigating and negotiating the ICC Arbitration claims, including the fees, costs and expenses of a chapter 7 trustee).  This assumption is based on several considerations, including, among others, the substantial costs, risks and uncertainties associated with pursuing and defending against claims in the ICC Arbitration.  The Debtor believes the assumption is reasonable in light of (i) these costs, risks and uncertainties associated with litigation, (ii) the fact that the assumption represents the contractual liquidated damages portion of the TSE Arbitration Claims, and (iii) the fact that, assuming it accepts the Plan, the DOE will have concluded that a litigated or other recovery on the TSE Arbitration Claims would be less than that provided under the Plan (and, accordingly, substantially less than the amount of its Prepetition Note Claim).

Additional third-party claims consist of approximately $23.8 million of warranty claims held by the Debtor as of June 30, 2020.  The Liquidation Analysis assumes that no amount would be recovered on account of such warranty claims in a chapter 7 scenario.

## E. Prepaid Expenses and Deposits

Prepaid expenses and deposits at the Debtor are based on a balance of $5.1 million as of June 30, 2020, with a projected reduction of $2.2 million through the Conversion Date based on the projected payments, amortization of prepaid expenses and changes in deposit balances.  Prepaid expenses consist primarily of payments made in advance for project site rent, insurance, loan maintenance fees and property taxes.  Deposit balances consist primarily of professional fee retainers and an auxiliary power deposit with NV Energy.  In a chapter 7 scenario, the Liquidation Analysis assumes prepaid expenses and deposits would be recoverable at 7%, 13% and 18% in the low, mid-point and high scenarios, respectively, after adjusting for

professional fee retainers accounted for in the cash collateral budget.

F.  Property, Plant and Equipment

Property, plant and equipment primarily consists of the Power Plant net of accumulated depreciation.  The Liquidation Analysis assumes a net book value of $270.6 million as of June 30, 2020, adjusted for incremental projected depreciation of $8.0 million through the Conversion Date.

The Liquidation Analysis assumes that the Power Plant would be demolished for scrap value.  This assumption is based on two third-party analyses conducted by independent engineers that were commissioned for purposes of estimating the decommissioning cost.

The primary components of value include approximately 67.8 million pounds of salt, equipment (including the stream turbine) and scrap metal.  The Debtor assumed that the range of value from the liquidation of these components would range from approximately $8.3 million to $21.5 million.  The Liquidation Analysis assumes implied recovery levels of 3%, 5% and 8% in the low, mid-point and high scenarios with respect to such components.

G.  Spare Parts

Spare parts at the Debtor is based on a balance of $5.4 million as of June 30, 2020.  The Liquidation Analysis assumes no adjustments through the Conversion Date with any possible depreciation offset by projected purchases of new spare parts.  Spare parts consist primarily of replacement parts, materials and supplies for facility maintenance and repair of plant machinery.  Given the unique nature of the spare parts, as well as transportation and handling costs from a remote location, the Liquidation Analysis assumes spare parts would be recoverable at 5%, 10% and 15% in the low, mid-point and high scenarios, respectively.

H.  BLM Reclamation Deposit

The BLM Reclamation Deposit at the Debtor is based on a balance of $13.2 million as of June 30, 2020 with no projected change through the Conversion Date.  The BLM Reclamation Deposit represents a deposit held by the U.S. Department of the Interior's Bureau of Land Management (the "**BLM**") for costs necessary to reclaim and restore the land as a result of the requisite decommissioning of the Power Plant at the end of its useful life.  The Liquidation Analysis assumes that the BLM would recover the full amount of the deposit in a chapter 7 scenario since the BLM is currently holding the cash deposit in trust and the Liquidation Analysis does not assume any reclamation efforts by the Project.

*Liquidation Adjustments*

I. <u>Estate Wind-Down Costs</u>

Estate wind-down costs would include post-conversion overhead costs, excluding professional fees, necessary to wind down the estate over the 12-month Liquidation Period.  Any decommissioning costs of the facility that would be in excess of the BLM Reclamation Deposit are not taken into account; some of this decommissioning activity may be necessary to realize the value of scrap metal.  In a chapter 7 case, the Liquidation Analysis assumes the estate wind-down costs would be $5 million, $7.5 million and $10 million in the low, mid-point and high scenarios, respectively.

J. <u>Chapter 7 Professional Fees</u>

Post-conversion chapter 7 professional fees include estimates for certain professionals required to prosecute and settle the ICC Arbitration during the Liquidation Period (as discussed in more detail in paragraph D above), including arbitration counsel, expert witnesses and fact witnesses, as well as financial advisors and counsel required to assist in the wind down of the estate.  The Liquidation Analysis assumes that chapter 7 professional fees would be approximately $7.5 million, which assumption is based in part on budgets previously prepared in connection with the ICC Arbitration.

K. <u>Chapter 7 Trustee Fees</u>

Section 326 of the Bankruptcy Code provides for chapter 7 trustee fees not to exceed 3% of distributable proceeds in excess of $1 million.  The Liquidation Analysis assumes that chapter 7 trustee fees would be 3% of gross distributable proceeds.

<u>*Net Liquidation Proceeds Available for Distribution*</u>

The gross cash proceeds net of the liquidation adjustments discussed above result in a range of net liquidation proceeds available for distribution to creditors: approximately $177.1 million, $186.4 million and $195.7 million in the low, mid-point and high scenarios, respectively.

The above assumptions and notes were developed and made solely for the purpose of this Liquidation Analysis and for no other purpose.  Accordingly, such estimates (including the estimated value to the Debtor of a consensual resolution of the ICC Arbitration) are without prejudice to all of the Debtor's rights, claims and defenses in the ICC Arbitration, shall not be admissible in such proceeding and shall not be used or relied on for any other purpose, including the ICC Arbitration.

**Projected Chapter 7 Claims Distributions**

**A.  Class 1 – Priority Non-Tax Claims**

- The Debtor estimates that there would be no Priority Non-Tax Claims as of the Conversion Date.

**B.  Class 2 – Other Secured Claims**

- The Debtor estimates that there would be approximately $482,000 in Other Secured Claims as of the Conversion Date.

- The Liquidation Analysis projects that all allowed and undisputed Other Secured Claims would be paid in full in a chapter 7 scenario.

**C.  Class 3 – Prepetition Note Claims**

- The Debtor estimates that there would be not less than $424.7 million in Prepetition Note Claims as of the Conversion Date.

- The Liquidation Analysis projects that all allowed and undisputed Prepetition Note Claims would receive a recovery of approximately 40% in a chapter 7 liquidation in a mid-point scenario.

**D.  Class 4 – General Unsecured Claims**

- The Debtor estimates that there would be approximately $10 million in General Unsecured Claims as of the Conversion Date.

- The Liquidation Analysis projects that General Unsecured Claims would receive no recovery in a chapter 7 liquidation.

**E.  Class 5 – Existing Interests**

- The Liquidation Analysis projects that Existing Interests would receive no recovery in a chapter 7 liquidation.

**<u>EXHIBIT 1</u>**

**Tonopah Solar Energy, LLC**
**Liquidation Analysis and Claims Recoveries**
*$ in '000s*

| Summary Recovery Table | Plan | Liquidation | | |
|---|---|---|---|---|
| | | **Liquidation Value** | | |
| | | **Low** | **Midpoint** | **High** |
| Gross Liquidation Proceeds | | 200,584 | 207,604 | 214,624 |
| Less: Liquidation Adjustments | | (23,518) | (21,228) | (18,939) |
| **Net Liquidation Proceeds Available for Distribution** | | **$ 177,067** | **$ 186,376** | **$ 195,685** |

| Claim / Interest | Claim ($) | Recovery % | Recovery % | | |
|---|---|---|---|---|---|
| | | | **Low** | **Midpoint** | **High** |
| **Superpriority Carve-Out Claims** | $ 1,980 | 100% | 100% | 100% | 100% |
| **Superpriority DOE Adequate Protection Claims** | $ 12,584 | 100% | 100% | 100% | 100% |
| **Priority Non-Tax Claims (Class 1)** | $ - | 100% | N/A | N/A | N/A |
| **Other Secured Claims (Class 2)** | $ 482 | 100% | 100% | 100% | 100% |
| **Total Prepetition Notes (Class 3)** | $ 424,732 | 47% | 38% | 40% | 43% |
| **Chapter 11 Administrative Expense and Priority Claims** | $ 1,061 | 100% | 0% | 0% | 0% |
| **General Unsecured Claims (Class 4)** | $ 10,000 | 100% | 0% | 0% | 0% |
| **Existing Interests (Class 5)** | $ 420,779 | 0% | 0% | 0% | 0% |

**Tonopah Solar Energy, LLC**
**Liquidation Analysis and Claims Recoveries**
*$ in '000s*

## Illustrative Liquidation Analysis

| Claim / Interest | Footnotes | Tonopah Solar Energy, LLC | | | Potential Recovery | | | | | |
| | | Net Book Value | Adjustments | Pro Forma Value | Recovery Estimate (%) | | | Recovery Estimate ($) | | |
| | | 6/30/2020 | Adjustments | 12/31/2020 | Low | Midpoint | High | Low | Midpoint | High |
|---|---|---|---|---|---|---|---|---|---|---|
| **Gross Liquidation Proceeds** | | | | | | | | | | |
| **Current Assets** | | | | | | | | | | |
| Unrestricted Cash | [A] | 286 | - | 286 | 100% | 100% | 100% | 286 | 286 | 286 |
| Restricted Cash | [B] | 29,803 | (24,548) | 5,255 | 100% | 100% | 100% | 5,255 | 5,255 | 5,255 |
| Accounts Receivable | [C] | - | - | - | 0% | 0% | 0% | - | - | - |
| Due from Related Parties | [D] | 210,180 | - | 210,180 | 89% | 89% | 89% | 186,275 | 186,275 | 186,275 |
| Prepaid Expenses and Deposits | [E] | 5,144 | (2,201) | 2,943 | 7% | 13% | 18% | 217 | 378 | 539 |
| **Total Current Assets** | | 245,413 | (26,749) | 218,664 | | | | 192,033 | 192,194 | 192,355 |
| | | | | | | | | | | |
| **Property, Plant & Equipment, Net** | [F] | 270,551 | (8,045) | 262,506 | 3% | 6% | 8% | 8,280 | 14,868 | 21,456 |
| | | | | | | | | | | |
| **Noncurrent and Other Assets** | | | | | | | | | | |
| Spare Parts | [G] | 5,420 | - | 5,420 | 5% | 10% | 15% | 271 | 542 | 813 |
| BLM Reclamation Deposit | [H] | 13,192 | - | 13,192 | 0% | 0% | 0% | - | - | - |
| **Other Noncurrent Assets** | | 18,612 | - | 18,612 | | | | 271 | 542 | 813 |
| | | | | | | | | | | |
| **Total Assets and Recovery Estimate** | | **534,576** | **(34,793)** | **499,782** | | | | **200,584** | **207,604** | **214,624** |

| | | Liquidation Adjustment (% of Total Recoveries) | | | Liquidation Adjustment ($) | | |
| | | Low | Midpoint | High | Low | Midpoint | High |
|---|---|---|---|---|---|---|---|
| **Liquidation Adjustments** | | | | | | | |
| Estate Wind-Down Costs | [I] | 5.0% | 3.6% | 2.3% | (10,000) | (7,500) | (5,000) |
| Chapter 7 Professional Fees | [J] | 3.7% | 3.6% | 3.5% | (7,500) | (7,500) | (7,500) |
| Chapter 7 Trustee Fees | [K] | 3.0% | 3.0% | 3.0% | (6,018) | (6,228) | (6,439) |
| **Total Liquidation Adjustments** | | | | | **(23,518)** | **(21,228)** | **(18,939)** |

| Net Liquidation Proceeds Available for Distribution | | | | | | | | 177,067 | 186,376 | 195,685 |

**Tonopah Solar Energy, LLC**
**Liquidation Analysis and Claims Recoveries**
*$ in '000s*

| Illustrative Claims Recovery | Claim Amounts | | | Liquidation Value | | | Plan Recovery % | Liquidation Recovery % | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Claim / Interest | Low | Midpoint | High | Low | Midpoint | High | | Low | Midpoint | High |
| Net Liquidation Proceeds Available for Distribution | | | | $ 177,067 | $ 186,376 | $ 195,685 | | | | |
| | | | | | | | | | | |
| Superpriority Carve-Out Claims | 1,980 | 1,980 | 1,980 | (1,980) | (1,980) | (1,980) | 100% | 100% | 100% | 100% |
| Remaining Amount Available for Distribution | | | | $ 175,086 | $ 184,396 | $ 193,705 | | | | |
| | | | | | | | | | | |
| Superpriority DOE Adequate Protection Claims | 12,584 | 12,584 | 12,584 | (12,584) | (12,584) | (12,584) | 100% | 100% | 100% | 100% |
| Remaining Amount Available for Distribution | | | | $ 162,502 | $ 171,811 | $ 181,121 | | | | |
| | | | | | | | | | | |
| Priority Non-Tax Claims (Class 1) | - | - | - | - | - | - | 100% | N/A | N/A | N/A |
| Remaining Amount Available for Distribution | | | | $ 162,502 | $ 171,811 | $ 181,121 | | | | |
| | | | | | | | | | | |
| Other Secured Claims (Class 2) | 482 | 482 | 482 | (482) | (482) | (482) | 100% | 100% | 100% | 100% |
| Remaining Amount Available for Distribution | | | | $ 162,020 | $ 171,329 | $ 180,639 | | | | |
| | | | | | | | | | | |
| Prepetition Notes (Class 3) | | | | | | | | | | |
| Principal | 424,732 | 424,732 | 424,732 | (162,020) | (171,329) | (180,639) | | 38% | 40% | 43% |
| Interest and Fees | - | - | - | - | - | - | | N/A | N/A | N/A |
| Total Prepetition Notes (Class 3) | 424,732 | 424,732 | 424,732 | (162,020) | (171,329) | (180,639) | 47% | 38% | 40% | 43% |
| Remaining Amount Available for Distribution | | | | $ - | $ - | $ - | | | | |
| | | | | | | | | | | |
| Chapter 11 Administrative Expense and Priority Claims | 1,061 | 1,061 | 1,061 | - | - | - | 100% | 0% | 0% | 0% |
| Remaining Amount Available for Distribution | | | | $ - | $ - | $ - | | | | |
| | | | | | | | | | | |
| General Unsecured Claims (Class 4) | 10,000 | 10,000 | 10,000 | - | - | - | 100% | 0% | 0% | 0% |
| Remaining Amount Available for Distribution | | | | $ - | $ - | $ - | | | | |
| | | | | | | | | | | |
| Existing Interests (Class 5) | 420,779 | 420,779 | 420,779 | - | - | - | 0% | 0% | 0% | 0% |
| Remaining Liquidation Proceeds Available for Distribution | | | | $ - | $ - | $ - | | | | |

## Appendix C

**Financial Projections**

**Tonopah Solar Energy, LLC**
**5-Year Forecast**
*$ in '000s*

| Year | 2021F | 2022F | 2023F | 2024F | 2025F |
|---|---|---|---|---|---|
| **Revenue** | | | | | |
| Generation (GWh) | 400 | 404 | 408 | 412 | 416 |
| PPA Price per MWh | 70.00 | 71.40 | 72.83 | 74.28 | 75.77 |
| **Plant Operation Revenue** | **28,000** | **28,846** | **29,717** | **30,614** | **31,539** |
| **Operating Costs** | | | | | |
| Wages & Benefits | (6,049) | (6,170) | (6,293) | (6,419) | (6,548) |
| Backfeed Power | (2,074) | (2,032) | (1,991) | (1,952) | (1,913) |
| Fixed & Variable O&M | (1,949) | (1,976) | (2,002) | (2,029) | (2,057) |
| Maintenance | (3,435) | (3,420) | (3,395) | (3,515) | (3,453) |
| Plant Administration | (225) | (230) | (234) | (239) | (244) |
| Lease | (807) | (824) | (840) | (857) | (874) |
| Taxes | (2,581) | (2,479) | (2,389) | (2,303) | (2,220) |
| Insurance | (3,130) | (3,193) | (3,257) | (3,322) | (3,388) |
| Other Owner's Cost | (1,452) | (1,481) | (1,511) | (1,541) | (1,572) |
| **Total Operating Costs** | **(21,702)** | **(21,804)** | **(21,913)** | **(22,177)** | **(22,268)** |
| **EBITDA** | **6,298** | **7,041** | **7,804** | **8,437** | **9,271** |
| Capital Expenditures | (315) | (205) | (180) | (175) | (100) |
| Change in NWC | (2,191) | (136) | (140) | (143) | (143) |
| **Unlevered Free Cash Flow** | **3,792** | **6,700** | **7,484** | **8,119** | **9,028** |
| Debt Service | (2,900) | (2,900) | (2,900) | (2,900) | (2,900) |
| **Levered Free Cash Flow** | **892** | **3,800** | **4,584** | **5,219** | **6,128** |

## **Exhibit 1**

**Restructuring Support Agreement**

**EXECUTION VERSION**

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR DEEMED BINDING ON ANY OF THE PARTIES HERETO UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN.

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (as may be amended, modified or supplemented from time to time, and including all exhibits attached hereto, this "Agreement") is made and entered into as of July 29, 2020, by and among Tonopah Solar Energy, LLC, a Delaware limited liability company (the "Company"), on the one hand, and Cobra Thermosolar Plants, Inc. ("CPI"), Cobra Energy Investment, LLC ("CEI"), and ACS Servicios Comunicaciones y Energía S.L. ("ACS", and together with CPI and CEI, "Cobra"), on the other hand.  This Agreement collectively refers to the Company and Cobra as the "Parties."[1]

### *RECITALS*

**WHEREAS**, the Company issued that certain Future Advance Promissory Note No. 2 in the original principal amount of Four Hundred Fifty-Five Million Six Hundred Ninety-Three Thousand Dollars (US $455,693,000) payable to the Federal Financing Bank ("FFB") (as the same may be amended, modified or supplemented from time to time, the "Promissory Note"), and purchased by the FFB pursuant to that certain Note Purchase Agreement, dated September 23, 2011, among the Company, the FFB, and the United States Department of Energy (the "DOE"), acting through the Secretary of Energy (the "Note Purchase Agreement," and together with the Promissory Note and the other "Financing Documents" (as such term is defined in the LGA (as defined herein), the "Loan Documents");

**WHEREAS**, the repayment obligations of the Company under or in respect of the Loan Documents are guaranteed by the DOE pursuant to that certain Loan Guarantee Agreement dated as of September 23, 2011 (as heretofore amended, modified and restated, the "LGA");

**WHEREAS**, the obligations of the Company under or in respect of the Financing Agreements are secured *inter alia* by that certain Security Agreement, dated as of October 11, 2011, among the Company, the DOE, and PNC Bank, National Association, doing business as Midland Loan Services, a division of PNC Bank, National Association, as collateral agent (the "Collateral Agent") (as heretofore amended, modified and restated, the "Security Agreement," and together with all other "Security Documents" (as such term is defined in the LGA), the "Security Documents");

---

[1]    Capitalized terms used but not defined herein have the meanings given to them in the Plan (as defined herein).

**WHEREAS**, the aggregate amount outstanding under the Loan Documents as of the Agreement Effective Date (as defined herein) is approximately $432.12 million;

**WHEREAS**, the Company has determined it would be in its best interests to implement a restructuring of its outstanding indebtedness under the Loan Documents through a pre-negotiated chapter 11 case (the "<u>Bankruptcy Case</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>");

**WHEREAS**, the Parties have in good faith and at arm's length negotiated and agreed upon the material terms of a restructuring transaction (the "<u>Transaction</u>") pursuant to which, among other things: (a) the DOE shall receive, in full and complete satisfaction of the Company's outstanding obligations under the Loan Documents, a payment of $200 million in cash upon the Effective Date of the Plan, plus a $100 million contingent note to be guaranteed by Cobra, with Cobra funding the Company's obligations under the Plan through new debt financing and cash to be provided on the Effective Date of the Plan (as defined therein); (b) the security interests granted under the Security Documents shall be released; (c) the Parties shall mutually release each other from all Claims on the terms set forth in the Plan; (d) Cobra or an affiliate thereof shall own 100% of the Company upon completion of the restructuring; and (e) all other Claims shall remain unimpaired as set forth in the Plan;

**WHEREAS**, the Parties have agreed on the material terms of the Transaction, which are memorialized in the proposed pre-negotiated chapter 11 plan for the Company attached hereto as <u>Exhibit A</u> (as may be amended, modified, or supplemented from time to time with the written Consent of the Parties, the "<u>Plan</u>" or the "<u>Chapter 11 Plan</u>"); and

**WHEREAS**, the following sets forth the agreement among the Parties concerning their respective obligations in connection with the Transaction and the Bankruptcy Case.

**NOW, THEREFORE,** in consideration of the foregoing, the Parties agree as follows:

*AGREEMENT*

**Section 1.**    ***Chapter 11 Plan and Definitive Documentation.***

**1.1**    <u>Support of Plan and Definitive Documentation.</u>

(a)    So long as the Termination Date (as defined below) has not occurred, and subject to Section 3 of this Agreement, the Company agrees to:

(i) support and take any and all necessary and appropriate actions in furtherance of the Transaction and the other restructuring transactions contemplated under this Agreement and the Plan;

(ii) commence the Bankruptcy Case and consummate the Transaction in accordance with the terms of this Agreement;

(iii) file and seek approval on an interim (to the extent applicable) and final basis of "first day" motions (including a motion to approve the use of cash collateral, as

such term is defined in section 363(a) of the Bankruptcy Code ("Cash Collateral") and a motion to approve the New O&M Agreement (as defined below)) in accordance with the terms of this Agreement;

(iv) file the Plan and a related disclosure statement (as may be amended, modified or supplemented from time to time with the Consent of Cobra, the "Disclosure Statement") with the Bankruptcy Court and seek approval of the Disclosure Statement and confirmation of the Plan in accordance with the terms of this Agreement;

(v) act in good faith and use commercially reasonable efforts to support and complete successfully the solicitation of votes in favor of the Plan in accordance with the terms of this Agreement;

(vi) use commercially reasonable efforts to obtain any and all required regulatory approvals and third-party approvals of the Transaction required of the Company, and reasonably cooperate with Cobra in its efforts to obtain any and all material or required regulatory approvals and third-party approvals of the Transaction required of Cobra;

(vii) upon reasonable request of Cobra, inform Cobra as to: (a) the material business and financial (including liquidity) performance of the Company; (b) the status and progress of the negotiations of the Definitive Documentation (as defined below); and (c) the status of obtaining any necessary or desirable approvals or third-party approvals of the Transaction for which the Company is responsible;

(viii) provide prompt written notice to Cobra of: (a) the occurrence of a Termination Event (defined below) of which the Company has actual knowledge (provided that the failure to provide such notice with respect to a Termination Event pursuant to Section 2.2(b) shall not release any claims the Company may have on account of a breach by Cobra giving rise to such termination); (b) a breach of this Agreement of which the Company has actual knowledge (provided that the failure to provide such notice with respect to a breach by Cobra shall not release any claims the Company may have on account of such breach); or (c) to the extent of the Company's actual knowledge, any representation or statement made by the Company under or in connection with this Agreement which is or proves to have been materially incorrect or misleading in any respect when made;

(ix) provide to Cobra (a) reasonable access (without any material disruption to the conduct of the Company's businesses) during normal business hours to the Company's books and records, (b) reasonable access to the management and advisors of the Company for the purposes of evaluating the Company's assets, liabilities, operations, businesses, finances, strategies, prospects and affairs, and (c) timely and reasonable responses to all reasonable diligence requests; *provided, however,* that the Company shall have no obligation to provide any access to the Company's books and records or to the management and advisors of the Company or responses to diligence requests that the Company determines, in its sole and

absolute discretion, would result in the waiver of any attorney-client privilege, access to attorney work product, or would be detrimental, prejudicial or otherwise harmful to the Company's position in the arbitration pending before the Arbitral Tribunal constituted under the Rules of Arbitration of the International Court of Arbitration of the International Chamber of Commerce, captioned Cobra Thermosolar Plants, Inc. (USA) v. Tonopah Solar Energy, LLC (USA), Case No. 23247/MK (the "Arbitration");

(x) operate in the ordinary course of business, consistent with past practice (subject to clause (xi) below), taking into account the Transaction and the pendency of the Bankruptcy Case;

(xi) cooperate with Cobra and use commercially reasonable efforts to implement the O&M oversight protocol set forth on Exhibit B hereto (the "O&M Protocol");

(xii) to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Transaction, take all steps reasonably necessary and desirable and within its control to address any such impediment;

(xiii) timely file and prosecute a formal objection, in form and substance reasonably acceptable to Cobra, to any motion filed with the Bankruptcy Court by any party seeking the entry of an order (a) directing the appointment of a trustee or examiner, (b) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, (c) dismissing the Bankruptcy Case, or (d) modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(xiv) not object to Cobra's proposed tax treatment of the transaction, as set forth on Exhibit C hereto (the "Tax Treatment");

(xv) request that the Bankruptcy Court enter (a) the New O&M Agreement within thirty-five (35) days after the Petition Date, and (b) the Confirmation Order (as defined below) within ninety (90) days after the Petition Date; and

(xvii) not take any actions inconsistent with this Agreement, the Plan, and any other related documents executed by the Company or the expeditious consummation of the Transaction and the other restructuring transactions contemplated under this Agreement and the Plan.

(b)     So long as the Termination Date has not occurred, Cobra hereby agrees that it shall:

(i) not (v) sell, transfer, or assign, other than to an Affiliate (provided such Affiliate agrees in writing to be bound to all of the terms and conditions of this Agreement and any such sale, transfer or assignment shall not release Cobra of its obligations hereunder), any of its Claims against the Company or the DOE, (w) object to, delay, impede or take any other action to interfere with acceptance, approval, confirmation or implementation of the Plan (or support any other person's or entity's efforts to do any of the foregoing), (x) directly or indirectly (A) initiate, solicit, encourage or

facilitate any inquiries, proposals or offers from any person or entity relating to, or that could reasonably result in, any merger, acquisition, divestiture, sale of material assets or equity, business combination, recapitalization, joint venture, or other extraordinary transaction directly or indirectly involving the equity, voting power or all or a material portion of the Company's assets or any other similar transaction that would serve as an alternative to the transactions contemplated by this Agreement and the Plan (any such transaction, an "Alternative Transaction"), (B) participate in discussions or negotiations regarding the Company, the Claims under the Loan Documents, the Plan, or the Transaction with any other person or entity with respect to, or that would reasonably be expected to result in, an Alternative Transaction, or (C) propose, support, solicit, encourage, or participate in the formulation of any chapter 11 plan or any other restructuring or reorganization of the Company in the Bankruptcy Case other than the Plan, (y) terminate, or seek authority from the Bankruptcy Court to terminate, that certain *Contract for the Engineering, Procurement and Construction of the 110MW Nominal Capacity Thermosolar Electrical Generation Facility in Tonopah, Nevada, USA*, entered into by and between the Company and CPI, dated as of September 20, 2011 (as may be amended, modified or supplemented from time to time), notwithstanding section 40.3(d) thereof, as a result of the Company's potential insolvency or bankruptcy filing, or (z) otherwise take any action that would in any material respect interfere with, delay or postpone the consummation of the Transaction and other restructuring transactions contemplated under this Agreement and the Plan;

(ii) use commercially reasonable efforts to support and take all reasonably necessary and appropriate actions in furtherance of the restructuring transactions contemplated under this Agreement and the Plan and to consummate the Transaction within the time frames contemplated by this Agreement;

(iii) use its commercially reasonable efforts to support confirmation of the Plan and entry of the Confirmation Order (defined below);

(iv) use its commercially reasonable efforts to support (and not object to) the "first day" motions (including the motion seeking interim and final approval of the use of Cash Collateral);

(v) cooperate with the Company to implement and use commercially reasonable efforts to implement the O&M Protocol;

(vi) use commercially reasonable efforts to obtain any and all required regulatory approvals and third-party approvals of the Transaction required of Cobra, and reasonably cooperate with the Company in its efforts to obtain any and all required regulatory approvals and third-party approvals of the Transaction required of the Company,

(vii) provide prompt written notice to the Company of (a) the occurrence of a Termination Event (defined below) of which Cobra has actual knowledge (provided that the failure to provide such notice with respect to a Termination Event pursuant

to Section 2.1 shall not release any claims that Cobra may have on account of any breach by the Company giving rise to such termination); (b) a breach of this Agreement of which Cobra has actual knowledge (provided that the failure to provide such notice with respect to a breach by the Company shall not release any claims Cobra may have on account of such breach), or (c) to the extent of Cobra's actual knowledge, any representation or statement made by Cobra under or in connection with this Agreement which is or proves to have been materially incorrect or misleading in any respect when made; and

(ix) provide to the Company (a) reasonable access (without any material disruption to the conduct of Cobra's businesses) during normal business hours to Cobra's books and records, (b) reasonable access to the management and advisors of Cobra for the purposes of evaluating Cobra's assets, liabilities, operations, businesses, finances, strategies, prospects and affairs, (c) copies of any notices Cobra receives or sends in connection with the Backstop Agreement (as defined in the Plan), and (d) timely and reasonable responses to all reasonable diligence requests; *provided, however,* that Cobra shall have no obligation to provide any access to Cobra's books and records or to the management and advisors of Cobra or responses to diligence requests that Cobra determines, in its sole and absolute discretion, would result in the waiver of any attorney-client privilege, or claim of attorney work product that Cobra would otherwise be entitled to assert in the Arbitration.

(c)     Without limiting any other provision hereof, until the Termination Date, the Company and Cobra hereby agree to negotiate in good faith the Definitive Documentation (as defined below) and any other agreements or documents referenced in, or reasonably necessary or desirable to effectuate, the Transaction, this Agreement and the Plan, which shall consist of, among other things: (i) all amendments, exhibits and supplements to the Plan, it being acknowledged and agreed that a condition precedent to consummation of the Plan shall be that this Agreement remains in full force and effect; (ii) the Disclosure Statement, the other solicitation materials in respect of the Plan (such materials, collectively, the "Solicitation Materials"), and the order to be entered by the Bankruptcy Court approving the Disclosure Statement and Solicitation Materials as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code (the "Disclosure Statement Order"); (iii) the order to be entered by the Bankruptcy Court confirming the Plan (the "Confirmation Order") and pleadings in support of entry of the Confirmation Order; and (iv) such other documents, pleadings, agreements or supplements as may be reasonably necessary or advisable to implement the Transaction and other restructuring transactions contemplated under this Agreement and the Plan (collectively, as may be amended, modified or supplemented from time to time, the "Definitive Documentation"). Any references herein to any document constituting Definitive Documentation (including, without limitation, the Plan, the Disclosure Statement, the Solicitation Materials, the Disclosure Statement Order, and the Confirmation Order) shall mean such document in form and substance satisfactory, or reasonably satisfactory, as the case may be, to the Company and Cobra.

For the avoidance of doubt, nothing in this Section 1 or elsewhere in this Agreement shall require Cobra to incur any material expenses, liabilities or obligations, or agree to any commitments, undertakings, concessions, indemnities or other agreements that would result in expenses, liabilities or obligations to Cobra, other than as expressly stated above (including in connection with obtaining any necessary consents or required approvals of Cobra), in other provisions of this Agreement or any other Definitive Documentation.

**Section 2.**     ***Termination Events.***

**2.1**     Cobra Termination Events.

The occurrence of any of the following shall be a "Cobra Termination Event":

(a)     11:59 p.m. (EST) on the date that is two (2) Business Days after this Agreement is executed (the "Petition Date"), unless (i) the Bankruptcy Case is commenced in the Bankruptcy Court, (ii) a motion to reject that certain *Operation and Maintenance Agreement*, by and between the Company and PIC Group, Inc., dated as of September 20, 2011, is filed with the Bankruptcy Court (iii) a motion to enter into and approve a new operations and management agreement between the Company and Cobra (substantially in the form of agreement annexed hereto as Exhibit D, the "New O&M Agreement") is filed with the Bankruptcy Court, and (iv) the Plan and the Disclosure Statement are filed with the Bankruptcy Court;

(b)     11:59 p.m. (EST) on the date (x) that is five (5) days after the Petition Date, unless the Bankruptcy Court has entered an order, reasonably satisfactory to Cobra, approving the use of Cash Collateral on an interim basis (the "Interim Cash Collateral Order") and (y) that is thirty-five (35) days after the Petition Date, unless the Bankruptcy Court has entered the Interim Cash Collateral Order on a final basis in a form reasonably satisfactory to Cobra;

(c)     11:59 p.m. (EST) on the date that is sixty (60) days after the Petition Date, unless the Bankruptcy Court has entered the Disclosure Statement Order and an order authorizing and approving the New O&M Agreement;

(d)     11:59 p.m. (EST) on the date that is one hundred twenty (120) days after the Petition Date, unless the Bankruptcy Court has entered the Confirmation Order;

(e)     11:59 p.m. (EST) on the date that is one hundred fifty (150) days after the Petition Date (as such date may be extended pursuant to Section 8.14 hereof, the "Outside Date"), unless the Company has substantially consummated the Plan pursuant to its terms;

(f)     the occurrence of any breach by the Company of any of the material undertakings, representations, warranties or covenants of the Company, as applicable, set forth in this Agreement (to the extent not otherwise cured or waived within five (5) Business Days after notice of such breach is provided in accordance with Section 2.4 of this Agreement);

(g)  the withdrawal of the Plan or Disclosure Statement or the filing of a pleading by the Company without the Consent of Cobra that seeks to amend or modify any of the Definitive Documentation, including without limitation, the Plan or the Disclosure Statement, which amendment, modification or filing is (i) materially inconsistent with this Agreement and/or the Plan, as applicable, and (ii) adverse to Cobra without its Consent; and such motion or pleading has not been withdrawn prior to the earlier of (x) five (5) Business Days after the Company receives written notice from Cobra that such motion or pleading is (A) materially inconsistent with this Agreement and/or the Plan and (B) adverse to Cobra, in each case, without its Consent, and (y) entry of an order of the Bankruptcy Court approving such motion or pleading;

(h)  the Company files with the Bankruptcy Court any motion or application seeking authority to sell any material assets outside the ordinary course of business without the Consent of Cobra;

(i)  any court of competent jurisdiction or other competent governmental or regulatory authority issues a final, non-appealable order or takes action that could reasonably be expected to result in an order that would prevent or prohibit the consummation of the transactions contemplated in the Plan or any of the Definitive Documentation in a way that cannot be reasonably remedied by the Company or Cobra, subject to the satisfaction of Cobra or the Company, as applicable;

(j)  the Bankruptcy Case shall be dismissed or converted to a chapter 7 case, or a chapter 11 trustee with plenary powers, or a responsible officer or an examiner with enlarged powers relating to the operation of the businesses of the Company (beyond those powers set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in the Bankruptcy Case or the Company shall file a motion or other request for such relief;

(k)  the Bankruptcy Court shall enter one or more orders terminating, annulling, modifying or conditioning the automatic stay with respect to any assets of the Company in an aggregate amount greater than $500,000;

(l)  any order approving the Plan or the Disclosure Statement is reversed, stayed, dismissed or vacated without the Consent of Cobra, or is modified or amended in a manner that is inconsistent with this Agreement or not satisfactory to Cobra;

(m)  the Company's Board of Managers (the "Board") exercises a fiduciary out pursuant to and in accordance with Section 3 of this Agreement;

(n)  the Company loses the exclusive right to file and solicit acceptances of a chapter 11 plan;

(o)  any material representation or warranty in this Agreement made by the Company shall have been untrue in any material respect when made or shall have become untrue in any material respect, and such breach remains uncured (to the extent

- 8 -

curable) and unwaived for a period of five (5) Business Days following such Company's receipt of notice in accordance with Section 2.4 hereof;

(p)  the DOE withdraws its support for or opposes the Plan;

(q)  unless as a result of Cobra's breach of its obligations hereunder, the Debtor's ability to use Cash Collateral terminates and is not restored within five (5) Business Days of such termination;

(r)  the Company terminates the New O&M Agreement (other than for cause); and

(s)  the Company files, or publicly announces that it will file, or joins in or supports, any plan of reorganization other than the Plan, or files any motion or application seeking authority to sell any assets, in each case, without the Consent of Cobra.

Notwithstanding anything to the contrary herein, unless and until there is an unstayed order of the Bankruptcy Court providing that the giving of notice under and/or termination of this Agreement in accordance with its terms is prohibited by the automatic stay imposed by section 362 of the Bankruptcy Code, the occurrence of any Cobra Termination Event in this Section 2.1 shall result in an automatic termination of this Agreement, to the extent Cobra would otherwise have the ability to terminate this Agreement in accordance with Section 2.4, five (5) Business Days following such occurrence unless waived (including retroactively) in writing by Cobra.

**2.2**  <u>Company Termination Events.</u>

The occurrence of any of the following shall be a "<u>Company Termination Event</u>" (and together with any Cobra Termination Event, a "<u>Termination Event</u>"):

(a)  the Board determines in good faith, after consultation with its outside financial advisors and outside legal counsel, that proceeding with the Plan and Transaction would be inconsistent with its fiduciary duties pursuant to Section 3 of this Agreement;

(b)  the occurrence of any material breach of any of the undertakings, representations, warranties or covenants set forth in this Agreement by Cobra, to the extent not otherwise cured or waived within five (5) Business Days following Cobra's receipt of written notice from the Company, which may be by email, in accordance with Section 2.3 hereof;

(c)  unless as a result of the Debtor's breach of its obligations hereunder or under any cash collateral order entered by the Bankruptcy Court, the Debtor's ability to use cash collateral terminates and is not restored within five (5) Business Days of such termination;

(d)  11:59 p.m. (EST) on the Outside Date, unless the Company has substantially consummated the Plan pursuant to its terms;

(e)     any court of competent jurisdiction or other competent governmental or regulatory authority issues a final, non-appealable order or takes action that could reasonably be expected to result in an order that would prevent or prohibit the consummation of the transactions contemplated in the Plan or any of the Definitive Documentation in a way that cannot be reasonably remedied by the Company or Cobra, subject to the satisfaction of Cobra or the Company, as applicable; and

(f)     the Bankruptcy Case shall be dismissed.

**2.3**     Company Termination Event Procedures.

Upon the occurrence of any Company Termination Event and written notice being provided to Cobra by the Company, this Agreement and each of the Parties' obligations hereunder shall terminate (the date of the effectiveness of such termination, the "Company Termination Date"); provided that in the case of a termination effected pursuant to Subsection 2.2(b), such termination is subject to and shall be effective only upon the breach remaining uncured for at least five (5) Business Days following Cobra's receipt of written notice from the Company of such breach.

**2.4**     Cobra Termination Event Procedures.

Upon the occurrence of a Cobra Termination Event and written notice being provided to the Company by Cobra, this Agreement and each of the Parties' obligations hereunder shall terminate (the date of the effectiveness of such termination, together with the Company Termination Date, the "Termination Date"); provided that in the case of a termination effected pursuant to Subsections 2.1 (f) or (g) or (o), such termination is subject to and shall be effective only after the applicable notice period in such subsections has expired and the breach or other matter giving rise to the right to so terminate this Agreement shall not have been cured or waived during the applicable notice period.  For the avoidance of doubt, the automatic stay arising pursuant to section 362 of the Bankruptcy Code shall be deemed waived or modified for purposes of providing notice or exercising rights hereunder and the Company agrees it shall not take any action to enforce the automatic stay to prevent such termination.

**2.5**     Limitation on Termination.

Except with respect to a termination pursuant to Section 3 below, no occurrence shall constitute a Termination Event if such occurrence is the result of the action or omission of the Party seeking to terminate this Agreement.

**2.6**     Consensual Termination.

In addition to any Termination Event otherwise set forth herein, this Agreement shall terminate immediately upon (i) the written agreement of the Company and Cobra, or (ii) upon the Effective Date of the Plan.

**2.7**     Effect of Termination.

Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Transaction or otherwise, that it would have been entitled to take had it not entered into this Agreement. Nothing in this Agreement shall be construed as prohibiting any Party from contesting whether any such termination is in accordance with the terms of this Agreement or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Party or the ability of any Party to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any other Party. No purported termination of this Agreement shall be effective under this Section 2.7 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement. Following the occurrence of a Termination Date, the following shall survive any such termination: (a) any claim for breach of this Agreement that occurs prior to such Termination Date, and all rights and remedies with respect to such claims shall not be prejudiced in any way; and (b) Sections 2.6, 6, 7, 8.2, 8.3, 8.4, 8.5, 8.6, 8.7, 8.9, 8.12 and 8.13 hereof. The automatic stay applicable under section 362 of the Bankruptcy Code shall not prohibit a Party from taking any action or delivering any notice necessary to effectuate the termination of this Agreement pursuant to and in accordance with the terms hereof.

**Section 3.**     _Fiduciary Obligations._

Notwithstanding anything to the contrary herein, the Board shall be permitted to take (or permitted to refrain from taking) any action with respect to the Transaction to the extent the Board determines, in good faith and in consultation with counsel, that taking such action, or refraining from taking such action, as applicable, is reasonably required to comply with applicable law, including its fiduciary duties, and may take such action without incurring any liability to Cobra under this Agreement or the Plan. In the event that the Board determines that its fiduciary duties require it to terminate this Agreement, pursuant to this Section 3, the Company shall provide written notice to Cobra within two (2) Business Days of making such determination, after which period this Agreement shall terminate.

**Section 4.**     _Conditions Precedent to Agreement._

The obligations of the Parties and the effectiveness of this Agreement are subject to execution and delivery of signature pages for this Agreement by each of the Parties hereto (the date upon which such condition is satisfied, the "Agreement Effective Date"). All representations and warranties made pursuant to Section 5 herein are made as of the Agreement Effective Date.

**Section 5.**    ***Representations, Warranties and Covenants.***

**5.1**    Power and Authority.

Cobra, jointly and severally, represents, warrants, and covenants to the Company, and the Company represents, warrants, and covenants to Cobra, that (a) such Party has and shall maintain all requisite corporate, partnership, or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under this Agreement, and (b) the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

**5.2**    Enforceability.

Cobra, jointly and severally, represents and warrants to the Company, and the Company represents and warrants to Cobra, that this Agreement is its legally valid and binding obligation, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws limiting creditors' rights generally or by equitable principles relating to enforceability or ruling of the Bankruptcy Court.

**5.3**    Governmental Consents.

Cobra, jointly and severally, represents and warrants to the Company, and the Company represents and warrants to Cobra that its execution, delivery, and performance of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with, or by, any federal, state, or other governmental authority or regulatory body, except:  (a) any of the foregoing as may be necessary and/or required in connection with the Bankruptcy Case, including the approval of the Disclosure Statement and confirmation of the Plan; (b) in the case of the Company, (i) filings of amended articles of formation or other organizational documents with applicable state authorities, (ii) such registrations, filings, consents, approvals, notices, or other actions that are reasonably necessary to maintain permits, licenses, qualifications, and governmental approvals to carry on the business of the Company, and (iii) such authorizations, consents, orders or approvals of, or registrations or declarations with, any federal, state, or other governmental authority or regulatory body that have been or will be obtained or made prior to or on the closing date of the Transaction (the "Closing Date").

**5.4**    Other Support Agreements.

Until the Termination Date, the Company shall not enter into any other restructuring support agreement related to a partial or total restructuring of the Company's obligations without the Consent of Cobra.

**5.5**    Plan Documents

Cobra, jointly and severally, represents and warrants to the Company, and the Company represents and warrants to Cobra, that:

(a)    the form of order approving the New O&M Agreement attached hereto as Exhibit D is in form and substance satisfactory to Cobra and the Company, respectively,

for the purpose of satisfying the condition precedent to the Effective Date set forth in Section 11.1(b) of the Plan

(b)     the form of Disclosure Statement attached hereto as <u>Exhibit E</u> is in form and substance satisfactory to Cobra and the Company, respectively, for the purpose of satisfying the condition precedent to the Effective Date set forth in Section 11.1(c) of the Plan;

(c)     the form of Confirmation Order attached hereto as <u>Exhibit F</u> is in form and substance satisfactory, as of the date hereof, to Cobra and the Company, respectively, for the purpose of satisfying the condition precedent to the Effective Date set forth in Section 11.1(d) of the Plan; <u>provided</u> that each of Cobra and the Company acknowledges to the other that material events in the Bankruptcy Case may necessitate changes to the Confirmation Order, and that each of Cobra's and the Company's rights under Section 11.1(d) of the Plan are expressly reserved; and

(d)     the Plan Documents included in the Plan Supplement attached hereto as <u>Exhibit G</u> are in form and substance satisfactory to Cobra and the Company, respectively, for the purposes of satisfying the conditions precedent to the Effective Date set forth in Sections 11.1(e), 11.1(h), and 11.1(i) of the Plan.

**5.6**     <u>No Conflict.</u>

Cobra, jointly and severally, represents and warrants to the Company, and the Company represents and warrants to Cobra that, as of the Agreement Effective Date, the execution, delivery and performance by such Party of this Agreement does not and will not (a) subject to receipt of the authorizations, consents, orders or approvals of, or registrations or declarations with, any federal, state, or other governmental authority or regulatory body that have been or will be obtained or made prior to or on the Closing Date with respect to the Transaction, violate any material provision of law, rule or regulation applicable to it or its charter or bylaws (or other similar governing documents), or (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party, except, in the case of the Company, for the filing of the Bankruptcy Case.

**5.7**     <u>Publicity; Confidentiality.</u>

(a)     <u>Publicity.</u>  Each Party shall consult each other regarding the content of, and shall not issue without the Consent of the other (such consent not to be unreasonably withheld, delayed or conditioned), any press release or public announcement regarding the Transaction (other than with respect to the Company's filings in the Bankruptcy Case, in which case the Parties' obligations are governed by Section 8.1 herein); provided that prior to the Petition Date, the Company shall provide a copy of any press release or public announcement to Cobra prior to the issuance thereof and incorporate reasonable comments that are timely provided by Cobra.

(b)     <u>Confidentiality.</u> Each Party agrees to use commercially reasonable efforts to maintain the confidentiality of the existence of this Agreement and all related documents until the commencement of the Bankruptcy Case; provided, however,

that such information may be disclosed: (i) to each Party's respective affiliates, and its and their respective directors, trustees, executives, officers, managers, members, partners, auditors, employees, advisors (including financial and legal advisors), other agents, and potential debt and equity financing sources (and any others as permitted pursuant to a confidentiality agreement signed prior to the date hereof between the Parties, collectively referred to herein as the "Representatives" and individually as a "Representative"); provided, that such Representatives are informed of and agree to the confidentiality of the existence and contents of this Agreement, and that Cobra is responsible for any breach of this Agreement by such Representatives; (ii) to the DOE; (iii) in connection with any suit, action or proceeding related to this Agreement and the transactions underlying the Transaction and the restructuring described herein; and (iv) to persons or entities in response to, and to the extent required by, any subpoena, or other legal process or other disclosure required by law or to any other regulatory agency or authority. If any Party or any of its Representatives receives a subpoena or other legal process as referred to in this Section 5.6.2 in connection with the Agreement, such Party shall provide the other Parties hereto with prompt written notice of any such request or requirement, to the fullest extent permissible and practicable under the circumstances (as advised by such Party's internal or outside counsel), so that the other Parties may seek a protective order or other appropriate remedy or waiver of compliance with the provisions of this Agreement.

**Section 6.**     *Remedies.*

Subject to Section 2.7 of this Agreement, it is understood and agreed by each of the Parties that any breach of this Agreement would give rise to irreparable harm for which money damages would not be an adequate remedy and accordingly the Parties agree that, in addition to any other remedies, each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief for any such breach without the posting of a bond or other security. The Parties agree to waive any defense in any action for specific performance that a remedy at law would be adequate. The Parties agree that for so long as the Parties have not taken any action to prejudice the enforceability of this Agreement (including without limitation, alleging in any pleading that this Agreement is unenforceable), and have taken such actions as are reasonably required or desirable for the enforcement hereof, then the Parties shall have no liability for damages hereunder in the event a court determines that this Agreement is not enforceable.

**Section 7.**     *Acknowledgement.*

This Agreement and the Plan and transactions contemplated herein and therein are the product of negotiations among the Parties, together with their respective representatives. Notwithstanding anything herein to the contrary, this Agreement is not, and shall not be deemed to be, a solicitation of votes for the acceptance of the Plan or any chapter 11 plan for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.

**Section 8.** *__Miscellaneous Terms__.*

**8.1** Certain Additional Chapter 11 Related Matters.

The Company shall provide draft copies of all material motions or applications and other documents (including all "first day" and "second day" motions and orders, any cash collateral motion and proposed orders, the Plan, the Disclosure Statement, ballots and other Solicitation Materials in respect of the Plan and any proposed amended version of the Plan or the Disclosure Statement, the Confirmation Order and any other Definitive Documentation) it intends to file with the Bankruptcy Court to counsel for Cobra at least two (2) Business Days prior to the date when the Company intends to file any such pleading or other document (provided that if delivery of such motions, orders or materials (other than the Plan, the Disclosure Statement or Confirmation Order) at least two (2) Business Days in advance is not reasonably practicable, such motion, order or material shall be delivered as soon as reasonably practicable prior to filing). Counsel to the respective Parties shall consult in good faith regarding the form and substance of any such proposed filings with the Bankruptcy Court and any Definitive Documentation that is subject to ongoing negotiation and completion.

**8.2** No Third Party Beneficiaries.

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Company and Cobra. No other person or entity shall be a third party beneficiary.

**8.3** Entire Agreement.

This Agreement, including exhibits and annexes hereto, constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, including exhibits and annexes, and supersedes all other prior negotiations, agreements and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement, including exhibits and annexes hereto; provided, however, that any confidentiality agreement executed by any Party, including, without limitation, (i) the confidentiality provisions of the Third Amended and Restated Limited Liability Company Agreement for the Company, and (ii) the confidentiality provisions of the New O&M Agreement, shall survive this Agreement, and shall continue in full force and effect, subject to the terms thereof, irrespective of the terms hereof.

**8.4** Counterparts.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement. Delivery of an executed signature page of this Agreement by email or facsimile transmission shall be as effective as delivery of a manually executed counterpart hereof.

**8.5** Settlement Discussions.

This Agreement and the Plan are part of a proposed settlement of disputes among certain of the Parties hereto. Nothing herein shall be deemed to be an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be submitted or admitted into evidence in any proceeding

other than a proceeding to enforce the terms of this Agreement or in connection with the confirmation of the Plan.

**8.6**    Reservation of Rights.

(a)    Except as expressly provided in this Agreement, nothing herein is intended to, does or shall be deemed in any manner to waive, limit, impair or restrict the ability of any Party to protect and preserve its rights, remedies and interests (if any), including, but not limited to, any and all of its claims and causes of action against the Company or any third parties, any liens or security interests it may have in any assets of the Company or any third parties, or its full participation in the Bankruptcy Case, if commenced.

(b)    Without limiting Subsection 8.6(a) in any way, if the transactions contemplated by this Agreement and in the Plan are not consummated as provided herein, if a Termination Date occurs, or if this Agreement is otherwise terminated for any reason, each Party fully reserves any and all of its respective rights, remedies and interests (if any) under applicable law and in equity.  Notwithstanding anything to the contrary herein, termination of this Agreement shall not relieve any Party that breaches this Agreement from liability for such breach.

(c)    The Parties acknowledge and agree that the lack of a draw by the Company or the Collateral Agent on any letters of credit issued or caused to be issued by Cobra or an Affiliate of Cobra prior to the Petition Date shall not prejudice, preclude, or prohibit the Company or the Collateral Agent (at the direction of the DOE) from drawing on such letters of credit in accordance with their terms at any time after the Petition Date and the Company's and the Collateral Agent's rights in respect of such letters of credit are fully reserved, including, without limitation, drawing on such letters of credit in accordance with their terms in the event that there are insufficient amounts in the Project Accounts (as defined in that certain Collateral Agency and Accounts Agreement, by and between the Company, DOE, and Collateral Agent, dated as of September 23, 2011), to fund the Company's operation.

**8.7**    Governing Law; Waiver of Jury Trial.

(a)    The Parties waive all rights to trial by jury in any jurisdiction in any action, suit, or proceeding brought to resolve any dispute between or among the Parties arising out of this Agreement, whether sounding in contract, tort or otherwise.

(b)    This Agreement shall be governed by and construed in accordance with the Bankruptcy Code and the laws of the State of Delaware, without regard to any conflicts of law provision that would require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each Party irrevocably and unconditionally agrees for itself that, subject to Subsection 8.7(c), any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may

be brought in any state or federal court of competent jurisdiction in Delaware, and by execution and delivery of this Agreement, each of the Parties hereby: (i) irrevocably accepts and submits itself to the nonexclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding; and (ii) waives any objection to laying venue in any such action, suit or proceeding.  Any dispute arising out of or in connection with this Agreement shall not be subject to arbitration.

(c)    Notwithstanding the foregoing, nothing in Subsections 8.7(a)-(b) shall limit the authority of the Bankruptcy Court to hear any matter related to or arising out of this Agreement, and each Party irrevocably and unconditionally consents to the jurisdiction and venue of the Bankruptcy Court, as applicable, to hear and determine such matters during the pendency of the Bankruptcy Case.

**8.8**    <u>Successors.</u>

This Agreement is intended to bind the Parties and inure to the benefit of the Parties and each of their respective successors, assigns, heirs, executors, administrators and representatives.

**8.9**    <u>Acknowledgment of Counsel.</u>

Each of the Parties acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with this Agreement and the transactions contemplated by this Agreement.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.  The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties hereto.  No Party shall have any term or provision construed against such Party solely by reason of such Party having drafted the same.

**8.10**    <u>Amendments, Modifications, Waivers.</u>

(a)    This Agreement, the Plan and the Disclosure Statement may only be modified, amended or supplemented, and any of the terms thereof may only be waived, with the Consent (which may be by email with written acknowledgement by the recipient) of each Party.

(b)    Each of the Parties agrees to negotiate in good faith all amendments and modifications to this Agreement, the Plan, the Disclosure Statement, or any Definitive Documentation as reasonably necessary and appropriate to obtain Bankruptcy Court confirmation of the Plan pursuant to a final order of the Bankruptcy Court; <u>provided</u> that Cobra shall not have any obligation to agree to any modification that creates any new obligation on or adversely affects Cobra's treatment or rights in any respect.  Notwithstanding the foregoing, the Company may amend, modify or supplement the Plan and Disclosure Statement, from time to time, without Cobra's Consent, to cure any ambiguity, defect (including any technical defect) or inconsistency, <u>provided</u> that any such amendments,

modifications or supplements do not materially and adversely affect Cobra's rights, interests or treatment under such Plan and Disclosure Statement.

(c)    Except as otherwise expressly set forth herein, "Consent," as used in this Agreement, shall mean the prior written consent of Cobra or the Company, as applicable, not to be unreasonably withheld, delayed or conditioned.

**8.11**    Further Assurances.

Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Transaction.

**8.12**    Enforceability of Agreement.

Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

**8.13**    Remedies Cumulative.

All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

**8.14**    Extension of Outside Date

In the event that (a) the Committee on Foreign Investment in the United States ("<u>CFIUS</u>") requires that the Company or Cobra submit a full long-form notice (a "<u>Long Form Notice</u>") in connection with the CFIUS review process of the Transaction or (b) regulatory approvals or consents required from the Federal Energy Regulatory Commission, Bureau of Land Management and the Federal Communications Commission (the "<u>Regulatory Approvals/Consents</u>") in connection with consummation of the Transaction and Plan are not obtained or reasonably expected to be obtained within 150 days of the Petition Date, the Parties agree that they shall negotiate in good faith a sufficient extension of the Outside Date to permit the CFIUS review process to be completed, or the Regulatory Approvals/Consents obtained, prior to the occurrence of the Outside Date, provided that the Parties shall not be required to agree to an Outside Date beyond January 31, 2021.

**8.15**    Email Consents.

Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, or otherwise, including a written approval by the Company and Cobra, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement confirmed in writing (including electronic mail) between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel.

**8.16**    Severability of Provisions.

If any provision of this Agreement for any reason is held to be invalid, illegal or unenforceable in any respect, that provision shall not affect the validity, legality or enforceability of any other provision of this Agreement, and the Parties shall negotiate in good faith to replace such invalid, illegal or unenforceable provision with such other valid provision that most closely replicates the rights and obligations created by such invalid, illegal or unenforceable provision.

**8.17**    Headings.

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

**8.18**    Notices.

Any notices required to be given hereunder must be in writing and may be served in person or by overnight mail or telecopy upon the respective parties as follows (or to such other addresses as may hereafter be designated):

if to the Company or the Board:

Tonopah Solar Energy, LLC
c/o FTI Consulting, Inc.
999 17th Street, Suite 700
Denver, Colorado 80202
Attn:  Christopher R. LeWand
Chris.Lewand@fticonsulting.com

with a copy to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attention: Matthew A. Feldman, Esq., Paul V. Shalhoub, Esq., and Andrew S. Mordkoff, Esq.
Email:  mfeldman@willkie.com, pshalhoub@willkie.com, amordkoff@willkie.com

-and-

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Attention: Edmon L. Morton, Esq. and Matthew B. Lunn, Esq.
Email: emorton@ycst.com and mlunn@ycst.com


if to Cobra:

Jose Maria Castillo Lacabex, President
Email: jmcastillo@grupocobra.com

with a copy to:

Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178
Attention:  Joel S. Rublin, Esq., Eric R. Wilson, Esq., and Benjamin D. Feder
Email: jrublin@kelleydrye.com, ewilson@kelleydrye.com and bfeder@kelleydrye.com

with a copy to:

Herbert Smith Freehills
ANZ Tower 161 Castlereagh Street
Sydney  NSW  2000
Australia
Attention:  Guillermo García-Perrote
Email:  guillermo.garcia-perrote@hsf.com

with a copy to:

Potter Anderson & Corroon LLP
1313 North Market Street, 6th Floor
P.O. Box 951
Wilmington, Delaware 19801
Attention:  Christopher M. Samis, Esq and L. Katherine Good, Esq.
Email: csamis@potteranderson.com and kgood@potteranderson.com

*[Remainder of page intentionally blank]*

IN WITNESS WHEREOF the Parties have executed this Agreement as of the date first set forth above.

**TONOPAH SOLAR ENERGY, LLC**

By:

_____
Name: Chris R. LeWand
Title:  President

**COBRA THERMOSOLAR PLANTS, INC.**

By:

_____
Name:
Title:

**COBRA ENERGY INVESTMENT, LLC**

By:

_____
Name:
Title:

**ACS SERVICIOS COMUNICACIONES Y ENERGIA S.L.**

By:

_____
Name:
Title:

[Signature Page to the Restructuring Support Agreement]

IN WITNESS WHEREOF the Parties have executed this Agreement as of the date first set forth above.

TONOPAH SOLAR ENERGY, LLC, a Delaware Limited Liability Company

By: _____

    Name:  Chris LeWand
    Title:  President

COBRA THERMOSOLAR PLANTS, INC.

By: _____

Name: JOSE ANTONIO FERNANDEZ GARCIA
Title: OFFICER

ACS SERVICIOS COMUNICACIONES Y ENERGÍA S.L.
By: _____
Name:
Title:

COBRA ENERGY INVESTMENT, LLC
By: _____
Name:
Title:

*[Signature Page to Restructuring Support Agreement]*

IN WITNESS WHEREOF the Parties have executed this Agreement as of the date first set forth above.

TONOPAH SOLAR ENERGY, LLC, a Delaware Limited Liability Company

By:_____
    Name:  Chris LeWand
    Title:  President

COBRA THERMOSOLAR PLANTS, INC.

By: _____
Name:
Title:

ACS SERVICIOS COMUNICACIONES Y ENERGÍA S.L.
By: _____
Name:
Title:

COBRA ENERGY INVESTMENT, LLC
By: _____
Name:
Title:

*[Signature Page to Restructuring Support Agreement]*

IN WITNESS WHEREOF the Parties have executed this Agreement as of the date first set forth above.

TONOPAH SOLAR ENERGY, LLC, a Delaware Limited Liability Company

By: _____
Name:  Chris LeWand
Title:  President

COBRA THERMOSOLAR PLANTS, INC.

By: _____
Name:
Title:

ACS SERVICIOS COMUNICACIONES Y ENERGÍA S.L.
By: _____
Name:
Title:

COBRA ENERGY INVESTMENT, LLC
By: _____
Name:
Title:

*[Signature Page to Restructuring Support Agreement]*

[*Exhibits to RSA attached to RSA filed with Plan Supplement*]